Exhibit 1

# [Proposed]
# Primary Jurisdiction Referral Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| State of Arizona, ex rel. Kristin K. Mayes Attorney General et al. | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Case No. 4:23-cv-00233-EJM |
| Michael D. Lansky, LLC, dba Avid Telecom, an Arizona Limited Liability Company; | ) ) ) ) | |
| Michel D. Lansky, individually As a Member/Manager/Chief Executive Officer of Michael D. Lansky, LLC dba Avid Telecom; and | ) ) ) ) ) | **[PROPOSED] PRIMARY JURISDICTION REFERRAL ORDER** |
| Stacey S. Reeves, individually as a Manager/Vice President of Michael D. Lansky LLC dba Avid Telecom | ) ) ) ) | |
| Defendants. | ) ) ) | |

**THIS MATTER** having been brought to the Court by the Motion to Stay and Refer as a matter of Primary Jurisdiction to the Federal Communications Commission (the "Motion") filed by Defendants, the Court having reviewed the Motion, and good cause appearing therefor;

**IT IS HEREBY ORDERED** that Plaintiff's Motion (Doc. 30) is granted.

**IT IS FURTHER ORDERED** that this matter is referred to the primary jurisdiction of the Federal Communications Commission the following issues:

➢ What are the rules regarding the grant of consent by a party receiving inbound voice communications, including (a) the means by which consent can be given; (b) can a called party grant consent to more than one entity at a time; (c) what information needs to be provided by a party to grant its consent to receive calls;

(d) what is the obligation of a common carrier to rely on the representation of consent by a calling party.

➢ Is a VoIP-based provider of long-distance telecommunications services a common carrier subject to applicable exemptions.

➢ Can a traceback be based on information obtained from a call that was recorded illegally.

➢ Can a traceback be based on information that was obtained from the illegal scraping of data from the called party's voicemail;

➢ Can a traceback be issued by anyone other than the Industry Traceback Group;

➢ Can a traceback be based on a call delivered to a business phone that was improperly placed on the Do Not Call List (which is only for residential phone numbers);

➢ Does the delegation of authority by the FCC to the Industry Traceback Group authorize it to determine if a call is legal.

➢ What is the Statute of Limitations under the TCPA.

**IT IS FURTHER ORDERED** that this matter is stayed until the FCC has addressed the issues set forth above. Upon receipt of the FCC's response, the parties shall promptly notify the Court and provide the Court with a copy of the FCC's response, at which point the Court will lift the stay and schedule further proceedings to conclude this matter.

SO ORDERED

Dated:                                         _____

Exhibit 2

# Defendants' White Paper

# Summary of Key Facts and Defenses to Complaint[5]

## I.     Background Facts

As a preliminary matter, while Avid Telecom certainly understands and shares the Attorneys General concerns regarding *illegal* robocalls.  But, all robocalls are not illegal and that all providers of short duration telecommunications services are not the same.  Unlike some entities who are demonstrably engaged in the origination and/or the transmission of *illegal* robocalls, Avid Telecom is one of the "good guys" in the telecommunications industry, diligently following all of the rules and working hard and successfully to thwart the illegal activities of others.

The following examples of Avid Telecom's industry-leading practices highlight the efforts Avid Telecom has undertaken both to comply with applicable regulations and laws and to thwart illegal activities:

**A.     Avid Telecom's Robust Robocalling Mitigation Efforts.**   Avid Telecom has implemented all applicable robocalling mitigation requirements. Avid Telecom has filed a comprehensive fully compliant Robocall Mitigation Plan with the FCC.  That Plan includes a description of the automatic processes in place that block calls prior to hitting the routing engine in our switch.  Among the essential elements of that Plan are the following:

- Avid Telecom blocks calls with an invalid caller ID
- Avid Telecom blocks calls with matching originating and terminating numbers
- Avid Telecom blocks "Neighborhood Spoofing" calls (i.e., calls with the same "NPA/NXX")
- Avid Telecom blocks calls from blacklisted media IP's (i.e., media IP's that are known to have been used for scams, such as government and corporate impersonation.)
- Avid Telecom blocks calls from phone numbers that are known to be used for spoofing
- Avid Telecom blocks ANIs on a real time basis that produce less than 5% ASR, 5 second or less ACD, and any number with greater than 60% short duration calls (calls of 6 seconds or less)
- Avid Telecom blocks calls from wireless ANIs unless the customer is a wireless carrier
- Avid Telecom blocks calls that have been labeled as "almost certainly" spam by YouMail
- Avid Telecom blocks calls that are labeled as "scam" by YouMail

---

[5] The Summary is being provided to the Court along with Defendants' Opposition to the Application for Default so that the Court is aware of certain of the key factual disputes and legal defenses that Defendants will assert in its responsive pleading and at trial.  It is not intended to be a complete list of these facts and legal defenses and Defendants reserve all rights with respect to the manner in which these facts and legal claims are presented and supplemented hereafter.

**B.     Avid Telecom's Rigorous Customer Requirements**.   Avid Telecom has implemented fully compliant "Know Your Customer" procedures.  For all new customers, Avid requires the completion of a Customer Information Form.  Avid Telecom's questions to its new customers include, among other things, verification of compliance with tracebacks, a description of their vetting process for new customers and actions taken when fraudulent customers are found.  All requested information in the document *must* be supplied and completed in order for Avid Telecom to do business with them.

Among other internal processes and procedures, Avid Telecom requires that all customers have:

- FCC 499 Filer ID
- FCC Registration Number ("FRN")
- Verified trade references from respected sources
- A Stir Shaken compliance plan
- Verified bank references
- Confirmed state of incorporation
- Confirmed federal tax ID
- A verified description of kind(s) of traffic that they will deliver
- Identified company responsible parties
- A signed Master Service Agreement (MSA) with Avid Telecom
- Proof of federal Universal Service Fund ("FUSF") compliance for the current year
- Verification of a filed Robocall Mitigation Plan

In addition to the above, applications from non-US carriers attempting to terminate traffic in the USA are denied unless they come from a known and respected international company. This practice is critical as many Attorneys General have acknowledged that most illegal robocalls originate overseas and that the focus of enforcement efforts should be directed to parties involved in foreign originated traffic.

II.     Avid Telecom Has Never Been Found By Any State Or Federal Authority To Have Engaged In, Aided Or Abetted Any Illegal Conduct**.**

**A.     Avid Telecom Has Always Been Fully "Stir/Shaken" Compliant**.  Avid Telecom upgraded its switching platform—well in advance of the applicable deadline—to comply with Stir/Shaken mandate to accept and accurately transmit all Stir/Shaken data it receives in a call path.

**B.     Avid Telecom Voluntarily Pays for Enhanced Monitoring Services**. Avid Telecom spends at least $400,000 each year to purchase enhanced switch data services from its switch provider that allow it to identify illegal calls and to terminate the providers of those calls. The only purpose for this expenditure is to allow Avid Telecom to better identify and to block illegal calls. Avid Telecom voluntarily obtains and pays for these enhanced services, which are not required by law or regulation to process its calls.

**C.      Avid Telecom is Fully Regulatorily Compliant**. Avid Telecom is fully regulatory complaint in all areas.

**D.      Avid Telecom Refuses to Do Business with "Bad Actor" Customers.** Avid Telecom will not knowingly do business with any "bad actor" customer.  During the twelve-month period prior to the Complaint, Avid Telecom has received only eighty-four (84) tracebacks from the Traceback Group out of a total of in excess of 8.5 billion completed calls (*e.g.,* a rate of 000001%). In each case, regardless of whether the tickets appeared to reflect illegal activity, Avid Telecom promptly investigated the issue, provided a complete response and, where there were a material number of tracebacks from a single customer, Avid promptly terminated its relationship with the customer.

**E.      Avid Telecom Only Accepts Traffic From Carriers who have Represented and Warranted that they Fully Comply with all Applicable Robocalling Rules and Regulations**. Avid Telecom requires all of the carriers from which it takes traffic to certify that all of their traffic is legal and that, where required, they have compliant opt-in documentation. Consistent with this requirement, Avid Telecom's Carrier Service Agreement provides as follows (bold all caps in original):

> **13.2      CUSTOMER REPRESENTS AND WARRANTS THAT IT IS PRESENTLY FULLY COMPLIANT—AND THAT IT WILL REMAIN FULLY COMPLIANT THROUGHOUT THE TERM—WITH ALL STATE AND FEDERAL LAWS AND REGULATIONS, INCLUDING WITHOUT LIMITATION ALL LAWS AND REGULATIONS REGARDING THE ESTABLISHMENT AND MAINTENANCE OF THE CORPORATE FORM, ALL STATE AND LOCAL LAWS AND REGULATIONS REGARDING THE ACQUSITION OF BUSINESS LICENSES, ALL LAWS AND REGULATIONS GOVERNING THE CUSTOMER'S OPERATIONS, INCLUDING WITHOUT LIMITATION, FCC 499 FILING AND UNIVERSAL SERVICE FUND PAYMENT REQUIREMENTS, AS WELL AS ALL STATE OR FEDERAL MARKETING, TELEMARKETING, ROBOCALLING LAWS AND REGULATIONS SUCH AS STIR SHAKEN, "KNOW YOUR CUSTOMER" AND ROBOCALLING PLANS.  WITH RESPECT TO STATE AND FEDERAL LAWS AND REGULATIONS, CUSTOMER SPECIFICALLY REPRESENTS AND WARRANTS THAT IT WILL NOT KNOWINGLY DELIVER TO AVID ANY CALLS THAT IT KNOWS OR REASONABLY SHOULD KNOW, VIOLATE ANY STATE OR FEDERAL LAW OR REGULATION RELATING TO MARKETING, TELEMARKETING, ROBOCALLING AND THAT IF IT BECOMES AWARE THAT IT HAS DELIVERED SUCH CALLS TO AVID, IT WILL IMMEDIATELY INFORM AVID, IDENTIFYING ALL SUCH  CALLS WITH SPECIFICITY AND IT WILL TAKE ALL AVAILABLE MEASURES TO IMMEDIATELY CEASE AND TO DESIST FROM THE DELIVERY OF ALL SUCH CALLS.**

**F.      Avid Telecom Denies over 90 percent of Requests for Service**.  Avid Telecom rejects more than ninety percent (90%) of the service requests that it receives, based upon information and/or suspicions regarding the legality of the traffic at issue.

**G.      Avid Terminates Carrier where it Receives a Material Number of "Traceback Tickets"**.  Contrary to the allegation in the complaint, Avid Telecom has terminated carriers where it has received a material number of traceback "tickets".

**H.      Avid Telecom is Never an Originating Carrier, and Has No Way of Knowing the Originating Customer or the Content of the Call**.  Avid Telecom never has a direct relationship with the person or company on whose behalf the call is placed.  All calls are based on the exclusive design and selection of the originating customer. For example, where Avid Telecom accepts traffic from its customer, Digital Marketing Services ("DMS"), it does not originate that traffic. Instead, it receives the traffic from the call center or other entity engaged by DMS for that purpose. Similarly, where Avid Telecom accepts traffic from DMS, it has no role of any kind in the selection of the underlying customer (generally a large corporate client like CVS), the numbers to which the calls will be directed, the authorization of the underlying customer or DMS to place those calls or the underlying business purpose (*e.g.,* notification that a prescription is ready). As a result,  Avid Telecom has no knowledge of any of the factors that could make a robocall illegal, and no way to determine in real time if any specific call or any group of calls is/are illegal.

**III.      The Industry Traceback Group Has Limited Authority and is Deeply Problematic**

**A.      The Issuance of a Traceback By the Traceback Group is Not Evidence of Illegal Activity**.  No state or federal regulatory authority or law enforcement agency has ever found that even a single call placed by Avid Telecom was illegal, and every state law enforcement authority (*e.g.,* Ohio and Indiana) that has issued a CID to Avid Telecom has withdrawn it.  As such, there is no evidentiary basis for a claim of unlawful traffic. None. Accordingly, the AG complaint is predicated entirely on the demonstrably false assertion that virtually all tracebacks  reflect unlawful traffic. Notwithstanding the frequent posturing of The Industry Traceback Group, it lacks any legal authority to determine the types of traffic that constitute illegal robocalling or whether a specific call was actually illegal. The Industry Traceback Group can only investigate the flow of calls that are suspected illegal robocalls from their point of origination. The authority to enforce robocalling rules resides exclusively with the FCC Enforcement Bureau and the Department of Justice; not with The Industry Traceback Group. To the extent that the complaint assumes that tracebacks reflect illegal robocalls, that assumption is simply wrong. As traceback  are merely requests for tracking information and not a finding of illegality, any suggestion that the mere issuance of a traceback  is an indication of illegal robocalling is also in error.  The data relating to Avid Telecom's traffic clearly evidences that the overwhelming majority of the tracebacks "tickets" Avid Telecom has received are for lawful calls. As such, any conclusion about Avid Telecom's involvement in illegal robocalling activity cannot be based on the issuance of tracebacks; this position is both legally unsustainable—as tracebacks do not reflect evidence of illegal activity – and demonstrably inconsistent with the data, which shows that most of the tracebacks were associated with lawful calls.

**B.      The Industry Traceback Group Has Consistently Refused to Engage with Avid Telecom Regarding the Meaning and Treatment of Traceback "Tickets"**.  Not only has the Industry Traceback Group materially exceeded its authority by pretending that it has the authority to determine the legal status of a robocall, but it has also been intentionally evasive in response to direct requests for assistance from Avid Telecom regarding multiple traceback "tickets".  The

following exchange is representative both of Avid Telecom's efforts to work with the Industry Traceback Group to address its concerns:

> **From:** Jessica Thompson <jthompson@ustelecom.org>
> **Sent:** Friday, March 4, 2022 6:25 AM
> **To:** Stacey Reeves <reeves@avid-telecom.com>
> **Cc:** Michael Lansky <lansky@avid-telecom.com>
> **Subject:** RE: Tracebacks - DMS
>
> How we should move forward with addressing DMS's concerns. We typically do not reach out to the callers, in this case, DMS is the caller. We also want to make sure we provide you, the originating provider with the necessary information as to why we are tracing these particular calls and what makes them illegal.
>
> **From:** Stacey Reeves <reeves@avid-telecom.com>
> **Sent:** Friday, March 4, 2022 9:23 AM
> **To:** Jessica Thompson <jthompson@ustelecom.org>
> **Cc:** Michael Lansky <lansky@avid-telecom.com>
> **Subject:** RE: Tracebacks - DMS
>
> Jessica,
>
> Can you clarify what the situation is?  We are trying to get everyone on the same page so that there is an understanding of their process and the validity of their traffic.
>
> Regards,
>
> Stacey Reeves
> Vice President of Operations and Sales
> Office:  520-395-9473
> Cell:  601-447-3530
>
> www.avid-telecom.com
>
> 8729 East Sunrise Drive, #209
> Tuscon, AZ  85718
>
> **From:** Jessica Thompson <jthompson@ustelecom.org>
> **Sent:** Friday, March 4, 2022 9:08 AM
> **To:** Stacey Reeves <reeves@avid-telecom.com>
> **Subject:** RE: Tracebacks - DMS
>
> Hi Stacey – We are having some internal discussions regarding this situation. We will reach out to you or DMS when we have an update.
>
> Jessica Thompson
> Director, Policy & ITG/Traceback Operations
> USTelecom – The Broadband Association

601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448

**USTELECOM** | THE BROADBAND ASSOCIATION

**From:** Stacey Reeves <reeves@avid-telecom.com>
**Sent:** Tuesday, February 15, 2022 1:35 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>
**Cc:** 'Lucy Rodriguez | DMS' <lrodriguez@dmsgroup.com>; 'Robert Pulsipher | DMS'
<rpulsipher@dmsgroup.com>; Evan King | DMS
<eking@dmsgroup.com>; Michael Lansky <lansky@avid-telecom.com>
**Subject:** Tracebacks - DMS

Jessica,

As discussed, the DMS team would like to set up a call with you to introduce themselves
and to discuss the tracebacks from last week.  I have included the following members of
the DMS team on copy of this email - Robert Pulsipher, SVP of Operations, Lucy Rodriguez,
Compliance and Data Manager, and Evan King, DMS Regulatory Attorney.  In order to
facilitate the call, I have also attached DMS's responses to the tracebacks which include
the consent details and a description of the campaign.  This information has also been
added to the traceback portal.

Please let me know if you have additional questions for Avid, but to clarify, Lucy will be
the contact for coordinating the date/time of the call.

Regards,

Stacey Reeves
Vice President of Operations and Sales
Office:  520-395-9473
Cell:  601-447-3530

www.avid-telecom.com

8729 East Sunrise Drive, #209
Tuscon, AZ  85718

ITG never agreed to speak with DMS to clarify ITG's concerns or explain how those
concerns could be  resolved. It took more than a year for ITG to *first* explain the basis of
its concerns:

      **C.**    **The Industry Traceback Group Is Not an Independent Organization
With Trustworthy "Opinions" on the Legality of Robocalls**. The Traced Act mandates
that the Industry Traceback Group be an independent organization, but it is nothing of the
kind. The members of the Industry Traceback Group are, themselves, telecom carriers that
have paid their way into USTelecom and, thereby into the Industry Traceback Group. Not

surprisingly, a well-known robocall advocate has referred to the Industry Traceback Group as a "protection racket". Moreover, many of the members of the Industry Traceback Group are direct competitors of the carriers, like Avid Telecom, to whom they regularly issue tracebacks. When tracebacks are issued, it is not uncommon that only some of the carriers in a call string receive them, and the excluded carriers are—by no coincidence—often members of the Industry Traceback Group. Further, Avid Telecom and many other smaller carriers are routinely denied membership in USTelecom (allegedly because they have too many tracebacks). The data demonstrates that many of the members of the Industry Traceback Group—who are never the targets of attorneys general complaints—have far more traceback "tickets" than those denied membership. As the complaint against Avid Telecom relies substantially on traceback "tickets" for its claim of "facilitating" and "aiding and abetting," the transparently flawed and seemingly biased and self-serving manner in which the "tickets" are issued will be at the core of Avid Telecom's defense.

## IV.   The Complaint is Rife With False and Unproveable Allegations of Fact

**A.   Much of the Data On Which the Complaint Relies May Have Been Obtained Illegally**.  On information and belief, much of the data on which the complaint relies was provided by third parties who appear to have obtained it illegally and/or through improper means.  For example, Avid Telecom is aware that many of the transcripts of calls that have been provided to the Attorneys General and are cited in the complaint were obtained through the illegal recording of calls in states which require two party consent, and such consent was not received.  Second, many of the calls were associated with recorded AI systems that answer calls with a recorded message that prevents the calling party from completing its disclosure, thereby intentionally causing the allegedly illegality that they report to third parties. Third, many of the "honeypots" that are used to capture allegedly illegal robocalls, and are listed on the "Do Not Call List"—which is reserved for residential telephone numbers—are in fact "owned" by a business.  This deceptive practice is relevant as calls to this number are also reported as violating the Do Not Call List. As those calls were, in fact, made to a number that does not qualify to be on that list, the delivery of those calls cannot be in violation of Do Not Call laws and regulations.  Thus, to the extent that the complaint relies on violations of the Do Not Call List laws and regulations, that reliance is misplaced. Fourth, much of the data that is used in support of claims of illegal robocalling has apparently been scraped from the voicemails of unsuspecting consumers and handed to third parties who have an economic interest in pursuing claims against Avid Telecom and other carriers. This data scraping potentially violates the terms of use of the customers whose voicemails have been scraped, as well as state and federal laws.  Each of these issues is, of course, also relevant to the admissibility of any associated documents and data.

**B.   Many of the Compliance Failures Alleged in the Complaint are Associated with Rules, Regulations and/or Tools That Did Not Exist at the Time of the Alleged Failure.**

The rules and regulations include uncertainties regarding a carriers legal right to block calls.  Nonetheless, in an abundance of caution, Avid Telecom blocked all wireless originations out of concern that those calls could be illegal.  Once SipNAV made available the technology and tools that allowed for the blocking of numbers, including calls with invalid originating numbers or the same originating and terminating numbers, Avid Telecom promptly implemented those tools and technologies as the associated calls were more likely to be illegal.

###    C.    The Complaint Contains Numerous Material Allegations that are Either Unsupported, Misleading or Demonstrably False

Avid Telecom is frankly shocked at the unsupported and demonstrably, materially false factual allegations in the Complaint. These allegations pertain to the number of allegedly illegal robocalls that Avid Telecom has transited, and the alleged transmission of scam social security calls. These false allegations have serious real-world consequences, including the delivery of dozens of death threats Avid Telecom's principal, employees, and outside counsel. For example, the following message was transmitted to Avid Telecom employee Stacey Reeves from a sender who read the Complaint:

> "I'm going to murder your children.  You are a piece of sh#!  You deserve nothing more than the worst torture on earth.  I hope that you drown in a pool of sh#! and piss.  You're horrible.  Go kill yourself.  Go f%$k yourself with a railroad spike.  Go eat a hot branding iron.  Die and never return to this earth.  F%$k you, f%$k your children, f%$k everyone who knows you. Please, just kill yourself."

Ms. Reeves' Arizona attorney was so concerned about the implications of this email (and many similar ones) for Ms. Reeves' safety, that he sent the following email to Daniel Barr, Laura Dilweg, Joseph Hubble, and Dylan Jones at the Arizona Attorney General's office:

> Dan – I am sure you are aware of the multi-state complaint filed by your office this week against Avid Telecom, Michael Lansky, and Stacey Reeves (I have copied the lawyers from the AG's office who appear in the caption). We represent Stacey Reeves and Neil Ende and Bruce Samuels (copied here) represent Mr. Lansky and Avid.  I am writing to you to alert you to the fact that since the complaint was filed, both Ms. Reeves and Ms. Lansky are receiving a torrent of vile, threatening, and abusive voice messages, text messages and emails.  Many of these emails have crossed the line to being threats.  I have attached just two examples in which the callers, using vulgar language, inform Mr. Lansky that he has his home address and that he intends to come to his house and in the other, the caller threatens to murder Ms. Reeves' children. We are genuinely concerned for Mr. Lansky

and Ms. Reeves' safety and are asking that the Attorney General's office assist us in investigating the threats, which we believe are criminal, and marshalling security to protect them. We, of course, will cooperate fully with your office and any other law enforcement agency, but the fact that there is so much activity and we are heading into a holiday weekend has our clients especially concerned.

Thank you in advance for your immediate attention to this matter.

In a second email, Mr. Stein literally begged for assistance in protecting Ms. Reeves:

Laura, Joseph and Dylan – I think it is imperative that the Attorney General's Office send out a press release of some sort condemning the harassing conduct here and reminding people that the claims in the complaint are merely allegations and that they need to let the judicial process work. Truly, the attacks that our clients are receiving are horrifying and we hope you will do what you can to calm things down. We are available to discuss. Thanks.

Mr. Stein received the following terse response:

Lee,

If you have concerns related to the safety of your clients, please direct them to contact 9-1-1, or their local police department. I am available to discuss tomorrow if necessary.

Laura

No press release or statement was issued by the Arizona Attorney General, and the threats against Ms. Reeves and others associated with Avid Telecom have continued to date, all resulting from the unsupported and scurrilous allegations in the Complaint.

Here is but one example (curse words redacted) of the many threatening emails that Michael Lansky, CEO of Avid Telecom, has received:

**From:** [REDACTED]
**Sent:** Thursday, May 25, 2023 7:39 AM
**To:** Avid Info <info@avid-telecom.com>
**Subject:** F%$k you f%$k you f%$k you F%$k you f%$k you f%$k you f%$k you

F%$k you F%$k you f%$k you f%$k you F%$k you f%$k you F%$k you f%$k you F%$k you f%$k you f%$k you f%$k you f%$k you f%$k you

f%$k you f%$k you f%$k you F%$k you F%$k you F%$k you F%$k you
kill yourself you f%$king scumbags f%$king kill yourselves You should all
f%$king kill yourself F%$k you f%$king scumbags f%$king kill yourselves
f%$king kill yourselves f%$king kill yourself that whole company should all
f%$king kill yourselves F%$k all of you kill yourselves You should all go
home and f%$king kill yourselves in front of your families F%$k you F%$k
you F%$k you.

We include the above transcripts in this submission because it is imperative that the
Attorneys General understand the actual, real-life consequences that the false allegations
have had, not only on the Defendants' business and personal reputations, and their financial
security, but, literally, on their day-to-day personal safety and on the day-to-day safety of
their children.

**D.   The False Allegation that Avid Telecom has Never Blocked a Call**.  This
allegation is demonstrably false.   The AGs did not approach Avid Telecom for its call
blocking data.  The only other party with access to these data would be Avid Telecom's
switch provider.  On information and belief, these data were not provided to the AGs by
the switch provider.  Had such data been requested or obtained, it would have shown that
every year Avid Telecom blocks huge numbers of suspected illegal calls.  For example, in
2023, the number of calls that Avid Telecom blocked was in excess of 2.3 billion.  Given
the massive number of blocked calls, it is difficult to understand how the allegation that
Avid telecom does not block illegal calls could have been made in good faith.

**E.   The False Allegation that Avid Telecom does not Respond to Tracebacks.**
Again, this allegation—which is not supported by any facts or evidence—is demonstrably
false.    Although Avid Telecom firmly believes that the process by which traceback
"tickets" are issued is often self-serving and potentially corrupt, nonetheless, as a legitimate
carrier, to the best of its knowledge, Avid Telecom has timely and properly responded to
***each and every*** traceback that it has received.   Avid Telecom will provide all of its
traceback responses, if necessary.  The below email trail reflecting an exchange regarding
tracebacks is representative of the many such engagements:

**From:** Jessica Thompson <jthompson@ustelecom.org>
**Sent:** Monday, February 14, 2022 3:20 PM
**To:** Michael Lansky <lansky@avid-telecom.com>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Thank you
**From:** Michael Lansky <lansky@avid-telecom.com>
**Sent:** Monday, February 14, 2022 2:15 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>; Stacey Reeves <reeves@avid-

telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Good afternoon Jessica,

Sorry I missed this email on Friday- they are called Digital Media Services and I believe Stacey will work with them to make the introduction and call.

Thanks again,

Michael Lansky
800-799-4415 ext 101
520-395-9471 direct
520-370-1514 cell

www.avid-telecom.com

**From:** Jessica Thompson <jthompson@ustelecom.org>
**Sent:** Friday, February 11, 2022 1:36 PM
**To:** Michael Lansky <lansky@avid-telecom.com>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Hi Michael –
What's the company's name? This way we know who to look out for?

Jessica Thompson
Director, Policy & ITG/Traceback Operations
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448

**USTELECOM** | THE BROADBAND ASSOCIATION

**From:** Michael Lansky <lansky@avid-telecom.com>
**Sent:** Friday, February 11, 2022 3:23 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Good afternoon Jessica,

Thank you for getting back to us so quickly- it's much appreciated on our end. We understand and know this customers traffic pretty well and often have conversations as to how they can ensure that they operate in total compliance. I have suggested to them that they reach out to you and your team to start communications with USTA. They are a large publicly traded company that do marketing for many fortune 500 companies and are always wanting to ensure that they are doing things correctly.  I believe they will be

11

reaching out to you next week to see if they can arrange a call to create a better direct relationship.

Thanks again and have a wonderful weekend.

Michael Lansky
800-799-4415 ext 101
520-395-9471 direct
520-370-1514 cell

www.avid-telecom.com

**From:** Jessica Thompson <jthompson@ustelecom.org>
**Sent:** Friday, February 11, 2022 12:34 PM
**To:** Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Cc:** Michael Lansky <lansky@avid-telecom.com>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Hi Stacey –
We believe these are deceptive telemarketing robocalls promoting a product or service that may not be of any value. The consent or opt in information may be obtained without being aware or not at all. We are tracing these specific types of calls to identify the originator and hope they can confirm whether or not they have consent and provide evidence. **Last year, the FCC issued the largest fine in its history – $225 million – against Texas-based telemarketers for transmitting approximately 1 billion robocalls, many of them illegally spoofed, to sell short-term, limited duration health insurance plans. The robocalls falsely claimed to offer plans from well-known health insurance companies such as Blue Cross Blue Shield (BCBS) and Cigna.**

Jessica Thompson
Director, Policy & ITG/Traceback Operations
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448

USTELECOM | THE BROADBAND ASSOCIATION

**From:** Stacey Reeves <reeves@avid-telecom.com>
**Sent:** Friday, February 11, 2022 2:15 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>; Warren Currie <wcurrie@ustelecom.org>
**Cc:** Michael Lansky <lansky@avid-telecom.com>
**Subject:** FW: Traceback Request for Traceback #8069 – Information

Jessica,

We received two tracebacks today (8070 and 7069) for which we need to consult with our customer in regard to action they may need to take. However, based on the information provided in the traceback, I'm not clear exactly what the issue is. In the attached recording, they give their company name and a call back number, and based on our knowledge of our customer, calls are made using opt-ins. The only information in the traceback is "Calls referencing Consumer Council regarding recipients' health insurance. Various toll-free numbers provided for call back".

Thanks in advance for your assistance.

Regards,

Stacey Reeves
Vice President of Operations and Sales
Office: 520-395-9473
Cell: 601-447-3530

www.avid-telecom.com

**From:** Traceback Notice <traceback-notice@tracebacks.org>
**Sent:** Friday, February 11, 2022 1:36 PM
**To:** Stacey Reeves <reeves@avid-telecom.com>
**Subject:** Traceback Request for Traceback #8069

# INDUSTRY TRACEBACK GROUP

Dear Voice Service Provider:

**As part of traceback conducted by the Industry Traceback Group, your network has been identified in the call path for voice traffic that has been deemed suspicious and potentially illegal. Consistent with U.S. federal law and regulations, the ITG requests that you identify the source of this suspected fraudulent, abusive or unlawful network traffic.**

We appreciate your past cooperation with the Industry Traceback Group, the official U.S. Federal Communications Commission-designated traceback consortium. Consistent with the FCC's requirement the voice service providers must cooperate with traceback requests, we would appreciate a response to this traceback inquiry in three business days or sooner.

Please respond by clicking the link below, which will take you to our secure traceback portal. There, you can indicate who sourced the call(s) to you. **For confidentiality and security purposes, please provide this information <u>only</u> through the online portal and <u>not</u> via email.**

Feel free to reply to this email with any questions, and we appreciate your continued support of ITG efforts.

For help or questions, email support@tracebacks.org.

13

As the substance of this email trail reflects, Avid Telecom was completely responsive to the traceback. Avid Telecom has maintained a positive relationship with ITG in the traceback process, routinely responding in good faith to tracebacks. As this email and similar data regarding Avid Telecom's response rate is available in the Industry Traceback Group database, or could have been obtained from Avid Telecom, it is difficult for Avid Telecom to understand how the Attorneys General could have pled that Avid Telecom did not respond in good faith.   Apparently, the drafters of the made his argument without checking.

   **F.  The False Allegation that Michael Lansky Has Utilized the Company Credit Card for Personal Purchases**.   In support of the attempt to hold Mr. Lansky personally liable, the complaint alleges that he routinely utilizes the company credit card for personal purchases.  That allegation is demonstrably false, and no AG approached Avid Telecom with a request for information regarding any of the charges identified in the Complaint. The principal of Avid Telecom, like the heads of many other closely held companies, uses the company credit card for a wide range of corporate and personal transactions. Where a charge is determined to be personal, he makes reimbursement to the company.  Notably, each of the charges (which, together, totaled less than $1250) identified in the Complaint was either made for a business purpose or was the subject of proper reimbursement.

   **G.  The False and Misleading Allegations Regarding Social Security and Other Calls.** In paragraph 19 of the complaint, the Attorneys General allege:

> Every day, millions of American consumers receive a barrage of unwanted robocalls that are harassing, annoying, threatening, and malicious. Some consumers are told that their "Social Security Number has been used for some kind of fraudulent activity in the South Border of Texas."[4] Sometimes, the message states the "SSA department is filing a lawsuit against you. An arrest warrant has been released on your name."  Other calls purport to be from Amazon, luring the call recipient into a scam. These calls are all scams designed to scare and harm consumers. Other robocalls may not be scams but are harassing, abusive, and illegal, nonetheless. (footnotes omitted)

The clear implication of this paragraph is that Avid Telecom is aware at the time of transmission that a call is illegal. This implication is plainly false. Avid Telecom is never the originating carrier for any of these calls at issue in the Complaint. All of them arrived onto the Avid Telecom network from a previous carrier. Avid Telecom had no reason to know that these calls were suspicious prior to its receipt of a traceback, and Avid Telecom had no reason to know that they were illegal. Cynically, the complaint does not reference the fact that Avid Telecom responded fully, appropriately and in a timely manner to each of the traceback tickets that it received, fully meeting its obligations under all applicable laws and regulations.

### H. <u>Examples of False or Misleading Allegations Regarding the Meaning of Tracebacks</u>

In paragraph 22 the Complaint, the Attorneys General allege:

> Avid Telecom received more than 329 Traceback notifications from the USTelecom-led Industry Traceback Group ("ITG"). These notifications put Defendants on notice that Avid Telecom was transmitting illegal robocalls.

Tracebacks are ***not*** notifications of illegal robocalls. Tracebacks are investigative requests. In response, carriers are only required to investigate the call and respond with originating customer information. Avid Telecom met each of these requirements in all cases.  At no point did the FCC — the only body with legal authority — determine that any of these calls were illegal. The FCC never put Avid Telecom "on notice" that it was transmitting illegal calls.  Nor did the FCC ever instruct Avid Telecom to cease doing business with any of the originating carriers of these calls. Thus, there is no basis in fact for the conclusion that Avid Telecom had notice that it was transmitting illegal robocalls. Moreover, as a practical matter, even assuming *arguendo* that these calls were illegal (an unsupported conclusion), they would reflect 0.00000000658 percent of Avid Telecom's total traffic during the relevant period. The tiny percentage that these 329 tracebacks constitute—rather than creating notice of a problem as the complaint suggests, actually demonstrates the extraordinary effectiveness of Avid Telecom's robocalling mitigate and that the claim that Avid Telecom transmitted millions of illegal robocalls  is baseless and facially absurd.[6]

This reality also reveals the absurdity of the allegation in the following paragraph of the Complaint that, "[d]espite receiving these 329 notifications, and despite receiving additional letters and correspondence from the ITG about needing to improve Avid Telecom's traffic screening procedures, week after week Defendants chose profit over running a business that conforms to state and federal law." Looking at the percentage of tracebacks (which, again do not reflect a finding of illegality) to total calls, it is mathematically impossible for Avid Telecom's performance to have been materially better. This conclusion is amplified by the fact that in 2022 alone, Avid Telecom blocked nearly 2.3 billion suspicious calls.

---

[6] On information and belief, the claim to millions of illegal robocalls is based on the assertion by an industry consultant that every traceback is the equivalent of 100,000 illegal robocalls.  This assertion is absurd as tracebacks themselves are not evidence of illegality and thus using them as the baseline for a calculation cannot possibly be reliable. Moreover, this assertion, even if based on a reliable baseline, has never been supported by empirical data for any carrier; it certainly has not been supported by empirical evidence as it related to Avid Telecom's traffic.

## I.  Example of a Misleading Allegation Regarding the Use of Call Detail Records

In paragraph 24, the Attorneys General Allege:

Even if Defendants had not been specifically informed at least 329 times by the ITG that Avid Telecom was carrying illegal robocall traffic, they knew or should have known that Avid Telecom was assisting and facilitating telemarketers or sellers transmitting illegal robocalls based on its call detail records, which are business records that are automatically generated by every telecom provider when a call is originated or transmitted and are kept in order to bill for the service of originating or transmitting each call across the provider's network.

This allegation is false and reflects a misunderstanding of how call detail records are created and used. First, because tracebacks do not reflect a finding of illegality, it is false and misleading to allege that Avid Telecom was informed at least 329 times by the ITG that it was carrying illegal robocall traffic. This was simply not the case. In fact, the FCC has never found that any of the calls Avid Telecom transmitted was illegal. And while it is true that call detail records are "business records that are automatically generated by every telecom provider when a call is originated or transmitted and are kept in order to bill for the service of originating or transmitting each call across the provider's network," the automatic creation of real-time billing records is not equated with knowledge of whether the call was an illegal robocall. Nothing in those data would assist with such a determination.

## J.  Example of False Allegation Regarding the Origination of Avid Telecom Traffic.

In paragraph 29 of the complaint, the Attorneys General allege: "Defendants and their customers made or initiated calls to both residential and cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express consent of the called parties."

This allegation is demonstrably false as it relates to Avid Telecom because Avid Telecom is never the originating carrier for a call, and never makes or initiates calls. Indeed, Avid Telecom lacks the outbound switching ability required to initiate a call. As a result, Avid Telecom never has a relationship with the customer on whose behalf the calls are made.

K.  **Example of False Allegation that Avid Telecom Facilitated the Transmission of Robocall Campaigns the Contained False or Misleading Information**

As an initial matter, Avid Telecom has no knowledge of or involvement in the creation of the message contained in any call that it transits, including whether that content is legal or illegal.  Avid Telecom has no knowledge of which, if any, called parties have opted in or otherwise given permission to the calling party to receive the call. As such, Avid Telecom cannot be liable for "facilitating" the transmission of illegal robocalls.

Moreover, it is not credible to suggest that the fact that Avid Telecom received 329 tracebacks—which are merely requests for information—on the 50 billion calls that it transmitted somehow placed Avid Telecom on notice that every call in every campaign that it was handling was illegal.  Indeed, it did just the opposite; it showed that only a miniscule percentage of Avid Telecom's calls were the subject of inquiry.  And when *none* of those inquiries ever even led to an investigation by the FCC, Avid Telecom's rightful belief that its efforts to prevent illegal robocalling were working well.

L.  **There is No Factual Basis for the Demonstrably False Claims of Spoofing**

Spoofing involves the use of a number to initiate and document a call that is not owned by the calling party.  This claim misperceives how Avid Telecom operates. To be clear, whether Avid Telecom is the first carrier in line or not, it *never* selects or determines the telephone number shown on the called party's Caller ID. Avid Telecom cannot engage in spoofing because all numbers used by customers where Avid Telecom is the first carrier in the line are owned by the customer. The number used by the customer to initiate an outbound call is selected by the call center or third party originating the call, and that number simply passes intact to the next carrier in the string. Where Avid Telecom is the first carrier in line, it "attestates" that call exactly as required in the Stir/Shake protocol. Avid Telecom does not initiate any "neighbor" spoofing and/or "snowshoe" spoofing. With the technologies presently in place, Avid has the ability to block (and does block) any call that is not Stir/Shaken compliant and any call from an originating number on the SOMOS Do Not Originate ("DNO") list. Where Avid Telecom is not the first carrier in line, any carrier sending calls with a spoofed number is either immediately terminated or given the opportunity to remove the traffic from Avid Telecom's network.

M.  **Avid Telecom's Rapid Acquisition of DIDs is Routine**

In paragraph 11 of the Complaint, the AGs allege that "in a January 28, 2022, email to Call48, Reeves wrote: 'Please understand, the very thing that sets Avid apart from its competitors for DID business is the fact that Avid can fill orders within 2-3 days as opposed to 5- 7.'" This is an accurate statement. *The process for acquiring numbers is the same for all carriers*. Due to the experience and ability of the company, at the time this statement

was made, Avid Telecom was in a position to manage the process of acquiring DIDs quickly through an Application Programming Interface ("API") in which the order file is uploaded to the number database and the system returns results within a few hours. There is nothing unlawful or nefarious about this process. Paragraph 12 of the Complaint implies that there is something suspicious about the fact that in January 2022 Avid Telecom had 865,683 DIDs assigned to Call48 and that on February 1, 2022, Avid Telecom returned over 400,000 DIDs to Call48.These two events are innocent and unrelated. On average, Avid Telecom customers, including the customer at issue here, hold their DIDs for well over the ninety-day requirement. In this instance, the 400,000 DIDs were returned because Avid Telecom terminated the customer—ironically out of a concern that the traffic level could be problematic.

In paragraph 68, the AGs make an unsupported companion allegation that Avid Telecom customers regularly rotate their DIDs and that this is often indicative of callers who do not want to be identified.  The Complaint fails entirely to establish that Avid Telecom's customers regularly rotate their DIDs. As stated above, the actual truth is that a majority of Avid Telecom's DIDs are held for over a year—well in excess of the 90-day minimum requirement.

## N.  Issues Relating to DMS Opt-Ins

As set forth in Section II.E. hereinabove, Avid Telecom required its customers to represent and warrant that all of the traffic it delivered to Avid Telecom was fully compliant with all applicable rules and regulations associated with robocalls.  With specific respect to DMS—which comprises the majority of Avid Telecom's traffic—Avid Telecom was repeatedly and specifically assured throughout their relationship that all of the traffic it delivered to Avid Telecom was lawful and, where necessary, had fully legitimate opt-ins. As DMS is a publicly traded company with a substantial legal and compliance department, Avid Telecom rightfully relied on the continuing representations and warranties that were provided.  Moreover, Avid Telecom is not aware of any language in the applicable FCC rules, regulations or any associated statutes that can be interpreted to require Avid Telecom to vet the representations that it receives from its customers. Further, to this very date, the FCC's rules and regulations regarding the opt-in process—including the duration of an opt-in and how opt-ins may be acquired—are widely understood, both in the industry and the regulatory community to be vague and ambiguous.  Indeed, the fact of the uncertainty was made clear again last month when a coalition of 28 State Attorneys General asked the FCC to clarify these rules, stating, "We urge the FCC to clarify the rules and protect Marylanders' ability to choose who gets to contact them and how."  In this context, the allegations of the complaint that Avid Telecom is somehow liable for knowingly accepting improper opt-ins that it received and accepted in good faith from a publicly traded company cannot withstand scrutiny.

## O.  False Statements Regarding Avid Telecom's Sales Activities

### 1. Avid Telecom Sold Data in the Form of Call Recipient Phone Numbers to Customers to use as "Leads" in Telemarketing Campaigns

The AGs make this allegation in paragraph 41.  First, there would be nothing illegal about selling these data for telemarketing campaigns, and the implication to the contrary is troubling.  Second, and more importantly, *Avid Telecom never sold any such data at any time or in any form*.

### 2. Avid Telecom Held Itself Out as a Provider of Predictive Dialer, Voice Broadcasting, List Management and Agent Management Software

The AGs make this allegation in paragraph 66.  There is nothing illegal about selling these data for telemarketing campaigns.  This service was offered to Avid Telecom by a third party and the reference was improperly added to the website by its website manager. In fact, *Avid Telecom never planned to sell, nor did it sell any such software at any time or in any form*.

### 3. Avid Telecom Held Itself Out as a Provider of Call Data Advertising

The AGs make this allegation in paragraph 70 of the complaint.  As an initial matter, all call data advertising is not illegal, and the mere fact that Avid Telecom could have provided call data advertising is not evidence of wrongdoing. In actuality, Avid Telecom never provided any consulting with respect to illegal robocalling practices, and the Complaint does not offer any facts to the contrary. In point of fact, *Avid Telecom never sold any such advertising at any time or in any form*.

### 4. Defendants Provide Robocall Consulting Services

The AGs make this allegation in paragraph 42 of the Complaint. As an initial matter, all robocalling is not illegal, and thus the mere fact that Avid Telecom could have provided consulting is not evidence of wrongdoing. In fact, to the extent that Avid Telecom provided any such consulting, it was directed to best practices by carriers in responding properly to tracebacks. Avid Telecom never provided any consulting with respect to any illegal robocalling practice, and the Complaint does not offer any facts to the contrary.

### 5. Without Defendants' Support, Assistance, Facilitation, and Participation of Defendants, American Consumers would not be Plagued by Billions of Illegal Robocalls Sent by, to, and through the Avid Telecom Network

The AGs make this allegation in paragraph 47 of the complaint. There is not a scintilla of evidence that a single *illegal* robocall ever transited the Avid Telecom network.

There is certainly no evidence that billions of *illegal* robocalls did so. Again, **no regulatory authority or law enforcement agency with jurisdiction has ever concluded that Avid Telecom transited even a single illegal call**. There is plenty of evidence that in 2022, Avid Telecom voluntarily blocked approximately 2.3 billion suspicious calls from its network.

> **6.  *Avid Telecom Participated in Social Security Administration Scams, Medicare Scams, Auto Warranty Scams, Amazon Scams, DirecTV Scams, and Credit Card Interest Rate Reduction Scams.***

These allegations, found in paragraphs 74-85 of the Complaint, are particularly scurrilous and misleading.[7] Not a single one of these calls was originated by Avid Telecom. As Avid Telecom's tracebacks evidence, where Avid Telecom is the intermediate carrier, it is, on average, the fifth caller in line.  As an intermediate carrier, Avid Telecom receives these calls from third party carriers—many of the members of the Industry Traceback Group that, remarkably, are not party to the AG complaint or any other complaint.  Avid Telecom utilizes state-of-the-art third-party switch and mitigation software to block any suspicious calls in real time.  As Avid Telecom is so far removed from the originating source, Avid has to rely on technology and information after the fact to remove that traffic. Avid Telecom routinely terminated carriers who are associated with repeat traceback requests.

> **P.  Misleading Allegations Regarding Avid Telecom's Continued Relationships with Accused Illegal Robocallers**

> **1.  *The FCC has sent Robocall Cease-and-Desist Letters to the following Avid Telecom customers from whom Avid Telecom accepted and routed illegal robocalls: a. Airespring; b. Great Choice Telecom; c. Icon Global; d. Mobi Telecom; e. Third Rock; f. Yodel Tech; and g. Urth Access.***

This allegation, which appears in paragraph 110 of the Complaint, is particularly disingenuous as it fails to note is that Avid Telecom had **already terminated each of these carriers** based on information gathered from its own careful operating practices prior to or immediately upon the issuance of the cease-and-desist letters. To blame Avid Telecom for a relationship with a problematic carrier before the responsible authorities, with access to vastly greater data, provided notice of illegal robocall activity is unfair and cynical. At the time, Avid Telecom engaged with these carriers based on their specific authorization to operate through an FCC granted 499.

---

[7] These false allegations appear to have prompted many of the death threats that have been received by Mr. Lansky, Ms. Reeves and outside counsel.

      *2.   On July 7, 2022, the FCC and the State of Ohio took simultaneous enforcement actions against a massive auto warranty robocall operation run through a common enterprise involving numerous individuals and business entities including but not limited to, Sumco Panama SA, Sumco Panama USA, Virtual Telecom Kft, Virtual Telecom Inc., Davis Telecom Inc., Geist Telecom LLC, Fugle Telecom LLC, Tech Direct LLC, Mobi Telecom LLC—another of Avid Telecom's customers—and Posting Express Inc.*

This allegation, which appears in paragraph 117 of the Complaint, is disingenuous as it fails to note both that Mobi Telecom was the only one of the named entities that was a customer of Avid Telecom, and that Avid suspended Mobi Telecom on July 8, 2022, the day after public notice of the enforcement action. Again, it is unfair and cynical to blame Avid Telecom for not terminating their relationship with Mobi Telecom before the responsible authorities, with access to vastly greater data, provided notice of illegal activities. At the time, Avid Telecom engaged with these carriers based on their specific authorization to operate through an FCC granted 499.

      *3.   On December 8, 2022, the FCC ordered VoIP service providers, including Avid Telecom, to block student loan robocalls coming from Urth Access.*

This allegation, which appears in paragraph 125 of the Complaint, is particularly disingenuous as Avid Telecom closed the Urth Access account nearly a month prior to the issuance of the referenced FCC order. It did so based on an investigation it undertook, voluntarily and of its own accord, based on information available through the traceback process. As with the previous carriers, at the time that Avid Telecom engaged with Urth Access, it did so based on the specific authorization Urth Access had received to operate through an FCC granted 499.

## Q. <u>False Allegations Regarding Call Blocking and New Customers</u>

      *1.   In paragraph 434 and 436 of the Complaint, the AGs argue that Defendants did not choose to regularly block calls from telephone numbers that the FCC has authorized to be blocked.*

First, as the language of the applicable regulations provide, carriers are not mandated to block calls, they are simply authorized to do so. The failure to block those calls is not actionable. Yet Avid Telecom did take all available measures to block traffic

that it had reason to believe was illegal.[8] Avid Telecom has provably blocked billions and billions of calls, including nearly 2.3 billion calls in 2022.

>    **2.  Defendants violated 47 C.F.R. § 64.1200(n)(3) by failing to take effective measures to prevent new and renewing customers from using its network to originate illegal calls.**

This allegation, which is presented in paragraph 437 of the Complaint, is demonstrably false. Avid Telecom has taken on very few new customers since 2021. Avid Telecom follows the detailed guidelines listed in Avid Telecom's Robocall Mitigation Plan and its Know-Your Customer Procedures,) and does not allow customer origination from any IPs outside the USA.  During the testing process that all new customers must undertake, Avid Telecom closely monitors traffic and manually dials ANIs being used for calls. If ANIs are found to be invalid, the customer is immediately terminated. As to existing carrier customers, Avid Telecom uses its Robocall Mitigation Plan and its Know-Your Customer Procedures and feedback from complaints and tracebacks.

>    **3.  Avid Telecom's equipment or services were used for more than the transportation, handling, or retransmitting of calls.**

This allegation, which is presented in paragraph 437 of the Complaint, is not supported by any facts. Avid Telecom's equipment is only capable of transmitting calls. It is not capable of changing any portion of the call, including the called number or the Caller ID entered by the initiating customer.  Avid Telecom merely transmits the call data that it receives from originating party or the previous carrier to the next carrier in line.  Avid Telecom is never the originating-party or the terminating carrier.

## V.    The Complaint Cannot Be Sustained as a Matter of Law

### COUNT I: Violations of the Telemarketing Sales Rule 16 C.F.R. §§ 310.3-310.4

### As a Common Carrier, Avid Telecom is Immune from Liability Under the Telemarketing Sales Rule

The complaint cites 16 C.F.R. § 310.3 ("TSR") as a basis for its investigation. However, under long-standing law, carriers like Avid Telecom are exempted from TSR claims when the complained-of conduct arises out of their common-carrier activities. *See FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 850 (9th Cir. 2018) (citing 15 U.S.C. § 45(a)(1)). Clearly, the conduct that is the subject of the Complaint arises out of Avid

---

[8]Avid Telecom blocks calls in Category A using the SOMOS DNO list. Blocking of category B is an active feature on Avid Telecom's switch. Avid also blocks originations from wireless numbers. And, Avid Telecom's switch is programmed to block calls from category C and D as they would not have Stir/Shaken attestation.

Telecom's common carrier activities, and thus it is exempt from claims arising under the TSR.

Section 5 of the Federal Trade Commission Act also exempts common carriers from TSR Claims. *Id.* Section 5 "provides immunity [to a common carrier] from FTC [Federal Trade Commission] regulation … to the extent that a common carrier is engaging in common-carrier services." *Id.* The "Section 5 exemption" extends to the TSR, meaning that common carriers are not subject to TSR claims premised on their actions that occurred while they were engaged in common carrier activities. *See* Telemarketing Sales Rule, 60 Fed. Reg. 43842, 43843 (Aug. 23, 1995) (stating that the TSR does not cover activity beyond the jurisdiction of the FTC Act); *see also The Broadcast Team, Inc. v. FTC*, 429 F.Supp.2d 1292, 1298-99 (M.D. Fla. 2006). Under this controlling test, an entity's common carrier status turns on: "(1) whether the carrier 'holds himself out to serve indifferently all potential users'; and (2) whether the carrier allows 'customers to transmit intelligence of their own design and choosing.'" *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1329 (D.C. Cir. 2002); *Payton v. Kale Realty, LLC,* 164 F. Supp. 3d 1050, 1056 (N.D. Ill. 2016).  As there is no dispute that Avid Telecom qualifies as a "common carrier," Avid Telecom is entitled to the Section 5 exemption for any claim for violation of the TSR.

### COUNT II: Violation of the TCPA – 47 U.S.C. § 227 and 47 C.F.R. § 64.1200(n)(3) (Failure to Exercise Due Diligence/KYC)

### There is No Factual Basis For the Allegation that Avid Telecom Aids and Abets or Facilitates the Transmission of Illegal Robocalls

There is no factual basis for the allegations that Avid Telecom fails to know its customers, fails exercise due diligence in ensuring that its services are not used to originate illegal traffic, fails exercise caution in granting access to high-volume origination services, to ensure that bad actors do not abuse such services, fails to block calls, fails to prevent new and renewing customers from using its network to originate illegal calls.

The Complaint does not allege that Avid Telecom places the call, selects the recipient, or has a direct business relationship with the recipients. The Complaint also does not allege that Avid Telecom has any involvement in or knowledge of the content of any call. There is no dispute that Avid Telecom merely acts as a common carrier, accepting the calls it receives from third parties.  As such, the Complaint rests on the claim that, notwithstanding the absence of any actual knowledge, based on its receipt of a mere 329 tracebacks out of 50 billion calls, Avid Telecom should have known that it was transmitting illegal robocalls. It is beyond cavil that there is no factual basis for his allegation and thus no basis for liability.

### COUNT III: Violations of the TCPA – _47 U.S.C. §§ 227(b)(1)(A)(iii) and (b)(1)(B) (Robocalls to Cellular and Residential Telephone Lines)

As set forth *ad infinitum*, Avid Telecom does not initiate telephone calls or cause any telephone calls to be initiated. Avid Telecom does not determine whether a call is prerecorded or live, or have knowledge of the content of the call. Where Avid Telecom is the first carrier in line, it obtains a representation and warranty from the originating customer that the recipient expressly consented to receive every telephone call that Avid Telecom transmits. Accordingly, there is no factual basis for the allegation that Avid Telecom has engaged in a pattern or practice of initiating telephone calls to residential and cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express consent of the called parties.

Avid Telecom is never the terminating carrier.  Accordingly, there is no basis for the allegation that Avid Telecom delivers prerecorded or artificially voiced messages to cellular and residential telephone lines to consumers in the Plaintiffs' jurisdictions. Moreover, as mobile phones are frequently located in a state other than the state associated with the area code and NNX associated with the call, as a matter of jurisdiction, there is no way to know from the facts presented in the Complaint whether a mobile phone was located in a particular jurisdiction when a call was received.

As Avid Telecom is never the initiating carrier and thus has no knowledge about any aspect of the call (including the calling party, the receiving party, the content of the call or the authorization of the receiving party), there is no viable factual basis in the Complaint to support the contention that Avid Telecom had knowledge that the calls were scam robocalls delivering prerecorded or artificially voiced messages.  Moreover, because no regulatory or law enforcement agency has ever found a single call delivered by Avid Telecom to be illegal, and because tracebacks do not constitute a legal finding or warning that a call is illegal, Avid Telecom also did not even have a reason to believe that  the calls were scam robocalls delivering prerecorded or artificially voiced messages.

**COUNT IV: Violations of the TCPA – _47 U.S.C. §§ 227(c) and 47 C.F.R. § 64.1200(c)(2) (Calls to Telephone Numbers on the National DNC Registry)**

Avid Telecom does not ever initiate a telephone call or cause any telephone call to be initiated.  Avid Telecom does not have any role in selecting the party who  initiates a telephone call or cause any telephone call to be initiated.  Avid Telecom also has no role in determining whether a call is prerecorded or live or any aspect of the content of the call. Where Avid Telecom is the first carrier in line, it obtains an express representation and warranty from the originating customer that it has the express consent of the recipient to receive every telephone call that Avid Telecom transmits. Accordingly, there is no factual basis for the allegation that Avid Telecom has engaged in a pattern or practice of initiating telephone calls to residential telephone subscribers in the Plaintiffs' respective jurisdictions who have registered their telephone numbers on the National DNC Registry. Many (if not

all) of the calls underlying the Plaintiffs' claim of a violation of the DNC registry were registered by a business and thus do not qualify to be in that registry.

### COUNT V: Violations of the Truth in Caller ID Act – 47 U.S.C. § 227(e) (Prohibition Against Spoofing)

Spoofing involves the use of a number to initiate and document a call that is not owned by the calling party.   Avid Telecom *never* selects or determines the telephone number shown on the called party's Caller ID. As all numbers used by customer where Avid Telecom served as the first  carrier in line are owned by the customer, spoofing does not and cannot occur in that context.  Each number used by the customer to initiate an outbound call number is selected by the call center or other third party that originates the call in the data string and that number simply passes intact to the next carrier in the string to which Avid Telecom hands the call (as Avid Telecom is never the carrier that terminates the call).  Where Avid Telecom is the first carrier in line, it "attestates" that call exactly as required in the Stir/Shake protocol.

### COUNT VI-XXIII: Various State Statutes

As discussed above, the facts necessary to support each of the state statutory claims have not been established.


**V.**    <u>**Individual Claims**</u>

**A.**  <u>**Mr. Lansky Has Not Comingled Corporate and Personal Assets**</u>

This claim is predicated on five examples of circumstances in which Lansky is claimed to have "used the Michael D. Lansky, LLC corporate credit card, bank account, and/or PayPal account a company credit card to pay for personal expenses": (i) Ancestry.com DNA LLC; (ii) Bandcamp for the full digital discography (9 releases) by Clann An Drumma; (iii) Payment for the SMHS reunion for Michael Lansky and another person; (iv) Payment for a "Michael D. Lansky for bicycle replacement; and (v) Payment for bachelor party lodging.[9]

The mere use of the Michael D. Lansky, LLC corporate credit card, bank account, and/or PayPal account by Mr. Lansky to pay personal expenses is not the relevant issue. The relevant issue for a veil-piercing analysis (which the Complaint fails completely to address) is whether the company or Mr. Lansky took ultimate responsibility for the payment of the referenced charges.   In fact, while it is apparently true that, like many closely held companies, the corporate credit card or PayPal account is occasionally used as

---

[9] It will be of interest to determine how the AGs acquired the credit card and other referenced financial information.

the initial basis of payment, Avid Telecom's books and records clearly demonstrate that, in each case, Mr. Lansky reimbursed the company in full.  Moreover, even if there was no reimbursement, the total charges for these matters totaled less than One Thousand Two Hundred Fifty Dollars ($1250) dollars.  As such, the alleged level of "co-mingling"— as a matter of the total dollar amount is insufficient to justify the kind of veil-piercing that the Complaint seeks.

The Complaint also fails to present any factual basis for its claim that Mr. Lansky undertook any action in his personal name or on behalf of himself outside of the company.[10] In the absence of such evidence, there is no basis for piercing the corporate veil, and thus no basis for personal liability.

### As an Independent Contractor, Ms. Reeves is Not Liable for the Acts of Avid Telecom

The Complaint alleges Ms. Reeves (i) "possessed and exercised the authority to control the policies and trade practices of Michael D. Lansky, LLC; (ii) was responsible for creating and implementing the illegal policies and trade practices of Michael D. Lansky, LLC that are described herein; (iii) participated in the illegal trade practices that are described herein; (iv) directed or supervised those employees of Michael D. Lansky, LLC who participated in the illegal trade practices that are described herein; and (v) knew or should have known of the illegality of the trade practices that are described herein and had the power to stop them, but rather than stopping them, promoted their use."  This attempt to render Ms. Reeves liable for the acts of Avid Telecom is non-viable.

The Complaint does not present even a hint of evidentiary support for any of its claims against Ms. Reeves. In actuality, Ms. Reeves did not engage in any of these alleged acts.  First, as an independent contractor, Ms. Reeves did not ever possess or exercise authority to control the policies and trade practices of Michael D. Lansky, LLC. She lacked any authority to create or to implement any business practices at the company, nor did she have the authority to direct or supervise employees of Michael D. Lansky, LLC, of which there were none. Finally, as an independent contractor, Ms. Reeves did not have had the power to stop any illegal trade practices that might have occurred. In sum, Ms. Reeves' conduct as an independent contractor does not permit vicarious liability under Arizona law, or the laws of virtually every other state.

Moreover, the controlling law in the United States Court of Appeals for the Ninth Circuit does not allow for the application of vicarious liability of one party against another

---

[10] Arizona recognizes that a limited liability company, like a corporation, is a legal entity that exists separate and distinct from its members; the members and employees are **_not_** liable for the corporation's contractual obligations or the actions those individuals take on behalf of the corporation.  *See Kirchof v. Friedman*, 10 Ariz. App. 220, 222, 457 P.2d 760 (1969); *Ferrarell v. Robinson*, 11 Ariz. App. 473, 465 P.2d 610 (Ariz. App. 1970) (a corporation is a legal entity doing business on its own credit as distinct from the credit of its shareholders, and an individual defendant, either as an officer or director, cannot be held liable on the corporate contracts where there is no evidence that he undertook to bind himself individually on those contracts).

under the TCPA, where the alleged conduct arises out of an independent contractor relationship. *See, e.g., Jones v. Royal Admin. Servs., Inc.* 887 F.3d 443 (9th Cir. 2017); *see also, Worsham v. Direct Energy Services, LLC*, No. SAG-20-00193, 2021 WL 948819 (D. Md. Mar. 12, 2021).

In this context, the allegations regarding Ms. Reeves' alleged knowledge about the carriers with which Avid Telecom did business, even if true, are insufficient to attach liability in light of her limited independent contractor role at Avid Telecom. Moreover, the suggestion that simply because Ms. Reeves was aware that certain carriers were accused (but never legally determined)  to have engaged in illegal robocalling, and that certain of them entered into confidential settlement agreements, indicates her knowledge that they were delivering illegal traffic to Avid Telecom is an illogical jump. The allegation that Ms. Reeves should have known that various third parties were paying Avid Telecom for traffic delivered by Virtual Telecom and Mobi Telecom is both unsupported and untrue.

## VI.    The Complaint Smacks of Selective Enforcement, Improper Influence and Tainted Data

Prior to the filing of the complaint, it was well known in the telecom industry that Avid Telecom was a carrier that did its best to do things right.  It followed the rules, often in advance of any legal requirement, and it spent substantial additional funds to ensure maximum compliance.  Even if all of the allegations against Avid Telecom in the Complaint were true (which they plainly are not), Avid Telecom is a small fish; it transmits far fewer calls and it has received far fewer tracebacks than many of the larger players in the industry.

This begs the question—why does *every single Attorney General* want to target Avid Telecom? Why not AT&T or Peerless or the other players in the industry who transmit far more calls and receive far more tracebacks than Avid Telecom does? Musing on this causes a cascade of related queries:

> ➢ how was the data that underlie the Complaint obtained;
> ➢ who had access to databases in which those data were held;
> ➢ how are decisions made as to which carriers get tracebacks;
> ➢ how are decisions made as to which carriers are the subject of AG complaints;
> ➢ why is Avid Telecom the subject of the Complaint as an "aider and abettor" yet DMS, the underlying customer whose traffic Avid Telecom carried and who is responsible for the opt-ins, is not the subject of a complaint
> ➢ why are other carriers being allowed to continue to carry DMS traffic
> ➢ why do companies in the Industry Traceback Group—who have many multiples of the number of tracebacks—rarely targeted by federal and state law enforcement—or regulators.

➤ did members of The Industry Traceback Group receive favorable treatment regarding tracebacks;

➤ how are decisions were made as to which companies are allowed to join USTelecom and to work inside The Traceback Group;

➤ who has the authority to issue a traceback and what was the legal basis for that authority;

➤ do certain persons or groups gain, economically, from the issuance of tracebacks (*e.g.,* are traceback being sold?);

➤ do certain persons or groups gain, economically, from selling consulting services and/or software to state AGs that are used in the development and/or the pursuit of claims against Avid Telecom and others;

➤ was some or all of the data underlying the Complaint derived from databases that include data that was obtained in an unlawful or an improper manner?

Avid Telecom believes that a full understanding of these issues will properly inform the AGs regarding their desire to proceed with the litigation or whether it would be best to find a good faith basis for settlement.

VII. **Avid Telecom's Proposed Terms of Settlement**

Avid Telecom, Mr. Lansky and Ms. Reeves desire to resolve the State AG taskforce's claims without further litigation, upon reasonable terms. They seek a settlement framework appropriately tailored to the facts and legal analysis set forth in this letter. The general parameters they propose include the following key elements:

➤ The winding down and ultimate dissolution of Avid Telecom;

➤ Reasonable restrictions on Mr. Lansky's future ownership, employment by, and/or control of a 499-telecom carrier;

➤ No restriction on Ms. Reeve's ability to continue making a living within the telecom industry; and

➤ Minimal, if any, monetary penalties

These terms reflect the realities of this case. Namely, that Avid Telecom met and exceeded every applicable regulatory requirement imposed on its business. The State AG taskforce has targeted one of the industry's bulwarks against illegal robocalling, which in 2022 alone blocked over 2.3 billion illegal robocalls from reaching U.S. consumers. The TCPA and state-based consumer sales act claims asserted against Avid Telecom are misguided, while the claims against Mr. Lansky and Ms. Reeves in their individual contexts face steep obstacles to pierce the corporate veil and, as to Ms. Reeves, are unavailable due to her status as an independent contractor.

The State AG Taskforce has proposed that Avid Telecom, Mr. Lansky and Ms. Reeves "exit the telecom industry going forward." When pressed for clarification, the

taskforce responded that it seeks a "total and complete ban from the telecom industry." The taskforce explained that Mr. Lansky and Ms. Reeves "would not be able to own, work for, consult, or provide any services to companies that provide VoIP services or telephony services. Further, there would be a ban from assisting and facilitating anyone that sends outbound telemarketing calls and/or robocalls or is involved in any entity or platform in the ecosystem that results in the initiation of telemarketing calls and/or robocalls."

As we have previously informed the taskforce, such a "total and complete ban" is unworkable because of its breadth. As written, Mr. Lansky and Ms. Reeves would be forbidden from seeking employment with a massive swath of U.S. employers given the taskforce definition of the industry as "companies that provide VoIP services or telephony services" or that send or initiate "telemarketing calls." Most domestic tech companies fall under that definition. Huge numbers of business in the U.S. use telemarketing services to market their goods and services, not to mention public entities, colleges and universities, politicians, and numerous others.  The "complete and total ban" is also unworkable because such a broad definition is not reasonably related to the narrow market in which Avid Telecom operated or the taskforce's focus. As the press release announcing the taskforce's formation said: "The task force's goal is to investigate and sue telecom companies responsible for facilitating robocalls from foreign countries." Avid did not facilitate any robocalls from foreign countries. The ban is also unworkable because Mr. Lansky and Ms. Reeves must be able to make a living. A ban of this scope is unwarranted, punitive and not viable for the individual defendants.

We propose to give the taskforce its primary desire – to put Avid Telecom out of business. Avid Telecom will wind down operations and dissolve within a swift and appropriate timeframe. Regardless of the merits of the taskforce's claims against Avid Telecom, defendants will agree to put Avid Telecom out of business.

With respect to Mr. Lansky, he will agree to surrender his ownership interest in Avid Telecom, dissolve Avid Telecom, and have no ownership stake or managerial oversight in any 499-certificated carrier specializing in short-duration calls for three years. Mr. Lansky needs to be able to continue making a living. Barring him from the telecom industry entirely is a non-starter.

With respect to Ms. Reeves, she has no ownership interest in or managerial discretion at Avid Telecom. She is an independent contractor, and her title of Vice President is just that – a title. All control, management, strategic discretion and ownership is held exclusively by Mr. Lansky. Ms. Reeves has no significant assets.  Ms. Reeves will agree to minimal injunctive relief that does not interfere with her ability to continue making a living.

We look forward to discussing these issues with you during our upcoming call.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Silsa Cabezas

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| State of Arizona, ex rel. Kristin K. Mayes<br>Attorney General et al. | ) ) ) | |
| Plaintiffs | ) ) ) | |
| v. | ) ) | Case No. 4:23-cv-00233-EJM |
| Michael D. Lansky, LLC, dba<br>Avid Telecom, an Arizona<br>Limited Liability Company; | ) ) ) ) | |
| Michel D. Lansky, individually<br>As a Member/Manager/Chief<br>Executive Officer of Michael D.<br>Lansky, LLC dba Avid Telecom;<br>and | ) ) ) ) ) ) | |
| Stacey S. Reeves, individually as<br>a Manager/Vice President of<br>Michael D. Lansky LLC dba<br>Avid Telecom | ) ) ) ) ) | |
| Defendants. | ) | |

_____

## [PROPOSED] ORDER

Upon consideration of the Motion to Stay and Refer, the opposition and reply, it is the considered judgment of this Court that Defendant have established that the prudential doctrine of primary jurisdiction should be applied and, that the Court should stay and refer each of the counts set forth in the Complaint, as appropriate, to the Federal Communications Commission (Counts II-V) and to the Federal Trade Commission (Count I).

This Court retains jurisdiction over the case.

SO ORERED:


Dated:                                    _____