Exhibit I

**<u>Hybrid Expert Report</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, *ex rel*. Kristin K. Mayes, Attorney General; et al., | NO. CV-23-00233-TUC-CKJ |
| Plaintiffs, | |
| v. | **EXPERT REPORT** |
| Michael D. Lansky, L.L.C., dba Avid Telecom; et al., | |
| Defendants. | |

### <u>Hybrid Expert Report</u>

### Introduction

My name is Michael D Lansky. I am a 63-year-old army veteran. I reside in a modest home in Tucson, Arizona. Until my company, Michael D. Lansky, LLC dba Avid Telecom, LLC ("Avid Telecom") was forced out of business in July 2023—shortly after the complaint was filed—I was the sole owner and CEO of Avid Telecom. The extraordinarily aggressive manner in which the attorneys general have publicized and pursued the complaint has left me without income for more than two years. As a direct result of the loss of my business, including the two years of endless material legal expense that has followed, I do not have the funds available to pay an independent expert to provide testimony. This, the only opportunity that Avid

1

Telecom, Stacey Reeves, and I have to present expert testimony in this case, is for me to do so.

I believe that a good cause exists for my hybrid expert testimony to be allowed. As evidenced in my attached resume, I have spent more than two decades in the telecom industry. I am intimately familiar with all aspects of the telecom business, including every substantive issue presented in the Rudolph Expert Report. The difference is that I have actually lived these issues day-to-day for several decades, and I do not need to support my testimony with the myriad generic industry wide assumptions that are found throughout the Rudolph Expert Testimony. Unlike the Rudolph Expert Report, which relies totally on *secret and undisclosed computer programs and software, presented by a witness with zero real world operating experience*, my testimony presents the court with a fully disclosed, facts-on-the-ground explanation of the industry that is essential to a proper understanding of this case. My opinions are rooted in real-time observations and day-to-day involvement, rather than simply reviewing highly selective and unverified generic information generated from sources of uncertain reliability solely for the purpose of this litigation. Indeed, every data point relied upon by Rudolph comes from a carrier that has, itself, engaged in the very same allegedly willful and illegal conduct that Plaintiffs allege against Defendants and, thus, those data are inherently suspect. In contrast, it is well understood that testimony presented by persons with direct personal knowledge provides a more accurate and nuanced account than that given

by retained experts who are brought in solely for litigation and who have a direct financial interest in maximizing the scale of illegal robocalling.[1]

My expert report is divided into two sections. The first section contains the factual portion of the report and is not presented as expert testimony. The second section contains my expert opinions, based on my personal knowledge and decades of experience in the telecommunications industry as the CEO of Avid Telecom.

Attached as Exhibit I to this Report is a Declaration setting forth facts evidencing my personal knowledge of the facts presented herein, as well as a resume describing my decades of experience in the telecom industry and my specific experience with Avid Telecom's business and operations.

<u>Discussion of Material Facts</u>

Robocalling is generally defined as the placement of a phone call that uses a computerized autodialer to deliver a pre-recorded message. Although the term "robocalling" has become pejorative, the fact is that not all robocalls are illegal. Indeed, a call is only an illegal robocall in the limited circumstances when it is placed using a computerized autodialer **and** the message is prerecorded (*i.e.,* not delivered via a live human voice). Calls that do not meet **both** criteria are legal and even where the call is placed using a computerized autodialer **and** the message is prerecorded, a

---

[1] The Description provided on the website of YouMail, which literally points out the marketability approach dependent on the existence of the robocalling issue: "Our intelligent call blocking system filters out spam, robocalls, and telemarketers, allowing you to enjoy uninterrupted communication with the people who matter most. Reclaim your peace of mind and take back control of your phone with YouMail's powerful spam call protection. https://www.youmail.com/home/why-youmail.

robocall is entirely legal if it comes from a caller who is exempted from an applicable telemarketing statute (for example, a political campaign to a landline telephone) or where the party receiving the call has agreed in advance to receive the call.

These customers, who represent a large percentage of robocall recipients, include persons who, for example, have opted-in to receive notifications from doctors, pharmacies, or delivery services, and parents opting into a school emergency notification service. As a result, carriers like Avid Telecom that transmit calls falling within one of these allowed categories are operating in an entirely legal and proper manner, without reference to the number of calls they transmit. Put another way, the mere fact that a carrier like Avid Telecom transmits a lot of calls is not evidence of illegal activity, as many robocalls are legal.

## **Avid Telecom's Full Compliance with All Applicable Regulatory Requirements**

During all times relevant to the Complaint, Avid Telecom has been fully compliant with all applicable regulatory requirements, including the following:[2]

> ➢ Avid Telecom only provides services to carriers that have all required authorizations from the FCC.

_____

[2] In addition to the specific procedures outlined below, for all new carrier customers, Avid Telecom requires: (i) that the carrier have a FCC 499 Filer ID; (i) that the carrier have a FCC Registration Number ("FRN"); (iii) Verified trade references from respected source; (iv) a STIR/SHAKEN compliance plan; (v) Verified bank references; (vi) confirmed federal tax ID; (vii) proof of federal FCC Universal Service Fund ("FUSF") compliance for the then-current year; and (viii) verification of a filed Robocall Mitigation Plan. A copy of Avid Telecom's Robocall Mitigation Plan is attached as Exhibit II hereto. Defendants request that the Court take judicial notice of the facts contained in Avid Telecom's Robocall Mitigation Plan as a governmental record.

➢ Avid Telecom has implemented all regulatorily required robocalling mitigation requirements (some well in advance of the required implementation date), including a comprehensive and fully compliant Robocall Mitigation Plan.

➢ Avid Telecom is in full compliance with the FCC's "STIR/SHAKEN" mandate.[3]

➢ Avid Telecom has implemented "Know Your Customer" procedures that are fully compliant with all applicable FCC regulations.

*Notably, neither the complaint nor the Rudolph Expert Report makes any mention of Avid Telecom's full compliance with all applicable regulatory requirements.*

**A. Avid Telecom's Robust Robocalling Mitigation Efforts.**

Avid Telecom has implemented all applicable robocalling mitigation requirements. Avid Telecom has filed a comprehensive, fully compliant Robocall Mitigation Plan with the FCC. That Plan includes a description of the automatic processes in place that block calls prior to hitting the routing engine in our switch. Among the essential elements of that Plan are the following:

• Avid Telecom blocks calls with an invalid caller ID

---

[3] STIR/SHAKEN are acronyms for the Secure Telephone Identity Revisited (STIR) and Signature-based Handling of Asserted Information Using toKENs (SHAKEN) standards. For a common carrier provider to be in complete STIR/SHAKEN compliance, all calls traveling through the common carrier provider's interconnected phone networks must have their caller ID "signed" as legitimate by originating carriers and validated by other carriers before reaching consumers. STIR/SHAKEN digitally validates the handoff of phone calls passing through the complex web of networks, allowing the phone company of the consumer receiving the call to verify that the call is in fact from the number displayed on Caller ID.

• Avid Telecom blocks calls with matching originating and terminating numbers

• Avid Telecom blocks calls from blacklisted media IP's (i.e., media IP's that are known to have been used for scams, such as government and corporate impersonation).
• Avid Telecom blocks calls from phone numbers that are known to be used for Spoofing.

• Avid Telecom blocks ANIs on a real-time basis that produce less than 5% ASR, 5 second or less ACD, and any number with greater than 60% short-duration calls (calls of 6 seconds or less).

• Avid Telecom blocks calls from wireless ANIs unless the customer is a wireless Carrier.

• Avid Telecom blocks calls that have been labeled as "almost certainly" spam by YouMail

• Avid Telecom blocks calls that are labeled as "scam" by YouMail

*Notably, neither complaint nor the Rudolph Expert Report makes any mention of Avid Telecom's aggressive robocalling mitigation efforts.*

**B. Avid Telecom's Rigorous Customer Requirements**.

Avid Telecom has implemented fully compliant "Know Your Customer" procedures. For all new customers, Avid requires the completion of a Customer Information Form. Avid Telecom's questions to its new customers include, among other things, verification of compliance with tracebacks, a description of their vetting process for new customers, and actions taken when fraudulent customers are found. All requested information in the document *must* be supplied and completed in order for Avid Telecom to do business with them.

Among other internal processes and procedures, Avid Telecom requires that all customers have:

- FCC 499 Filer ID

- FCC Registration Number ("FRN")

- Verified trade references from respected sources

- A Stir Shaken compliance plan

- Verified bank references

- Confirmed state of incorporation

- Confirmed federal tax ID

- A verified description of kind(s) of traffic that they will deliver
- Identified company responsible parties

- A signed Master Service Agreement (MSA) with Avid Telecom

- Proof of federal Universal Service Fund ("FUSF") compliance for the current year

- Verification of a filed Robocall Mitigation Plan

In addition to the above, applications from non-US carriers attempting to terminate traffic in the USA are denied unless they come from a known and respected international company. This practice is critical as many Attorneys General have acknowledged that most illegal robocalls originate overseas and that the focus of enforcement efforts should be directed to parties involved in foreign originated traffic.

*Notably, neither complaint nor the Rudolph Expert Report makes any mention of Avid Telecom's full compliance with Avid Telecom's aggressive compliance programs.*

7

B. Avid Telecom Has Never Been Found By Any State Or Federal
   <u>Authority To Have Engaged In, Aided Or Abetted Any Illegal Conduct</u>.

**1.  Avid Telecom Has Always Been Fully "STIR/SHAKEN" Compliant**.

STIR/SHAKEN compliance refers to adherence by telecom service providers to a regulatory framework mandated by the Federal Communications Commission (FCC) designed to combat illegal caller ID spoofing and robocalls on IP-based voice networks.

STIR (Secure Telephone Identity Revisited) is a technical protocol that uses digital certificates and cryptographic signatures (called PASSporTs) to authenticate the origin of phone calls. SHAKEN (Signature-based Handling of Asserted information using toKENs) specifies how STIR is implemented within carrier-grade IP networks, enabling service providers to sign and verify calls. The core idea is that when a call is made, the originating provider electronically signs the call with a digital token that asserts the caller's identity and the legitimacy of the caller ID. The terminating provider must then verify this token to confirm the call's authenticity. Calls are assigned attestation levels:

- A-level attestation means the caller is fully verified and authorized to use the phone number.

- B-level means the caller is known but not fully verified for number usage rights.

- C-level means the caller is not verified, and the call likely came through an intermediary or gateway.

Compliance requires voice service providers to both sign outbound calls and verify inbound calls. Verification involves decoding the digital signature, checking its authenticity with public certificates, and validating the data (caller number, time, etc.). Providers may then use this information to block or label calls as spam or fraud, though blocking is not mandated by the regulations. The overall goal is to increase trust in the telephone network by reducing fraudulent and spoofed calls, helping consumers avoid nuisance calls while assisting law enforcement in tracing illegal robocalls.

Unlike many telecom service providers—notably the one's attorneys general have chosen not to pursue—Avid Telecom upgraded its switching platform well in advance of the applicable deadline to comply with the Stir/Shaken mandate to accept and accurately transmit all Stir/Shaken data it receives in a call path.

*Notably, neither complaint nor the Rudolph Expert Report makes any mention of Avid Telecom's full compliance with the Stir/Shaken mandate.*

### 2. Avid Telecom Voluntarily Pays for Enhanced Monitoring Services.

Avid Telecom spent at least $400,000 each year to purchase enhanced switch data services from its switch provider that allow it to identify illegal calls and to terminate the providers of those calls. The only purpose of this expenditure is to allow Avid Telecom to better identify and block illegal calls. Avid Telecom *voluntarily* obtained and paid for these enhanced services, which are not required by law or regulation to process its calls.

### 3. Avid Telecom is Fully Regulatorily Compliant.

Avid Telecom has always been fully compliant in all aspects of its regulatory operations.

*Notably, neither complaint nor the Rudolph Expert Report makes mention of Avid Telecom's compliance with all then-applicable regulations.*

**D.** Telecom did not knowingly do business with any "bad actor" customer.

During the twelve-month period prior to the Complaint, Avid Telecom received only eighty-four (84) tracebacks from the Traceback Group out of a total of in excess of 8.5 billion completed calls (*e.g.,* a rate of 0.000001%). In each case, regardless of whether the tickets appeared to reflect illegal activity, Avid Telecom promptly investigated the issue, provided a complete response, and where there was a material number of tracebacks from a single customer, Avid promptly terminated its relationship with the customer.

**E. Avid Telecom Only Accepts Traffic from Carriers who have Represented and Warranted that they Fully Comply with all Applicable Robocalling Rules and Regulations**.

Avid Telecom requires all of the carriers from which it takes traffic to certify that all of their traffic is legal and that, where required, they have compliant opt-in documentation. Consistent with this requirement, Avid Telecom's Carrier Service Agreement provides as follows (bold all caps in original):

> **13.2 CUSTOMER REPRESENTS AND WARRANTS THAT IT IS PRESENTLY FULLY COMPLIANT—AND THAT IT WILL REMAIN FULLY COMPLIANT THROUGHOUT THE TERM— WITH ALL STATE AND FEDERAL LAWS AND REGULATIONS, INCLUDING WITHOUT LIMITATION ALL**

**LAWS AND REGULATIONS REGARDING THE ESTABLISHMENT AND MAINTENANCE OF THE CORPORATE FORM, ALL STATE AND LOCAL LAWS AND REGULATIONS REGARDING THE ACQUSITION OF BUSINESS LICENSES, ALL LAWS AND REGULATIONS GOVERNING THE CUSTOMER'S OPERATIONS, INCLUDING WITHOUT LIMITATION, FCC 499 FILING AND UNIVERSAL SERVICE FUND PAYMENT REQUIREMENTS, AS WELL AS ALL STATE OR FEDERAL MARKETING, TELEMARKETING, ROBOCALLING LAWS AND REGULATIONS SUCH AS STIR SHAKEN, "KNOW YOUR CUSTOMER" AND ROBOCALLING PLANS. WITH RESPECT TO STATE AND FEDERAL LAWS AND REGULATIONS, CUSTOMER SPECIFICALLY REPRESENTS AND WARRANTS THAT IT WILL NOT KNOWINGLY DELIVER TO AVID ANY CALLS THAT IT KNOWS OR REASONABLY SHOULD KNOW, VIOLATE ANY STATE OR FEDERAL LAW OR REGULATION RELATING TO MARKETING, TELEMARKETING, ROBOCALLING AND THAT IF IT BECOMES AWARE THAT IT HAS DELIVERED SUCH CALLS TO AVID, IT WILL IMMEDIATELY INFORM AVID, IDENTIFYING ALL SUCH CALLS WITH SPECIFICITY AND IT WILL TAKE ALL AVAILABLE MEASURES TO IMMEDIATELY CEASE AND TO DESIST FROM THE DELIVERY OF ALL SUCH CALLS.**

**F. Avid Telecom denied over Ninety Percent (90%) of Requests for Service**.

Avid Telecom rejected more than ninety percent (90%) of the service requests that it receives, based upon information and/or suspicions regarding the legality of the traffic at issue.

**G. Avid Terminated Carrier, where it received a Material Number of "Traceback Tickets"**.

Contrary to the allegations in the complaint, Avid Telecom terminated carriers where it has received a material number of traceback "tickets".

**H. Avid Telecom is Never an Originating Carrier and Has No Way of Knowing the Originating Customer or the Content of the Call**.

Avid Telecom never had a direct relationship with the person or company on whose behalf the call is placed. All calls are originated by another carrier or call center. In all instances, the called number and the content of the call are determined exclusively by the calling party; Avid Telecom never has any role in selecting the originating customer or the knowing about content of any call, the number to which any calls will be directed, the authorization of the underlying customer to place those calls or the underlying business purpose (*e.g.,* notification that a prescription is ready). As a result, Avid Telecom has no knowledge of any of the factors that could make a robocall illegal, and no way to determine in real time if any specific call or any group of calls is/are illegal.

## III. The Industry Traceback Group Has Limited Authority

### A. The Issuance of a Traceback By the Traceback Group is Not Evidence of Illegal Activity.

The Industry Traceback Group's role is merely to investigate— "trace"-the flow of calls that are suspected illegal robocalls from their point of origination. Indeed, as Industry Traceback Group has repeatedly acknowledged in its quarterly reports, its reporting on tracebacks ". . .. does not constitute a finding of illegal activity… This report in itself is not determinative as to whether the calls . . . are illegal, or as to whether the parties identified in Attachment 1 have violated federal statutes or the Commission's rules or engaged in any unlawful conduct." No state or federal regulatory authority or law enforcement agency has ever found, following an evidentiary proceeding, that even a single call placed by Avid Telecom was illegal.

Thus, it is not surprising that, in his expert Report, Mr. Bercu confirms that the Industry Traceback Group does not have the authority to determine whether a robocall is "illegal", that the issuance of traceback is merely a "determination that a call meets the criteria for suspicious traffic", or whether a service provider that has received a traceback has "legal liability" for that call.  Bercu Expert Report at 20-21.

The authority to enforce robocalling rules resides exclusively with the FCC Enforcement Bureau, not with the Industry Traceback Group. To the extent that the complaint assumes that tracebacks reflect illegal robocalls, that assumption is simply wrong. As traceback are merely requests for tracking information and not a finding of illegality provided under law, any suggestion that the mere issuance of a traceback is an indication of illegal robocalling is also in error.

The data relating to Avid Telecom's traffic clearly evidences that the overwhelming majority of the tracebacks "tickets" Avid Telecom has received are for lawful calls. As such, any conclusion about Avid Telecom's involvement in illegal robocalling activity cannot be based on the issuance of tracebacks; this position is both legally unsustainable—as tracebacks do not reflect evidence of illegal activity—and demonstrably inconsistent with the data, which shows that most of the tracebacks were associated with lawful calls.

**B. The Industry Traceback Group Has Consistently Refused to Engage with Avid Telecom Regarding the Meaning and Treatment of Traceback "Tickets"**.

Not only has the Industry Traceback Group materially exceeded its authority by pretending that it has the authority to determine the legal status of a robocall, but

it has also been intentionally evasive in response to direct requests for assistance from

Avid Telecom regarding multiple traceback "tickets". The following exchange is

representative Avid Telecom's efforts to work with the Industry Traceback Group to

address its concerns:

> **From:** Jessica Thompson <jthompson@ustelecom.org>
> **Sent:** Friday, March 4, 2022, 6:25 AM
> **To:** Stacey Reeves <reeves@avid-telecom.com>
> **Cc:** Michael Lansky <lansky@avid-telecom.com>
> **Subject:** RE: Tracebacks - DMS
>
> How we should move forward with addressing DMS's concerns. We
> typically do not reach out to the callers, in this case, DMS is the caller.
> We also want to make sure [we] provide you, the originating provider
> with the necessary information as to why we are tracing these particular
> calls and what makes them illegal.
>
> **From:** Stacey Reeves <reeves@avid-telecom.com>
> **Sent:** Friday, March 4, 2022, 9:23 AM
> **To:** Jessica Thompson <jthompson@ustelecom.org>
> **Cc:** Michael Lansky <lansky@avid-telecom.com>
> **Subject:** RE: Tracebacks - DMS
>
> Jessica,
> Can you clarify what the situation is? We are trying to get everyone on
> the same page so that there is an understanding of their process and the
> validity of their traffic.
>
> Regards,
> Stacey Reeves
> Vice President of Operations and Sales
> Office: 520-395-9473
> Cell: 601-447-3530
> www.avid-telecom.com
> 8729 East Sunrise Drive, #209
> Tucson, AZ 85718
>
> **From:** Jessica Thompson <jthompson@ustelecom.org>
> **Sent:** Friday, March 4, 2022, 9:08 AM
> **To:** Stacey Reeves <reeves@avid-telecom.com>

14

**Subject:** RE: Tracebacks - DMS

Hi Stacey – We are having some internal discussions regarding this situation. We will reach out to you or DMS when we have an update.

Jessica Thompson
Director, Policy & ITG/Traceback Operations
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448

**From:** Stacey Reeves <reeves@avid-telecom.com>
**Sent:** Tuesday, February 15, 2022, 1:35 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>
**Cc:** 'Lucy Rodriguez | DMS' <lrodriguez@dmsgroup.com>; 'Robert Pulsipher | DMS'
<rpulsipher@dmsgroup.com>; Evan King | DMS
<eking@dmsgroup.com>; Michael Lansky <lansky@avid-telecom.com>
**Subject:** Tracebacks -

Jessica,

As discussed, the DMS team would like to set up a call with you to introduce themselves and to discuss the tracebacks from last week. I have included the following members of the DMS team on copy of this email - Robert Pulsipher, SVP of Operations, Lucy Rodriguez, Compliance and Data Manager, and Evan King, DMS Regulatory Attorney. In order to facilitate the call, I have also attached DMS's responses to the tracebacks which include the consent details and a description of the campaign. This information has also been added to the traceback portal. Please let me know if you have additional questions for Avid, but to clarify, Lucy will be the contact for coordinating the date/time of the call.

Regards,
Stacey Reeves
Vice President of Operations and Sales
Office: 520-395-9473
Cell: 601-447-3530
www.avid-telecom.com
8729 East Sunrise Drive, #209
Tucson, AZ 85718

Examples of the extraordinary efforts undertaken by Avid Telecom to be transparent and responsive to tracebacks abound.  I am advised that, in this instance, ITG never agreed to speak with DMS to clarify ITG's concerns or explain how those concerns could be resolved. Indeed, it took more than a year for ITG to *first* explain the basis of its concerns.

**C. The Industry Traceback Group Is Not an Independent Organization With Trustworthy "Opinions" on the Legality of Robocalls**.

The Traced Act mandates that the Industry Traceback Group be an independent organization, but it is apparently nothing of the kind. Many of the members of the Industry Traceback Group are direct competitors of the carriers, like Avid Telecom, to whom they regularly issue tracebacks. On information and belief, when tracebacks are issued, it is not uncommon that only some of the carriers in a call string receive them, and the excluded carriers are often members of the Industry Traceback Group.

Further, Avid Telecom and many other smaller carriers are routinely denied membership in USTelecom (allegedly because they have too many tracebacks). Many of the members of the Industry Traceback Group have far more traceback "tickets" than those denied membership. As the complaint against Avid Telecom relies substantially on traceback "tickets" for its claim of "facilitating" and "aiding and abetting," the transparently flawed, seemingly biased, and self-serving manner in which the "tickets" are issued is at the core of Avid Telecom's defense.

**IV. The Complaint is Rife With False and Unprovable Allegations of Fact**

16

**A. Much of the Data On Which the Complaint Relies May Have Been Obtained Illegally**.

On information and belief, much of the data on which the complaint and the Rudolph Expert rely was provided by third parties who appear to have obtained it illegally and/or through improper means. For example, Avid Telecom is aware that many of the transcripts of calls that have been provided to the Attorneys General and are cited in the complaint were obtained through the illegal recording of calls in states that require two party consent, and such consent was not received.

Second, the Rudolph Expert Reports contains no discussion of any actions undertaken to verify the source of any of the data.

Third, many of the calls were associated with recorded AI systems that answer calls with a recorded message that prevents the calling party from completing its disclosure, thereby intentionally causing the alleged illegality that they report to third parties. Fourth, many of the "honeypots" that are used to capture alleged illegal robocalls and are listed on the "Do Not Call List"—which is reserved for residential telephone numbers—are in fact "owned" by a business. This deceptive practice is relevant as calls to this number are also reported as violating the Do Not Call List. As those calls were, in fact, made to a number that does not qualify to be on that list, the delivery of those calls cannot be in violation of Do Not Call laws and regulations. Thus, to the extent that the complaint relies on violations of the Do Not Call List laws and regulations, that reliance is misplaced. Fifth, much of the data that is used in support of claims of illegal robocalling has apparently been scraped from the

17

voicemails of unsuspecting consumers and handed to third parties who have an economic interest in pursuing claims against Avid Telecom and other carriers. This data scraping potentially violates the terms of use of the customers whose voicemails have been scraped, as well as state and federal laws. Each of these issues is, of course, relevant to the admissibility of portions of the Rudolph Expert Report and any associated documents and data.

**B.  Many of the Compliance Failures Alleged in the Complaint are Associated with Rules, Regulations, and/or Tools That Did Not Exist at the Time of the Alleged Failure.**

During the relevant time period, the applicable rules and regulations included uncertainties regarding a carrier's legal right to block calls. Nonetheless, in an abundance of caution, Avid Telecom blocked all wireless originations out of concern that some of those calls could be illegal. Once available technology and tools allowed for the blocking of numbers, including calls with invalid originating numbers or the same originating and terminating numbers, Avid Telecom promptly implemented those tools and technologies as the associated calls were more likely to be illegal.

**C. The Complaint Contains Numerous Material Allegations that are Either Unsupported, Misleading, or Demonstrably False**

**1.  The False Allegation that Avid Telecom has Never Blocked a Call**.

This allegation is demonstrably false. The AGs did not approach Avid Telecom for its call blocking data. The only other party with access to these data would be Avid Telecom's switch provider.

On information and belief, these data were not provided to the AGs by Avid Telecom's switch provider. Had such data been requested or obtained, it would have shown that every year Avid Telecom blocks huge numbers of suspected illegal calls. For example, in 2022, the number of calls that Avid Telecom blocked was in excess of 2.3 billion. Given the massive number of blocked calls, it is difficult to understand how the allegation that Avid Telecom does not block illegal calls could have been made in good faith.

**2. The False Allegation that Avid Telecom does not Respond to Tracebacks.**

This allegation—which is not supported by any facts or evidence—is demonstrably false. In fact, based on the data available to me, it appears that Avid Telecom has timely and properly responded to ***each and every*** traceback that it has received. The email trail below is an exchange regarding tracebacks and is representative of the many such engagements between Avid Telecom and the Industry Traceback Group:

> **From:** Jessica Thompson <jthompson@ustelecom.org>
> **Sent:** Monday, February 14, 2022, 3:20 PM
> **To:** Michael Lansky <lansky@avid-telecom.com>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
> **Subject:** RE: Traceback Request for Traceback #8069 – Information
> Thank you
>
> **From:** Michael Lansky <lansky@avid-telecom.com>
> **Sent:** Monday, February 14, 2022, 2:15 PM
> **To:** Jessica Thompson <jthompson@ustelecom.org>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
> **Subject:** RE: Traceback Request for Traceback #8069 – Information

Good afternoon Jessica,

Sorry I missed this email on Friday- they are called Digital Media Services, and I believe Stacey will work with them to make the introduction and call.

Thanks again,

Michael Lansky
800-799-4415 ext. 101
520-395-9471 direct
520-370-1514 cell
www.avid-telecom.com

**From:** Jessica Thompson <jthompson@ustelecom.org>
**Sent:** Friday, February 11, 2022, 1:36 PM
**To:** Michael Lansky <lansky@avid-telecom.com>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>

**Subject:** RE: Traceback Request for Traceback #8069 – Information

Hi Michael –

What's the company's name? This way we know who to look out for?

Jessica Thompson
Director, Policy & ITG/Traceback Operations
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448


**From:** Michael Lansky <lansky@avid-telecom.com>
**Sent:** Friday, February 11, 2022, 3:23
**To:** Jessica Thompson <jthompson@ustelecom.org>; Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Good afternoon, Jessica,

Thank you for getting back to us so quickly- it's much appreciated on our end. We

understand and know this customers traffic pretty well and often have conversations as to how they can ensure that they operate in total compliance. I have suggested to them that they reach out to you and your team to start communications with USTA. They are a large publicly traded company that do marketing for many fortune 500 companies and are always wanting to ensure that they are doing things correctly. I believe they will be reaching out to you next week to see if they can arrange a call to create a better direct relationship.

Thanks again and have a wonderful weekend.

Michael Lansky
800-799-4415 ext. 101
520-395-9471 direct
520-370-1514 cell
www.avid-telecom.com

**From:** Jessica Thompson <jthompson@ustelecom.org>
**Sent:** Friday, February 11, 2022, 12:34 PM
**To:** Stacey Reeves <reeves@avid-telecom.com>; Warren Currie <wcurrie@ustelecom.org>
**Cc:** Michael Lansky <lansky@avid-telecom.com>
**Subject:** RE: Traceback Request for Traceback #8069 – Information

Hi Stacey –

We believe these are deceptive telemarketing robocalls promoting a product or service that may not be of any value. The consent or opt in information may be obtained without being aware or not at all. We are tracing these specific types of calls to identify the originator and hope they can confirm whether or not they have consent and provide evidence. Last year, the FCC issued the largest fine in its history – $225 million – against Texas- based telemarketers for transmitting approximately 1 billion robocalls, many of them illegally spoofed, to sell short-term, limited duration health insurance plans. The robocalls falsely claimed to offer plans from well-known health insurance companies such as Blue Cross Blue Shield (BCBS) and Cigna.

Jessica Thompson
Director, Policy & ITG/Traceback Operations
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
O: 202-326-7273 | M: 240-355-1448

**From:** Stacey Reeves <reeves@avid-telecom.com>
**Sent:** Friday, February 11, 2022, 2:15 PM
**To:** Jessica Thompson <jthompson@ustelecom.org>; Warren Currie <wcurrie@ustelecom.org>
**Cc:** Michael Lansky <lansky@avid-telecom.com>
**Subject:** FW: Traceback Request for Traceback #8069 – Information

Jessica,

We received two tracebacks today (8070 and 7069) for which we need to consult with our customer in regard to action they may need to take. However, based on the information provided in the traceback, I'm not clear exactly what the issue is. In the attached recording, they give their company name and a call back number, and based on our knowledge of our customer, calls are made using opt-ins. The only information in the traceback is "Calls referencing Consumer Council regarding recipients' health insurance. Various toll-free numbers provided for call back".

Thanks in advance for your assistance.

Regards,

Stacey Reeves
Vice President of Operations and Sales
Office: 520-395-9473
Cell: 601-447-3530
www.avid-telecom.com

**From:** Traceback Notice <traceback-notice@tracebacks.org>
**Sent:** Friday, February 11, 2022, 1:36 PM
**To:** Stacey Reeves <reeves@avid-telecom.com>
**Subject:** Traceback Request for Traceback #8069
**INDUSTRY TRACEBACK GROUP**

Dear Voice Service Provider:
As part of traceback conducted by the Industry Traceback Group, your network has been identified in the call path for voice traffic that has been deemed suspicious and potentially illegal. Consistent with U.S. federal law and regulations, the ITG requests that you identify the source of this suspected fraudulent, abusive or unlawful network traffic.

***We appreciate your past cooperation with the Industry Traceback Group, the official U.S. Federal Communications Commission-designated traceback***

22

***consortium.*** Consistent with the FCC's requirement the voice service providers must cooperate with traceback requests, we would appreciate a response to this traceback inquiry in three business days or sooner. ***(Emphasis added)***

As the substance of this email trail reflects, Avid Telecom was completely responsive to the traceback. Avid Telecom has maintained a positive relationship with ITG in the traceback process, routinely responding in good faith to tracebacks. As this email and similar data regarding Avid Telecom's response rate is available in the Industry Traceback Group database, or could have been obtained from Avid Telecom, it is difficult for Avid Telecom to understand how the Attorneys General could have pled that Avid Telecom did not respond in good faith. Apparently, it is evident that the drafters of the Complaint made this argument without checking.

## C. False and Misleading Allegations Regarding Social Security and Other Calls.

In paragraph 19 of the complaint, the Attorneys General allege: Every day, millions of American consumers receive a barrage of unwanted robocalls that are harassing, annoying, threatening, and malicious. Some consumers are told that their "Social Security Number has been used for some kind of fraudulent activity in the South Border of Texas." Sometimes, the message states the "SSA department is filing a lawsuit against you. An arrest warrant has been released on your name." Other calls purport to be from Amazon, luring the call recipient into a scam. These calls are all scams designed to scare and harm consumers. Other robocalls may not be scams but are harassing, abusive, and illegal, nonetheless. (footnotes omitted)

The implication of this paragraph is that Avid Telecom is aware at the time of transmission that a call is illegal. This implication is false. Avid Telecom is never the originating carrier for any of these calls at issue in the Complaint. All of them arrived on the Avid Telecom network from a previous service provider. Avid Telecom had no reason to know that these calls were suspicious prior to its receipt of a traceback, and Avid Telecom had no reason to know that they were illegal.

## H. Examples of False or Misleading Allegations Regarding the Meaning of Tracebacks

In paragraph 22 of the Complaint, the Attorneys General allege:

> Avid Telecom received more than 329 Traceback notifications from the USTelecom-led Industry Traceback Group ("ITG"). These notifications put Defendants on notice that Avid Telecom was transmitting illegal robocalls."

In fact, as noted previously, and as The Industry Traceback Group has repeatedly acknowledged, Tracebacks are ***not*** notifications of illegal robocalls. Tracebacks are investigative requests. In response, carriers are only required to investigate the call and respond with the originating customer information. Avid Telecom met each of these requirements in all cases.

Moreover, as a practical matter, even assuming *arguendo* that these calls were illegal (an unsupported conclusion), they would reflect 0.00000000658 percent of Avid Telecom's total traffic during the relevant period. The tiny percentage that these 329 tracebacks constitute—rather than creating notice of a problem as the complaint suggests, actually demonstrates the extraordinary effectiveness of Avid Telecom's

robocalling mitigation and that the claim that Avid Telecom transmitted millions of illegal robocalls is baseless and facially absurd.

## I. Example of a Misleading Allegation Regarding the Use of Call Detail Records

In paragraph 24, the Attorneys General Allege:

> Even if Defendants had not been specifically informed at least 329 times by the ITG that Avid Telecom was carrying illegal robocall traffic, they knew or should have known that Avid Telecom was assisting and facilitating telemarketers or sellers transmitting illegal robocalls based on its call detail records, which are business records that are automatically generated by every telecom provider when a call is originated or transmitted and are kept in order to bill for the service of originating or transmitting each call across the provider's network.

This allegation reflects a misunderstanding of how call detail records are created and used. First, because tracebacks do not reflect a finding of illegality, it is false and misleading to allege that Avid Telecom was informed at least 329 times by the ITG that it was carrying illegal robocall traffic. This was simply not the case. In fact, the FCC has never found that any of the calls Avid Telecom transmitted were illegal and while it is true that call detail records are "business records that are automatically generated by every telecom provider when a call is originated or transmitted and are kept in order to bill for the service of originating or transmitting each call across the provider's network," the automatic creation of real-time billing records is not equated with knowledge of whether the call was an illegal robocall. Nothing in those data would assist with such a determination of providing knowledge of the calls being Illegal as per the law. The CDR provides no information about whether the call was using any automatic telephone dialling system or an artificial or

prerecorded voice without prior consent, which is required for the robocall to be considered Illegal.

**J. Example of False Allegation Regarding the Origination of Avid Telecom Traffic.**

In paragraph 29 of the complaint, the Attorneys General allege: "Defendants and their customers made or initiated calls to both residential and cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express consent of the called parties." This allegation is demonstrably false as it relates to Avid Telecom because Avid Telecom never makes or initiates calls. Indeed, Avid Telecom lacks the outbound switching ability required to initiate a call. As a result, Avid Telecom never has a direct relationship with the customer on whose behalf the calls are made.

**K. Example of False Allegation that Avid Telecom Facilitated the Transmission of Robocall Campaigns Contained False or Misleading Information**

As an initial matter, Avid Telecom has no knowledge or involvement in the creation of the message contained in any call that it transits, including whether that content is legal or illegal. Avid Telecom has no knowledge of which, if any, called parties have opted in or otherwise given permission to the calling party to receive the call. As such, Avid Telecom cannot be liable for "facilitating" the transmission of illegal robocalls.

It is not credible to suggest that the fact that Avid Telecom received 329 tracebacks on the billions of calls that it transmitted somehow placed Avid Telecom

on notice that every call in every campaign that it was handling was illegal. Indeed, it did just the opposite; it showed that only a minuscule percentage of Avid Telecom's calls were even the subject of inquiry and when *none* of those inquiries ever even led to an investigation by the FCC, Avid Telecom's rightful belief was that its efforts to prevent illegal robocalling were working well.

## L. There is No Factual Basis for the Demonstrably False Claims of Spoofing

Spoofing involves the use of a number to initiate and document a call that is not owned by the calling party. This claim misperceives how Avid Telecom operates. To be clear, whether Avid Telecom is the first carrier in line or not, it *never* selects or determines the telephone number shown on the called party's Caller ID. Avid Telecom cannot engage in spoofing because all numbers used are owned by the customer. The number used by the customer to initiate an outbound call is selected by the call center or third party originating the call, and that number simply passes intact to the next carrier in the string. Where required, Avid Telecom "attestates" that call exactly as required in the Stir/Shake protocol. Avid Telecom does not initiate any "neighbor" spoofing and/or "snowshoe" spoofing.

With the technologies presently in place, Avid has the ability to block (and does block) any call that is not Stir/Shaken compliant and any call from an originating number on the SOMOS Do Not Originate ("DNO") list. Where Avid Telecom is not the first carrier in line, any carrier sending calls with a spoofed number is either immediately terminated or given the opportunity to remove the traffic from Avid Telecom's network.

**M. Avid Telecom's Rapid Acquisition of DIDs is Routine**

In paragraph 11 of the Complaint, the AGs allege that "in a January 28, 2022, email to Call48, Reeves wrote: 'Please understand, the very thing that sets Avid apart from its competitors for DID business is the fact that Avid can fill orders within 2-3 days as opposed to 5- 7.'" I understand this to be an accurate statement. *The process for acquiring numbers is the same for all carriers*. Due to the experience and ability of the company, at the time this statement was made, Avid Telecom was in a position to manage the process of acquiring DIDs quickly through an Application Programming Interface ("API") in which the order file is uploaded to the number database and the system returns results within a few hours. To my knowledge, there is nothing unlawful or nefarious about this process.

Paragraph 12 of the Complaint implies that there is something suspicious about the fact that in January 2022 Avid Telecom had 865,683 DIDs assigned by Call48 and that on February 1, 2022, Avid Telecom returned over 400,000 DIDs to Call48. There is also nothing suspicious about this fact, if true. On average, Avid Telecom customers, including the customer at issue here, hold their DIDs for well over the ninety-day requirement. In this instance, the 400,000 DIDs were returned because Avid Telecom terminated the customer—ironically, I understand out of a concern that the traffic level could be problematic.

In paragraph 68, the AGs make an unsupported companion allegation that Avid Telecom customers regularly rotate their DIDs and that this is often indicative of callers who do not want to be identified. However, I am aware of no facts in the

Complaint that support the conclusion that Avid Telecom's customers regularly rotate their DIDs. The reality is that a majority of Avid Telecom's DIDs are held for over a year—well in excess of the 90-day minimum requirement.

## N. Issues Relating to DMS Opt-Ins

As set forth in Section II.E. above, Avid Telecom required its customers to represent and warrant that all of the traffic it delivered to Avid Telecom was fully compliant with all applicable rules and regulations associated with robocalls. With specific respect to DMS—which comprises the majority of Avid Telecom's traffic—Avid Telecom was repeatedly and specifically assured throughout its relationship that all of the traffic it delivered to Avid Telecom was lawful and, where necessary, had fully legitimate opt-ins. As DMS is a publicly traded company with a substantial legal and compliance department, Avid Telecom relied on the continuing representations and warranties that were provided.

I am not aware of any language in the applicable FCC rules, regulations, or any associated statutes that can be interpreted to require Avid Telecom to vet the representations that it receives from its customers.

Further, during the relevant time period, the FCC's rules and regulations regarding the opt-in process—including the duration of an opt-in and how opt-ins may be acquired—were widely understood, both in the industry and the regulatory community, to be vague and ambiguous. Indeed, the fact of the uncertainty was made clear again when, in 2023, a coalition of 28 State Attorneys General asked the FCC to clarify these rules, stating,

"We urge the FCC to clarify the rules and protect Marylanders' ability to choose who gets to contact them and how." In this context, the allegations of the complaint that Avid Telecom is somehow liable for knowingly accepting improper opt-ins that it received and accepted in good faith from a publicly traded company cannot withstand scrutiny.

## O. False Statements Regarding Avid Telecom's Sales Activities.

### 1. Avid Telecom Sold Data in the Form of Call Recipient Phone Numbers to Customers to use as "Leads" in Telemarketing Campaigns

The AGs make this allegation in paragraph 41. First, it is my understanding that there would be nothing illegal about selling these data for telemarketing campaigns. Second, and more importantly, *Avid Telecom never sold any such data at any time or in any form.*

### 2. Avid Telecom Held Itself Out as a Provider of Predictive Dialer, Voice Broadcasting, List Management, and Agent Management Software

The AGs make this allegation in paragraph 66. Again, it is my understanding that there is nothing illegal about selling these data for telemarketing campaigns. This service was offered to Avid Telecom by a third party, and the reference was improperly added to the website by its independent website manager. In fact, I am advised that *Avid Telecom never planned to sell, nor did it sell any such software at any time or in any form.*

### 3. Avid Telecom Held Itself Out as a Provider of Call Data Advertising

The AGs make this allegation in paragraph 70 of the complaint. As an initial matter, it is my understanding that call data advertising is not illegal, and the mere fact that Avid Telecom could have provided call data advertising is not evidence of wrongdoing. In actuality, again, I am advised that Avid Telecom never provided any

consulting with respect to illegal robocalling practices, and the Complaint does not offer any facts to the contrary. In point of fact, *Avid Telecom never sold any such advertising at any time or in any form*.

### 4. Defendants Provide Robocall Consulting Services

The AGs make this allegation in paragraph 42 of the Complaint. Again, to my knowledge, all robocalling is not illegal, and thus, the mere fact that Avid Telecom could have provided consulting is not evidence of wrongdoing. In fact, to the extent that Avid Telecom provided any such consulting, I am told that it was directed to best practices by carriers in responding properly to tracebacks. I find no facts in the Complaint that support the conclusion that Avid Telecom provided consulting with respect to any illegal robocalling practice.

**5. *Avid Telecom Participated in Social Security Administration Scams,
Medicare Scams, Auto Warranty Scams, Amazon Scams, DirecTV Scams,
and Credit Card Interest Rate Reduction Scams.***

These allegations, found in paragraphs 74-85 of the Complaint. As Avid
Telecom's tracebacks evidence, where Avid Telecom is the intermediate carrier, it is,
on average, the fifth caller in line. As an intermediate carrier, Avid Telecom receives
these calls from third party carriers. It has no visibility to the originating party, the
technology used to originate the call (*e.g.,* a predictive dialer), or whether the call
utilizes a recorded voice or to what, if any product or service is being offered.  Avid
Telecom utilizes state-of-the-art third-party switch and mitigation software to block
any suspicious calls in real time. As Avid Telecom is so far removed from the
originating source, Avid has to rely on technology and information after the fact to
remove that traffic. Avid Telecom has routinely terminated carriers who are
associated with repeat traceback requests.

**P. Misleading Allegations Regarding Avid Telecom's Continued Relationships
with Accused Illegal Robocallers**

1.     Plaintiffs allege in paragraph 110 of the Complaint that:

The FCC has sent Robocall Cease-and-Desist Letters to the following
Avid Telecom customers from whom Avid Telecom accepted and routed
illegal robocalls: a. Airespring; b. Great Choice Telecom; c. Icon Global;
d. Mobi Telecom; e. Third Rock; f. Yodel Tech; and g. Urth Access.

These allegations, like many similar ones, fails to note that ***Avid Telecom had
already terminated each of these carriers*** based on information gathered from its
own operating practices prior to or immediately upon the issuance of the cease-and-

desist letters. To blame Avid Telecom for a relationship with a problematic carrier before the responsible authorities, with access to vastly greater data, provided notice of illegal robocall seems to me to be unjust. Prior to voluntarily terminating each of them, Avid Telecom engaged with these carriers based on their specific and continuing authorization to operate through an FCC granted 499.

2. Plaintiffs allege in paragraph 117 of the Complaint that:

On July 7, 2022, the FCC and the State of Ohio took simultaneous enforcement actions against a massive auto warranty robocall operation run through a common enterprise involving numerous individuals and business entities including but not limited to, Sumco Panama SA, Sumco Panama USA, Virtual Telecom Kft, Virtual Telecom Inc., Davis Telecom Inc., Geist Telecom LLC, Fugle Telecom LLC, Tech Direct LLC, Mobi Telecom LLC— another of Avid Telecom's customers—and Posting Express Inc.

This allegation fails to note both that Mobi Telecom was the only one of the named entities that was ever a customer of Avid Telecom, and that Avid suspended Mobi Telecom on July 8, 2022, the day after public notice of the enforcement action. Again, to blame Avid Telecom for not terminating their relationship with Mobi Telecom before the responsible authorities, with access to vastly greater data, provided notice of illegal activities again seems to me to be unjust. At the time, Avid Telecom engaged with these carriers based on their specific authorization to operate through an FCC granted 499.

3. Plaintiffs allege in paragraph 125 of the Complaint that:

***On December 8, 2022, the FCC ordered VoIP service providers, including Avid Telecom, to block student loan robocalls coming from Urth Access.***

This allegation fails to note that Avid Telecom closed the Urth Access account **nearly a month prior** to the issuance of the referenced FCC order. It did so based on an investigation it undertook, voluntarily and of its own accord, based on information available through the traceback process. As with the previous carriers, at the time that Avid Telecom engaged with Urth Access, it did so based on the specific authorization Urth Access had received to operate through an FCC granted 499.

**Q. False Allegations Regarding Call Blocking and New Customers**

4. Plaintiffs allege in paragraph *434 and 436* of the Complaint that:

Defendants did not choose to regularly block calls from telephone numbers that the FCC has authorized to be blocked.

First, as the language of the applicable regulations provides, carriers are not mandated to block calls; they are simply authorized to do so. The failure to block calls in and of itself is not actionable. Yet the data shows that Avid Telecom did take available measures to block traffic that it had reason to believe was Illegal, blocking billions and billions of calls, including nearly 2.3 billion calls in 2022. Avid Telecom blocked calls in Category A using the SOMOS DNO list. Blocking of category B traffic was an active feature on Avid Telecom's switch. Avid has also blocked originations from all known wireless numbers.

5. Plaintiffs allege in paragraph 437 of the Complaint that:

Defendants violated 47 C.F.R. § 64.1200(n)(3) by failing to take effective measures to prevent new and renewing customers from using its network to originate illegal calls.

This allegation is contrary to the evidence that I have seen. First, Avid Telecom has taken on very few new customers since 2021. Avid Telecom follows the detailed guidelines listed in Avid Telecom's Robocall Mitigation Plan and its Know-Your Customer Procedures, and does not allow customer origination from any IPs outside the USA. During the testing process that all new customers must undertake, Avid Telecom closely monitors traffic and manually dials ANIs being used for calls. If ANIs are found to be invalid, the customer is immediately terminated. As to existing carrier customers, Avid Telecom uses its Robocall Mitigation Plan, it's Know-Your Customer Procedures, and feedback from complaints and tracebacks.

6. Plaintiffs allege in paragraph 437 of the Complaint that:

Avid Telecom's equipment or services were used for more than the transportation, handling, or retransmitting of calls.

This allegation is not supported by any facts. Avid Telecom's equipment is only capable of transmitting calls. It is not capable of changing any portion of the call, including the called number or the Caller ID entered by the initiating customer. Avid Telecom merely transmits the call data that it receives from the originating party or the previous carrier to the next carrier in line. Avid Telecom is never the originating party or the terminating carrier.

## Initial Expert Opinion

The following represents my expert review of the Expert Reports presented by Joshua Bercu and Michael Rudolph.

## Summary of Opinions

Plaintiffs' Expert Reports each provide evidence that their opinions regarding the calls transited by Avid Telecom are not based on call specific data. Rather, every conclusion is, by their own admission, couched in uncertainty: i.e., it is "more likely than not. . . ." At no point does either expert state without reservation that any of their conclusions are absolute and identify each allegedly illegal call with precision.

Among the most significant concerns is that neither Report contains a single data point or document evidencing that a call alleged to be illegal meets all of the legal requirements, including that it was auto dialed, pre-recorded, and that it contained a commercial message. Rather, both expert reports rely on sampling data without even the effort to demonstrate that the campaigns at issue involved illegal calls, or that the sample calls, themselves, exhibit all of the requirements of illegality, and, even if they do, that the number of examples chosen is sufficient to provide a statistically significant basis for extrapolating them over millions of calls.

### The Bercu Expert Report

In paragraph 2 of the Bercu Expert Report, Mr. Bercu acknowledges that, by mandate of the Traced Act, the Industry Traceback Group must operate in a "neutral" manner. . ." The Industry Traceback Group is an organization operating under the corporate umbrella of USTelecom. USTelecom's mission is ["t]o ensure our members can compete, grow and thrive . . . ."

Every USTelecom member—including every member that *pays a premium* to be a member of the Industry Traceback Group—is a telecom service provider that competes directly with Avid Telecom—any data that they produce must be viewed

with a cynical eye. I am not aware of any other circumstance where a governmental agency has allowed one group of competitors effectively to regulate and even to punish its competitors.

In paragraph 7 of the Bercu Expert Report, he alleges that membership in the Industry Traceback Group does not "confer any favor" with respect to the traceback process. I believe that statement is false, First, on information and belief, smaller carriers like Avid Telecom are routinely denied membership in USTelecom, allegedly based on the number of tracebacks that they have received despite the fact that they (including Avid Telecom) often have far fewer traceback issues than those who are allowed membership, including membership in the Industry Traceback Group. Second, while I understand that the discovery process is ongoing as to the number of traceback issued to members and non-member of the Industry Traceback Group, on information and belief, members of the Industry Traceback Group receive far fewer tracebacks than non-members, including where a member is part of the carrier string with a non-member, like Avid Telecom, who receives a traceback (including most if not all of the tracebacks referenced in the complaint).

I agree with the statement in paragraph 20 of the Bercu Report that the Industry Traceback Group is not a determination of legal liability.

Bercu's statement at paragraph 22 that the Industry Traceback Group cannot "target" specific providers, allegedly because it "does not know in advance which providers—other than the terminating provider—will appear in the call path of the traceback—" is misleading at best. Even if true, as Bercu admits, becomes known as

the traceback is "launched and progresses." Thus, before the traceback process is complete, the Industry Traceback Group has all the data required to send a traceback to all carriers in the string, especially including the originating carrier, who is most responsible for the selection of the customer and, often—as the entry carrier—for bringing the call into the country. Thus, evidence that only select carriers are targeted to receive tracebacks—and others are not—cannot be cast aside on the false premise that the Industry Traceback Group does not have visibility to all of the carriers in the string.

Mr. Bercu argues that "[c]ampaigns are selected based on data from sources including analytic providers, honeypots. . ." No information is provided regarding the identities of these so-called "analytic providers," nor is there any basis to conclude that the "information" that they provide is accurate and/or not targeted. No information is provided either by Bercu or Rudolph regarding which "analytic providers" supplied any of the data referenced in the complaint or in the Rudolph Expert Report, nor do Defendants have any basis to review or to evaluate. That information apparently resides only behind the wall of secrecy that underlies all of the data referenced in the complaint.

Mr. Bercu argues that, [t]racebacks are initiated using individual call examples. . ." drawn from "campaigns" selected based on "data from sources including analytics providers, honeypots and referrals from governmental agencies and organizations. Mr. Bercu does not identify any of the "campaigns" nor does he identify even a single one of the so-called "analytics providers", "honeypots",

38

"governmental agencies" or "organizations". Not a single name or telephone number is supplied. Thus, again, it is impossible to determine the reliability of any of these sources or the data that they provided.

Moreover, no information is provided in either the Bercu Expert Report or in the Rudolph Expert Report as to how those "examples" were selected or used. Mr. Bercu provides no information as to how many "examples" were used or any basis on which to conclude that the examples are representative or in a statistically significant number. We are left to wonder whether the "examples" are based on actual data—not mere speculation—evidencing that the call was initiated using an auto-dialing system, and/ or a pre-recorded voice, or that it contained a commercial message. The complete absence of proof on this issue completely negates the reliability of every aspect of the Bercu Expert Report and the Rudolph Expert Report, as all of the calculations of illegal calls are based on an extrapolation of these "examples" to "hundreds, thousands, or even millions of additional illegal calls." Absent real data regarding each "example", there is literally no basis to support the conclusion that the "example" call was illegal, let alone to extrapolate that alleged illegality across any other call, let alone the millions of other calls as Rudolph does in his Expert Report.

Remarkably, to make matters worse, Bercu admits that *he does not know* that the "example" is actually representative of any other call, as the most he can say is that the other calls have "identical *or nearly identical* messaging". (Emphasis added). Bercu Expert Report at para. 23. Does the characterization of "nearly identical relate to the "content" of the call, or to the manner that it was initiated (*e.g.,* auto dialed) or

whether it was pre-recorded; no information is provided. Thus, it is completely impossible to know where the Industry Traceback Group drew the line as to which calls were sufficiently "identical" to be included in any circumstance. We are left to wonder. And, as it is apparent that neither the Industry Traceback Group nor YouMail listens to or analyzes each one of the millions of calls at issue, it is apparent that they have no idea whether any call other than the examples were illegal.

## The Rudolph Expert Report

My opinions are presented in two categories. First, I identify a number of "High Level Concerns" that apply to multiple issues across the Expert Report. Second, I set forth concerns with specific aspects of the Report

## High Level Concerns

As set forth below, the Rudolph Expert Report is fundamentally and irretrievably flawed with respect to virtually all of its specifics. However, the most basic flaw is that the entire Report fails even to attempt to demonstrate—on a call-by call-basis—that any call meets the standard for illegality under the TCPA; i.e., that the call was originated from an auto-dialer, pre-recorded, and that it contained a commercial message. Rather, Rudolph relies exclusively on *aggregate data* from certain selected call campaigns that may or may not have included illegal calls and then, without even alleging that it has a statistically significant number of actual call transcripts of calls actually transited by Avid Telecom, it extrapolates the supposed illegality over all of the calls that Avid Telecom allegedly transited. As I am advised by counsel that TCPA violations need to be established on a call-by-call basis—i.e.,

that proof cannot be based on aggregate data—the entire basis of the Rudolph Report must be rejected on the basis that it is nothing more than multi-levels of pure speculation.

My Report also identifies the following high-level concerns:

➢ Failure to Verify Data. The Rudolph Expert Report relies entirely on 31 sets of datasets allegedly provided by the State of Arizona (referred to in the Expert Report as "Requestor"). The Report does not set forth any of the procedures that were utilized by Requestor to obtain those data sets, and, on information and belief, most of them were obtained by persons who are not associated with Requestor. Yet, neither the individuals associated with Requestor, nor the persons associated with the third parties that plainly provided the data sets is identified. Nor is there any statement regarding the chain of custody of these data sets or what steps were taken to ensure that the data was as represented and/or not mishandled or corrupted.

➢ Failure to Demonstrate Data Reliability. Mr. Rudolph admits that his Expert Report is not based on the "most complete and reliable" data. At best, Mr. Rudolph admits that the data available to him provides an "understanding of [Avid Telecom's] operations." Mr. Rudolph does not argue, because he does not have the data to argue, that his conclusions are based on anything more than his "understanding" of Avid Telecom's operations. Mr. Rudoph's Report, once again, merely assumes that the

data sets allegedly provided by Avid Telecom's "downstream providers", both individually and in the aggregate, were both complete and accurate. No data is offered in support; no data showing the CID or other basis on which the data was allegedly collected; no self-serving data evidencing the chain of custody; not even an explanation of how Mr. Rudolph verified that the "downstream providers" were actually carrying Avid Telecom traffic or that even one of the calls actually originated. Indeed, Mr. Rudolph seems to be fully prepared to accept the "word" of carriers who he also must, by definition, believe also transited illegal robocalls.

➢ <u>Affirmative Reliance on Unreliable Data</u>. Mr. Rudolph merely assumes, without any supporting evidence or that "downstream providers capture the same traffic sent by Defendants". For example, one would have thought that Mr. Rudolph would feel the need to run tests to confirm the accuracy of each downstream switch on whose data he relies. No reference is made to any such effort. Indeed, it is clear that the only effort Mr. Rudolph undertook was an apparent, but unexplained effort to "de-dupe" the CDRs. How did he do that? What software or procedures did he use? We are left to guess. In this context, given the gaping holes in documenting how his data was collected, Mr. Rudolph's conclusion that his method is sound and reliable is nothing more than self-serving rhetoric unsupported by fact.

➢ <u>Reliance on Demonstrably False or Irrelevant Data</u>.  First, many of the data include at least nine sets of call records that were undisputedly transited outside of the applicable statute of limitations:  Sumco, SipNav16, SipNav36, Talkie-Sonic, Connection 256, Verizon-NC, VoIP innovations, Windstream, and Spiller.  As such, I am advised by counsel that those data cannot be considered in this proceeding.

➢ <u>Use of Unsubstantiated Do Not Call Registry Data</u>.  The Report provides no data evidencing that the numbers associated with any of the identified Do Not Call Registries were properly populated in that/those Registry(ies).  Among other flaws, the Report does not even purport to confirm that the numbers were residential and not business numbers.  I am aware that companies like ZipDX, which was one of the larger entities that placed honeypots for the purpose of catching robocalls, acquired its numbers as a business and improperly placed them into one or more registries.  There is also no data evidencing when these numbers were obtained from NANPA, including whether they were removed prematurely and put back in use prior to the required ninety day resting period.  As a result, the data presented regarding alleged violations of the Do Not Call Registry are unreliable at best.

➢ <u>Reliance on Unverified Consumer Data.</u>  The referenced data are merely a compilation of reports from unidentified consumers.  There is nothing in the Report that even suggests that these second hand-party or third

hand-party data were vetted for accuracy. Even if the data were somehow verified as accurate, there is nothing in the report that confirms either that the calls used a pre-recorded voice or that they were originated using a predictive dialer.

➢ <u>Improper Reliance on Industry Traceback-Avid Traceback Data</u>. As set forth above, the issuance of a traceback is nothing more than a request for information required to trace the path of a call that is identified as "suspicious" using extremely undefined and inconsistent standards. Even if these standards are deemed adequate, I am advised by counsel that the issuance of a traceback is not evidence that any call was an illegal one, and thus these data cannot be the basis of a claim of illegality, let alone knowing illegality. No one that I know in the industry considers tracebacks to be evidence of illegality.

### Specific Concerns

As stated above, not all robocalls are illegal. Indeed, it is estimated that at least thirty to thirty-five percent of all robocalls are legal telemarketing calls where consent has been granted. The Rudolph Expert Report does not account for any of these legal calls, merely assuming without any basis in fact that one hundred percent of all the calls in the datasets provided by the Requestor were illegal. Rudolph offers no testimony or data supporting his decision to merely to assume that all calls within the data sets were the same and illegal.

Rudolph does not provide any details on the alleged de-duplication protocol, not even an identification of the third-party software or internal system utilized. As with all of its allegations, Rudolph cannot state with certainty that the YouMail de-duping process works to remove duplicates, stating instead only that it prevents "duplicate or near duplicate records." Thus, it is not possible to verify the accuracy of any of the data sets, including whether the alleged de-duping process was complete or accurate.

Also, no explanation is provided as to why the "5 second interval" that was allegedly applied is appropriate. It is generally agreed that the de-duping period should be closer to thirty seconds to properly balance removing duplicate records due to network retransmissions or multiple carrier hops, while ensuring distinct calls are not mistakenly merged. The shorter cycle used by Rudolph fails to capture a large number of duplicate calls that occurred outside of its 5 second interval, thereby overstating the number of separate calls. In all events, the arbitrary nature of the de-duping process creates substantial uncertainty regarding the number of separate calls, legal or illegal. As Rudolph acknowledges (Report at p. 7), the number of calls is the foundation for the remainder of Rudolph's analysis, this uncertainty regarding all of his calculations.

Rudolph asserts that YouMail applied a "chain of custody" of the call records that it received from the Requestor. However, the Rudolph testimony provides no information regarding the chain of custody of the records that were received from multiple third parties or the chain of custody from the Requestor to YouMail. As

such, there is no basis on which to conclude that proper protocols were in place that ensured that there was a proper chain of custody protocol in the delivery of the call data provided by the downstream carriers to YouMail or in the chain of custody in the delivery of the call data from The Requestor to YouMail.

The Rudolph Expert Report also does not state or even suggest that YouMail undertook any measures to ensure that the call data that it received was, in fact, data evidencing calls transited by Avid Telecom. Indeed, the Rudolph Expert Report provides no reason to believe that any effort was made to confirm this relationship. Given the number of carriers with which YouMail interacts on a daily basis and the massive amount of data that it ingests for its monthly Robocall Index Reports, it is entirely conceivable that data could be improperly associated.

On page 8 of his Expert Report, Rudolph asserts that the most complete and reliable record of a telecommunications provider's activities ordinarily comes from that provider's own call detail records. I disagree. Call Detail Records reflect calls *after* they have been processed by the carrier billing system. As a result, it is impossible to properly understand the accuracy of those records without undertaking a careful review of the billing system and comparing the results to switch record data, which is the data reflecting

call records *before* they are processed by the billing system.[4]  Rudolph's failure to undertake this comparison—which a person with actual industry experience would have known to undertake—standing alone, let alone the myriad of other concerns identified herein, renders all of the data underlying his Report suspect and unreliable.

Moreover, even if call detail records were reliable, much of the data on which Rudolph relies was taken from third party carriers.  Ironically, many of these carriers, including John Spiller (see Report at p. 8), have been accused or sued for allegedly engaging in unlawful activities.  Yet, apparently without a thought, and certainly without any effort to verify, Rudolph merely assumes that these data are complete and accurate.  Respectfully, the Plaintiffs' own rhetoric in bringing legal action against many of these data-providing-carriers—often referring to them as "scammers"— renders the opinions expressed by Rudolph's, which reflect his blind and unverified reliance on these data, unreliable at best.[5]  Indeed,

---

[4]  This process is referred to as CDR Validation.  CDR validation is the process of checking whether the CDRs match the actual calls that occurred on the network. This involves comparing the CDRs with other sources of data, such as network logs, switch records, or customer feedback. CDR validation can help identify and correct errors, such as missing, duplicated, or corrupted CDRs, or incorrect call attributes, such as duration, destination, or rate. CDR validation can be done manually or automatically, depending on the volume and complexity of the data. Some tools that can assist with CDR validation are CDR Analyzer, CDR Validator, or CDR Auditor.

[5] For example, the Attorney General of Indiana, referred to John Spiller, on whose data Rudolph substantially relies, as perpetrating "deceptive practices that disrupt lives and erode trust." Apparently, this erosion of trust was sufficient evidence

the carriers providing data on which Rudolph relies (see Rudolph Taskforce List at. p. 8) is literally a "Who is Who" of carriers that the Plaintiffs have directly accused in the complaint of the worst telecom abuses.

Rudolph goes on to argue that data provided by downstream providers is reliable because the downstream provider captures the same traffic as the provider sending the call. I disagree. The best way to determine the traffic carried by a carrier is the carrier's own data. The fact that Rudolph does not have access to these data—forcing him to utilize third party data—renders his Report inherently less reliable. Even worse, is the naïve assumption that the downstream provider captures the same traffic as the provider sending the call. How does he know that. To know that with certainty, he would have to have identified and reviewed the switch and billing systems of each downstream carrier, for example, to ensure that the data generated from those carriers is correct and reliable, including whether any of those carriers had hidden duplication or other record issues. Remarkably, Rudolph did nothing to verify any of the data provided by any of the downstream carriers.

---

for Indiana to get a judgment against Spiller but it not sufficient for Rudolph to undertake any effort to ensure the accuracy of the Spiller data on which he relies.

This is no small problem. As anyone who actually works in the telecom industry knows, Carrier billing errors are very frequent, with an estimate by the Gartner Group that eighty percent (80%) of telecom bills, all of which are based on CDRs, contain errors. Common issues include incorrect rates, extra charges, and billing for services that were disconnected. The complexity of modern systems and manual processes contributes to a high rate of mistakes across the industry. Thus, Rudolph's complete reliance on third party provided CDRs—including mostly from third party carriers that the Plaintiffs have accused of knowing illegality—as the sole foundation for his opinion, is naïve at best and wrong at worst.

The remaining data on which Rudolph relies is equally suspect. First, as to the National Do-Not-Call Registry Data, the Indiana Do Not Call Registry Rudolph provides no data regarding when those data were obtained in comparison to when the call records were created. I also understand that many of the numbers that are included on the Do-Not-Call Registries, including most or all of the numbers identified by ZipDX, are business numbers that are not subject to Do-Not-Call limitations and thus no claim of illegality can be associated with these calls.

On page 11 of the Rudolph Report, he presents what he refers to as Call Volume and Routing data. These data are not supported by any data evidencing that a single one of these calls meets the requirements of an illegal robocall; i.e., that it was originated on an auto-dialer, using a pre-recorded voice, and contained a commercial message. No data is provided regarding which of the alleged campaigns any of the calls are associated. Also, no data is provided regarding the jurisdictional

status of any of the calls.*i.e.,* whether the calls are jurisdictionally interstate as required to be subject to the TCPA. Given each of these failings, these data are essentially without any value.

In the next section, Robocall Behaviors, Rudolph attempts to paint over the obvious failings in his data by claiming that he can ordain whether a call is an illegal robocall based on certain factors— Average Call Duration (ACD) and Answer-Seizure Ration (ASR)—other than those that are actually necessary to prove that a robocall is illegal. As a starting point, the FCC has never recognized (ACD) and Answer-Seizure Ratio (ASR) as direct predictors of illegal robocalls in its published rulings or notices. Instead, the FCC's focus has primarily been on technological and regulatory measures like STIR/SHAKEN protocols to enhance compliance with the Telephone Consumer Protection Act (TCPA). Perhaps it is Rudolph's awareness that Avid Telecom was always in full compliance with all STIR/SHAKEN protocols that led him to contrive speculative and unaccepted alternative methodologies that he can manipulate in an effort to prove his point.

As Rudolph admits, no single ACD value is conclusive on its own; rather, it must be interpreted in the context of other traffic patterns." The most he can argue is that "ACD consistently below 20 seconds ***should prompt heightened scrutiny*** by the provider. . . . He does not, because he cannot, argue that ACD is a conclusive predictor of illegal robocalling based on the data in front of him.

The same inconclusive speculation is apparent in Rudolph's discussion of ACD. Again, the best he can do is to speculate that, "[a] low ASR **may indicate** that the caller is unrecognized - as is often the case when originating numbers are highly variable - or that the calls are unwanted. It **can also reflect** technical blocking, either in the public telephone network or on the recipient's device." His obvious uncertainty continues as he writes, "[r]obocallers **may attempt** to manipulate ASR by selectively leaving voicemail messages to improve engagement rates. While no fixed ASR threshold conclusively identifies robocalling, **rates consistently below 30-40% are often** a strong early warning of calls being rejected or ignored by recipients, or delivery issues **warranting investigation**." Again, Rudolph is unable to state with any measurable degree of certainty that ASR data provides any evidence, even generically, of illegal robocalling, and he certainly has not and cannot demonstrate that his ASR data proves that Avid Telecom was engaged in illegal robocalling. The very most he can even allege is that, "[w]hen both ACD and ASR deviate substantially from the norms observed in legitimate traffic—especially when short call durations coincide with low answer rates –this provides an objective, data-driven signal that a provider's network **_may be_ carrying large volumes of unlawful or _unwanted calls_**. Thus, even if one were to accept his multi-layered speculation, his ultimate conclusion does not even isolate the issue to unlawful calls; rather, we are left to speculate whether any of the calls are actually "unlawful" or if they are all just "unwarranted".

51

In apparent recognition that his data is speculative and unpersuasive, Rudolph argues that, "[a] CSP that is earnestly seeking to mitigate robocalls would reasonably be expected to monitor these metrics. . .." Yet, because the narrative portion of his Expert Report is apparently generically applied to all cases, he offers no facts or even a reason to believe that Avid Telecom did not do so, ignoring entirely the fact that Avid Telecom terminated many carriers that failed on these very metrics.

The table presented on page 13, which purports to reflect data provided by Secure Voice and Dorial, is once again completely unsupported. Even worse, the lack of care in and reliability of Rudolph's Report is again evident in that the table and resulting calculations are based on data for the period of December 2018 through January 2023. This time period includes years before Avid Telecom sent traffic to Secure Voice and years after Avid Telecom stopped sending traffic to Secure Voice, and it includes again years before Avid Telecom sent traffic to Dorial and years after Avid stopped sending traffic. In addition, as an unspecified portion of the data comes from 2018, which I am informed by counsel is likely outside the statutory period, and may not be considered.

The endless pattern of speculation is repeated, again, on page 22 of the Rudolph Expert Report in his presentation of data purporting to show "unusual quantities of calls with very specific duration ranges . . ." He argues that, "even if just 1-3% of calls are zero duration, *it could be indicative of technical issues* that would be impacting legitimate customer calls that would

merit investigating.  Again, Rudolph does not even suggest that unusual quantities of calls with very specific duration ranges *are* evidence of illegal robocalling generally and, with respect to the data he has for Avid Telecom, his argument is not that it actually demonstrates the transiting of illegal robocalls, but, rather, only that it ". . .could be signal meriting investigation or suspicion of *problems* (not illegality)" that could be the byproduct of either "call connectivity" or robocalls (not illegal robocalls). Once again, it is hard to imagine testimony that is less definitive or more speculative.

The pattern of speculation continues in Rudolph's discussion of so-called "Deceptive Robocall Techniques".  Report. He identifies four such techniques: snowshoeing, number spoofing, neighborhood calling, and use of invalid numbers. With respect to the use of invalid numbers, Rudolph alleges that,

> "[t]here were approximately 49.86 billion call records where the calls originated from a +1 (United States North American Numbering Plan) country code.  Of these 49.86 billion call records, 429 million call records used an origination telephone number that was not valid per the North American Numbering Plan.  Of these 49.86 billion call records, 429 million call records used an origination telephone number that was not valid per the North American Numbering Plan.

Simple math indicates that the percentage of Avid call records that were allegedly associated with an origination telephone number that was not valid per the North American Numbering Plan is **one percent (1%).**  As Rudolph fails to provide any statistics regarding the overall percentage of calls that **are** associated with an origination telephone number that was not valid per the North American Numbering Plan, the extremely tiny percentage of calls

allegedly transited by Avid Telecom cannot be seen as unusual or as evidence of illegal robocalling. Moreover, Rudolph's seemingly generic analysis fails to take into account that Avid Telecom is never the originating carrier and it never selects the telephone number from which a call originates, so this entire analysis is irrelevant to Avid Telecom's operations. Perhaps, it is for this reason that Rudolph does not directly allege that Avid Telecom engaged in any of these behaviors, nor does he properly explain the actual basis on which he concludes these behaviors are associated with Avid Telecom.

Again, the same speculative approach and irrelevant analysis apply to Rudolph's analysis of call spoofing. He argues that:

> The presence of over 2 billion unique originating telephone numbers within the records is conclusive that some degree of number spoofing must have been present.

> The presence of over 260 million unique but invalid originating telephone numbers, based on the use of invalid NPA-NXX prefixes, sustained over time is further evidence that number spoofing was utilized since it is highly unlikely honest error would employ so many unique but invalid telephone numbers.

Rudolph fails completely to explain, and I am actually unable to make sense of the first allegation, that merely because there are a lot of telephone numbers in the records, somehow, that equates to "some degree of number spoofing." Also, Rudolph fails to explain how he concluded that there were over 260 million unique but invalid originating telephone numbers; it is impossible for me to address this allegation.

Moreover, Rudolph's seemingly generic analysis fails to take into account that ***Avid Telecom is never the originating carrier*** and even where it is the first "carrier" to received calls from a call center, it never selects the telephone number from which a call originates (the call center does). Thus, as a matter of technical reality, Avid Telecom cannot spoof that number, which reality renders Rudolph's entire spoofing analysis irrelevant to Avid Telecom's operations.

In this same context, Rudolph argues that:

> The high volume of record matches for large banks and companies such as Comcast, FedEx, Amazon would indicate the operators of the calls were intentionally selecting these numbers in order to maximize the potential success rates in victimizing call recipients. Otherwise, the volumes of observed calls with these origination numbers would obey a more even distribution to origination numbers unrelated to these companies.

Once again, Rudolph's seemingly generic analysis fails to take into account that Avid Telecom is never the originating carrier, and it never selects the telephone number from which a call originates, and thus it cannot spoof that number. As with his previous allegation regarding snowshoeing and selective number choices, the fact that Avid Telecom never selects the number to be called renders his entire spoofing analysis irrelevant to Avid Telecom's operations.

Rudolph's allegations regarding "Invalid Originating Numbers" are both completely unsubstantiated as to the applicable date(s) or even as to the applicable

carriers.  Also, the Report does not even attempt to draw a connection between an invalid originating number and the alleged illegality of the call.  As I am advised that making a call from an invalid originating number, standing alone, does not make that call an illegal robocall, without this connection for each call, Mr. Rudolph's data is of no value.

Mr. Rudolph's analysis of calls made from or to numbers listed on a Do Not Call Registry is equally unavailing.  He claims that, "[o]f the over 50 billion de-duplicated call records, nearly 18 million (36%) were to over 1.7 million unique destination telephone numbers registered on the National Do-No-Call Registry."  With respect to Indiana, he argues:

> Of the 2.25M registered telephone numbers provided by the State of Indiana containing registered telephone numbers from the Indiana State Do-Not-Call Registry, 147.9M calls were placed to those recipients within the nearly 50 billion call records (and the 709 million specifically calling recipients in Indiana).

First, on information and belief, Rudolph's numbers were not vetted to determine whether they are associated with a residential number, which can be included in the Registry, or whether they are associated with a business number that cannot.  On information and belief, a material number of these numbers were associated with "honeypots" obtained by business or other non-residential entities.

Secondly, while it may be true that 147.9M calls were placed to those numbers, again, Rudolph fails to provide any specific data evidencing that

those calls were illegal; *i.e.,* that they were originated using an auto-dialer, used a pre-recorded voice, and included a commercial message. Absent such specific evidence for each call at issue, there is no basis to conclude that any of the calls were illegal robocalls.

Perhaps the most revealing aspect of Rudolph's Expert Report is the portion addressing YouMail Content and Robocalling Campaigns. The theory on which Rudolph relies is nothing short of extraordinary. As Rudolph readily admits, the accuracy of the data extracted from YouMail relies on the ability to "match" the originating telephone number associated with the YouMail record with the number in the dataset. Rudolph claims that YouMail did that successfully, and thus it was able to determine that the referenced calls came from Avid Telecom. Yet, in nearly the same breath, Rudolph argues aggressively that *these very same robocallers* are routinely engaged in illegal activity. This alleged illegal activity casts doubt on the reliability of the data that they have allegedly provided to YouMail. This doubt is materially enhanced by the fact that the data sets that YouMail apparently received did not have any information independently verifying that it was Avid Telecom call records and Rudolph's testimony provides no reason to believe that YouMail made any effort to verify that the data is properly associated with Avid Telecom.

Also, Rudolph provides no basis for the decision to use a 300 second time window between the time shown on the carrier data and the time shown

on the YouMail data. Publicly available information indicates that the average call completion time for an interconnected VoIP call is 1 to 5 seconds, and the average time for a residential call to be answered and transferred to YouMail is 15 to 30 seconds. Thus, Rudolph's use of a 300 second time window is both well outside the reasonable time period. The excessive time window allowed is likely to capture many calls that are not actually associated with the alleged illegality.In an effort to associate certain robocalls with Avid Telecom, Rudolph presents data under the rubric, "Findings in Audio Content and Robocall Campaigns." Here, Rudolph alleges that there were 1,309,213 recorded and transcribed unlawful or fraudulent robocalls for the Plaintiff States. First, Rudolph makes no attempt to disaggregate the calls that he alleges are "unlawful" and thus potentially subject to the TCPA and calls that were "fraudulent" and are not. The examples of the "top ten" call texts to California add nothing of value to his presentation for a number of reasons. First, the data is limited to California and thus is not demonstrably relevant to the other 47 Plaintiff states.

Second, there is absolutely nothing in the text of any message that demonstrates that the call was auto dialed or that the voice was pre-recorded. Third, as it is apparent that Rudolph did not speak directly with any of the called parties, there is nothing in the Rudolph Expert Report that demonstrates that any aspect of the message was fraudulent. Rudolph's unsupported assumptions are nothing more *than* speculation.

As with all of his "findings," Mr. Rudolph is unable to and does not state conclusively that any one of the referenced calls *was an* illegal robocall.  In fact, his uncertainty is evidenced by his own words, describing these calls as "unlawful **or** "fraudulent."  Moreover, Mr. Rudolph does not even allege that he has proof that any of these calls were sent using a predictive dialer *or* that they used a pre-recorded voice.  As Mr. Rudolph does not include a *way* or other audio file containing the actual spoken words—not even for the call he specifically references—nor does he state how each transcription was created (by some unidentified program or by unnamed person(s)), Defendants have no way to verify the accuracy of any of the transcriptions.  As such, Mr. Rudolph's entire presentation on this issue is nothing more than speculation.

Finally, even if one could get beyond the myriad proof issues outlined above, Mr. Rudolph provides no data evidencing the chain of custody or any basis to believe that his audio data is reliable.  Mr. Rudolph also offers no evidence that and Defendant was aware of the content of these calls or that any Defendant participated in the selection of the calling party or in the creation of the message.

Rudolph's presentation regarding Consumer Sentinel Complaints is similarly lacking in supporting data.  First, and most fundamentally, Rudolph's analysis is based on unverified consumer complaints.  It is apparent that Rudolph did absolutely nothing to verify that even a single one of the complaints was well founded or even that he had personally reviewed any of them.  For these very reasons, enforcement agencies like the Federal Trade Commission (FTC) explicitly state that their complaint data is "unverified" because they are reported directly by consumers.

Among other things, it is well known that consumers forget that they have consented to receive certain robocalls, and many consumers fail to understand that many categories of calls that they receive—including auto-dialed and pre-recorded calls—are *legal*.[6] Rudolph makes no effort to address either of these circumstances.

Moreover, much like each of his previous presentations, Mr. Rudolph is unable to reach any definitive conclusion regarding any Defendant's involvement in any of the referenced matters. Also, despite his recognition of this very fact at page 41 of his Report (". . . the telephone number's area code, [which] may not always reflect the recipient's actual location"), Rudolph makes the false assumption that the "state of residence" is also the location of the phone when the alleged calls were reported and received. This assumption is demonstrably false as it relates to mobile phones, which often travel out of state, and thus it puts his entire analysis in question.[7]

---

[6] The many categories of legal robocalls include:

  - Non-commercial calls: Calls that are not for a commercial.
  - Emergency calls: Calls regarding urgent health risks, public safety threats, or critical service outages.
  - Health care message calls: These are exempt if they are made by a covered entity or its business associate under HIPAA.
  - Transactional and informational calls: Calls that are not telemarketing and are directly related to a transaction, such as package delivery or account alerts.
  - Calls from certain organizations: Calls from tax-exempt non-profit and political organizations.
  - Calls with prior consent: Calls where the recipient has given prior express consent (including prior express written consent for automated calls to mobile phones) are exempt.

[7] It is widely acknowledged that a high percentage of mobile phone as not actually located in the area code associated with the phone and thus that the area code is an unreliable indicator of the location of the phone when a call is received.

Moreover, Mr. Rudolph offers no evidence regarding the reliability of "self-reported" data, which is known to be unreliable for many reasons.  For example, is there any evidence that the person making the report was actually the person who "owns" the telephone number.  Does the database of Sentinel Complaints include a transcript of the call text or any other reliable basis to conclude that the reported data is accurate (*e.g.,* a follow-up call from the FTC or YouMail confirming the accuracy of even a single complaint).  Mr. Rudolph provides no basis for us to believe that the data is reliable or accurate.

Rudolph also fails to define the "the period of analysis" for the data presented, nor is any information provided regarding the content of any of the complaints. Finally, even if all of the above concerns do not apply, this entire analysis assumes both that Avid Telecom had any knowledge of the content of these calls—which it did not—any involvement in the creation of the content of these calls—which it did not, that it had any relationship with the calling party who created the content—which it did not, or even that any of these calls was originated with an auto-dialer, was pre-recorded or that it was for a commercial purpose.

Rudolph's analysis of post notification conduct is misleading at best.  First, Rudolph asserts that the average number of "hops"--*i.e.,* the number of intermediate devices, such as routers or gateways, that a data packet or phone call passes through on its way from its source to its destination—was 4.62. That means that in every one of the calls at issue, there were at least 3 and often 4 or five other carriers involved. In the majority of cases, Avid Telecom was neither the first carrier nor the terminating

carrier.  And, even in the circumstances in which Avid Telecom was the first "carrier", all of those calls were originated by a call center that had a relationship with the originating customer.  Avid Telecom never had that relationship, and thus it never had any visibility to or role in the decision whether the call would be auto dialed, pre-recorded, or in any aspect of the content of the call.

The portion of Rudolph's Expert Report that addresses the traceback issue is particularly revealing as to the conclusory nature of his testimony.  To level set, first, with respect to tracebacks, it is undisputed that a traceback is not a finding of illegality.  Indeed, virtually every, if not every, periodic report issued by the Industry Traceback Group contains the following disclaimer language:

> This report does not constitute a finding of illegal activity… This report in itself is not determinative as to whether the calls identified in Attachment 1 are illegal, or as to whether the parties identified in Attachment 1 have violated federal statutes or the Commission's rules or engaged in any unlawful conduct.

Nonetheless, Mr. Rudolph apparently concludes that the mere fact that Avid Telecom received a traceback—which did not even purport to claim that the call at issue was illegal—should be considered a Post Call Notification of Illegality.  That conclusion is neither logical nor correct.  Moreover, even if one could find any merit in Mr. Rudolph's attempt to connect tracebacks with a knowledge of illegality, his analysis is exactly backwards.  Indeed, as Plaintiffs have alleged that Avid Telecom transited more than 50 billion calls, the 327 traceback that Plaintiffs allege were sent to Avid Telecom represent .0.00000654 percent of the total calls.  If this percentage

has any meaning, it shows that Defendants did a remarkable job of limiting the number of "suspicious", let alone proven illegal calls, to a tiny fraction of a percent. Rudolph makes an unavailing effort to use an alleged relationship between YouMail contacts and tracebacks in an apparent effort to suggest that Avid Telecom was not responsive to tracebacks. This statement is false. In fact, Avid Telecom responded directly and completely to each of the tracebacks it received from the Industry Traceback Group.

Rudolph asserts that Avid's network **repeatedly carried robocalls** from a set of upstream partners for months at a time, particularly:

➢ Medical/Healthcare: heavy, sustained traffic via J Squared/ RPG/ Rising Eagle and additional recurring activity via Great Lakes Communication.

➢ Auto Warranty: sustained activity centered on Mobi Telecom LLC (spanning nine distinct months) after beginning with J Squared/ RPG/ Rising Eagle and Trixcom / Vibtree Technologies. Traffic eventually originates directly from Avid.

➢ Government/Amazon/Apple Imposter: a tight 2022 cluster via Autelecom LLC and multiple single-month appearances by others.

As an initial matter, Rudolph provides no information as to *when* during these "months" Avid Telecom received any notice, including a traceback identifying any of these alleged calls. Thus, the implication that Avid Telecom delayed in responding to a traceback or in taking remedial action is not established.

Virtually all of the allegations made by Rudolph about the auto warranty programs are misleading if not facially untrue. For example, the allegation that "comments

frequently do not show decisive upstream-level mitigation, and often mention blocking single telephone numbers of the upstream providers that are using millions of telephone numbers to originate the calls" is at best misleading, as carriers were not required to provide comments, and thus the absence of comments does not demonstrate that no action was taken. Indeed, in many cases, significant actions were taken but were not documented in the comments field.

Moreover, it was our understanding that Avid Telecom's responsibility was to participate in good faith in the traceback process; it was up to the Industry Traceback Group and/or the FCC Enforcement to take any appropriate remedial action based on the information that Avid Telecom provided. And, notably during the described period, it was not clear that Avid Telecom had the legal authority to turn off a carrier's traffic. Further, it was Avid Telecom's policy to send emails to each carrier identified in a traceback instructing them to investigate the call at issue, to respond directly to the Industry Traceback Group as required, within the time required, and to take the appropriate remedial action. These emails have been produced to Plaintiffs in the discovery process. In addition, a spreadsheet downloaded from the Industry Traceback Group website showing the timeliness of Avid Telecom's response is attached as Exhibit I.

With respect to Rudolph's allegations regarding Government/Apple/Amazon Imposter, contrary to the implication of Rudolph's Report, in no case was Avid Telecom the first carrier to handle any of these calls; thus, its responsibility in the traceback process was limited to assisting the Industry Traceback Group to trace the

call.  In each case, it was Avid Telecom's policy to send emails to each carrier identified in a traceback instructing them to investigate the call at issue, to respond directly to the Industry Traceback Group as required, within the time required, and to take the appropriate remedial action. And, notably during the described period, it was not clear that Avid Telecom had the legal authority to turn off a carrier's traffic.  It was up to the Industry Traceback Group and/or the FCC to take any remedial action.  It is not Avid Telecom's fault if either failed to do so.

With respect to Rudolph's specific allegations regarding Mobi, first, it is misleading to the extent that Rudolph only identifies a comment where there were multiple traceback and the comment was directed to all of the identical tracebacks. Thus, his table dramatically understates the number of tracebacks where an explanatory comment was clearly intended.  *See* Rudolph Expert Report at p. 74 (TBID 6413, 6410, 6405, 6408).

With respect to Rudolph's allegations regarding Auto Warranty Post-Notification Conduct- Mobi Telecom traffic, contrary to the implication of Rudolph's Report, in no case was Avid Telecom the first carrier to handle any of these calls; thus, its responsibility in the traceback process was limited to assisting the Industry Traceback Group to trace the call.  In each case, it was Avid Telecom's policy to send emails to each carrier identified in a traceback instructing them to investigate the call at issue, to respond directly to the Industry Traceback Group as required, within the time required, and to take the appropriate remedial action. And, notably during the described period, it was not clear that Avid Telecom had the legal

authority to turn off a carrier's traffic. Rudolph's allegation is particularly troubling as, in fact, Avid Telecom shut down Mobi within one day after the FCC specifically authorized the termination of carrier traffic. It was up to the Industry Traceback Group and/or the FCC to take any remedial action. It is not Avid Telecom's fault if either failed to do so.

Rudolph's unexplained and disconnected allegation that there was no response to tracebacks is either misleading or intentionally false. In fact, there was never an instance in which Avid Telecom failed to respond to a traceback for anything like "five months"; indeed, in most instances, Avid Telecom responded within the same day. *See, e.g.,* the auto warranty spreadsheet attached hereto Exhibit II. The only reason that Avid Telecom would not have responded in any of the five months was because Avid Telecom did not receive any tracebacks in those months. And, again, the reference to "No Response" in the "Traceback Outcome" column for tracebacks associated with Mobi refers to whether there was a response from the originating carrier, which Avid Telecom never was. It is not an indication that Avid Telecom did not respond, as it did to every traceback. Also, contrary to the implication of Rudolph's testimony, the Industry Traceback Group never advised Avid Telecom that it was not receiving responses from Mobi; in fact, in many instances, we were told directly by Jessica Thompson of the Industry Traceback Group that Mobi was responding.

Rudolph alleges that after appearing to end its relationship with Mobi Telecom due to Auto Warranty robocalls, Avid Telecom LLC began to indicate that it was now the direct originator on subsequent notifications of auto warranty robocalls. This statement is not true. Avid Telecom never indicated that we were the direct originator. As with other traceback issues, we notified the responsible party and instructed them to stop the calls. We understand that they did. Further, Rudolph alleges that after October 3, 2022, Avid no longer responded to tracebacks regarding Social Security Disability Benefits, indicating that it was the originator and did not include comments or mitigative action explanations similar to the above purported consumer permissions. This statement is false. As the Industry Traceback Group's own records show, Avid Telecom responded in a timely manner to every traceback that it received, in each case providing the opt-in information provided by the originating provider and/or their customer.

The Documents relied upon for this report are attached as Exhibit II.

### **Conclusion**

As explained at length and repeatedly in the above report, the Rudolph expert report fails completely to demonstrate that even a single call meets all of the requirements to be an illegal robocall under the TCA or the TRE. Instead, the report relies exclusively on generic campaign data, none of which is verified, to merely assume that if any call in a campaign is illegal, then, by definition, all the calls are

illegal. That level of speculation is not permissive in an expert report and cannot be accepted as argued.

In addition, the Rudolph expert report is full of additional, often generic, allegations of fact that are either demonstrably false or completely unproven. It is my understanding from counsel that to recover under the TCPA or the TSR, Plaintiffs are required to prove that each call at issue is illegal. It is not sufficient simply to assume that if a single call is illegal, then all similar calls are also illegal without any call-by-call specific proof. The Rudolph report demonstrably fails to meet this standard of proof.

Dated: October 29, 2025

Michael D. Lansky

68

Exhibit I

**<u>Declaration of Michael D. Lansky</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| State of Arizona, ex rel. Kristin K. Mayes<br>Attorney General et al. | ) <br>) <br>) <br>) | |
| Plaintiffs | ) <br>) | |
| v. | ) <br>) | Case No. 4:23-cv-00233-EJM |
| Michael D. Lansky, LLC, dba<br>Avid Telecom, an Arizona<br>Limited Liability Company; | ) <br>) <br>) <br>) | |
| Michel D. Lansky, individually<br>As a Member/Manager/Chief<br>Executive Officer of Michael D.<br>Lansky, LLC dba Avid Telecom;<br>and | ) <br>) <br>) <br>) <br>) <br>) | |
| Stacey S. Reeves, individually as<br>a Manager/Vice President of<br>Michael D. Lansky LLC dba<br>Avid Telecom | ) <br>) <br>) <br>) <br>) | |
| Defendants. | ) <br>) | |

_____

## **Declaration of Michael Lansky**

### I.    **Qualifications**

I have served as the CEO and the day-to-day person in charge of all Avid Telecom operations since 1997. In that capacity, I have decades of experience in all aspects of the telecommunications business, including networking and technology issues, regulatory compliance, and robocall mitigation, including direct involvement in creating compliance protocols. Prior to the forced closure of Avid Telecom in 2023, I was widely viewed in

the industry as an expert in these issues and for my leadership in efforts to mitigate and to prevent illegal robocalling.

As the CEO of Avid Telecom, I have directly observed every aspect of company operations, including each of the issues associated with the complaint and the issues set forth in the Rudolph Expert Testimony. I believe that I am fully qualified and capable of offering relevant factual testimony and expert opinions on all material issues in the case that are essential to the trier of fact. Indeed, unlike much of the facts alleged in the Rudolph Expert Report, all of the fact evidence provided in my hybrid testimony is based on my personal observation, knowledge and expertise.

II.     Scope of Work

I am providing hybrid fact and expert testimony, affirmatively to present facts in support of Defendants' defenses in the captioned proceeding, and as an expert witness in response to the Rudolph Expert Report. The hybrid testimony that I am presenting clearly delineates between my allegations of fact and my expert opinions. The bases for my opinions are presented in accordance with Federal Rule of Civil Procedure 26(a)(2)(C). I am not being compensated for providing this testimony.


Dated:  October 29, 2025

_____
Michael D. Lansky

Exhibit II

**<u>Documents Relied Upon</u>**

| Carrier | Out Calls |
|---|---:|
| ANI Blacklist | 526,363 |
| Disconnected Global | 888,341,741 |
| Full Number Match | 516,973 |
| Inbound Media IP | 42,113,983 |
| Invalid ANI | 50,357,474 |
| NPANXX Match | 11,345 |
| Source Wireless | 853,252,066 |
| Unsigned STIR/SHANKEN | 944,409 |
| YouMail Fraud | 2,677,357 |
| YouMail Spam | 152,678,381 |
| Totals: | 2,936,673,694 |

| Carrier | In Calls |
|---|---|
| ANI Blacklist | 49,071 |
| Destination | 335,307,622 |
| Disconnected Global | 89,414,287 |
| DNIS Blacklist | 7,503,279 |
| Full Number Match | 23,980 |
| Inbound Media IP | 12,572,710 |
| Invalid ANI | 2,081,602 |
| NPANXX Match | 1,330,872 |
| RoboGuard | 2,743,235 |
| Somos DNO | 2,264,126 |
| Source Wireless | 142,824,177 |
| YouMail Fraud | 7,766 |
| YouMail Spam | 1,922,251 |
| CID Blocking | 63,068,445 |
| Totals: | 661,113,423 |

* Default setting blocks ANI's with less than 5% ASR, 5 second ACD and less than 60% short duration (less than 6 seconds)

| Estimated Blocked Revenue | |
|---|---|
| Calls Blocked - Disco'd #'s | 661,089,443 |
| 2022 Average ASR | 54.16% |
| Completed Calls | 358,046,042 |
| 2022 Average ACD | 0.180333333 |
| Estimated Minutes on Blocked Calls | 64,567,636.30 |
| 2022 Average Rate | 0.002967 |
| Estimated Revenue on Blocked Calls | 191,572.18 |
| Average Margin | 25.54% |
| Estimated Profit on Blocked Calls | 48,927.53 |

| TB # | Notes | Hop # | Calling # | Called # |
|---|---|---|---|---|
| 10591 | ORG | 5 | 4074646762 | 4078682514 |
| 10589 | ORG | 3 | 9412803552 | 9417864558 |
| 10590 | ORG | 4 | 9034842735 | 9038048309 |

Avid Comments - Opt Ins

| | | | | |
|---|---|---|---|---|
| 10/3/2022 15:44 | reeves@avid-telecom.com | 57441 | 10590 | upstream |
| 10/3/2022 15:51 | reeves@avid-telecom.com | 57446 | 10591 | upstream |
| 10/3/2022 15:58 | reeves@avid-telecom.com | 57419 | 10589 | upstream |

Downstream Provider
TouchTone
Sinch / Inteliquent / Onvoy / Vitelity / Neutral Tandem
Bandwidth

Consumer permission information - Name: Earlina Watson Phone: 9038048309 Address: 7062 PORTHVILLE DR MABANK TX 75156 Email: alananjason17@gmail.com URL: http://path.shareyourfreebies.com/ Signup date/time

Name: patricia aviles Phone: 4078682514 Address: 9195 Chandler Drive Groveland FL 34736 Email: pattyaviles331@gmail.com URL: https://www.jobsense.com/job-search/ Signup date/time: 2022-06-02 06:56:35 IP: 18.118.21

Consumer permission information - Name: Dalton Oday Phone: 9417864558 Address: 10364 Gulfstream Blvd Englewood FL 34224 Email: gspott522@outlook.com URL: surveyclubfun.com Signup date/time: 5/9/2022 6:16:34 A

| Upstream Provider | Call Date & Time | Notified | Completed | Elapsed | Traceback Outcome | FTC DNC |
|---|---|---|---|---|---|---|
| | 2022-09-19 18:01:10 +0000 UTC | 2022-09-22 14:42:28 +0000 UTC | 2022-09-22 14:51:26 +0000 UTC | 8 minutes 58 seconds | Complete | Not Listed |
| | 2022-09-20 20:22:10 +0000 UTC | 2022-09-22 13:26:48 +0000 UTC | 2022-09-22 13:34:11 +0000 UTC | 7 minutes 23 seconds | Complete | FEDERAL DNC |
| | 2022-09-20 21:35:29 +0000 UTC | 2022-09-22 14:24:39 +0000 UTC | 2022-09-22 14:37:16 +0000 UTC | 12 minutes 37 seconds | Complete | Not Listed |

: 9/20/2021 11:14:29 AM IP: 107.77.237.213
0.222
M Jornaya opt-in: 10/19/2021 05:27:50 PM IP: 67.227.94.51

| Term Carrier ID | Term Line | Term State | Campaign Name | Signer | Attestation Status | Audio Link |
|---|---|---|---|---|---|---|
| CELLCO PARTNERSHIP DBA VERIZON WIRELESS - FI | wireless | FL | AutoWarranty-Various-P2 | Avid Telecom LLC | A | https://portal.tracebacks.org/api/public/attachments/1043176 |
| CELLCO PARTNERSHIP DBA VERIZON WIRELESS - FI | wireless | FL | AutoWarranty-Various-P2 | Avid Telecom LLC | A | https://portal.tracebacks.org/api/public/attachments/1043172 |
| CELLCO PARTNERSHIP DBA VERIZON WIRELESS - T: | wireless | TX | AutoWarranty-Various-P2 | Avid Telecom LLC | A | https://portal.tracebacks.org/api/public/attachments/1043174 |

# *CREDIT APPLICATION*

*The following info is provided to Avid Telecom to establish a credit line for "applicant"*

## *COMPANY INFORMATION:*

Company Name: _____     Fed ID#: _____

DBA/Alternative Name: _____     DUNS number _____

Address: _____

City: _____     State: _____     Zip Code: _____

Phone Number: _____     Fax Number: _____

Company Type:          Corporation [   ]          Partnership [   ]          Proprietor [   ]          LLC [   ]

Entity Creation Date and /State: _____     Is this company publicly traded?    Yes [   ]          No [   ]

If yes, what is your stock symbol? _____     What is your stock exchange? _____

Please list your company's web address: _____

Financials must be provided:          Audited [   ]          Compiled [   ]     Date Range of Financials: _____

## *OFFICERS/OWNERS:*

Name: _____     Title: _____

Phone Number: _____     Fax Number: _____

Social Security Number: _____

Name: _____     Title: _____

Phone Number: _____     Fax Number: _____

Social Security Number: _____

## *BANK REFERENCE*

Bank Name: _____     Contact Person: _____

Address: _____     City: _____     State: _____     Zip Code: _____

Phone Number: _____     Fax Number: _____

Account Number (s): _____
(Operating Accounts, Loans Outstanding, Other Relevant)

## *TRADE REFERENCES*

Name: _____     Contact Person: _____

Address: _____     City: ___     State: _____     Zip Code: _____

Phone Number: _____     Fax Number: _____

Name: _____     Contact Person: _____

Address: _____     City: _____     State: _____     Zip Code: _____

Phone Number: _____     Fax Number: _____

Name: _____     Contact Person: _____

Address: _____     City: _____     State: _____     Zip Code: _____

Phone Number: _____     Fax Number: _____

*The undersigned guarantees that all statements made herein are true and correct to the best of his/her knowledge and authorizes the release of credit and financial information to Avid Telecom by applicant's bank and other references.*

Signed: _____     Date: _____

Print Name: _____     Phone Number: _____

Title: _____



# Customer Profile Set Up Form
*Please complete this form in its entirety*

## SECTION A: SECTION A:

**Customer Name** _____

**DBA/Other Trade Name(s), Holding Co.,**
**etc. - complete if applicable or state None** _____

**Type of Entity (Corp., Individual, Partnership, LLC, etc.)** _____

**Type of Business (Wholesale/Retail, etc.)** _____

**State of Incorporation** _____ **Federal Tax ID No.** _____

(if different than Customer Name)
**FCC Registration No.** _____ **FCC Registration Name** _____

(if different than Customer Name)
**FCC 499 Filer ID No.** _____ **Name of Entity with 499 Filer ID** _____

**Tax Exempt: Yes ☐  No ☐**    A Tax Exemption Package will be sent for completion prior to production

**Legal Compliance Contact Name** _____ **Email** _____

**Website URL** _____

**Main Telephone No.** _____ **Fax Number** _____

**Headquarters Physical Address** _____
                        *Street*              *City*           *State*    *Zip Code*

**Billing Address - If address same as Headquarter Address Check Box - ☐**

_____
*Street*                        *City*                *State*          *Zip*

**Other Associated Physical Street Address(s)** _____

**Previous Addresses (past 5 years)** _____

_____

## SECTION B:

**Accounts Payable Contact** _____ **Email** _____ **Phone** _____

**Entity Name - Payment Remittance** _____

**Bank Name - Payment Remittance** _____

## SECTION C:

| OFFICER(S)/OWNER(S)/PRINCIPAL(S): | | | |
|---|---|---|---|
| NAME | TITLE | Ownership % | PHONE/EMAIL |
| | | | |
| | | | |
| | | | |
| | | | |

| TRADE REFERENCES | | |
|---|---|---|
| **Company** | **Contact Name** | **Phone/Email** |
| | | |
| | | |
| | | |
| | | |

| BANK REFERENCES | | |
|---|---|---|
| **Bank Name** | **Contact Name** | **Phone/Email** |
| | | |
| | | |

## SECTION D:

**1.** Has Customer or any controlling person of the Customer been the subject of a lawsuit or the subject of any other law enforcement action by any state or federal agency as a result of its business practices?
No: ☐ Yes ☐  (If Yes, Explain): _____

**2.** Customer has implemented the STIR/SHAKEN Authentication Framework or has a documented and approved (by its requisite corporate authority) plan to implement the STIR/SHAKEN Authentication Framework no later than June 30, 2021, unless changed pursuant to applicable legislation, or a successor authentication framework if subsequently mandated by applicable federal law or regulation. No: ☐ Yes ☐

Customer affirms and certifies that all information and answers to questions herein are complete, true and correct to the best of signatory's knowledge and belief.  AVID TELECOM, LLC retains the right to deny credit or close the account whenever it deems necessary. It is understood and agreed that an investigative report may be made whereby information is obtained through personal interviews with third parties, such as credit reporting agencies, business associates, financial sources, or others with whom the applicant is acquainted. This investigation is not limited to the references listed in this application. This inquiry may include information as to the applicant's capacity, general credit reputation, business character, and other information we deem necessary to make a sound credit decision.

The signatory below represents and warrants that he/she has full capacity and authority to sign on behalf of customer.

**Customer Name:** _____

**Signature** _____

**Printed Name:** _____

**Title:** _____

**Date:** _____

## AVID TELECOM CARRIER SERVICE AGREEMENT

This Carrier Service Agreement (this "Agreement") is made this _____ day of _____, 2022 (the "Effective Date"), by and between Avid Telecom LLC, a Arizona corporation at 4729 East Sunrise Drive, #209 Tucson, Arizona 85718 and _____ a _____ Company ("Customer") located at _____ and, together the "Parties".

## RECITALS

WHEREAS, Avid is engaged in the business of providing Services (as defined herein).

## TERMS

NOW, THEREFORE, in consideration of the foregoing promises, the mutual covenants and promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree upon the following terms and conditions:

## Section 1.

## Obligations of the Parties.

1.1    AVID agrees to provide to Customer Domestic and International Long-Distance Telecommunication Services, including Voice telephony services using Voice over IP (the "Services"), in accordance with the terms and conditions of this Agreement and at the rates set forth in the official pricing addendum.

1.2    Customer hereby agrees to pay for such Services according to the terms and conditions set forth in this Agreement.

## Section 2.

## Term.

2.1    Unless earlier terminated in accordance with Section 2.2 or 2.3 herein, the term of this Agreement shall commence on the Effective Date and shall continue in full force and effect for one (1) year thereafter (the "Initial Term"). Upon the expiration of the Initial Term, this Agreement shall automatically renew on a month-to-month basis until either Party sends thirty (30) days' prior written notice to the other party of its intent to terminate this Agreement (the "Renewal Term" and, together with the Initial Term, the "Term").

2.2    During the Initial Term, either Party may terminate this Agreement upon providing thirty (30) days' prior written notice to the other Party of its intent to terminate this Agreement.

2.3    During the Term, either Party may terminate this Agreement and disconnect the Services provided hereunder upon providing one (1) days' prior written notice to the other Party in the event that the other Party breaches any provision of this Agreement.

2.4    The Parties further agree that, in the event of termination in accordance with this Section 2, AVID may recover from Customer all sums it is owed at the time of termination.

## Section 3.

## Rates.

3.1    The rates, charges and currency (US Dollars) for Services provided in accordance with this Agreement are set forth on the Rate Schedule attached hereto as Exhibit A (the "Rate Schedule"). The Parties understand and agree that AVID may change any or all of the rates to any destinations reflected on the Rate Schedule upon five (5) days' prior written notice to Customer at the notification address listed in Section 14, paragraph 14.1 including electronic notification via e-mail. Rate notices shall be sent to Customer as follows:

To Customer: _____

Email address: _____

3.2    Unless otherwise agreed to in writing by the Parties, the billing method shall be as follows:

(a)    <u>International Termination</u>:  one (1) second increments with a minimum of one (1) second per call.

(b)    <u>Mexico Termination</u>:  one (1) minute increments with a minimum of one (1) minute per call.

(c)    <u>Domestic U.S. Termination</u>:  six (6) second increments with a minimum of six (6) seconds per call.

(d)    <u>800 U.S. Termination</u>:  six (6) second increments with a minimum of six (6) seconds per call.

(e)    <u>Call Duration</u>: The rates agreed to by Customer under this Agreement are based upon the condition that Customer will maintain a call duration of greater than 6 seconds in length for at least 80% of Customers total domestic calls. If more than 20% of Customers traffic is 6 seconds or less in duration, Avid shall charge an additional one-cent ($0.01) per call for all calls that are 6 seconds or less above the 20% limit. Customer acknowledges that calls that surpass the call duration threshold and are charged accordingly, as defined above, are due and owing to Avid Telecom, LLC. These charges are non-negotiable and Customer waives the right to dispute these charges.

**Section 4.**

**Billing and Payment Terms.**

4.1    AVID shall bill Customer for the Services on a weekly basis.  Subject to subparagraph 4(C) below, the Services shall be billed at the rates and billing increments described in Service Schedule A.  Customer shall pay each invoice in full for Services within three (3) day from receipt of invoice ("Due Date").  Invoices are payable by wire transfer to a United States bank designated from time to time by AVID.  Payment shall be deemed received as of the date of written confirmation of payment instruction issued by the payor bank in the case of wire transfer. Payments not made by the Due Date, including payments withheld on claim of dispute that is not sustained, shall accrue interest at the rate of one and one half percent (1.5%) per month or the maximum rate allowed by law, whichever is less.  Such interest shall accrue daily on all amounts due hereunder including accrued default interest from the due date until payment in full is received, notwithstanding the termination of this Agreement.

4.2    Each invoice shall include the following:  (i) country/destination codes; (ii) country/destination; and (iii) rate and amount due per country/destination.  Each Invoice shall be sent in US dollars unless stated and agreed by both parties via email as follows:

If to Customer: _____

Attention: _____

Phone: _____

Email: _____

4.3    If Customer fails to pay such undisputed amounts to AVID by the applicable Due Date, then such undisputed amounts shall be considered past due (the "Past Due Amounts").  Interest shall be charged on such Past Due Amounts commencing on the first business day after the applicable Due Date and continuing thereafter until paid at a rate equal to 1.5% per month.

4.4    If Customer, in good faith, disputes any amounts set forth on the invoices, Customer shall, within thirty calendar (30) days of receipt of the invoice (the "Dispute Deadline"), submit to AVID written documentation that includes the CDRs analysis of various calls identifying and substantiating the disputed amounts (the "Dispute

Notice"). If the dispute is identified as a dispute pertaining to dialing plan options including, but not limited to, cellular, audio text or any other special service, the resolutions shall be based on the addendums provided by AVID to Customer. If Customer fails to dispute an amount by or on the Dispute Deadline, then the Parties hereby agree that an irrefutable presumption of the correctness of such amount is created. The Parties shall resolve the dispute within sixty calendar (60) days of AVID's receipt of the Dispute Notice. Upon resolution of the dispute, either through negotiations, discussions or by way of other legal means, and in the event that such dispute is resolved in favor of AVID; Customer shall pay such amount within seven (7) business days of such resolution.

4.5    Customer shall provide AVID with a valid tax exemption form to exempt Customer, under applicable law, from taxes that would otherwise be paid by such Customer. AVID shall invoice Customer for taxes that are not covered by the tax exemption certificate properly filed with AVID.

4.6    Customer shall be solely responsible for billing and collecting from its customers. Under no circumstances shall AVID be responsible for fraudulent, unbillable calls, credits given by Customer or bad debts incurred by Customer.

4.7    Payments to AVID shall be made via wire transfer:

Avid Telecom, LLC
Account#  023825406
Wires ABA # 121100782
ACH ABA # 122105647
Swift Code BWSTUS66

Bank Of The West
Tucson Arizona 85711

4.8    <u>Credit Check; Credit Limit Amount</u>. An initial credit check is required to determine payment terms and credit limit for any post paid account. Customer is required to provide recent audited financial information if available or any type of financial information.

4.9    <u>High Call Volume.</u>    If Customer places an extraordinarily high volume of calls on Customer's account, AVID may terminate this Agreement or suspend Services. An extraordinarily high volume of calls is the volume of calls placed in any 24-hour period which, if continued at that rate for a period of one month, would exceed at least three (3) times Customer's estimated monthly usage charges for that Service (as determined by the lower of Customer's designated monthly minimum usage commitment for that Service, if any, or the immediately preceding month's usage charges). AVID will make a reasonable attempt to contact Customer by telephone and seek satisfactory assurances that Customer is not using the Services with the intent to avoid payment of charges before terminating or suspending as described above.

5.0    AVID retains the right to bill, including any amended or corrected billing, for the Service(s) for a period of up to six (6) months, commencing from the date the billed Service(s) were provided to Customer. AVID shall retain such billing rights for this six month period notwithstanding any prior billing to Customer for the same period(s) and regardless of any otherwise conflicting billing conditions in this Agreement. Customer agrees that for the duration of this six month period, AVID shall not be deemed to have waived any rights with regard to billing for the provided Service(s) that are subject to this period, nor shall any legal or equitable doctrines apply, including estoppel or laches.


## Section 5.

## <u>Confidentiality</u>.

5.1    During the Term and for one (1) year thereafter, neither Party shall disclose any terms of this Agreement, including pricing, or Confidential Information (as defined herein) of the other Party. For purposes of this Agreement, the term "Confidential Information" shall mean information in written or other tangible form specifically labeled as such when disclosed by a Party. Confidential Information transmitted orally shall be identified

as such at the time of its disclosure. Confidential Information shall remain the property of the disclosing Party. A Party receiving Confidential Information shall: (i) use or reproduce such information only when necessary to perform its obligations under this Agreement; (ii) provide at least the same care to avoid disclosure or unauthorized use of such information as it provides to protect its own Confidential Information; (iii) limit access to such information to its employees or agents who need such information to perform the obligations under this Agreement; and (iv) return or destroy all such information, including copies, after the need for it has expired, upon request of the disclosing Party, or upon termination of this Agreement. Notwithstanding anything to the contrary contained herein, a Party shall be allowed to disclose Confidential Information pursuant to judicial or governmental order or if otherwise required to do so by law.

## Section 6.

## Relationship to Parties.

6.1     Neither this Agreement nor the provision of Services hereunder creates a joint venture, partnership or agency between AVID and Customer.

## Section 7.

## Use of Names and Trademarks.

7.1     This Agreement confers no right upon either Party to use the name, service marks, trademarks, copyrights or patents of the other Party except as expressly provided herein. Neither Party shall take any action that would compromise the name, service marks, trademarks, copyrights or patents of the other Party.

## Section 8.

## Parties' Responsibilities.

8.1     Each Party hereby agrees to comply with the other Party's network interface procedures, and each Party hereby agrees to promptly provide the other Party with such network interface procedures. Unless the Parties otherwise agree, each Party hereby agrees to pay its own costs and expenses associated with the provisioning of any of its facilities.

## Section 9.

## Service Activation.

9.1     Service Description. AVID service provides the termination of IP voice traffic from the Customer's premise to the PSTN or an on-net IP enabled endpoint. AVID service specifically EXCLUDES the following:
   a) 911/E911
   b) 711
   c) 611
   d) Any and all other x11 services
   e) Operator services
   f) Collect calling
   g) Any and all other operator, assisted, or intercept calling services
   h) Class 5 features
   i) 976, 900, and 1010xxx calling

9.2     Each Party shall use reasonable efforts to provide Services within fifteen (15) days of the execution of contract.

## Section 10.

10.1     **Call Jurisdiction.**

(a)     For the purpose of determining each call's jurisdiction (Interstate or Intrastate), Customer acknowledges that the originating and terminating information in the call stream data [i.e. Calling Party Number (CPN), Local Routing Number (LRN), Originating and Terminating ANI, etc.] will be used to assign jurisdiction. Local Number Portability (LNP) will be used in determining jurisdiction and is addressed by using a combination of fields in the call stream to accurately determine the originating or terminating end office.  In the event that the appropriate call jurisdictional information (a valid ANI is a 10-digit telephone number with a valid NPA/NXX; a 8XX number is not a valid ANI) is not available to AVID in the call stream, the jurisdiction of Customer's calls will be determined, by the location of Customer's Service Interconnection and the state where AVID terminated or originated the call, as applicable.  Customer agrees to indemnify AVID for any liability AVID incurs due to Customer's traffic not containing appropriate call jurisdictional information.

(b)     In the event AVID or any other third party requires an audit of AVID's interstate/intrastate minutes of traffic, Customer agrees to cooperate in such audit at its expense and make its call detail records, billing systems and other necessary information reasonably available to AVID or any third party solely for the purpose of verifying Customer's interstate/intrastate minutes of traffic.  Customer agrees to indemnify and hold AVID harmless for any failure to provide accurate originating information available to AVID's billing system and any liability AVID incurs in the event Customer's interstate/intrastate minutes of traffic are different that that determined by the audit

## Section 11.

### Indemnification.

11.1     Each Party (as "Indemnitor") shall indemnify, defend and hold harmless the other Party (as "Indemnitee") from and against any and all liabilities, costs, damages, fines, assessments, penalties and expenses (including reasonable attorney's fees) resulting from a breach of any provision in this Agreement by Indemnitor, its employees or agents, arising out of the Indemnitor's performance hereunder.  Each Party shall indemnify, defend and hold the other Party harmless from and against any and all liabilities, costs and damages (including reasonable attorneys' fees) resulting from any claim (including, but not limited to, any claim arising out of libel, slander, or patent or trademark infringement) arising from the combination or use of Services with services or facilities provided by such Party or such Party's marketing, sales or promotional activities.

## Section 12.

### Limitation of Liability.

12.1     IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF CUSTOMERS, CLIENTS OR GOODWILL ARISING IN ANY MANNER FROM THIS AGREEMENT AND THE PERFORMANCE OR NON-PERFORMANCE OF BUSINESS HEREUNDER.

THE LIABILITY OF EITHER PARTY WITH RESPECT TO THE INSTALLATION (INCLUDING DELAYS THEREOF), PROVISION, TERMINATION, MAINTENANCE, REPAIR, INTERRUPTION, OR RESTORATION, OF ANY SERVICE OR FACILITIES OFFERED UNDER THIS AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO THE CHARGE APPLICABLE UNDER THIS AGREEMENT TO THE PERIOD DURING WHICH SERVICES WERE AFFECTED.  FOR THOSE SERVICES WITH MONTHLY RECURRING CHARGES, THE LIABILITY OF AVID IS LIMITED TO AN AMOUNT EQUAL TO THE PROPORTIONATE MONTHLY RECURRING CHARGES FOR THE PERIOD DURING WHICH SERVICE WAS AFFECTED.

## Section 13.

### Warranties.

13.1     EACH PARTY SHALL USE REASONABLE EFFORTS UNDER THE CIRCUMSTANCES TO MAINTAIN ITS OVERALL NETWORK QUALITY.  THE QUALITY OF SERVICES PROVIDED HEREUNDER SHALL BE CONSISTENT WITH OTHER COMMON CARRIER INDUSTRY STANDARDS, GOVERNMENT REGULATIONS AND SOUND BUSINESS PRACTICES.

## Section 14.

**Force Majeure.**

14.1    Neither Party shall be liable for any delay or failure in performance of any part of this Agreement, other than for any delay or failure in an obligation to pay money, to the extent such delay or failure is caused by fire, flood, explosion, accident, war, strike, embargo, governmental requirement, civil or military authority, Act of God, inability to secure materials or labor or any other causes beyond their reasonable control (each a "Force Majeure Event").  Any such delay or failure shall suspend this Agreement until the Force Majeure Event ceases and the Term shall be extended by the length of such suspension.

**Section 15.**

**Notices.**

15.1    Notices, requests or other communications (excluding invoices) hereunder shall be in writing.  If mailed, notices shall be sent by certified mail return receipt requested or by overnight carrier and, if by fax, then notices shall be sent with acknowledgement from the receiving Party. Notices delivered via e-mail shall be deemed delivered if, within a reasonable period of time, measured in hours, AVID, does **NOT receive a returned** 'undelivered' or 'delivery failure' of AVID's Notice sent to the e-mail address listed below.

If to AVID:

4729 East Sunrise Drive, #209
Tucson, Arizona 85718
Attn: Michael Lansky
Tel:  520-795-9500 ext 1
Fax: 520-795-7888
E-mail: lansky@avid-telecom.com

If to Customer:

**Section 16.**

**Assignment**.

16.1    Neither Party shall assign this Agreement or any right or obligation hereunder to any other entity without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

**Section 17.**

**Rules of Construction**.

17.1    No rule of construction requiring interpretation against the draftsman shall apply in the interpretation of this Agreement.

**Section 18.**

**Entire Agreement**.

18.1    This Agreement, together with any exhibits attached hereto, represents the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements (written or oral) between the Parties relating to the Services.

**Section 19.**

**Modification of Agreement.**

19.1    This Agreement, including any exhibits attached hereto, may be amended, modified, or supplemented only by a separate written document executed by authorized representatives of both Parties. Rates (prices) issued within the parameters of Section 3 herein require the signature of an authorized representative of the Party issuing such rates and a counter-signature of an authorized representative of the other Party.

### Section 20.

### Waiver of Terms.

20.1    No term or provision herein shall be waived, and no breach or default excused, unless such waiver or consent is in writing and signed by the Party to which it is attributed. No consent by a Party to, or waiver of, a breach or default by the other, whether express or implied shall constitute a consent to, or waiver of, any subsequent breach or default.

### Section 21.

### Partial Invalidity.

21.1    If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render the Agreement unenforceable, but rather the Agreement shall be construed as if not containing the invalid or unenforceable provision. However, if such provision is an essential element of this Agreement, the Parties shall promptly attempt to negotiate a substitute therefore.

### Section 22.

### Cumulative Remedies.

22.1    Except as otherwise provide herein, the remedies provided for in this Agreement are in addition to any other remedies available at law or in equity.

### Section 23

### Dispute Resolution.

23.1    At the written request of either Party, each Party will appoint a knowledgeable representative to meet and negotiate in good faith to resolve any dispute arising out of or relating to this Agreement.    All discussions and correspondence among the representatives shall be treated as confidential information developed for the purposes of settlement, exempt from discovery, and shall not be admissible in the arbitration described below or in any lawsuit without the agreement of the Parties.

23.2    If the negotiations do not resolve the dispute within thirty (30) days of the initial written request, at the request of either Party, the dispute shall be submitted to binding arbitration by a single arbitrator experienced in the matters at issue and selected by the Parties in accordance with the rules of the American Arbitration Association ("AAA"). Unless the Parties agree otherwise, the arbitration shall take place in Tucson, Arizona.

23.3    The arbitration proceedings and all documents exchanged as part of those proceedings shall be considered Confidential Information. Neither Party shall disclose or permit the disclosure of any information about the evidence adduced or the documents produced by the other Party in the arbitration proceedings or about the existence, contents or results of the arbitration award without the prior written consent of such other Party except in the course of a judicial, regulatory or arbitration proceeding or as may be requested by a governmental authority. Before making any disclosure permitted by the preceding sentence, the Party intending to make such disclosure shall give the other Party reasonable written notice of the intended disclosure and afford the other Party a reasonable opportunity to protect its interests as to confidentiality.

23.4    The Parties agree that the arbitration shall proceed ex-parte in the event that a Party, after being duly notified refuses to participate in the arbitration. The decision of the arbitrator will be final and may not be appealed. Judgment on the arbitrator's award may be entered by any court of competent jurisdiction

including, but not limited to, any court that has jurisdiction over either of the Parties or any of their assets. The prevailing Party shall be entitled to reasonable costs and attorney's fees.

23.5    EACH PARTY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER OR IN ANY COUNTERCLAIM ASSERTED BY THE OTHER PARTY OR IN ANY MATTERS WHATSOEVER BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT.

## Section 23.

### Governing Law.

23.1    This Agreement shall be governed and construed in accordance with the laws of the State of Arizona, and the Parties irrevocably agree to the exclusive jurisdiction of the courts of the State of Arizona.

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the Effective Date.

**AVID Telecom**

By: _____

Name:  Michael Lansky

Title: President

Date:_____

**"Customer"**

By: _____

Name: _____

Title: _____

Date:_____

*Avid Telecom, LLC*
Customer/Vendor Information

| COMPANY LEGAL NAME | |
|---|---|
| d/b/a (if any) | |
| Address Line 1: | |
| Address Line 2: | |
| City: | |
| State/Province: | |
| Zip/Postal Code: | |
| Country: | |
| CORPORATE INFORMATION | |
| Type of Corporation | |
| State Incorporated | |
| State Registration No. | |
| Company Fed. Tax ID (EIN) | |
| FCC Section 214 No. | |
| FCC form 499 A Filer ID | |
| Name of Entity files 499 A | |
| | |
| 1) Accounts Payable | |
| Name: | |
| E Mail: | |
| Phone | |
| | |
| 2) Invoice (to send the invoice) | |
| Name: | |
| E Mail: | |
| Phone: | |
| | |
| 3) Technical Contact | |
| Name: | |
| E Mail: | |
| Phone: | |
| IM: | |
| | |
| 4) NOC Info | |
| E Mail: | |
| Phone: | |
| IM: | |
| | |
| 5) Account Manager | |
| Name: | |
| E Mail: | |
| Phone: | |
| IM: | |
| | |
| 6) To send the Rate Notification | |
| E Mail: | |

1  KRISTIN K. MAYES
   Attorney General of Arizona
2  (Firm State Bar No. 14000)
3  Laura Dilweg (AZ Bar No. 036066)
   Dylan Jones (AZ Bar No. 034185)
4  Joseph Hubble (AZ No. 037113)
   Office of the Arizona Attorney General
5  2005 North Central Avenue
6  Phoenix, AZ 85004
   Phone: (602) 542-3725
7  Fax:    (602) 542-4377
8  consumer@azag.gov
   *Lead Counsel for Plaintiffs*
9  *(See signature pages for complete list*
10 *of parties represented. LRCiv 7.1)*

11
12              **UNITED STATES DISTRICT COURT**

13                   **DISTRICT OF ARIZONA**

14

15 | State of Arizona, *ex rel*. Kristin K. Mayes, Attorney General; State of Alabama *ex rel.* | CASE NO.: |

16 Attorney General Steve Marshall; State of
   Arkansas, *ex rel.* Tim Griffin; People of the
17 State of California *ex rel*. Rob Bonta, Attorney
   General of California; State of Colorado, *ex*
18 *rel*. Philip J. Weiser, Attorney General; State
   of Connecticut; State of Delaware *ex rel.*
19 Kathleen Jennings, Attorney General of the
   State of Delaware; District of Columbia;
20 Office of the Attorney General, State of
21 Florida, Department of Legal Affairs; State of
   Georgia, *ex rel.* Christopher M. Carr, Attorney
22 General of the State of Georgia; State of
   Hawaii; State of Idaho, through Attorney
23 General Raúl R. Labrador; People of the State
24 of Illinois; State of Indiana; State of Iowa *ex*
   *rel*. Brenna Bird, Attorney General of Iowa;
25 State of Kansas; Commonwealth of Kentucky;
26 State of Louisiana; State of Maine; Maryland
27 Office of the Attorney General;
28

          **COMPLAINT AND DEMAND**

               **FOR JURY TRIAL**

Commonwealth of Massachusetts; People of
the State of Michigan; State of Minnesota, by
its Attorney General, Keith Ellison; State of
Mississippi *ex rel.* Attorney General Lynn
Fitch; State of Missouri, *ex. rel.* Andrew
Bailey, Attorney General; State of Montana;
State of Nebraska, *ex rel.* Michael T. Hilgers,
Attorney General; State of Nevada; State of
New Hampshire; State of New Jersey; State of
New Mexico, *ex rel.* Raúl Torrez, Attorney
General; People of the State of New York, by
Letitia James, Attorney General of the State of
New York; State of North Carolina, *ex rel.*
Attorney General Joshua H. Stein; State of
North Dakota, *ex rel.* Drew H. Wrigley,
Attorney General; State of Ohio *ex rel.*
Attorney General Dave Yost; State of
Oklahoma *ex rel.* Attorney General Gentner
Drummond; State of Oregon, *ex rel.* Ellen F.
Rosenblum, Attorney General for the State of
Oregon; Commonwealth of Pennsylvania, by
Attorney General Michelle A. Henry; State of
Rhode Island; State of South Carolina *ex. rel.*
Attorney General Alan Wilson; State of
Tennessee; State of Texas; Utah Division of
Consumer Protection; State of Vermont;
Commonwealth of Virginia, *ex rel.* Jason S.
Miyares, Attorney General; State of
Washington; State of West Virginia *ex rel.*
Patrick Morrisey, Attorney General; State of
Wisconsin; and State of Wyoming,

       Plaintiffs,

       v.

Michael D. Lansky, L.L.C., dba Avid
Telecom, an Arizona limited liability
company;

Michael D. Lansky, individually as a Member/
Manager/Chief Executive Officer of Michael
D. Lansky, L.L.C., dba Avid Telecom; and

1
2    Stacey S. Reeves, individually as a
     Manager/Vice President of Michael D.
3    Lansky, L.L.C., dba Avid Telecom,

4        Defendants.

5

6

7        Plaintiffs, the State of Arizona, *ex rel.* Kristin K. Mayes, Attorney General; State

8    of Indiana; State of North Carolina, *ex rel.* Attorney General Joshua H. Stein; State of Ohio

9    *ex rel.* Attorney General Dave Yost; State of Alabama *ex rel.* Attorney General Steve

10   Marshall; State of Arkansas, *ex rel.* Tim Griffin; People of the State of California *ex rel.*

11   Rob Bonta, Attorney General of California; State of Colorado, *ex rel.* Philip J. Weiser,

12   Attorney General; State of Connecticut; State of Delaware *ex rel.* Kathleen Jennings,

13   Attorney General of the State of Delaware; District of Columbia; Office of the Attorney

14   General, State of Florida, Department of Legal Affairs; State of Georgia, *ex rel.*

15   Christopher M. Carr, Attorney General of the State of Georgia; State of Hawaii; State of

16   Idaho, through Attorney General Raúl R. Labrador; People of the State of Illinois; State of

17   Iowa *ex rel.* Brenna Bird, Attorney General of Iowa; State of Kansas; Commonwealth of

18   Kentucky; State of Louisiana; State of Maine; Maryland Office of the Attorney General;

19   Commonwealth of Massachusetts, by and through Attorney General Andrea Joy Campbell;

20   People of the State of Michigan; State of Minnesota, by its Attorney General, Keith Ellison;

21   State of Mississippi *ex rel.* Attorney General Lynn Fitch; State of Missouri, *ex. rel.* Andrew

22   Bailey, Attorney General; State of Montana; State of Nebraska, *ex rel.* Michael T. Hilgers,

23   Attorney General; State of Nevada; State of New Hampshire; State of New Jersey; State of

24   New Mexico, *ex rel.* Raúl Torrez, Attorney General; People of the State of New York, by

25   Letitia James, Attorney General of the State of New York; State of North Dakota, *ex rel.*

26   Drew H. Wrigley, Attorney General; State of Oklahoma *ex rel.* Attorney General Gentner

27   Drummond; State of Oregon, *ex rel.* Ellen F. Rosenblum, Attorney General for the State

28   of Oregon; Commonwealth of Pennsylvania, by Attorney General Michelle A. Henry; State

3

of Rhode Island; State of South Carolina *ex. rel.* Attorney General Alan Wilson; State of Tennessee; State of Texas; Utah Division of Consumer Protection[1]; State of Vermont; Commonwealth of Virginia, *ex rel.* Jason S. Miyares, Attorney General; State of Washington; State of West Virginia *ex rel.* Patrick Morrisey, Attorney General; State of Wisconsin; and State of Wyoming ("Plaintiffs"), file this Complaint on behalf of their respective jurisdictions against **Michael D. Lansky, L.L.C., dba Avid Telecom, Michael D. Lansky, individually and as Chief Executive Officer, and Stacey Reeves, individually and as Vice President of Operations and Sales**, (collectively "Avid Defendants"). This action is filed pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101 *et seq*.; the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310 *et seq.*; the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.;* and certain state laws that protect consumers against unfair and deceptive trade practices, including unfair, deceptive, abusive and illegal telemarketing practices.  Plaintiffs seek temporary and permanent injunctive relief, the imposition of civil penalties, restitution, statutory damages, an award of attorneys' fees and costs, and other legal, statutory, or equitable relief this Honorable Court deems proper, and allege the following:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1355; the Telemarketing Act, 15 U.S.C. § 6103(a); and the TCPA, 47 U.S.C. §§ 227(e)(6) and (g)(2). The Telemarketing Act is the enabling statute for the TSR.

2.      This Court has pendent jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

---

[1] With respect to Utah, references to the "Attorney General" refer to the Utah Attorney General's Office acting as counsel for the Division of Consumer Protection of the Utah Department of Commerce.

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), 1395(a), 47 U.S.C. §§ 227(e)(6)(E), 227(g)(4), and 15 U.S.C. § 6103(e). Avid Telecom is headquartered within this District and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District.

4.     Plaintiffs notified the Federal Trade Commission ("FTC") of this civil action prior to instituting such action, as required by 15 U.S.C. § 6103(b).

5.     Plaintiffs notified the Federal Communications Commission ("FCC") of this civil action prior to instituting such action, as required by 47 U.S.C. §§ 227(e)(6)(B) and (g)(3).

## **PLAINTIFFS**

6.     The Attorneys General of the Plaintiffs are the chief legal officers for their respective states and commonwealths. Plaintiffs bring this action in the public interest pursuant to the consumer protection, business regulation, and/or telemarketing authority conferred on them by their respective state statutes and/or pursuant to the doctrine of *parens patriae* and/or common law authority.

7.     Pursuant to the Telemarketing Act, 15 U.S.C. §§ 6103(a) and (f)(2), the Attorneys General and other authorized officers of the Plaintiffs' respective jurisdictions are authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, to enforce compliance with the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of residents, or to obtain such further and other relief as the court may deem appropriate.

8.     Plaintiffs are authorized to enforce the TCPA and the regulations prescribed under it by 47 U.S.C. § 227(e)(6)(A), which authorizes Plaintiffs to impose civil penalties for violations of the TCPA or its regulations, and by 47 U.S.C. § 227(g)(1), which authorizes Plaintiffs to enjoin Defendants' routing of illegal calls, and to be awarded

damages for each violation, with increased awards for willful or knowing violations of such regulations.

9. Below is a breakdown of each Plaintiff's statutory authority for those Plaintiffs bringing state claims:

| STATE | STATUTORY AUTHORITY |
|---|---|
| California | Cal. Bus. & Prof. Code §§ 17203, 17204, 17206, 17536, and 17593. |
| Florida | Chapter 501, Part II, Florida Statutes ("FDUTPA") |
| Indiana | Ind. Code § 4-6-3-2; Ind. Code 24-4.7; and Ind. Code 24-5-14. |
| Maryland | Md. Code Ann., Com. Law, § 14-3201, *et seq.* |
| Nevada | NRS 228.500-228.590, NRS 228.620, NRS 597.814, NRS 597.818, NRS 598.0916, NRS 598.0918, NRS 598.0923, NRS 598.0963, NRS 598.0973, NRS 598.0975 and NRS 598.0903 to 598.0999. |
| New York | New York General Business Law §§ 399-p and 399-z, and New York Executive Law § 63(12). |
| North Carolina | N.C. Gen. Stat. §§ 75-1.1, *et seq.*; N.C. Gen. Stat. §§ 75-100, *et seq.* |
| North Dakota | North Dakota Century Code ("N.D.C.C.") § 51-15-01 *et seq.* and N.D.C.C. § 51-28-01 *et seq.* |
| Rhode Island | R.I. Gen. Laws § 6-13.1-1, *et seq.*; R.I. Gen. Laws § 5-61-1, *et seq.* |
| Washington | Washington Consumer Protection Act, chapter 19.86 of the Revised Code of Washington (RCW). |
| Wisconsin | Wis. Stat. §§ 165.25(1m), 165(4)(ar), 100.20(6), 100.26, and 100.263. |

## **DEFENDANTS**

10. Defendant Michael D. Lansky, L.L.C., doing business as Avid Telecom (hereinafter "Avid" or "Avid Telecom"), is an Arizona limited liability company formed on November 1, 2000, with its principal place of business at 2830 N. Swan Rd. #160, Tucson, AZ 85712.

11.     At times, Avid Telecom has held itself out as Avid Telecom, LLC, including in the FCC's Robocall Mitigation Database.[2]

12.     At all relevant times to this Complaint, Avid Telecom was engaged in trade or commerce within the scope of the statutes enforced by Plaintiffs and transacted business by routing telephone calls to each of Plaintiffs' jurisdictions.

13.     Defendant Michael Lansky ("Lansky") is an individual residing in Tucson, Arizona.  According to filings in the Arizona Secretary of State business database, Lansky is a Member and Manager of Avid Telecom. Lansky holds himself out as CEO of Avid Telecom in business filings and on the FCC's 499 Filer Database website.[3] Lansky has also held himself out as the President of Avid Telecom. Lansky has formulated, directed, controlled, had the authority to control, or participated in the acts or practices of Avid Telecom as set forth in this Complaint.

14.     Defendant Stacey S. Reeves ("Reeves") is an individual residing in Oviedo, Florida. Reeves holds herself out as the Vice President of Operations and Sales for Avid Telecom in filings with the FCC's Robocall Mitigation Database.  Reeves began her position as Vice President of Avid Telecom in October of 2020.  Reeves has formulated, directed, controlled, had the authority to control, or participated in the acts or practices of Avid Telecom as set forth in this Complaint.

15.     Defendants Lansky and Reeves transacted business in this District through Avid Telecom and in their individual capacities.

---

[2] The FCC requires all voice service providers to file certifications in the publicly accessible Robocall Mitigation Database regarding their effort to fight illegal robocalls on their respective networks.  *See* FCC, Robocall Mitigation Database, https://www.fcc.gov/robocall-mitigation-database (last visited May 18, 2023).

[3] The FCC maintains a publicly accessible database of all the entities that register to provide voice services in the United States and to contribute to the federal Universal Service Fund. The Federal Communications Commission's form for voice service providers to file regarding their Universal Service Fund contributions is entitled "Form 499."  Avid Telecom's 499 information can be found here: https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=828064.

16.     Defendant Avid Telecom identifies itself as an interconnected Voice over Internet Protocol ("VoIP") service provider, registered with the FCC's Form 499 Filer Database as Filer ID No. 828064.

17.     According to the Avid Telecom's 499 filings, it does business in all U.S. states and territories.

18.     As an interconnected VoIP service provider, Avid Telecom uses broadband internet technology to route its customers' calls into, and throughout, the U.S. telephone network.

## INTRODUCTION

19.     Every day, millions of American consumers receive a barrage of unwanted robocalls that are harassing, annoying, threatening, and malicious.  Some consumers are told that their "Social Security Number has been used for some kind of fraudulent activity in the South Border of Texas."[4]  Sometimes, the message states the "SSA department is filing a lawsuit against you. An arrest warrant has been released on your name."[5]  Other calls purport to be from Amazon, luring the call recipient into a scam.[6]  These calls are all scams designed to scare and harm consumers.  Other robocalls may not be scams but are harassing, abusive, and illegal, nonetheless.[7]

---

[4] Avid Telecom transmitted a robocall with this message on November 04, 2021. https://portal2.tracebacks.org/api/public/attachments/550668.

[5] Avid Telecom transmitted a robocall with this message on April 16, 2020. https://portal2.tracebacks.org/api/public/attachments/1539.

[6] Avid Telecom transmitted a robocall with this message on July 09, 2022. https://portal2.tracebacks.org/api/public/attachments/951297.

[7] Avid Telecom transmitted a robocall with this message on December 12, 2022. https://portal2.tracebacks.org/api/public/attachments/1161599.

8

20.     Illegal robocalls are the most common contact method for scammers, and consumers reported losing over $692 million to them in 2021 alone.[8]

## OVERVIEW OF DEFENDANTS' BUSINESS PRACTICES
## AND WRONGDOING

21.     Defendants Avid Telecom, Lansky, and Reeves are in the business of providing VoIP services, facilitating or initiating robocalls, and/or helping others make robocalls.

22.     Avid Telecom received more than 329 Traceback[9] notifications from the USTelecom-led Industry Traceback Group ("ITG").  These notifications put Defendants on notice that Avid Telecom was transmitting illegal robocalls.

23.     Despite receiving these 329 notifications, and despite receiving additional letters and correspondence from the ITG about needing to improve Avid Telecom's traffic screening procedures, week after week Defendants chose profit over running a business that conforms to state and federal law.  Defendants could have chosen to implement effective and meaningful procedures to prevent—or even significantly mitigate—the perpetration of illegal behavior onto and across Avid Telecom's network but chose not to do so.

24.     Even if Defendants had not been specifically informed at least 329 times by the ITG that Avid Telecom was carrying illegal robocall traffic, they knew or should have known that Avid Telecom was assisting and facilitating telemarketers or sellers

---

[8] FTC Consumer Sentinel Network Data Book 2021, at 12 (February 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/CSN%20Annual%20Data%20Book%202020 21%20Final%20PDF.pdf.

[9] A "Traceback" is recognized by the voice communications industry as the method used by the ITG to trace the "call path" of a call, which identifies every provider that helped route the call across the telephone network, beginning with the call recipient and ending with the caller or the last provider closed to the caller that responds to the Traceback request.

9

transmitting illegal robocalls based on its call detail records, which are business records that are automatically generated by every telecom provider when a call is originated or transmitted and are kept in order to bill for the service of originating or transmitting each call across the provider's network.

25.    In short, Defendants were on notice, both through Tracebacks and complaints from their downstream providers, that Avid Telecom's network was being used by telemarketers or sellers to send illegal robocalls.

26.    Avid Telecom and Lansky have been on notice about this illegal call traffic for many years.

27.    Defendants knew or consciously avoided knowing that telemarketers or sellers were transmitting robocalls across Avid Telecom's network and using Avid Telecom's services to send call traffic that violated federal and state laws.

28.    Defendants provided substantial assistance to robocallers and facilitated the transmission and eventual delivery of millions of prerecorded telephone calls to residents in the Plaintiffs' respective jurisdictions.

29.    Defendants and their customers made or initiated calls to both residential and cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express consent of the called parties.

30.    Some of Defendants' customers were telemarketers and/or sellers.

31.    For many calls where Defendants' customers were not the caller, the caller was a telemarketer and/or seller.

32.    Defendants' customers' robocall campaigns advertise various goods and services including healthcare products and automobile extended warranties.

33.    Defendants facilitated the transmission of robocall campaigns in which the telemarketer and/or seller:

        a.    Misrepresented material aspects of goods or services, in violation of
              16 C.F.R. § 310.3(a)(2)(iii);

b.   Misrepresented the seller's or telemarketer's affiliation with corporations or government entities, in violation of 16 C.F.R. § 310.3(a)(2)(vii);

c.   Made false or misleading statements to induce any person to pay for goods or services, in violation of 16 C.F.R. § 310.3(a)(4);

d.   Failed to transmit or cause to be transmitted the real telephone number and the name of the telemarketer to caller identification services used by call recipients, in violation of 16 C.F.R. § 310.4(a)(8);

e.   Initiated or caused the initiation of outbound calls to telephone numbers on the National Do Not Call Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

f.   Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages, in violation of 16 C.F.R. § 310.4(b)(1)(v); and/or

g.   Failed to disclose the identity of the seller of the goods or services truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, in violation of 16 C.F.R. § 310.4(d)(1).

34.   Avid Telecom provided services customized to the needs of robocalling customers by enabling them to place a high volume of calls in quick succession, billing only for the duration of completed calls—typically in as little as 6-second increments—and ignoring clear indicia of illegal call traffic.

35.   Defendants provided their customers with Direct Inward Dialing numbers ("DIDs"), which would appear to the persons receiving the calls as the calling numbers or "Caller IDs."

11

36.     This service was likely provided to circumvent the procedural guardrails of the caller authentication framework of STIR/SHAKEN[10] that would otherwise mark a randomly generated or used calling number as "unverified" and cause such calls to be blocked from being delivered to the called party at a network level by a downstream provider.

37.     Defendants have quick[11] and inexpensive[12] access to millions of DIDs that they sell or lease to their customers.

38.     Defendants sold DIDs in bulk and were capable of providing DIDs for telephone numbers from every area code in the United States.

39.     The practice of "spoofing" is used deceptively by scammers to manipulate the caller ID system, so it appears that their calls are from legitimate phone numbers.

40.     Defendants used DIDs for "neighbor" spoofing and/or "snowshoe" spoofing. Neighbor spoofing is the practice of using caller ID numbers with the same area code and same or similar three-digit exchange as the call recipient to increase the odds of the call recipient answering the call due to the belief that the call is originating from the local area. Snowshoe spoofing is the practice of using massive quantities of unique numbers for caller ID on a short-term or rotating basis to evade behavioral analytics detection, or to bypass or hinder call blocking or call labeling analytics based on the origination numbers.  Numbers used for snowshoeing are often numbers that cannot receive incoming calls.

---

[10] STIR/SHAKEN is a framework of FCC-mandated processes and procedures that enables phone companies to verify that the Caller ID information transmitted to the call recipient matches the caller's real phone number, and is intended to stop or significantly mitigate illegal and fraudulent Caller ID spoofing.  *See* FCC, Caller ID Authentication Tools, https://www.fcc.gov/TRACEDAct (last visited May 18, 2023).

[11] In a January 28, 2022, email to Call48, Reeves wrote: "Please understand, the very thing that sets Avid apart from its competitors for DID business is the fact that we can fill orders within 2-3 days as opposed to 5- 7."

[12] In a January 2022 bill, Avid Telecom was paying $0.01 per DID to Call48 for 865,683 DIDs. On February 1, 2022, Avid Telecom provided a list of over 400,000 DIDs to return to Call48.

41.     Defendants claimed to provide and/or sell data in the form of call recipient phone numbers to their customers to use as "leads" in their customers' telemarketing campaigns.

42.     Defendants advertised they provide consulting services concerning how to effectively conduct robocalling operations. In one case, they provided a known robocaller with, at least, informal consulting.

43.     Defendants actively participated in the initiation of, or assisted and facilitated in the initiation of, illegal robocalls.

44.     Defendants assisted and facilitated telephone calls that used neighbor spoofing.

45.     Defendants knew or consciously avoided knowing they were routing illegal robocall traffic.

46.     Defendants provided substantial support and assisted sellers and telemarketers engaged in illegal robocalling in many ways, including but not limited to:

      a.    making and/or routing their customers' and robocallers' illegal calls to consumers in the Plaintiffs' respective jurisdictions;

      b.    taking express steps to obscure the ownership of at least one of their customers from ITG and other third parties after the principal owner became the subject of federal and state law enforcement actions and formed another named entity to continue to conduct business under another entity name;

      c.    providing some customers with DID rotation support, so that the customer could circumvent and undermine consumer, law enforcement, and industry efforts to block and mitigate illegal calls;

      d.    providing customers with the telephone numbers (DIDs or Caller IDs) used to make illegal calls to consumers in the Plaintiffs' respective jurisdictions;

     e.    providing customers with leads and/or data used by their customers to make illegal calls to consumers in the Plaintiffs' respective jurisdictions; and

     f.    providing customers with expertise on how to most effectively and profitably run their illegal robocalling and telemarketing schemes.

47.    Without the support, assistance, facilitation, and participation of Defendants, the billions of illegal robocalls sent by, to, and through their network would not have reached millions of consumers across the United States.

## Defendants' VoIP Provider Business Practices

48.    Avid Telecom is a VoIP business that makes and transmits telephone calls for profit.

49.    Avid Telecom provides services to retail customers who are the originating callers that place robocall and telemarketing calls, as well as wholesale customers who are other voice service providers that route and transmit robocall and telemarketing calls.

50.    Defendants' position in the call paths can vary from call to call and depends upon the operative contracts with other entities in the voice communications ecosystem.

51.    When serving as an "originating" VoIP provider, Avid Telecom is the first provider to make or initiate call traffic on behalf of its own retail customer.

52.    Then, Avid Telecom routes the call to another provider, which routes the call to another provider on the voice communications network[13] and so on, until the call is routed to a provider that delivers or terminates the call to the intended call recipient.

53.    Calls transit from provider to provider, and each stop is designated as a "hop" moving "downstream" to the call recipient. All the providers downstream of the "gateway"

---

[13] The public switched telephone network refers to the aggregate of landline and mobile telephone infrastructure that can be accessed by the public at large. This does not include private communications networks which are only accessible by select individuals such as intercom systems.

14

or "point of entry" on the U.S. voice communications network, except the last provider, are collectively referred to as "intermediate providers."

54. The last voice service provider that delivers the call to its customer, who is the call recipient, is identified as the "terminating" provider.

55. Depending on the private contractual—whether formal or informal—agreements with each of its customers, Avid Telecom is either an originating provider or intermediate provider, which is a call-by-call classification or categorization.

56. There are two filings in the FCC's Robocall Mitigation Database that are related to Lansky, Reeves, and Avid Telecom. One is a complete filing for "Avid Telecom LLC," which is an entity that does not exist. The other is an incomplete filing for "Michael D. Lansky LLC," which is an existing corporate entity.

57. According to Avid Telecom's FCC Form 499 Database registration[14], Avid Telecom provides VoIP services in all of the Plaintiffs' respective jurisdictions.

58. Avid Telecom structures some of its contracts and billing to appeal to upstream providers that transmit robocalls.

59. Avid Telecom's downstream providers often provide Avid Telecom with separate call routes for dialer traffic and conversational traffic.[15]

60. VoIP providers like Avid Telecom cater to callers using robocalling technology that allows for the transmission of high call volumes in short durations. A robocaller can make multiple calls in a single second. These calls may be prerecorded or

---

[14] FCC Form 499 Filer Database, *Detailed Information*, https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=828064 (last visited May 18, 2023).

[15] Dialer traffic is a high-volume number of calls per second with shorter duration times. Generally, dialer traffic is associated with a software or technology initiating as many calls as possible. Dialer traffic tends to have consistent patterns based on the type of call the calling party is making. Conversational traffic is traditional human-to-human call traffic. Conversational traffic tends to be longer duration with fewer calls per second.

artificially-voiced messages, or they can allow a computer to confirm a call recipient answers before connecting the call to a live operator.

61.     For example, one of Avid Telecom's downstream providers, All Access Telecom, provided Avid Telecom with an unrestricted route for dialer traffic. This allowed Avid Telecom to send an unlimited number of below-six-second calls.

62.     VoIP technology is particularly attractive to scammers that place illegal robocalls because it allows them to efficiently place millions or billions of calls as they troll for vulnerable consumers who will fall victim to their financial or identity theft scams.

63.     Avid Telecom catered its business to the needs of robocallers by offering special "dialer" rates for short duration calls.

64.     For example, in a February 6, 2020, email to voice service provider ANI Networks, Lansky pitched Avid Telecom's business like this:

> No worries.. it's been a very busy last few weeks and now certain parts of the industry are in a panic mode.. I think I may have some solutions for you all.. maybe make a messy situation more sane, that is if you are doing some of the short duration (CC[16]) traffic today
>
> If you are getting this traffic and blocking It or stopping it.. we can probably term it for you over our networks with quality termination and stats. If you are sending it carriers today.. we might be able to provide a better route with the same or better costs. We are not the least expensive guys out there doing this.. we don't want to be. We are in very good standing with the US Telecom Association and the FTC. And those are extremely good things…
>
> if you have following this much, such well known names are not in such good standing.
>
> I can probably get more into the details once I have a better understanding of how you handle short duration traffic today.

---

[16] In this context, "CC" is typically an abbreviation for "call center" indicating the call traffic he is offering to facilitate is short duration outbound calls from telemarketers.

**Avid Telecom's Website and Marketing**

65.    Before November 1, 2022, Avid Telecom's website homepage advertised that "Avid Telecom is a complete call center solution." Sometime after November 1, 2022, Avid Telecom made changes to its website. Prior to November 1, 2022, Avid Telecom's website advertised:



66.    Avid Telecom held itself out publicly as a provider of dialing software, which "includes a Predictive Dialer, Voice Broadcasting, List Management and Agent Management."[17]  Voice broadcasting is an industry term for robocalling which is the ability to simultaneously initiate mass quantities of calls that deliver prerecorded or artificial voiced messages. Prior to November 1, 2022, Avid Telecom's website advertised:

---

[17] A predictive dialer refers to a type of automated dialer that places phone calls even before the agents become available. Predictive dialers are often used by robocallers to increase efficiency.

67.   Avid Telecom held itself out publicly as a provider of Direct Inward Dialing ("DID") phone numbers, of which "Numbers can be ordered one-off or in bulk. Increase your sales with local callbacks for every state you dial . . . [Avid Telecom] can offer you fresh numbers on a regular rotation or port in your existing inventory." Prior to November 1, 2022, Avid Telecom's website advertised:



18

68.     The regular rotation of DID phone numbers is often indicative of callers that do not want to be identified. Legitimate businesses typically want their customers to be able to call them back with a DID phone number that does not change or rotate.

69.     Avid Telecom held itself out publicly as a service that "will help you complete more calls and improve sales with no dead air or FAS.[18] We offer flexible, volume-based pricing and a free credit to test our network." Prior to November 1, 2022, Avid Telecom's website advertised:

# Improved Connectivity
## With Tier-1 Routes

Avid Telecom uses their strong partner relationships to offer only the highest quality routes for your minutes. Our routes will help you complete more calls and improve sales with no dead air or FAS. We offer flexible, volume-based pricing and a free credit to test our network. **Try us today!**

 Minutes
 DIDs / Phone Numbers
 Dialing Software
 SMS
 Targeted Data
 Expertise

→ **Call Center Operations**     → **Wholesale Carrier Services**     → **Enterprise Solutions**

✈ Sign Up For A Free Test Drive

70.     Avid Telecom held itself out publicly as a provider of call data, advertising: "Avid Telecom combines a multitude of data sources to provide high quality and high connectivity contact leads for your call center. Data can be targeted by state, average talk time, likelihood of voicemail and likelihood of answering. Free samples are available. Take a test drive today!" Prior to November 1, 2022, Avid Telecom's website advertised:

---

[18] False Answer Supervision ("FAS") is a type of VoIP fraud, where a caller is billed for a call duration that is longer than the actual connection time.

19



71.    Further, Avid Telecom held itself out publicly to offer its employees expertise, stating: "Avid Telecom has over 30-years experience in wholesale and call center telephony. We can help guide you through routing, data management, DID management, taxation and industry compliance."  Prior to November 1, 2022, Avid Telecom's website advertised:



72.     Avid Telecom's website and marketing made it clear that it was courting robocallers and other VoIP providers that send voluminous robocall traffic.

## ROBOCALL MITIGATION, METRICS, AND ANALYSIS TOOLS

73.     In the last several years, both law enforcement and voice communications industry members have been working to develop resources, rules, and processes that have become essential to identifying and mitigating the sources of illegal robocall and telemarketing campaigns and those who enable them to route this traffic across the U.S. voice communications network.  Included among these resources, rules, and processes are Call Detail Records, Mitigation Metrics and Analyses, Traceback Notices, and other complaints.

### Call Detail Records

74.     Every attempted or completed call that reaches a VoIP provider's network automatically generates a record, known as a "call detail record" or "CDR," which generally includes the following information:

      a.     The date and time of the call attempt;

      b.     The duration of the call (calls that fail to connect are generally denoted by a zero-second duration);

      c.     The intended call recipient's telephone number;

      d.     The originating or calling number from which the call was placed (which may be a real number or may be spoofed);

      e.     An identifier such as a name or account number for the upstream provider that sent the call attempt to the VoIP provider's network; and

      f.     An identifier for the downstream provider to which the VoIP provider attempts to route the call.

75.     Since VoIP providers use these CDRs for billing purposes, they are incentivized to ensure that the CDRs are complete and accurate.

21

76. CDRs are maintained for some amount of time by every provider in order to, at a minimum, accurately bill an upstream provider for accepting and routing its call traffic.

77. Illegal robocalls create distinctive and identifiable patterns in CDRs. These calls are universally unexpected and unwanted, so most recipients hang up the phone immediately. Therefore, these calls typically connect for a very short duration, if at all. CDRs for illegal robocalls will often feature a high percentage of calls that are only a few seconds long. When examined in the aggregate, CDRs tend to show a very short average call duration.

78. Conversely, CDRs showing legitimate, consented-to robocalls or routine conversational call traffic typically have a much lower short call percentage, and a much longer average call duration.

79. Also, improper or questionable Caller ID spoofing—where a calling number is used relatively infrequently in relation to the total number of calls that are made with that number—is often apparent in CDRs and is indicative of illegal robocalls. Robocallers deceptively use spoofing to hide their identity, to circumvent call blocking and labeling tools, and to make it more likely that consumers will answer their calls.

80. Illegal robocallers frequently use caller ID spoofing to impersonate trusted organizations such as law enforcement, government agencies, and large corporations. These organizations' phone numbers are publicly available, and when these numbers appear in CDRs for calls that originate abroad, these robocalls are irrefutably illegal.

81. Patterns of neighbor spoofing or impersonating trusted numbers are easy to detect when present in CDRs and indicate that the upstream provider is sending illegal calls across the downstream provider's network.

82. Another identifier of illegal robocalls captured by CDRs is the presence of high numbers of unique calling phone numbers initiating calls. This technique of using a calling number only a handful of times to avoid detection by call blocking analytics is called "snowshoeing" or using "disposable" phone numbers.

22

83. As described above, illegal robocallers and telemarketers use the "snowshoeing" method of spoofing—using a calling number only once or a handful of times to avoid detection—to prevent large providers and legitimate companies from identifying and blocking the phone numbers the bad actors are using to perpetrate scam calls.

84. Legitimate telemarketers and people who make calls for ordinary business or personal purposes use the same phone number or a certain limited block of numbers for each placed call. For this reason, CDRs for legitimate traffic reflect that the total number of calls is significantly greater than the total number of unique calling phone numbers used. However, CDRs for illegal call traffic reflect close to a 1-1 ratio for the total number of calls to the total number of unique phone numbers.

85. The presence of high rates of calls to phone numbers on the National Do Not Call Registry ("National DNC Registry")[19] is another way to distinguish illegal robocalls and telemarketing calls from legitimate calls. Substantial volumes of illegal calls are placed to phone numbers on the National DNC Registry because problematic robocallers are unlikely to respect legal prohibitions on calling numbers on the National DNC Registry.

**Patterns of Illegal Calls Identified in Avid Telecom's Call Detail Records**

86. A preliminary review of CDRs from some of Avid Telecom's downstream providers shows that, between December 31, 2018, and January 31, 2023, Avid Telecom made and/or attempted to make more than 24.5 billion calls. Among the approximately 21 billion calls made to valid U.S. phone numbers, about 93% of those calls had a call duration of less than 15 seconds.

87. This significantly high percentage of calls of "short duration" calls that lasted only 15 seconds or less, coupled with the use of high volumes of different Caller IDs or

---

[19] FTC, National Do Not Call Registry, https://www.donotcall.gov/ (last visited May 18, 2023).

23

DIDS to place the calls, which Caller IDs significantly matched the call recipient's area code, are commonplace patterns of illegal call traffic.

88.    A preliminary review of Avid Telecom's call traffic shows that Avid Telecom regularly routed high volumes of calls consistent with patterns of illegal call traffic to phone numbers across the United States.  For instance:

        a.     Between January 1, 2019, and November 3, 2022, Avid Telecom routed to its downstream customer All Access Telecom more than 4.52 billion calls—an average of over 3.2 million calls per day transmitted to this provider alone—that were placed to over 685.7 million phone numbers across the country.  More than 474.8 million different Caller ID or DID numbers were used to place those calls, over 72% of which were used to make just one telephone call.  Among these calling numbers, over 58% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.   Of the 27% of these 4.52 billion calls that were actually answered, the average call duration was only 16 seconds.

        b.     Between June 18, 2021, and January 31, 2023, Avid Telecom routed to its downstream customer Bandwidth more than 587.8 million calls—an average of over 991,000 calls per day transmitted to this provider alone—that were placed to over 121 million phone numbers across the country.  More than 55.5 million different Caller ID or DID numbers were used to place those calls, over 71% of which were used to make just one telephone call.  Among these calling numbers, over 70% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.  Only 26% of the total calls sent were answered, and more than 124.4 million of those calls were only between 6 and 15 seconds.

c.   Between February 2, 2022, and January 30, 2023, Avid Telecom routed to its downstream customer Carrier Connect more than 513.6 million calls—an average of over 1.4 million calls per day transmitted to this provider alone—that were placed to over 106.2 million phone numbers across the country.  More than 78.9 million different Caller ID or DID numbers were used to place those calls, over 80% of which were used to make just one or two telephone calls.  Among these calling numbers, more than 30% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.  Of the only 16% of these 513.6 million calls that were answered, the average call duration was 19 seconds.

d.   Between December 31, 2018, and November 10, 2022, Avid Telecom routed to its downstream customer Inteliquent more than 2.96 billion calls—an average of over 2.1 million calls per day transmitted to this provider alone—that were placed to over 508.5 million phone numbers across the country.  More than 273.3 million different Caller ID or DID numbers were used to place those calls, over 80% of which were used to make just one telephone call.  Among these calling numbers, more than 64% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.  Of the approximately 50% of these 2.96 billion calls that were answered, the average call duration was only 18 seconds.

e.   Between February 2, 2022, and January 23, 2023, Avid Telecom routed to its downstream customer Secure Voice more than 2.94 billion calls—an average of over 8.3 million calls per day transmitted to this provider alone—that were placed to over 289 million phone numbers across the country.  More than 194 million different Caller ID or DID numbers were used to place those calls, over 71% of which

were used to make just one telephone call.  Among these calling numbers, more than 69% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.  Of the approximately 52% of these 2.94 billion calls that were answered, the average call lasted only 5 seconds.

f.    Between March 12, 2020, and October 31, 2020, Avid Telecom routed to its downstream customer VoIP Innovations more than 856 million calls—an average of over 3.67 million calls per day transmitted to this provider alone—that were placed to over 243 million phone numbers across the country.  More than 56.1 million different Caller ID or DID numbers were used to place those calls, over 84% of which were used to make just one telephone call.  Among these calling numbers, more than 51% matched the call recipient's area code, with a small percentage of that matching both the area code and local exchange.  Of the 31% of these 856 million calls that were answered, the average call duration was 14 seconds.

g.    More than 7.5 billion of the almost 21 billion calls sent and/or transmitted to U.S.-based telephone numbers by Avid Telecom since 2019 that were reviewed by Plaintiffs were calls made to telephone numbers registered on the National DNC Registry at the time of this filing.  A majority of these phone numbers were on the National DNC Registry at the time the calls were sent and/or transmitted by Avid Telecom.

h.    An initial review also shows that, since 2019, Avid Telecom sent and/or transmitted more than 1 million calls to consumers in the Plaintiffs' respective jurisdictions that were illegal and/or violative of federal and state law.

i.   These unlawful calls sent by Avid included Social Security Administration scams, Medicare scams, auto warranty scams, Amazon scams, DirecTV scams, and credit card interest rate reduction scams.

89.   For example, since 2019:

a.   Avid Telecom routed more than 25,983 calls containing unlawful content to phone numbers with Alabama area codes.

b.   Avid Telecom routed more than 28,790 calls containing unlawful content to phone numbers with Arizona area codes.

c.   Avid Telecom routed more than 12,811 calls containing unlawful content to phone numbers with Arkansas area codes.

d.   Avid Telecom routed more than 80,989 calls containing unlawful content to phone numbers with California area codes.

e.   Avid Telecom routed more than 19,861 calls containing unlawful content to phone numbers with Colorado area codes.

f.   Avid Telecom routed more than 13,825 calls containing unlawful content to phone numbers with Connecticut area codes.

g.   Avid Telecom routed more than 3,601 calls containing unlawful content to phone numbers with Delaware area codes.

h.   Avid Telecom routed more than 1,004 calls containing unlawful content to phone numbers with District of Columbia area codes.

i.   Avid Telecom routed more than 94,167 calls containing unlawful content to phone numbers with Florida area codes.

j.   Avid Telecom routed more than 56,779 calls containing unlawful content to phone numbers with Georgia area codes.

k.   Avid Telecom routed more than 1,975 calls containing unlawful content to phone numbers with Hawaii area codes.

1        l.      Avid Telecom routed more than 5,920 calls containing unlawful
2                content to phone numbers with Idaho area codes.

3        m.     Avid Telecom routed more than 46,737 calls containing unlawful
4                content to phone numbers with Illinois area codes.

5        n.      Avid Telecom routed more than 3,225 calls containing unlawful
6                content to phone numbers with Indiana area codes.

7        o.      Avid Telecom routed more than 8,197 calls containing unlawful
8                content to phone numbers with Iowa area codes.

9        p.      Avid Telecom routed more than 7,509 calls containing unlawful
10       content to phone numbers with Kansas area codes.

11      q.     Avid Telecom routed more than 12,819 calls containing unlawful
12       content to phone numbers with Kentucky area codes.

13      r.      Avid Telecom routed more than 13,780 calls containing unlawful
14       content to phone numbers with Louisiana area codes.

15      s.      Avid Telecom routed more than 3,208 calls containing unlawful
16       content to phone numbers with Maine area codes.

17      t.      Avid Telecom routed more than 27,097 calls containing unlawful
18       content to phone numbers with Maryland area codes.

19      u.     Avid Telecom routed more than 6,894 calls containing unlawful
20       content to phone numbers with Massachusetts area codes.

21      v.      Avid Telecom routed more than 16,861 calls containing unlawful
22       content to phone numbers with Michigan area codes.

23      w.    Avid Telecom routed more than 14,935 calls containing unlawful
24       content to phone numbers with Minnesota area codes.

25      x.      Avid Telecom routed more than 7,611 calls containing unlawful
26       content to phone numbers with Mississippi area codes.

27      y.      Avid Telecom routed more than 2,734 calls containing unlawful
28       content to phone numbers with Missouri area codes.

z.   Avid Telecom routed more than 3,539 calls containing unlawful content to phone numbers with Montana area codes.

aa.   Avid Telecom routed more than 1,119 calls containing unlawful content to phone numbers with Nebraska area codes.

bb.   Avid Telecom routed more than 13,990 calls containing unlawful content to phone numbers with Nevada area codes.

cc.   Avid Telecom routed more than 4,666 calls containing unlawful content to phone numbers with New Hampshire area codes.

dd.   Avid Telecom routed more than 33,514 calls containing unlawful content to phone numbers with New Jersey area codes.

ee.   Avid Telecom routed more than 6,034 calls containing unlawful content to phone numbers with New Mexico area codes.

ff.   Avid Telecom routed more than 79,558 calls containing unlawful content to phone numbers with New York area codes.

gg.   Avid Telecom routed more than 46,375 calls containing unlawful content to phone numbers with North Carolina area codes.

hh.   Avid Telecom routed more than 275 calls containing unlawful content to phone numbers with North Dakota area codes.

ii.   Avid Telecom routed more than 36,890 calls containing unlawful content to phone numbers with Ohio area codes.

jj.   Avid Telecom routed more than 11,828 calls containing unlawful content to phone numbers with Oklahoma area codes.

kk.   Avid Telecom routed more than 11,450 calls containing unlawful content to phone numbers with Oregon area codes.

ll.   Avid Telecom routed more than 48,933 calls containing unlawful content to phone numbers with Pennsylvania area codes.

mm.   Avid Telecom routed more than 3,031 calls containing unlawful content to phone numbers with Rhode Island area codes.

nn.    Avid Telecom routed more than 11,339 calls containing unlawful content to phone numbers with South Carolina area codes.

oo.    Avid Telecom routed more than 36,455 calls containing unlawful content to phone numbers with Tennessee area codes.

pp.    Avid Telecom routed more than 82,140 calls containing unlawful content to phone numbers with Texas area codes.

qq.    Avid Telecom routed more than 10,078 calls containing unlawful content to phone numbers with Utah area codes.

rr.    Avid Telecom routed more than 1,895 calls containing unlawful content to phone numbers with Vermont area codes.

ss.    Avid Telecom routed more than 33,764 calls containing unlawful content to phone numbers with Virginia area codes.

tt.    Avid Telecom routed more than 2,737 calls containing unlawful content to phone numbers with Washington State area codes.

uu.    Avid Telecom routed more than 3,983 calls containing unlawful content to phone numbers with West Virginia area codes.

vv.    Avid Telecom routed more than 11,692 calls containing unlawful content to phone numbers with Wisconsin area codes.

ww.    Avid Telecom routed more than 2,255 calls containing unlawful content to phone numbers with Wyoming area codes.

90.    The following are transcripts of a small sample of the many unlawful campaigns that Avid Telecom routed to consumers in the Plaintiffs' respective jurisdictions. [20]

---

[20] These call transcripts were identified through YouMail which publishes robocall call transcripts and reports through a publicly available no-cost website. YouMail is a private company that offers call protection and call answering services to consumers and robocall intelligence and mitigation solutions to providers and enterprises.

a. Social Security Disability Eligibility Scam:[21]

*Hello, this is Audrey and I'm a social security disability advisor on a recorded line and you can press one to be removed. Now, I show here that you recently inquired about your eligibility for social security disability benefits. Can you hear me okay? Is help people qualify for up to $2600 a month in Social Security disability. I'm with benefit advisors and my call back is 866-201-3779.*

b. Medicare Rewards Scam:[22]

*Hi, there. This is Ethan on a recorded line calling from Medicare rewards. Can you hear me okay? Hi, I am with Medicare rewards regarding Medicare insurance and my callback number is 866-951-2946.*

c. Auto Warranty "Final Courtesy" Extension Scam:[23]

*Hi, this is Amy and I'm giving you a call from the Dealer Service Center. We recently noticed your car's extended warranty was going to expire and wanted to give you one final courtesy call before your warranty expires and your coverage is voided. This would make you financially responsible for all service repairs. Press one now if you wish to extend or reinstate your car's warranty. Once again, press one now or press two to be placed on the do not call list or call our 800 number at 833-304-1447 UST 456.*

---

[21] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s3diZGlyXzhndmRmYTp0b21jYXQ5NDI3OjE1OTI1MTE1MjAxMTdoiECp4v.gen.mp3 (last visited May 18, 2023).

[22] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s6diZGlyX3B3bGRmYTp0b21jYXQ1MTc3OjE2MzQwNTk2MDMyNDFH1qhdu2.gen.mp3 (last visited May 18, 2023).

[23] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s3diZGlyX3Q2ZmRmYTp0b21jYXQ5OTcyOjE2MTQzNjM5OTI1MzU0wIBqxo.gen.mp3 (last visited May 18, 2023).

31

      d.    Employment Request Scam:[24]

> *Hi this is Chloe. I'm in our company's employment and staffing department on a recorded line and I show here that you inquired about a job in one of our websites. Can you hear me okay? So, I'm with EduMatcher and you can press one to be removed, and I show here that we have multiple jobs available in your area. Uhm, so what kind of job are you looking for? Again, I'm with EduMatcher and in case we get disconnected, my call back number is 888-441-0868.*

      e.    Amazon Account Debit Scam:[25]

> *Dear customer. Thank you for your purchase on Amazon shopping. This call is to inform you that your purchase for Apple Mac Book Pro will be delivered shortly and amount of $1,539 will be debited from your account for this purchase. If you authorize these charges, no action required, and if you did not authorize this charge press one to speak to Amazon customer support.*

      f.    DirecTV Discount Scam:[26]

> *Hi, I'm calling you from AT&T DirectTV. This call is to let you know that your account has been qualified for a 50% off. In order to avail the discounts, kindly call us back on the number you see on your Caller ID. Thank you and have a great day.*

91.    Plaintiffs have determined that Defendants made and routed calls into and across the United States that used illegally spoofed phone numbers to deliberately disguise

---

[24] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s3diZGlyX3R2OWRmYTp0b21jYXQ2MTY5OjE1ODkzOTEzNjk5NTddJNKpA8i.gen.mp3 (last visited May 18, 2023).

[25] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s3diZGlyX2RiOWRmYTp0b21jYXQ0MzA4OjE1OTk3NDYxMTE4MTB2bSysOC.gen.mp3 (last visited May 18, 2023).

[26] YouMail, Inc., https://media.youmail.com/mcs/glb/audio/s3diZGlyX3dtemRmYTp0b21jYXQyODQzOjE2MDI4NzE3NDQxOTRRFtgH74U.gen.mp3 (last visited May 18, 2023).

32

calls as legitimate call traffic from local, state, and federal government agencies within the United States.

92. Since 2019, Defendants also sent and/or transmitted more than 8.4 million calls across Avid Telecom's network that used spoofed Caller ID numbers which misrepresented the callers' affiliations with federal law enforcement agencies, state law enforcement agencies, and private sector entities.

93. These illegally spoofed calling numbers in Avid Telecom's call traffic, identified as "Do Not Originate" numbers, were associated with the following federal and state law enforcement agencies:

a.  Social Security Administration;

b.  Internal Revenue Service;

c.  Federal Bureau of Investigations;

d.  U.S. Treasury Inspector General for Tax Administration;

e.  U.S. Department of Health and Human Services;

f.  U.S. Immigration and Customs Enforcement;

g.  U.S. Department of Homeland Security;

h.  U.S. Secret Service

i.  U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives;

j.  Cybersecurity and Infrastructure Security Agency of the U.S. Department of Homeland Security;

k.  Office for Civil Rights and Civil Liberties of the U.S. Department of Homeland Security;

l.  U.S. Customs and Border Protection;

m.  Federal Communications Commission;

n.  Federal Trade Commission;

o.  U.S. Postal Service;

p.  United States District Court of the Southern District of New York;

q.  New Jersey Court System;

r.      Los Angeles Police Department Headquarters;

s.      New York Police Department;

t.      Virginia State Police Department;

u.      Phoenix Police Department Headquarters (Arizona);

v.      Raleigh Police Department (North Carolina); and

w.      Boulder Police Department (Colorado).


94.      These illegally spoofed calling numbers in Avid Telecom's call traffic, identified as "Do Not Originate" numbers, were also associated with established private sector entities including Comcast, USAA, Wells Fargo, Apple, Amazon, Experian, American Express, Citi, Bank of America, Mastercard, Visa, Chase, Discover Bank, Microsoft, UPS, FedEx, Best Buy, Walmart, Target, Venmo, First National Bank, Fifth Third Bank, Charles Schwab Corp, Boost Mobile, Verizon, AT&T, Quicken Loans, Coinbase, CenturyLink, eBay, E*TRADE, Groupon, and Merrill Lynch.

95.      Industry resources are available to voice service providers from various sources to implement blocking from numbers.

96.      Since 2019, Avid Telecom sent and/or routed more than 21.5 billion calls that were made using more than 1.3 billion Caller ID or DID numbers. Of those, more than 604.5 million calls were made using more than 155.4 million invalid Caller ID numbers, which means the calling number used to make the call was one that used a combination of

numbers that are not currently assigned and/or recognized as valid by the North American Numbering Plan Administrator ("NANPA").[27]

## OVERVIEW OF AVID TELECOM'S TRACEBACKS AND
## OTHER THIRD-PARTY NOTICES OF WRONGDOING

97.     In Avid Telecom's capacity as a provider of interconnected VoIP, it received Traceback requests from, and communicated with, ITG.

98.     Established in 2015, the ITG is a private collaborative industry group[28]—composed of providers across wireline, wireless, VOIP, and cable services—that traces and identifies the sources of illegal robocalls.

99.     The ITG's traceback operations are managed by a team of employees and contractors who work daily with industry and government partners to identify sources of illegal robocalling campaigns.

100.    Every day, the ITG traces back numerous robocalls, which are representative examples of the most prolific, ongoing, identified and suspected illegal robocall campaigns in the United States, equaling millions of illegal calls targeting U.S. consumers. The ITG

---

[27] The NANPA is the entity responsible for the neutral administration of the North American Numbering Plan ("NANP") numbering resources, as designated by the FCC. The NANPA's responsibilities are defined by the FCC.  NANP numbers are ten-digit numbers consisting of a three-digit Numbering Plan Area ("NPA") code, commonly called an area code, followed by a seven-digit local number.  The format is usually represented as **NPA-NXX-XXXX**, where N is any digit from 2 through 9 and X is any digit from 0 through 9.  *See* NANPA, *About NANPA*, https://www.nationalnanpa.com/about_us/index.html.

[28] In December 2019, Congress enacted the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (hereinafter "the TRACED Act") to combat the scourge of unlawful robocalls.  *See* Pub. L. No. 116-105, § 13(d), 133 Stat. 3274 (2019). Following its enactment, the FCC designated the ITG as the official private-led traceback consortium charged with leading the voice communications industry's efforts to trace the origin of suspected illegal robocalls through various communications networks through tracebacks.  *See* 47 C.F.R. § 64.1203.

35

provides notice to providers that are implicated in the call path for suspected and known illegal call traffic. The ITG also shares information from those traceback investigations with federal and state enforcement agencies, which information supports law enforcement actions.[29]

*The remainder of this page is intentionally left blank.*

---

[29] Industry Traceback Group, *Working with the Industry Traceback Group*, https://tracebacks.org/for-government/.

101.    Below are examples of two notices ITG sent Avid Telecom:

From: traceback-notice@tracebacks.org

To: noc@avid-telecom.com, reeves@avid-telecom.com

Date: 18 Mar 21 13:53 UTC

# USTELECOM | THE BROADBAND ASSOCIATION

Dear Voice Service Provider:

**An Industry Traceback Group (ITG) participant recently received traffic from your network that has been deemed suspicious, and we are seeking your assistance in order to identify its origin. Consistent with U.S. federal law and regulations, the ITG requests that you identify the source of this potentially fraudulent, abusive or unlawful network traffic. *Information, including call details, related to this traceback request is available in the ITG's secure online portal linked below.***

We appreciate your past support of the ITG, the official U.S. Federal Communications Commission-designated traceback consortium. We are writing to request your assistance on a traceback investigation that we reasonably believe involves fraudulent, abusive or potentially unlawful robocalls. We request that you assist industry stakeholders who are engaging in traceback efforts in order to help identify the source of this potentially fraudulent, abusive or unlawful network traffic. We would appreciate a response to this traceback inquiry in three business days or sooner, but please let us know if you need additional time.

Please respond by clicking the link below, which will take you to our secure traceback portal. There, you can indicate who sourced the call(s) to you. **For confidentiality and security purposes, please provide this information** *only* **through the online portal and** *not* **via email.**

Feel free to reply to this email with any questions, and we appreciate your continued support of ITG efforts.

Best Regards,

Josh Bercu
Vice President, Policy & Advocacy
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
Washington, DC 20001

**Submit your response via our secure on-line portal:**
**Redacted**
**(URL is a private login; do not share.)**

**Call Details for Traceback #4550** 0 seconds ago

| Campaign: | VZ-AutoWarrantyExtend |
|---|---|
| Date/Time: | 2021-03-10 14:54:00 +0000 UTC |
| To: | +16065480641 |
| From: | +13526123068 |

Calls to wireless numbers offering to extend or reinstate an auto warranty. Random auto-dialing. Sample message: "We've been trying to reach you concerning your car's extended warranty. You should have received something in the mail about your car's extended warranty. Since we have not gotten a response, we are giving you a final courtesy call before we close out your file. Press 2 to be removed and put on our do not call list; press 1 to speak with someone about possibly extending or reinstating your car's warranty. Again, press 1 to speak with a warranty specialist when calling from automotive services, if you would like to be removed from our calling list please call toll-free [PHONE]." Many variants of the message are used. To listen to the specific message for the call, please listen to the audio provided within the traceback, if available.

37

From: traceback-notice@tracebacks.org

To: noc@avid-telecom.com, reeves@avid-telecom.com

Date: 09 Apr 21 15:49 UTC

## USTELECOM | THE BROADBAND ASSOCIATION

Dear Voice Service Provider:

**An Industry Traceback Group (ITG) participant recently received traffic from your network that has been deemed suspicious, and we are seeking your assistance in order to identify its origin. Consistent with U.S. federal law and regulations, the ITG requests that you identify the source of this potentially fraudulent, abusive or unlawful network traffic. *Information, including call details, related to this traceback request is available in the ITG's secure online portal linked below.***

We appreciate your past support of the ITG, the official U.S. Federal Communications Commission-designated traceback consortium. We are writing to request your assistance on a traceback investigation that we reasonably believe involves fraudulent, abusive or potentially unlawful robocalls. We request that you assist industry stakeholders who are engaging in traceback efforts in order to help identify the source of this potentially fraudulent, abusive or unlawful network traffic. We would appreciate a response to this traceback inquiry in three business days or sooner, but please let us know if you need additional time.

Please respond by clicking the link below, which will take you to our secure traceback portal. There, you can indicate who sourced the call(s) to you. **For confidentiality and security purposes, please provide this information** *only* **through the online portal and** *not* **via email.**

Feel free to reply to this email with any questions, and we appreciate your continued support of ITG efforts.

Best Regards,

Josh Bercu
Vice President, Policy & Advocacy
USTelecom – The Broadband Association
601 New Jersey Avenue NW, Suite 600
Washington, DC 20001

Submit your response via our secure on-line portal:
**Redacted**
(URL is a private login; do not share.)

**Call Details for Traceback #4768** 0 seconds ago

| | |
|---|---|
| Campaign: | SSA-DisabilityAdvisor |
| Date/Time: | 2021-04-08 13:41:30 +0000 UTC |
| To: | +18046788776 |
| From: | +18046218566 |

Recorded voice says this is a Social Security Disability Advisor, suggesting caller is affiliated with SSA. Message, captured in consumer voice-mailbox, does not conform to 47 CFR § 64.1200(b): Must state name of business at beginning of message and must include toll-free callback number for automated opt-out. Many different caller-IDs so blocking the ANI is not effective. Access portal to listen to audio. This call is just one example representative of millions of calls. Callback connects to IVR that does disclose name of originating business nor give access to live agent.

102.    The ITG traces back the most prolific or damaging ongoing identified or suspected illegal robocall campaigns in the United States. This "Traceback" process starts when the ITG sends a notice to the "terminating provider," the voice service provider who delivered the call that is the subject of the Traceback to the call recipient. The notice contains a recording or description of the identified or suspected illegal robocall and requests that the terminating provider respond and identify the company which transmitted the call to that provider. The ITG then sends a notification to the company that sent the

38

terminating provider the call, and the process repeats until the ITG determines the source of the call or reaches a company that refuses to respond to the Traceback notification.

103.   Defendants were aware of the ITG Traceback process.

104.   Other third parties notified Defendants of illegal calls, including calls made in violation of statutes and regulations concerning the National DNC Registry and state Do Not Call Lists.

105.   The ITG notified Avid Telecom at least 329 times since January 6, 2020, about identified or suspected illegal calls that transited Avid Telecom's network.

106.   The ITG estimates that each traced call is representative of a large volume of similar illegal calls,[30] meaning Avid Telecom has caused vast numbers of scam robocalls to reach US consumers, despite multiple notifications of this identified and suspected illegal call traffic.

107.   Of these 329 representative calls traced back by the ITG, 160 calls were made to phone numbers on the National DNC Registry.

108.   Based on its Tracebacks, Avid Telecom knew that it routed identified scam calls, including government imposter, Amazon imposter, Apple imposter, and utility scams. Avid Telecom also routed many auto warranty, health insurance, and student loan robocalls.

109.   The following are some of Avid Telecom's upstream voice service provider customers and/or retail customers that have routed identified illegal robocalls to Avid Telecom that were the subject of Tracebacks:

---

[30] USTelecom, *Industry Traceback Group Policies and Procedures*, at 5 (revised April 2022) (*ITG Policies & Procedures*) (defining "campaign" as "[a] group of calls with identical or nearly identical messaging as determined by the content and calling patterns of the caller," where "[a] single Campaign often represents hundreds of thousands or millions of calls"), *available at* https://tracebacks.org/wp-content/uploads/2022/04/ITG-Policies-and-Procedures-Updated-Apr-2022.pdf.

39

| Customer | Approx. # of Tracebacks |
|---|---|
| Airespring | 4 |
| AllClear Connect | 7 |
| Autelecom LLC | 21 |
| BestiumPro | 2 |
| Connexum LLC | 9 |
| DID Central | 8 |
| Digital Media Solutions | 39 |
| Great Choice Telecom LLC | 22 |
| Great Lakes Communication | 24 |
| Icon Global Services | 8 |
| JSquared / RPG / Rising Eagle | 19 |
| Mobi Telecom LLC | 75 |
| Modok | 1 |
| NGL Communications LLC | 3 |
| Red Telecom LLC | 2 |
| StrategicIT | 1 |
| TCA VoIP | 1 |
| Telcast Network / Voovertel | 4 |
| Telesero / Fiducia | 7 |
| Tellza / Phonetime / Matchcom | 2 |
| Third Rock Telecom | 2 |
| TouchTone | 2 |
| Trixcom / Vibtree Technologies, LLC | 8 |
| Urth Access, LLC | 12 |
| VOIP Terminator / BL Marketing | 6 |
| Yodel Technologies / Yodel Voice | 8 |

110.     Of the providers from which Avid Telecom accepted and routed identified and known illegal robocalls, the FCC has sent Robocall Cease-and-Desist Letters which are publicly available to the following Avid customers:

        a.     Airespring;

        b.     Great Choice Telecom;

        c.     Icon Global;

        d.     Mobi Telecom;

        e.     Third Rock;

        f.     Yodel Tech; and

        g.     Urth Access.

111.     Further, on June 9, 2020, the FCC brought an enforcement action against Avid Telecom's customer John Spiller and JSquared Telecom LLC, which ultimately resulted in a record $225 million fine issued in March 2021.[31]

112.     Also on June 9, 2020, eight states—Arkansas, Indiana, Michigan, Missouri, North Carolina, North Dakota,[32] Ohio, and Texas—sued John Spiller, JSquared Telecom LLC, and several other related entities.[33]

113.     Defendants knew about the Cease-and-Desist Letters sent to its customers, knew about the FCC's enforcement action against John Spiller and JSquared Telecom

---

[31] *See FCC Proposes Record $225 Million Fine for 1 Billion Spoofed Robocalls*, FCC, (June 10, 2022), https://www.fcc.gov/document/fcc-proposes-record-225-million-fine-1-billion-spoofed-robocalls-0; *FCC Fines Telemarketer $225 Million for Spoofed Robocalls*, FCC (March 21, 2021), https://www.fcc.gov/document/fcc-fines-telemarketer-225-million-spoofed-robocalls.

[32] The State of North Dakota was added as a plaintiff in the *Rising Eagle* case in the First Amended Complaint filed on August, 28, 2020.

[33] *State of Texas et al. v. Rising Eagle Capital Group LLC et al.*, 4:20-cv-02021 (S.D.TX 2020).

LLC, and knew about the States' lawsuit filed against its customer John Spiller and JSquared Telecom LLC, and several other related entities.

114.    On April 19, 2021, the State of Vermont and StrategicIT—another of Avid Telecom's customers—entered into an Assurance of Discontinuance because of StrategicIT's illegal robocall traffic.[34]

115.    On March 18, 2022, the State of Vermont brought an action against TCA VoIP—another of Avid Telecom's customers—alleging that it knowingly facilitated illegal robocalls.[35]

116.    On April 26, 2022, the FTC brought a case against VoIP Terminator, Inc.—another of Avid Telecom's customers—for "assisting and facilitating the transmission of millions of illegal prerecorded telemarketing robocalls, including those they knew or should have known were scams, to consumers nationwide."[36]

117.    On July 7, 2022, the FCC[37] and the State of Ohio[38] took simultaneous enforcement actions against a massive auto warranty robocall operation run by recidivist

---

[34]   The Assurance can be found here: https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2021/04/Executed-AOD-SITP.pdf.

[35]   *State of Vermont v. Dominic Bohnett, et al.*, 5:22-cv-00069 (D.C.V. Mar. 18, 2022) https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2022/03/TCA-VOIP-Complaint.pdf.

[36]   *VoIP Terminator, Inc.*, FTC (Apr. 26, 2022), https://www.ftc.gov/legal-library/browse/cases-proceedings/1923189-voip-terminator-inc-us-v.

[37]   *FCC Takes Actions Against Auto Warranty Scam Robocall Campaign* FCC (July 7, 2022), https://www.fcc.gov/document/fcc-takes-actions-against-auto-warranty-scam-robocall-campaign.

[38]   *State of Ohio, ex rel Attorney General Yost v. Aaron Michael Jones, et al.*, U.S. District Court S.D. OH, Case No. 2:22-CV-2700 (July 7, 2022).

42

robocallers, Aaron Michael Jones[39] ("Jones") and Roy M. Cox, Jr.[40] ("Cox"). Jones and Cox operated through a common enterprise involving numerous individuals and business entities including but not limited to, Sumco Panama SA, Sumco Panama USA, Virtual Telecom Kft, Virtual Telecom Inc., Davis Telecom Inc., Geist Telecom LLC, Fugle Telecom LLC, Tech Direct LLC, Mobi Telecom LLC—another of Avid Telecom's customers—and Posting Express Inc. (collectively, "Sumco" or "Sumco Enterprise").

118.    On December 23, 2022, the FCC subsequently issued a Notice of Apparent Liability against certain individuals and entities involved in the Sumco Enterprise robocall operation, proposing a $299,997,000 fine.[41]

119.    On September 12 and 13, 2022, Avid Telecom received nine Tracebacks concerning another of its customers, Urth Access, for transmitting Student Loan robocalls. Three of the robocalls[42] were made to phone numbers on the National DNC Registry.

120.    On or around September 19, 2022, almost one week after receiving the ITG notices concerning Urth Access, Reeves reached out to ITG about these Tracebacks.

121.    A representative from ITG wrote back to Reeves:

> Thanks Stacey.  Is your question about the tracebacks in light of the originating provider claiming its customer has consent for the calls? If so, I think there's a few things worth flagging and that we can share. As an initial matter, we only trace (and keep tracing) these types of lead generation campaigns when we have reason to believe the

---

[39] See, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *FTC v. Pointbreak Media, LLC*, No. 0:18-cv-61017 (S.D. Fla.); *State of Texas v. SCM Media, Inc,* No. A-09-cv-387 (W.D. Tex); See, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *State of Texas v. SCM Media, Inc,* No. A-09-cv-387 (W.D. Tex).

[40] *See United States v. Cox*, No. 8:11-cv-01910 (C.D. Cal.).

[41] *See FCC Proposes Nearly $300M Fine Against Auto Warranty Scam Robocaller*, FCC, (Dec. 23, 2022), https://www.fcc.gov/document/fcc-proposes-nearly-300m-fine-against-auto-warranty-scam-robocaller.

[42] A recording of the robocall can be heard here: https://portal.tracebacks.org/api/public/attachments/1033499.

campaign is in violation of telemarketing laws. This includes evidence that calls into question whether there is valid consent, such as examples of the calls hitting honeypots at high volume (where no person could consent to the call) and data that the campaign is at such high volume that it calls into question whether there is in fact valid consent. Indeed, Federal Trade Commission officials have made clear that exceptionally high volume is a reason to question valid consent to receive telephone solicitations that are part of a prerecorded telemarketing campaign.

In this case, there are several additional issues with the campaign, including with the content of the call. First, the recording fails entirely to provide a toll free call back number as required by 47 C.F.R. § 64.1200(b)(3) of the Federal Communications Commission's rules. Second, the robocall identifies the Student Loan Forgiveness Center as the caller. A simple internet search does not yield a website for a "Student Loan Forgiveness Center." To the extent such business exists, it appears unlikely based on its lack of internet presence that it has the scale and scope to have valid consent to be making hundreds of thousands of these calls per day. Indeed, the only information an internet search yields is complaints about the unwanted calls and suggestions it's a scam. See https://www.yelp.com/biz/student-loan-forgiveness-center-irvine.

Other information yielded in the traceback raised more red flags. (We are working on ways to responsibly unleash more of this information to the provider ecosystem, but for now note that nothing precludes a provider from requesting from its upstream provider this type of information, including what the provider's response to the ITG.) Most notably, while the originating provider claimed the caller had consent, the purported caller was not the "Student Loan Forgiveness Center" nor even in the financial sector. The caller instead was reportedly in the health sector, and the consent was purportedly provided on a page about health insurance. The fine print buried on a separate page suggests that by giving them your number, you are consenting to receiving telemarketing calls from over 10,000 entities, including numerous that themselves are lead generators. This is not consistent with the Federal Trade Commission's requirements under the Telemarketing Sales Rule nor the Federal Communications Commission's requirements under the Telephone Consumer Protection Act. I hope this helps if you had questions about the campaign and the claims of consent. To the extent it was something

44

else regarding those tracebacks, please let us know and we can set up a call to discuss.

122.    Avid Telecom continued sending Urth Access's traffic after this notification from ITG and received yet another Traceback regarding a student loan robocall from Urth Access on October 26, 2022.

123.    Avid Telecom allowed Urth Access to submit payment for services using bank accounts held in names of one or more other business entities.

124.    On November 10, 2022, the FCC issued a robocall cease-and-desist letter to Avid Telecom's customer Urth Access.[43]

125.    On December 8, 2022, the FCC ordered VoIP service providers, including Avid Telecom, to block student loan robocalls coming from Urth Access.[44]

126.    In another example, Avid Telecom provided ITG with problematic evidence of consent for several of its Tracebacks.

127.    In response to a July 2021 Traceback, Avid Telecom responded, "We have notified the customer and have asked that they provide response.  Until we have complete understanding, we have taken steps to block the dialed number.  We will update once we have their response."

128.    On July 23, 2021, Avid Telecom wrote to the ITG: "We have had additional conversations with our customer.  They are performing an internal investigation to determine why these numbers were provided to them as valid numbers.  We will update with more detailed information as soon as we have it."

---

[43] *FCC Issues Robocall Cease-and-Desist Letter to Urth Access,* FCC (Nov. 10, 2022), https://www.fcc.gov/document/fcc-issues-robocall-cease-and-desist-letter-urth-access.

[44] *FCC Orders Voice Service Providers to Block Student Loan Robocalls*, FCC (Dec. 8, 2022),   https://www.fcc.gov/document/fcc-orders-voice-service-providers-block-student-loan-robocalls.

45

129.    In response to a December 3, 2021, Traceback for the same customer, Avid Telecom wrote to the ITG: "Based on information we have, calling party calls based only on valid permission.  We have requested the 'Opt In' and will provide once received. Please confirm issue with recording - recording states that called party qualifies for a no cost insurance analysis."

130.    This Traceback was for a Medicare rewards related call.

131.    On December 10, 2021, Avid Telecom responded with "proof" of a consumer's consent or "opt-in" information that was said to be obtained from either super-sweepstakes.com or shareyourfreebies.com.

132.    Neither of these websites are related to Medicare, health insurance, or medicine.

133.    Further, the alleged consent for the December 3, 2021 Traceback was for an out-of-service number assigned to a large voice communications provider. The owner of the number would not and could not have consented to the call, as it was part of the voice service provider's robocall tracking program. No end user was assigned to the phone number that could have provided consent.

134.    For a similar Medicare call on December 10, 2021, Avid Telecom provided "proof" of a consumer's consent or "opt-in" information that was said to have been given on January 24, 2019 through a website of https://www.flashrewards.co/default.aspx.

135.    This website is not related to Medicare, health insurance, or medicine.

136.    Again, the alleged consent for the December 10 call was for an out-of-service number assigned to a large voice service provider. The owner of the number would not have consented to the call, as it was part of the voice service provider's robocall tracking program.

137.    Between September 19 and September 21, 2022, Avid Telecom provided ITG with screenshots of websites that had purportedly obtained consent from the consumers called.

138.    For a call related to Social Security Disability Consultant, Reeves provided this screenshot as proof of consent:



139.    A    recording    of    the    call    can    be    found    here:
https://portal.tracebacks.org/api/public/attachments/1041845.

140.    The robocall was regarding disability benefits. It was a solicitation for products or services and had nothing to do with nursing jobs in Las Vegas, Nevada.

141.    The robocall failed to announce the name of the seller on behalf the robocall was being made.

142.    This is a clear violation of the TSR, and Defendants were on notice that their customer was violating the TSR.

143.   The website purports to be for nursing jobs in Las Vegas, Nevada and not calls about disability benefits, and was not legitimate or actual proof of consent from a consumer to receive the call that was the subject of the Traceback.

144.   Further, the grant of consent is to thousands of potential calling entities, which could and should have alerted Defendants their customer lacked proper consent to make these robocalls.

145.   For another call regarding Social Security Disability Consultant, Reeves provided this screenshot as proof of consent:



146.   A recording of the call can be found here: https://portal.tracebacks.org/api/public/attachments/1041847.

147.   The robocall was regarding disability benefits. It was a solicitation for products or services.

148.   The robocall failed to announce the name of the seller on behalf the robocall was being made.

149.   This is a clear violation of the TSR, and Defendants were on notice that their customer was violating the TSR.

150.   This consent form purports to give thousands of different people or entities consent to call the consumer, which should have alerted Defendants their customer lacked proper consent to make these robocalls.

151.   For an auto warranty call, Reeves provided this screenshot:



49

152.   A recording of the robocall can be found here: https://portal.tracebacks.org/api/public/attachments/1043172.

153.   The robocall was regarding auto warranties. It was a solicitation for products or services and had nothing to do with nursing jobs in Nevada.

154.   The robocall failed to announce the name of the seller on behalf the robocall was being made.

155.   This is a clear violation of the TSR, and Defendants were on notice that their customer was violating the TSR.

156.   The website purports to be for nursing jobs in Nevada and not information about auto warranties or auto warranty calls, and was not legitimate or actual proof of consent from a consumer to receive the call that was the subject of the Traceback

157.   Further, the grant of consent is to thousands of potential calling entities, which should have alerted Defendants their customer lacked proper consent to make these robocalls.

*The remainder of this page is intentionally left blank.*

158.    For another auto warranty call, Reeves provided this screenshot:



159.    A    recording    of    the    robocall    can    be    found    here:
https://portal.tracebacks.org/api/public/attachments/1043174.

160.    The robocall was regarding auto warranties. It was a solicitation for products or services and had nothing to do with free sample products.

161.    The robocall failed to announce the name of the seller on behalf the robocall was being made.

162.    This is a clear violation of the TSR, and Defendants were on notice that their customer was violating the TSR.

163.    The website purports to be for trying free products and not information about auto warranties or auto warranty calls and was not legitimate or actual proof of consent from a consumer to receive the call that was the subject of the Traceback.

164.    Further, the grant of consent is to thousands of potential calling entities, which should have alerted Defendants their customer lacked proper consent to make these robocalls.

165.    For another auto warranty call, Reeves provided this screenshot:



166.    A recording of the robocall can be found here: https://portal.tracebacks.org/api/public/attachments/1043262.

167.    The robocall was regarding auto warranties. It was a solicitation for products or services and had nothing to do with mortgages or refinances.

168.    The robocall failed to announce the name of the seller on behalf the robocall was being made.

169.    This is a clear violation of the TSR, and Defendants were on notice that their customer was violating the TSR.

170.    The website purports to be for refinance programs or mortgage programs and not information about auto warranties or auto warranty calls and was not legitimate or actual proof of consent from a consumer to receive the call that was the subject of the Traceback.

171.    Further, the grant of consent is to thousands of potential calling entities, which should have alerted Defendants their customer lacked proper consent to make these robocalls.

172.    For all these robocalls, Avid Telecom knew or should have known its customer did not have valid consent to make these robocalls.

173.    All these notices and the obvious lack of consent make clear that this call traffic was part of one or more illegal robocall schemes.

174.    On March 10, 2023, Reeves responded to another Traceback—ITG Traceback No. 12443—with evidence of alleged consent, and further stated: "Although customer has valid opt-in as shown above, they have added the number to their global do not call list in order to resolve this consumer complaint."

175.    An ITG representative responded as follows:

> Avid:  This traceback is based on a referral where a consumer complained that the consumer received the call multiple times from several numbers but had never opted in to it.  Please also note that email address you provided is invalid, which may indicate that the opt-in was not valid.  In addition, note that the IP address is a different geographic location from the consumer's address.   For all of these reasons, the ITG continues to have a reasonable basis to suspect that this call and others in the same campaign are unlawful.  As a result,

53

the ITG will not mark this traceback as Strike Exempt and may continue to trace back the same campaign.

The ITG will, however, keep a record of this and any other communications, which will be made available to any law enforcement or regulatory agency that makes a lawful demand for information that includes this traceback.

176.    On March 10, 2023, Reeves also responded to ITG Traceback No. 12480 as follows:  "Although customer has valid opt-in for the call, the number has been added to their global do not call list in order to fully resolve the consumer complaint.  The number has also been blocked in Avid's switch."

177.    An ITG representative responded as follows:

Avid:  The traceback is based on a referral where the consumer the robocall several times per day from different numbers, without ever opting in.  The consumer also asked to be added to the caller's do-not-call list to no avail.  We also are aware of numerous other complaints regarding the same calling campaign with similar allegations. Further, the ITG has many other examples of the same campaign, including reach numbers for which the ITG has evidence that no consent was provided.

Finally, please note that the website you provided includes hundreds of entities in a second hyperlink, which may not be consistent with regulators' expectations for consent.  The website also indicates that the consumer is providing consent for a loan quote, but the call is regarding disability benefits.

For these reasons, the ITG continues to have a reasonable basis to suspect that the call and others in the campaign are unlawful.  As a result, the ITG will not mark the traceback as Strike Exempt, and may continue to trace back the campaign.

Please note, however, that a record of this and all other communications will be maintained and will be provided to a law enforcement or regulatory agency that makes a lawful demand for information that includes this traceback.

178.   Upon information and belief, Avid Telecom continues to route this customer's robocalls.

## Illustrative Examples of Direct Downstream Provider Notices to Defendants About Illegal Robocall Traffic

179.   Further, Defendants were on notice from downstream providers that their customers were sending identified and suspected illegal traffic, which included illegal robocalls. The examples below are a small sample of notices sent to Defendants.

## Notices from Talkie Communications

180.   On March 3, 2020, Talkie Communications ("Talkie") notified, via email, Avid Telecom that Avid was sending "toll free pumping / spoofing" calls.

181.   Avid Telecom responded to this notice: "The ORIG number was blocked, and the upstream carrier was notified."

182.   On March 11, 2020, Talkie notified, via email, Avid Telecom that Talkie had received several complaints Avid Telecom was sending a "Google business verification scam."

183.   Avid Telecom responded to this scam notice: "The ORIG number was blocked, and the upstream carrier was notified."

## Notices from Red Telecom

184.   On April 15, 2020, a Red Telecom, LLC employee Skype messaged Lansky that he was "sending a TON" of spoofed Social Security scam calls.

185.    On January 31, 2022, in a Skype chat, Reeves notified Red Telecom that "I've blocked Vermont."

186.    Upon information and belief, Defendants intentionally blocked or stopped some telephone calls being routed to the State of Vermont.

187.    An analysis of Avid Telecom's CDRs show that Avid Telecom routed a minimal amount of call traffic to Vermont's area code of 802 from January 30, 2022 to April 24, 2022.

188.    Specifically blocking robocall traffic to an area code is another indication Defendants knew their traffic was illegal and likely to draw an investigation by the Vermont Attorney General.

189.    On March 25, 2022, in a Skype chat, Reeves notified Red Telecom, "Most of my high short duration traffic will now be coming to you signed with an A."

190.    On May 5, 2022, in a Skype chat, when discussing a third-party call blocking feature, Reeves wrote to Red Telecom that she was turning it off for some customers.

191.    On July 11, 2022, in a Skype chat, Red Telecom notified Reeves of a Traceback, regarding calls impersonating Amazon.

192.    Reeves responded: "Nice- just perfect."

193.    On July 21, 2022, in a Skype chat, Red Telecom notified Reeves of the FCC enforcement action against Sumco Panama.

194.    Reeves responded: "I just saw that."

195.    On October 5, 2022, in a Skype chat, Reeves described to Red Telecom that one of Avid Telecom's customers was a "turn key solution for call centers."

196.    On October 11, 2022, in a Skype chat, Reeves, regarding a third-party provider's honeypots, wrote to Red Telecom: "and now I know what his honeypot AI sounds like. At least for now because I'm sure he will change it."

197.    On December 9, 2022, in a Skype chat, Red Telecom inquired about Avid Telecom's lower traffic, Reeves responded: "Many insurance campaigns are over,. (sic) so this may be the volume through the end of the year."

198.    On January 3, 2023, in a Skype chat, Red Telecom followed up on why the traffic was still slow. Reeves responded: "they've slowed down their dialing. New campaigns won't start until mid Jan."

### Notices from Verizon

199.    On December 16, 2020, Verizon sent Lansky a letter regarding the "very large volume of" robocalls Avid Telecom was routing to Verizon.

200.    On December 16, 2020, Lansky responded: "I have asked that our VP of Operations quickly and thoroughly review our traffic to Verizon and make adjustments as necessary to remove as much of this traffic as possible, as quickly as possible. We understand the problematic issues that this type of traffic produces and clearly are willing to work with Verizon to do everything possible to mitigate this traffic altogether."

201.    On January 20, 2021, Verizon notified Lansky that Verizon was shutting off Avid Telecom's traffic because of "unacceptable levels of illegal or unwanted robocalls."

202.    Lansky responded: "We of course have not been sending you any traffic as your pricing has not been winning any. We term over 10 million mins a day of voice traffic with Verizon winning only a few dollars of it. We again as mentioned, can send you more and better traffic if the pricing was better."

### Notices from Call48

203.    On September 13, 2021, Call48 notified Avid Telecom of a "high volume of SPAM calls" regarding auto warranty messages.

204.    Reeves responded: "These calls are not considered spam. Our customer has Opt-Ins for their calls, and, as you know, uses valid ANI's."

205.    On October 19, 2021, Call48 notified Reeves of auto warranty robocalls being sent to someone whose number had been listed on the National DNC Registry since 2006.

206.    Reeves responded: "We have blocked the destination number on Avid's network and have requested the number be removed from the customer call list."

207.    On November 1, 2021, Call48 notified Avid Telecom of robocalls from "Senior Aid Helper" to someone who was on the National DNC Registry.

208.    Reeves responded: "We have blocked the destination number . . . on Avid's switch and have requested that our customer remove the number from their call list."

209.    On November 8, 2021, Call48 notified Avid Telecom of unwanted calls to a phone number on the National DNC Registry.

210.    Reeves responded: "We have blocked the destination number on Avid's switch and have requested that our customer remove the number from their call list."

211.    Reeves further responded: "To further confirm, our customer complies with TCPA guidelines. Calls are made based on Opt Ins only."

212.    On January 21, 2022, Call48 notified Lansky and Reeves that: "My guys are complaining that you are sending his dialer traffic down 2 of the 3 conversational trunks again and they are at risk of being shut down for good. Can you do what you can to clean this up and get them off my back?"

213.    On January 25, 2022, Call48 followed up that they were shutting down the route because the stats were too bad.

214.    On May 18, 2022, Call48 notified Avid Telecom that an individual was receiving robocalls from the "vehicle service center" despite not consenting to the calls or owning a car.

215.    Reeves responded: "We have blocked the terminating number from Avid's network and have required that our customer remove the number from all call lists."

216.   On June 16, 2022, Call48 notified Avid Telecom of a complaint regarding auto warranty calls going to someone who was on the National DNC Registry. The complainant asked for more information about the owner of the calling phone number.

217.   Reeves responded: "The destination number has been blocked in Avid's switch, and we have required our customer to remove the destination number from all dialing campaigns and block the number in their switch so the number is not included in future campaigns. As a note, our customer uses valid permission to dial. Also, per regulatory requirements and contractual requirements, we do not share customer information with a corresponding subpoena."

218.   On August 20, 2022, Call48 notified Avid Telecom unwanted car warranty calls, specifically that the caller does not honor the National DNC Registry. The alleged calls were sent through Avid Telecom on August 15, 2022. Call48 followed up on this notification several times.

219.   On August 30, 2022, Reeves eventually responded that "customer who sent the call to Avid's network has been terminated."

<u>Notices from Dorial Telecom</u>

220.   On October 12, 2020, Dorial Telecom ("Dorial") notified Avid Telecom and Lansky of Social Security Fraud traffic. The email included recordings of the illegal robocalls.

221.   One recording stated: "Hello, this call is from the Social Security Administration. The reason for this call is to inform you that your Social Security Number is suspended and there is an arrest warrant in your name. Please press one to talk to a Social Security Administration officer and know more about the case."

222.   A second recording stated: "This is an important notice from the Social Security Administration. The reason you have received this notice from our department because we have found some suspicious and fraudulent activities under your Social

59

Security Number and we are going to suspend the IP. So if you want to know about this and talk to our representative, please press one. I repeat, press one to connect."

223.   On October 8, 2021, Dorial notified Avid Telecom that Dorial's downstream provider was complaining about auto warranty traffic.

224.   Reeves responded: "The traffic is not fraud. Our customer had opt-ins and uses valid ANI's for terminating traffic. We have removed you from our routing."

225.   On November 3, 2021, Dorial notified Avid Telecom that:

> You sent us 34415 disconnected number calls and these are the ones we had in our database, there where (sic) many more. We cannot assign you ports and misuse them for disconnected number calling customers. . . .

> You sent us 9406 calls with unallocated ANI's, this is real fraud traffic, we do not want this traffic.

226.   On June 14, 2022, Dorial notified Reeves that: "Based on the excel sheet for the new/second trunk, that traffic has an SDP over 80% and an ACD of less than 10 sec. I don't know what they are doing but I don't think that we are interested in terminating that kind of traffic."

227.   Reeves responded: "Understood."

228.   Further, on August 17, 2022, Dorial's COO emailed Reeves asking why Avid Telecom's traffic was low.

229.   On August 18, 2022, Reeves responded: "the majority of our traffic is high SD, low ACD traffic."

230.   Dorial's COO then asked how the traffic level was on Avid Telecom's side.

231.   Reeves responded: "We saw a decline with that 2nd FCC order regarding the auto warranty companies. Given the amount there was in the marketplace, I'm not surprised it effected (sic) traffic."

232.   The companies in the referenced FCC order were discussed above and direct customers of Avid Telecom.

Notices from Telco Connection

233.    On March 31, 2022, Telco Connection notified Avid Telecom of "IRS impersonation calls/spoofing."

234.    Avid Telecom responded: "We have blocked the ANI and notified the originating carrier customers of the issue."

235.    On August 4, 2022, Telco Connection notified Avid Telecom of "IRS impersonation calls/spoofing."

236.    Avid Telecom responded: "We have blocked the ANI and notified the appropriate customer."

Notices from All Access Telecom

237.    On April 26, 2021, All Access Telecom notified Lansky and Reeves that: "Please be advised, due to the recent multiple tickets received, All Access Telecom is requesting Avid Telecom to remove customers from routing that are related to the AutoWarrantyExtend US Telecom tracebacks effective ASAP." All Access Telecom followed up two days later to alert Lansky and Reeves that the traffic had to be stopped.

238.    On April 28, 2021, Lansky responded: "I believe we have already moved it this morning."

239.    On August 24, 2021, All Access Telecom notified Avid Telecom of "Medicare scam" traffic.

Notices from Peerless Network

240.    On March 3, 2020, Peerless Network notified Avid Telecom that: "the following TNs Peerless assigned to your company are experiencing high levels of complaints tied to the FTC DNC and IRS complaints."

241.    On May 21, 2021, Peerless Network notified Avid Telecom that Peerless had "been made aware of an issue from one our downstream vendors and we need you guys to reach out to your end use that is sending these call to stop sending the calls (Auto Warranty scam)."

242.    Reeves responded: "What is exactly the issue with the traffic?"

243.    To which, Peerless Network responded:

> Multiple carriers of ours have complained that the calls are for Car Warranty scams. I have instructed the NOC to immediately block until the issue can be resolved.

> hi this is Katie and Im giving you a call from the dealer service center we recently noticed your card extended warranty was going to expire and wanted to give you one final courtesy call before your warranty expires and your coverage is voided this would make you financially responsible for all Service Repairs press 1 now if you wish to extend or reinstate your cars warranty once again press one now or press 2 to be placed on a Do Not Call List you can also call 833-3041 for….

244.    On May 21, 2021, Lansky then responded: "We have blocked that customers (sic) traffic to you."

245.    After May 21, 2021, Avid Telecom received 53 Tracebacks from ITG regarding Auto Warranty robocall traffic.

246.    On June 7, 2021, Peerless Network provided a list of FTC complaints related to DIDs Avid Telecom was renting or owning.

247.    On June 9, 2021, Peerless Network notified Avid Telecom of unwanted calls to someone on the National DNC Registry. The complainant specifically requested "I need to know who the carrier is and the business associated with these calls."

248.    Lansky responded: "As I understand, per APNI laws, rules and regulations until they have a subpoena, you nor Avid can release any records to an individual or organization."

62

249.    On June 11, 2021, Reeves responded: "DIDs are being used by a publicly traded company in compliance with all regulations."

### Notices from Inteliquent

250.    On June 26, 2020, Inteliquent[45] notified Avid Telecom of auto warranty robocalls being routed by Avid Telecom.

251.    On March 3, 2021, Inteliquent notified Avid Telecom of more auto warranty robocalls.

252.    On March 4, 2021, Reeves responded: "Customer has Opt Ins for all calls, however, we have blocked the terminating number."

253.    Inteliquent then asked if the opt ins could be passed along to the complainant.

254.    Reeves responded: "I do not have access to the Opt In."

255.    On April 14, 2021, Inteliquent notified Avid Telecom of more auto warranty robocalls.

256.    On April 14, 2021, Reeves responded: "Avid takes these issues and the vetting of our customers very seriously. We have notified our customer of the complaint and have asked that they investigate. We have also taken steps to block the ANI from terminating via Avid's network."

257.    On May 11, 2021, Inteliquent notified Avid Telecom of more auto warranty robocalls.

258.    On June 8, 2021, Inteliquent notified Avid Telecom of more auto warranty robocalls.

259.    On June 9, 2021, Avid Telecom responded: "Based on information Avid has received, Customer is compliant with all requests for Opt Ins and follows guidelines with regard to dialing. We have, however, blocked the listed ANI's from Inteliquent's network."

---

[45] In 2021, Inteliquent was acquired by Sinch.

260.    On June 15, 2021, Inteliquent notified Avid Telecom of more auto warranty robocalls.

261.    On June 15, 2021, Reeves responded: "Customer is compliant with regulations."

262.    Inteliquent responded: "You should take another look at this. We are working directly with Verizon and their honeypot captures and those are numbers that could, in no way, be opted in to receive anything."

263.    On June 15, 2021, Inteliquent sent Avid Telecom a warning letter regarding Avid Telecom's traffic. The letter stated, in part:

> Inteliquent's systems and processes have flagged your account as potentially carrying fraudulent robocalling traffic. In the past several months, we have received complaints that calls originating from your account have been used for scams and other wrongful purposes. As you know, impermissible robocalling violates the Federal Communications Commission's rules as well as other federal and state laws.
>
> We are sending you this notice to demand that you investigate, actively participate in any traceback or other investigation, and cease originating any traffic that may be unlawful.

264.    Lansky responded: "Understood and we take these issues incredibly serious. We have notified this customer of the issues and are working with them as we do with customers to help them mitigate this from our network and to keep all traffic within the acceptable regulatory guidelines."

265.    One month later, on July 13, 2021, Inteliquent emailed Lansky and Reeves, stating: "It has been nearly a month since this initial warning was sent and we have not seen improvement[.]"

266.    On July 13, 2021, Reeves responded: "I've made the final changes to remove a couple of problematic customers. We've also taken steps to notify the problematic carriers of the issues, but, again, the traffic has been removed from Inteliquent."

64

267.    On July 22, 2021, Inteliquent notified Reeves and Lansky: "Also, we have been receiving quite a few auto-warranty scam complaints and as we've sent them out to our customers the traceback has come back as a few points they are receiving those from, but you are one of them.  I've had to turn a few customers down for these and hope we don't get there with AVID, can you please share some details with me on what you are doing to get these off your network?"

268.    On July 23, 2021, Reeves responded: "As to the warranty traffic, we are continually working to remove this traffic from our network.  We have been able to identify most of our customers who are sending the traffic, but, as you know, it continues to pop up from other sources."

269.    Nevertheless, Defendants knowingly continued to route auto-warranty robocall traffic.

270.    On September 21, 2021, Inteliquent notified Avid Telecom of auto warranty robocall traffic.

271.    On April 11, 2022, Inteliquent sent Avid Telecom a Know-Your-Customer Notice because Avid Telecom's traffic was problematic. Further, Inteliquent notified Defendants that their traffic was hitting a large number of honeypots.

272.    Reeves replied: "We are reviewing the stats and had already resolved the SD issues on both trunks.  I have now removed the low ASR traffic from the SD trunk and will monitor tomorrow to ensure the guidelines are met."

273.    On July 30, 2022, Inteliquent sent Avid Telecom another Know-Your-Customer Notice because Avid Telecom's traffic was problematic. Further, Inteliquent notified Defendants that their traffic was hitting a large number of honeypots.

274.    On September 27, 2022, Inteliquent sent Avid Telecom another Know-Your-Customer Notice because Avid Telecom's traffic was problematic.

275.    Specifically, Inteliquent stated: "For your traffic, specific concern would be the spike in Tracebacks this month.  Can you please take a look and advise?"

276.    Inteliquent counted five Avid Telecom Tracebacks.

277. In September of 2022, Avid Telecom received at least 23 Tracebacks. Nine of the calls that were the subject of the Tracebacks were to telephone numbers on the National DNC Registry.

278. Upon information and belief, fourteen of the calls were to honeypots that would not have been able to provide consent to the calls received.

279. Internally, on September 27, 2022, Lansky emailed Reeves: "Stupid tracebacks."

280. On September 27, 2022, Reeves responded to Inteliquent: "We have been working with our customer to obtain the consumer permission documentation. The investigation is not completed, however, the information we have received to this point is valid."

281. On September 14, 2022, Inteliquent notified Avid Telecom that a call Avid Telecom routed went to a honeypot.

282. Reeves responded: "We have blocked the destination number and have notified our customer of the issue. We are requiring that the number be removed from their call list."

283. On November 7, 2022, Inteliquent notified Avid Telecom that it was terminating the Master Service Agreement.

*The remainder of this page is intentionally left blank.*

284.   On November 7, 2022, Lansky responded with this email:

From: Michael Lansky[lansky@avid-telecom.com]
Sent: Mon 11/7/2022 8:02:18 PM Coordinated Universal Time
Subject: RE: Termination of MSA: Avid Telecom, LLC

I'm just shocked to receive this email. Despite what the press release implies, Avid has not been charged with doing anything wrong by the State of Indiana. They have simply issued an investigative demand for Avid to produce records. The demand is overbearing and goes well beyond anything that would be deemed reasonable in a court of law.

We had engaged with the Indiana State AG's office through three formally written responses and several in person meetings with our Indiana based attorney to find a way to work with the AG in order to reduce the overbearing amount of data required by the CID. As an example, they were asking for 2 years of CDRs, all communications, all contracts, financials, customer payment methods, etc. During the meetings, the AG's office stated that, as they had with several other carriers, they were willing to offer a reasonable compromise regarding the requests made in the CID. We made it very clear that we were willing to respond in a similar manner as those renegotiated terms. We, like the State of Indiana, have a strong desire to keep the bad guys out of our industry. We have always cooperated with all state and federal regulatory and law enforcement agencies answering all CID/Subpoena. .

As to specifics in the press release, the referenced skype quotes were over 2/3 years old and were taken completely out of context. Those quotes were part of the conversation in which we terminated the customer. Either the AG's office didn't have or chose not to release the parts of the conversation where we required the customer had to remove any traffic that was considered to be illegal for us to even consider reestablishing their route to terminate traffic. The skypes show that the customer stated he had removed all questionable traffic. We therefore gave the customer a small amount of ports to test how clean the traffic was. However, we received a traceback within a few days, and we terminated the customer permanently. And to further clarify, this was prior to customer receiving formal allegations/fines against him.

As you may know many of the recent tracebacks we have received as of late were generated by one individual who seemingly has a vendetta against Avid. Until a couple of weeks ago they were trying to sell us their services which we chose not to purchase. Somehow this person was able to see our responses to those tracebacks and sent us direct emails questioning information in our traceback response and contrary to proof in the tracebacks showing the calls were legal, further claimed the calls to be illegal/fraud calls. Much of the information this person is sending to certain AG's is grossly misleading and most of it 100% wrong. They have now reached out to our customers directly through use of contact information gained in the ITG portal and are attempting to sell their services to our customer.

I understand this decision might have been made by people who may not be aware of all of the underlying facts. Therefore, we would like to see if we can have a conversation with you and any parties you think would be willing to further understand the chain events and our very active engagement with the Indiana AG. We have had a very strong relationship with Inteliquent/Sinch for many years and hope that Inteliqunet/Sinch will allow us to tell the facts as they truly occurred. Please let us know if there is an opportunity have a discussion as we would very much like to reverse this decision.

Michael Lansky

285.   On November 8, 2022, a representative from Inteliquent responded:

I received both your below email and your voicemail.  As you suggested, I wasn't the decision-maker here.  This comes from our executive team.  I know, for example, that they became aware of the Indiana petition, including the Skype conversations you had with a third-party, where you agreed to act as a commercial reference. They were troubled by that, among other things.  I'll add that our KYC policy and our approach to these sorts of matters are very strict.  As such, I am instructed to tell you that the decision stands.

67

286.    Lansky responded with this email:

From: Michael Lansky[lansky@avid-telecom.com]
Sent: Tue 11/8/2022 8:19:09 PM Coordinated Universal Time
Subject: RE: Termination of MSA: Avid Telecom, LLC

Hey Stacy,

Just to address the issue you said they had a concern with. Again much that skype message was taken out of context- there was never any intention to provide a commercial reference, and one was never given.

The customer was disconnected shortly thereafter. After 10 years of very good business with Inteliquent/Sinch to lose such a valuable business relationship over an unfounded accusation is devastating. This action rewards the bullies for making outlandish unsubstantiated and reckless claims. Again, I know that you are not the decision maker on these issues but I would hope that you can see the inequity of this situation and maybe try to see if we can just pause this and allow us to make our case. On the same issue, at a minimum we need at least 30 days to reassign/redirect the substantial amount of DID's

I have to believe there has to be a way to resolve this to benefit both Avid and Inteliquent/Sinch and not let politics get the better of both of us. Let us know about what we can do with the DID's in the interim.

Michael Lansky

## Notices from Bandwidth

287.    On June 11, 2020, Bandwidth notified Avid Telecom and Lansky that Bandwidth "has been notified that Avid Telecom has been identified as the sender of improper or illegal robocalls in six different tracebacks . . . Bandwidth's review of Avid's traffic profile also raises further concerns."

288.    On January 20, 2021, Bandwidth notified Avid Telecom regarding spoofing and possible violations of Bandwidth's Acceptable Use Policy.

289.    Reeves responded: "We have blocked the originating number and have notified our originating carrier customer. They are working to identify their originating customer and will be blocking them."

290.    On January 26, 2021, Bandwidth notified Avid Telecom regarding spoofing and possible violations of Bandwidth's Acceptable Use Policy.

291.    Avid Telecom responded: "We have blocked this number."

292.    On April 5, 2021, Bandwidth notified Avid Telecom regarding spoofing and possible violations of Bandwidth's Acceptable Use Policy.

293.    Avid Telecom responded to the spoofing notice: "We apologize for the issue. The ANI has been blocked, and the originating customer has been notified."

294.   On April 24, 2021, Bandwidth notified Avid Telecom regarding spoofing and possible violations of Bandwidth's Acceptable Use Policy.

295.   Reeves responded: "We have reviewed the information and have blocked the ANI and notified our originating customer."

296.   On February 10, 2023, Bandwidth notified Avid Telecom that Bandwidth has: "identified some potentially fraudulent traffic being sent by your network to these areas." The area was: "USA-IA (+1712775*)".

297.   On February 10, 2023, Reeves responded: "We have contacted our customer with regarding the nature of the traffic. In the meantime, we have removed the conversational customer from routing via Bandwidth and have blocked the originating number."

## Notices Show Defendants' Knowledge of Participation in
## Illegal Robocalling Schemes

298.   The notices above came from Avid Telecom's downstream providers and/or ITG.

299.   By receiving these notices, Defendants knew their services were being used to facilitate illegal robocalling.

300.   Despite the voluminous number of complaints and notices from multiple sources, Defendants continued offering services to entities and persons sending illegal robocalls.

301.   In several instances, despite being given evidence their clients did not have the legal authority to make or initiate so many robocalls, Defendants portrayed their clients as having valid consent to send robocalls.

302.   Defendants had ample opportunities to shut off their illegal traffic.

303.   In most instances, they made the business decision to continue routing illegal robocalls.

69

304.    Further, the notices show a pattern of Defendants not taking illegal robocalls seriously. In many instances, they respond that they have either blocked the calling number or the called number. Then, they took no further action. This is a wholly inadequate response. Avid Telecom was routing millions of robocalls per day, and blocking one number, is analogous to stopping a single raindrop in a thunderstorm.

## SAMPLING OF AVID TELECOM'S CUSTOMERS

### John Spiller and His Entities

305.    On June 9, 2020, the States of Arkansas, Indiana, Michigan, Missouri, North Carolina, North Dakota, Ohio, and Texas sued John Spiller ("Spiller"), Rising Eagle Capital Group LLC, JSquared Telecom LLC, and other entities in *State of Texas et al. v. Rising Eagle Capital Group LLC et al.,* 4:20-cv-02021 (S.D.T.X 2020).

306.    John Spiller, Rising Eagle Capital Group LLC, JSquared Telecom LLC and Spiller's other entity, Great Choice Telecom LLC, were customers of Avid Telecom.

307.    Spiller used Avid Telecom to send his own robocalls and the robocalls of his customers.

308.    At some points in time, Spiller was a seller or telemarketer.

309.    From May 2019 until March 2021, Spiller used Avid Telecom to send over 4 billion calls.

310.    In some instances, Spiller sent auto warranty robocalls to Avid Telecom. One such message states:

> We've been trying to reach you concerning your cars extended warranty. You should have received something in the mail about your cars extended warranty since we have not gotten a response. We are giving you a final courtesy call before we close out your file. Press two to be removed and put on our do not call list press one to speak with someone about possibly extending or reinstating your cars warranty. Again, press one to speak with a warranty specialist.

311. In some instances, the health care robocalls Spiller sent Avid Telecom delivered a pre-recorded message. One such message states:

> Hi, this is Ann. I am calling to let you know we have been granted a limited health enrollment period for a few weeks, so you and your family can get a great insurance plan at the price you can afford. And we make it hassle free to sign up. We have pre-approvals ready in your area including Cigna, Blue Cross, Aetna, United and many more. Press 1 to get a hassle-free assessment or press 2 to be placed on our do not call list. Thanks for your time and be healthy and blessed.

312. For most of his robocalls, Spiller did not have the call recipient's consent to call them.

313. Many of Spiller's robocalls and the robocalls of his customers were to telephone numbers on the National DNC Registry and various state Do Not Call Lists.

314. Many of Spiller's robocalling customers initiated robocalls to telephone numbers on the National DNC Registry and various state Do Not Call Lists.

315. In total, three different Spiller entities paid Avid Telecom at least $555,000.

316. Further, Avid Telecom sold Spiller tens of thousands of DIDs.

317. Avid Telecom also purchased DIDs for Rising Eagle Capital Group, which was the entity Spiller used to send illegal robocalls.

318. Defendants had direct knowledge that Spiller was sending illegal call traffic to Avid Telecom's network.

319. Defendants have been on notice since on or around January 7, 2020, that Spiller was using their services and/or network to send illegal robocalls.

320. Defendants had many opportunities to shut down Spiller's traffic and did not choose to do so. Instead, Defendants accepted hundreds of thousands of dollars from Spiller to further his illegal robocalling schemes.

321. Defendants knew Spiller was using Avid Telecom to route illegal robocalls.

322. Defendants provided substantial assistance to Spiller in this process.

71

### Defendants Had Knowledge of Spiller's Robocalling Schemes and Substantially Assisted Him

323.    On or around January 7, 2020, Avid Telecom received its first Traceback related to JSquared.

324.    On or around February 17, 2020, Avid received its first Traceback related to JSquared for auto warranty robocalls.

325.    On or around June 19, 2020, Avid received its last Traceback related to JSquared.

326.    On or around August 24, 2020, Avid received its first Traceback related to Great Choice Telecom, another entity owned by Spiller. The Traceback was related to auto warranty robocalls.

327.    Avid Telecom continued to receive Tracebacks related to Great Choice Telecom until on or around December 17, 2021.

328.    Avid Telecom received 19 Tracebacks for JSquared Telecom's traffic.

329.    Avid Telecom received 22 Tracebacks for Great Choice Telecom's traffic.

330.    Avid Telecom received 41 Tracebacks regarding suspected or known illegal traffic sent to its network by a Spiller-owned entity.

331.    Defendants were on notice from the Tracebacks that Spiller was using Avid Telecom to route illegal robocall traffic.

332.    Lansky and Reeves took steps to hide Great Choice Telecom's true ownership from ITG and other entities.

333.    Despite knowing that Spiller's traffic was illegal and that he was sending calls to phone numbers on the National DNC Registry and various state Do Not Call Lists, Lansky and Reeves continued working with Spiller.

334.    Spiller regularly communicated with Lansky and Reeves via Skype. In the messages, Spiller went by the handle "onlywebleads."

335.    On June 10, 2020, Lansky and Spiller discussed the States' lawsuit and the FCC action and the impact it would have on Lansky and Spiller's relationship. In the end, Lansky agreed to continue taking Spiller's traffic, writing:

> Michael Lansky - 6/10/2020 10:51:05 AM
>      we are all good until something changes from the FCC etc

> Michael Lansky - 6/10/2020 10:51:23 AM
>          meaning this goes from alagtions to something more serious (sic)

> Michael Lansky - 6/10/2020 10:51:39 AM
>      until then we drive on as normal

336.    On June 17, 2020, Lansky confirmed he knew Spiller was sending Avid Telecom health care and auto warranty robocall traffic.

337.    On June 19, 2020, Spiller and Lansky discussed the creation of Great Choice Telecom. Spiller was going to use Great Choice Telecom "to run my traffic if the FCC shuts off my business." Spiller notified Lansky that Spiller would be the CEO of Great Choice but that the paperwork would be in someone else's name. Lansky responded: "let me know when you are ready to tansit (sic) over to the new company."

338.    In these messages, Lansky agreed to help Spiller switch his traffic to a new company thus avoiding being shut down by the FCC.

339.    On June 25, 2020, Lansky followed up with Spiller about when Spiller was going to switch the traffic to Great Choice.

340.    Sometime between June 25, 2020, and August 26, 2020, Lansky, Reeves, and/or Avid Telecom switched Spiller's JSquared Telecom account to Great Choice Telecom and replaced Spiller's information with that of Mikel Quinn.

341.    On August 26, 2020, in responding to Great Choice Telecom's first Traceback, Avid Telecom responded to the ITG with Mikel Quinn's information, and not Spiller's.

342.    On September 30, 2020, Lansky agreed to be a credit reference for Spiller and Great Choice for Peerless Network, under Spiller's alias Mikel Quinn. Lansky wrote: "no worries.. I will give you a good reference."

343.    Through 2020 and 2021, Avid Telecom and Great Choice received Tracebacks regarding Great Choice's illegal robocall traffic.

344.    On June 23, 2021, Reeves wrote to ITG in response to a Great Choice Traceback: "we are closing the customer route."

345.    On June 29, 2021, Reeves wrote to ITG in response to another Great Choice Traceback: "We have blocked the customer until the issue can be investigated."

346.    On August 26, 2021, Avid Telecom wrote to ITG in response to another Great Choice Traceback: "We are informing the customer and blocking the customer pending further investiation (sic)," and "The customer had previously been permanently blocked." *Id.*

347.    From August 26, 2021 to August 27, 2021, Lansky and Spiller discussed Avid Telecom shutting off Spiller's traffic. Lansky agreed to turn Spiller's traffic back on.

348.    On September 2, 2021, Lansky notified Spiller to "be careful on your traffic" and that there was "very little room for error right now."

349.    On October 14, 2021, Lansky agreed to be a reference for a business loan for which Spiller was applying. Spiller notified Lansky that Spiller was not using his real name because he was involved in a lawsuit.

350.    On October 27, 2021, Reeves wrote to ITG in response to another Great Choice Traceback: "The customer was disconnected this morning based on previous traceback received this morning."

351.    On October 27, 2021, Lansky notified Spiller of "two USTA tickets with horrible calls that you have not answered." According to Lansky, these were "pure fraud" calls, and that they would have to block Spiller's traffic.

352.    Spiller went on to ask if he could earn Avid Telecom back as a vendor.

353.   Lansky responded:

>Michael Lansky - 10/27/2021 1:21:07 PM
>>if another ticket hit.. and we didnt have you turned off... they would tell our vendors to turn us off

>onlywebleads - 10/27/2021 1:21:15 PM
>>Understood

>Michael Lansky - 10/27/2021 1:21:30 PM
>>the landscape got brutal

>onlywebleads - 10/27/2021 1:21:47 PM
>>I'm going to fix my traffic

>Michael Lansky - 10/27/2021 1:21:51 PM
>>lets just let is simmer for a bit

>Michael Lansky - 10/27/2021 1:22:05 PM
>>like a week or so...

>onlywebleads - 10/27/2021 1:22:06 PM
>>Give me a week to fix my shit on my side I apologize

>Michael Lansky - 10/27/2021 1:22:24 PM
>>maybe start you back with some limited ports

354.   Despite these warnings, Avid Telecom continued routing Spiller's call traffic after October 27, 2021.

355.   On December 20, 2021, Reeves wrote to the ITG in response to another Great Choice Traceback: "Customer route has been permanently closed."

## **Sampling of Avid Telecom's Notices to Spiller Regarding Illegal Robocalls**

356.   While Spiller was a customer, Avid Telecom emailed Spiller about illegal or suspect calls Spiller sent to Avid Telecom's network.

357.    On September 23, 2019, Avid Telecom emailed Spiller regarding a person's complaint: "I receive an insane amount of unsolicited phones calls from telemarketers despite being listed on the national do not call list."[46]

358.    On November 4, 2019, Avid Telecom emailed Spiller another complaint: "Stop all calls from Whitestone Health . . . to my phone number immediately. [Phone number] is on the DO NOT CALL REGISTRY."

359.    These calls to phone numbers on the National DNC Registry are clear violations of the TSR prohibition of unsolicited and non-consensual telemarketing calls to phone numbers on the National DNC Registry. Defendants were on notice their customer was sending such calls in violation of the law.

360.    On February 17, 2020, Avid Telecom emailed Spiller regarding "Fraudulent IRS calls."

361.    On February 21, 2020, Avid Telecom emailed Spiller regarding more IRS scam complaints.

362.    On March 4, 2020, Avid Telecom emailed Spiller regarding a "Medical Insurance Scam."

363.    On March 16, 2020, Avid Telecom emailed Spiller regarding a call to a person on the "Do Not Call registry."[47]

364.    On April 3, 2020, Avid Telecom emailed Spiller: "Please remove [telephone number] from your calling lists as soon as possible."

365.    On April 3, 2020, Lansky emailed Spiller: "This number happens to belong to a senior exc of one of the largest mobile providers in the country.. they call the President of our ULC who called me.. so Please remove from your lists.. (sic)"[48]

---

[46] The call recipient's phone number had a Wisconsin area code.

[47] The call recipient's phone number had a New York area code.

[48] ULC stands for Underlying Carrier.

366.    On April 8, 2020, Avid Telecom emailed Spiller regarding robocalls to a number on the National DNC Registry.

367.    On April 20, 2020, Avid Telecom emailed Spiller regarding spoofed robocalls.

368.    On June 15, 2020, Avid Telecom emailed Spiller regarding unsolicited calls to a phone number on the National DNC Registry.[49]

369.    On June 26, 2020, Avid Telecom emailed Spiller regarding auto warranty robocalls.

370.    Further, in a deposition, Spiller testified that Lansky, personally, helped Spiller with the content of Spiller's prerecorded messages.

## The Sumco Auto Warranty Calling Scheme

371.    Before joining Avid Telecom, Defendant Reeves worked at Modok, LLC ("Modok") from June 2017 to June 2020 as the Director of Network Operations. Modok was a VoIP service provider which ceased business following an action by the Michigan Attorney General's Office for its role in facilitating illegal robocalls.[50]    Robocalls specifically at issue in the action included "Social Security Administration scams" and "suspected auto warranty scams."

372.    In her position with Modok, Reeves knew the type of robocall traffic that Modok facilitated which caused it to be the subject of the Michigan law enforcement action and ultimately caused it to shut down in August of 2020.

---

[49] The call recipient's phone number had a California area code.

[50] Assurance of Voluntary Compliance of Modok, LLC, State of Michigan Attorney General Dana Nessel, August 3, 2020.

373.   Sumco was a customer of Modok from January 1, 2020, through July 2020. Reeves assisted in its onboarding as a new retail (end-user) customer.  Modok knew that Sumco was a high-volume call center customer delivering auto warranty robocalls.

374.   In her position at Modok, Reeves knew the type of robocall traffic that Sumco initiated as she corresponded with the ITG regarding Traceback requests related to Sumco's robocall traffic. Within four months of opening the Sumco account, Modok had received 11 Traceback requests regarding Sumco's traffic.

375.   Due to pressure Modok was receiving from the ITG to mitigate Sumco's robocall traffic, Modok opened a new wholesale account in April of 2020 for Sumco under the name, Virtual Telecom Kft.  Virtual Telecom Kft ("Virtual Telecom") was registered as a 499 Filer with the FCC and was purportedly located in Budapest, Hungary.  Modok set up a wholesale account for Sumco so that Modok would no longer appear to be the originating voice service provider for the Sumco robocall traffic. Reeves assisted with the account set up for Virtual Telecom and facilitated the acquisition of over 800,000 DID numbers for Sumco's use.

376.   On June 17, 2020, Avid enrolled Virtual Telecom Kft as a wholesale voice service provider customer.

377.   Virtual Telecom provided Avid with an address from Budapest, Hungary and a Proton email address, which is an encrypted email service based in Switzerland.

378.   Avid allowed Virtual Telecom to enroll for its VoIP service without executing a written agreement regarding the terms of services as Virtual Telecom agreed to pay in advance for its services.  Avid set up Virtual Telecom with its "Dialer Special" service, a plan designed for short duration call traffic. This plan enabled Virtual Telecom to utilize 5000 VoIP sessions with each of the sessions able to initiate 300 simultaneous calls per session.

379.   Within one week, Defendant Lansky increased Virtual Telecom's calling capabilities by adjusting the account settings to triple the sessions to 15,000 with 1,000 simultaneous calls per session.

78

380.   By August 28, 2020, Lansky had increased the calling capabilities to allow 40,000 sessions with each session able to initiate 3000 simultaneous calls per session.

381.   Reeves took a position with Avid as the Vice President of Operations and Sales in October of 2020. According to account history records, Reeves first accessed and performed tasks related to Virtual Telecom's account on October 27, 2020.

382.   Following a temporary reduction in Virtual Telecom's call capacity on September 21, 2020, to 30,000 sessions with 3,000 calls per session, Reeves increased the calling capabilities on the account to back 40,000 sessions with 3,200 calls per session on December 9, 2020.

383.   Defendants provided these astounding call capabilities while knowing or consciously avoiding knowing that its customer was engaged in or facilitating illegal robocalling.

384.   On August 25, 2020, Lansky changed the name and contact information in Avid Telecom's account management system for Virtual Telecom's account to Mobi Telecom, LLC ("Mobi").

385.   Mobi was a newly formed company registered with the Wyoming Secretary of State in June of 2020 and registered in the FCC's 499 Filer database as an interconnected VoIP provider on April 1, 2020.

386.   Avid received its first Traceback request from the ITG on August 18, 2020 related to robocalls from Virtual Telecom. The Traceback request showed that Virtual Telecom was facilitating auto warranty robocalls.  As is customary with Traceback requests, the ITG provided a transcript of the robocall campaign at issue:

Call Details for Traceback #2917 (new)

Date/Time:          2020-08-18 13:59 UTC
Campaign:           VZ-AutoWarrantyExtend

Calls to wireless numbers offering to extend or reinstate an auto warranty. Random auto-dialing. Wireless numbers never been in service or currently not in service. Message: We've been trying to reach you concerning your car's extended warranty you should have received something in the mail about your car's extended since we have not gotten a response we are giving you a final courtesy call before we close out your file press 2 to be removed and put on our do not call list press 1 to speak with someone about possibly extending or reinstating your car's warranty again press 1 to speak with a warranty specialist when calling from automotive services if you would like to be removed from our calling list please call toll-free 844-989-1708

79

387.    The Traceback request provided Avid with notice and evidence of the abusive nature of the robocall campaign at issue.  The Traceback stated that robocalls were being made to wireless numbers and via random autodialing, including calls to wireless numbers that had never been in service or were currently not in service.

388.    Random dialing and playing a prerecorded message is a violation of the TSR and the TCPA, as prerecorded messages require express consent from the called party. There is no way a randomly dialed number consented to receive a prerecorded call. Defendants were on notice their customer was violating the TSR and the TCPA.

389.    The Traceback request also provided a transcript of the robocall message. Contrary to the requirements of federal and state telemarketing laws, the transcript showed the prerecorded messages were sent with no disclosure as to the entity responsible for the solicitation.

390.    Avid Telecom reported to the ITG that the auto warranty traffic came from Mobi Telecom, despite knowing that payments related to this account never came from Mobi Telecom. Avid accepted over $2,426,000 in payments for services on this account from at least four different Sumco entities including:

        a.      at least $277,000 from Virtual Telecom, with the first payment taking place on November 4, 2020, after the name change on the account, and the final payment occurring on March 17, 2021;

        b.      at least $678,000 from Davis Telecom, with the first payment occurring on August 11, 2020, and the final payment occurring on March 24, 2021;

        c.      at least $1,398,000 from Nadis Consulting, with the first payment occurring on April 2, 2021, and the final payment occurring on November 2, 2021; and

d.    at least $76,000 from Hoba Consulting, with the first payment occurring on March 4, 2022, and the final payment occurring July 7, 2022.

391.    Avid also supplied DID numbers used for caller ID to another Sumco entity, Geist Telecom, LLC ("Geist"), which were likely paid for by the same third-party entities as the Virtual Telecom/Mobi account. On January 19, 2021, the Wisconsin Department of Agriculture, Trade and Consumer Protection issued a subpoena to Avid Telecom. The subpoena stated that the office was investigating possible violations of its consumer protection laws, including its telemarketing and direct solicitations statutes. The subpoena demanded records related to a telephone number associated with an "auto warranty" telephone solicitation. Avid Telecom produced records which indicated it "supplied" the target telephone number plus an additional 9,784 DIDs with Wisconsin area codes to its customer, Geist Telecom, LLC, 905 Broadway Street, Sheridan, Wyoming 82801. Avid Telecom supplied the telephone numbers to Geist, despite the fact that Geist was not obtaining VoIP services from Avid Telecom.

392.    The Ohio Attorney General's Office issued a subpoena to Avid related to the Virtual Telecom/Mobi Telecom account on February 10, 2021, referencing its investigatory authority under the Ohio's Consumer Sales Practices Act and Telephone Solicitation Sales Act.

393.    Avid provided substantial assistance and support to Sumco and its related entities while they initiated many of the auto warranty calls that plagued the United States over the last few years.

394.    From June 2020 to February 2021, Avid facilitated over 5 billion calls for Sumco through the Virtual Telecom/Mobi Telecom account. A review of call analytics for the Virtual Telecom/Mobi Telecom traffic illustrates that the traffic is unwanted robocalls. Of the 5 billion calls Avid facilitated, approximately 80% were less than 6 seconds in duration, with approximately 96% of the calls having a duration of less than 30 seconds.

81

Of the 5 billion calls facilitated, calls were made to approximately 650 million unique telephone numbers throughout the United States.

395.    Defendants knew or consciously avoided knowing that their customer was initiating massive volumes of robocalls to cellular and residential telephone numbers without having the requisite prior express written consent to deliver robocalls to 650 million unique telephone numbers.

396.    Many of Virtual Telecom's/Mobi Telecom's calls were to telephone numbers on the National DNC Registry and various state Do Not Call Lists. Of the 5 billion calls Avid facilitated, at least 100 million of them were placed to over 9 million telephone numbers with Ohio area codes that were listed on the National DNC Registry for at least 31 days at the time of the call.

397.    Reeves knew from her employment at Modok that call center client, Sumco, changed its name to Virtual Telecom and that Virtual Telecom subsequently became an Avid customer. Despite knowing that different entities were paying Avid Telecom for the VoIP service provided to the account in the name of Virtual Telecom and subsequently, Mobi Telecom, Defendants reported to the ITG only that the robocall traffic came from Mobi Telecom.

398.    Defendants knew the true identity of the upstream provider.

399.    Avid Telecom and Lansky have been on notice since as early as August 18, 2020, that Virtual Telecom and Mobi were using Avid's services to send illegal robocalls.

400.    Reeves has been on notice since as early as October 2020 that Sumco and its affiliated entities were using Avid's services to send illegal robocalls.

401.    The illegal robocall traffic associated with the Virtual Telecom/Mobi account was brought to Defendants' attention on many occasions. Avid had the authority and the responsibility to mitigate the robocall traffic and failed to do so. Instead, they chose to accept millions of dollars in revenue while enabling Sumco, Virtual Telecom, and/or Mobi Telecom in furthering their illegal robocalling schemes.

402.   Avid provided substantial assistance and support to the Sumco, Virtual Telecom, and/or Mobi Telecom and Geist Telecom by providing VoIP services necessary for the initiation of the robocalls and DIDs used for caller ID.

403.   Defendants had direct knowledge that Sumco was sending them illegal call traffic.

## INDIVIDUAL LIABILITY OF DEFENDANTS LANSKY AND REEVES

404.   Defendants Lansky and Reeves are also both individually liable for the conduct alleged herein.

405.   Defendants Lansky and Reeves, as officers of Michael D. Lansky, LLC, possessed and exercised the authority to control the policies and trade practices of Michael D. Lansky, LLC; were responsible for creating and implementing the illegal policies and trade practices of Michael D. Lansky, LLC that are described herein; participated in the illegal trade practices that are described herein; directed or supervised those employees of Michael D. Lansky, LLC who participated in the illegal trade practices that are described herein; and knew or should have known of the illegality of the trade practices that are described herein and had the power to stop them, but rather than stopping them, promoted their use.

406.   The Court should also pierce the corporate veil between Defendants Michael D. Lansky, LLC and Defendant Lansky.

407.   Michael D. Lansky, LLC and Lansky demonstrated a complete lack of respect to the separate identities of each entity and comingled corporate and personal assets.

408.   Lansky controlled Michael D. Lansky, LLC's corporate bank account(s), corporate credit card(s), corporate check book(s), and corporate PayPal account(s). These accounts comingled money for Lansky's personal business.

409.   Lansky's use of corporate funds for personal expenses not only illustrates the lack of respect for the separateness of the corporate entity, but it also diverted assets from the corporation to fund substantial personal expenses, limiting the corporation's abilities to satisfy remedial obligations.

410.   Lansky used the Michael D. Lansky, LLC corporate credit card, bank account, and/or PayPal account for non-corporate purchases.

411.   For example, those purchases included:

    a.    Ancestry.com DNA LLC;

    b.    Bandcamp for the full digital discography (9 releases) by Clann An Drumma;

    c.    Payment for the SMHS reunion for Michael Lansky and another person;

    d.    Payment for a "Michael Lansky for Bicycle replacement;" and

    e.    Payment for "Bachelor Party lodging."

412.   Defendant Lansky controlled the illegal conduct of Michael D. Lansky, LLC and is vicariously liable for its conduct.

413.   Defendant Lansky operated through Michael D. Lansky, LLC and their conduct was one and the same.

414.   Defendants Lansky's conduct through Michael D. Lansky, LLC, has caused harm to consumers.

415.   Treating Michael D. Lansky, LLC and Lansky as separate entities would further sanction a fraud, promote injustice, and lead to an evasion of legal obligations.

416.   Defendants Lansky and Reeves are liable for the illegal conduct alleged herein because they directly participated in the conduct, authorized and directed others who committed the illegal conduct with knowledge of its illegality, and in the case of Lansky, because he controlled the illegal conduct of Michael Lansky, LLC and acted through his company to harm others.

# INDIANA: CERTIFICATE OF TERRITORIAL AUTHORITY

417.    To be a communications service provider that offers services in Indiana, a VoIP provider must have a Certificate of Territorial Authority ("CTA").

418.    A VoIP provider applies for a CTA with the Indiana Utility Regulatory Commission.

419.    The Indiana Utility Regulatory Commission then approves or disapproves the application.

420.    Providers must receive a CTA to offer these services in Indiana: advanced services, broadband service, information services, Internet Protocol-enabled services, and/or telecommunications services.

421.    At the time of this filing, Avid Telecom has not applied for a CTA or been granted a CTA.

422.    Further, Defendants transmitted or routed calls to the telephone numbers on the Indiana Do Not Call List. On August 1, 2022, the Office of the Indiana Attorney General issued a Civil Investigative Demand ("CID") to Avid Telecom related to, among other things, Avid Telecom assisting and facilitating persons or entities sending calls to telephone numbers on the Indiana Do Not Call List in violation of Indiana law. The CID made it clear Avid Telecom was the target of the investigation. On November 1, 2022, the Office of the Indiana Attorney General petitioned an Indiana court to enforce the CID. In the petition, the Office of the Indiana Attorney General highlighted that it was investigating Avid Telecom for violating Indiana law regarding the Indiana Do Not Call List.

423.    Defendants have been on notice that their clients are sending calls to Hoosiers who have telephone numbers on the Indiana Do Not Call List. Defendants have substantially assisted and facilitated or supported these clients in violating Indiana law. These clients were sellers and/or callers, and many of their calls were telephone sales calls.

424.    In an analysis of a sampling of Call48 CDRs related to Defendants' traffic, from September 2022 to December 2022, Defendants routed at least 11,369 phone calls to

85

Hoosiers on the Indiana Do Not Call List. During that time period, Defendants routed approximately 29,700 telephone calls to Indiana area codes.

425.    Upon information and belief, Defendants helped sellers and/or callers make many more calls to Hoosiers on the Indiana Do Not Call List after Defendants were on notice their clients were making calls to Hoosiers on the Indiana Do Not Call List.

## COUNT I
### Violations of the Telemarketing Sales Rule
### 16 C.F.R. §§ 310.3-310.4

426.    Plaintiffs incorporate and reallege each of the preceding paragraphs as if fully set forth herein.

427.    Pursuant to the Telemarketing Act, Congress directed the FTC to enact rules prohibiting abusive and deceptive telemarketing acts or practices. 15 U.S.C. § 6102(a)(1).

428.    In response to this direction, the FTC adopted the TSR, 16 C.F.R. § 310 *et seq.*

429.    The TSR prohibits abusive and deceptive acts or practices by "sellers"[51] or "telemarketers"[52] and, under 16 C.F.R. § 310.3(b), further prohibits persons from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR.

---

[51] 16 C.F.R. § 310.2(dd) defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

[52] 16 C.F.R. § 310.2(gg) defines "telemarketing," in relevant part, as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(ff) defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

430.   Many of the illegal robocalls that Defendants transmitted onto and across Avid Telecom's network constitute telemarketing and were created and initiated by sellers and/or telemarketers within the scope of the TSR.

431.   Defendants, on numerous occasions, provided substantial assistance or support to sellers and telemarketers that were violating the TSR in contravention of 16 C.F.R. § 310.3(b) by providing services including but not limited to: retail or wholesale voice termination; dialing software, including the use of a predictive dialer; helping customers with DID rotation; DID assignment; providing leads for customers to call; and providing expertise, whether formal or informal directly or indirectly, to one or more, "sellers" and/or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2, that Defendants knew, or consciously avoided knowing:

   a.   Misrepresented material aspects of goods or services, in violation of 16 C.F.R. § 310.3(a)(2)(iii);

   b.   Misrepresented the seller's or telemarketer's affiliation with corporations or government entities, in violation of 16 C.F.R. § 310.3(a)(2)(vii);

   c.   Made false or misleading statements to induce any person to pay for goods or services, in violation of 16 C.F.R. § 310.3(a)(4);

   d.   Failed to transmit or cause to be transmitted the real telephone number and the name of the telemarketer to caller identification services used by call recipients in violation of 16 C.F.R. § 310.4(a)(8);

   e.   Initiated or caused the initiation of outbound calls to telephone numbers on the National DNC Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

   f.   Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages, in violation of 16 C.F.R. § 310.4(b)(1)(v); and/or

87

g.    Failed to disclose the identity of the seller of the goods or services truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, in violation of 16 C.F.R. § 310.4(d)(1).

## COUNT II

### Violations of the TCPA – 47 U.S.C. § 227 and 47 C.F.R. § 64.1200(n)(3)
### (Failure to Exercise Due Diligence/KYC)

432.   Plaintiffs incorporate and reallege each of the paragraphs preceding Count I as if fully set forth herein.

433.   To target and eliminate unlawful robocalls, the FCC requires that all originating voice service providers know their customers and exercise due diligence in ensuring that their services are not used to originate illegal traffic and further recommends that voice service providers exercise caution in granting access to high-volume origination services, to ensure that bad actors do not abuse such services.[53]

434.   The FCC has authorized and encouraged voice service providers to block calls in specific circumstances.[54]  TCPA rule 47 C.F.R. § 64.1200(k) provides that voice service providers may block calls so that they do not reach a called party when the calls purport to originate from:

a.    Numbers where the subscriber of the originating number has requested that calls purporting to originate from that number be blocked because the number is used for inbound calls only (Do Not Originate list numbers);

b.    Numbers that are not valid under the North American Numbering Plan ("NANP");

---

[53] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Fourth Report and Order (2020).

[54] *Id.*

c.  Valid NANP numbers that are not allocated to a provider by the NANP Administrator or Pooling Administrator; and

d.  Valid NANP numbers that are allocated to a provider by NANP or the Pooling Administrator *but* are unused, so long as the provider blocking the calls is allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of the blocking.

435.  TCPA rule 47 C.F.R. § 64.1200(n)(3) provides that a voice service provider must take affirmative, effective measures to prevent new and renewing customers from using its network to originate illegal calls, including knowing its customers and exercising due diligence in ensuring that its services are not used to originate illegal traffic.

436.  Defendants did not choose to regularly, if at all, block calls made from telephone numbers that the FCC has authorized could be blocked so that those calls do not reach a called party pursuant to 47 C.F.R. § 64.1200(k).

437.  Defendants violated 47 C.F.R. § 64.1200(n)(3) by failing to take affirmative, effective measures to prevent new and renewing customers from using its network to originate illegal calls, including knowing its customers and exercising due diligence in ensuring that its services are not used to originate illegal traffic.

## COUNT III

### Violations of the TCPA – 47 U.S.C. §§ 227(b)(1)(A)(iii) and (b)(1)(B)
### (Robocalls to Cellular and Residential Telephone Lines)

438.  Plaintiffs incorporate and reallege each of the paragraphs preceding Count I as if fully set forth herein.

89

439.   In enacting the TCPA, Congress determined that unwanted prerecorded voice message calls were a greater nuisance and invasion of privacy than live calls and that such calls delivered to wireless phones can be costly.[55]

440.   The TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), prohibits any person within the United States, or any person outside the United States if the recipient is within the United States, from making any call using an automatic telephone dialing system or an artificial or prerecorded voice to any cellular telephone, with exceptions for certain emergency calls or calls placed with the prior express consent of the called party.

441.   The TCPA, 47 U.S.C. § 227(b)(1)(B), prohibits any person within the United States, or any person outside the United States if the recipient is within the country, from initiating any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, or is exempted by rule or order of the FCC under 47 U.S.C. § 227(b)(2)(B).

442.   Defendants violated 47 U.S.C. §§ 227(b)(1)(A)(iii) and (b)(1)(B) by engaging in a pattern or practice of initiating telephone calls to residential and cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express consent of the called parties.

443.   Defendants violated 47 C.F.R. § 64.1200(a)(2) by engaging in a pattern or practice of initiating or causing telephone calls to be initiated that include or introduce advertisements or constitute telemarketing to cellular telephone lines using artificial or prerecorded voices to deliver messages without the prior express written consent of the called parties.

---

[55] Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para 165 (2003) (2003 TCPA Order).

444.   Defendants violated 47 C.F.R. § 64.1200(a)(3) by engaging in a pattern or practice of initiating telephone calls to residential telephone lines using artificial or prerecorded voices to deliver messages without the prior express written consent of the called parties.

445.   Defendants transmitted calls delivering prerecorded or artificially voiced messages to cellular and residential telephone lines to consumers in each of the Plaintiffs' respective jurisdictions.

446.   Defendants initiated calls that terminated within Plaintiffs' jurisdictions because the calls would not have connected, but for Defendants' decision to allow them to transit their network despite having actual knowledge that many of the calls were scam robocalls delivering prerecorded or artificially voiced messages.

447.   Defendants knew or should have known that many of these calls violated 47 U.S.C. § 227(b)(1)(A)(iii) and (b)(1)(B).

## COUNT IV
### Violations of the TCPA – 47 U.S.C. §§ 227(c) and 47 C.F.R. § 64.1200(c)(2)
### (Calls to Telephone Numbers on the National DNC Registry)

448.   Plaintiffs incorporate and reallege each of the paragraphs preceding Count I as if fully set forth herein.

449.   The TCPA, under 47 U.S.C. § 227(c)(1), recognized that there is a need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.  In order to meet this directive, a single national database of telephone numbers was compiled of residential subscribers who objected to receiving telephone solicitations.  *See* 47 U.S.C. § 227(c)(3).

450.   Pursuant to 47 C.F.R. § 64.1200(c)(2), all persons and entities are prohibited from initiating any telephone solicitation to a residential telephone subscriber who has

registered his or her telephone number on the National DNC Registry, which registrations must be honored indefinitely, or until the registration is cancelled by the consumer.

451.    Defendants violated 47 C.F.R. § 64.1200(c)(2) by engaging in a pattern or practice of initiating telephone solicitations to residential telephone subscribers in the Plaintiffs' respective jurisdictions who have registered their telephone numbers on the National DNC Registry.

452.    Defendants knew or should have known that many, if not most, of these calls were made in violation of 47 C.F.R. § 64.1200(c)(2).

## COUNT V

## Violations of the Truth in Caller ID Act – 47 U.S.C. § 227(e)

## (Prohibition Against Spoofing)

453.    Plaintiffs incorporate and reallege each of the paragraphs preceding Count I as if fully set forth herein.

454.    The TCPA, 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604(a), prohibit any person or entity within the United States, or any person or entity outside the United States if the recipient is within the United States, with the intent to defraud, cause harm, or wrongfully obtain anything of value, from knowingly causing, directly or indirectly, any caller identification service to transmit misleading or inaccurate caller identification information in connection with any voice service or text messaging service.

455.    In enforcement actions, the FCC has found that when an entity spoofs a large number of calls in a robocall campaign, it causes harms to the subscribers of the numbers that are spoofed, the consumers who receive the spoofed calls and the terminating providers forced to deliver calls to consumers and the handle the "consumers' ire," thereby increasing their costs.[56]

---

[56] *John C. Spiller et al.*, File No.: EB-TCD-18-0027781, Notice of Apparent Liability for Forfeiture, 35 FCC Rcd 5948, 5957-61, paras 23-33 (2020).

92

456.   The FCC has further held when spoofing is done in conjunction with an illegal robocalling campaign—itself a harmful practice—it indicates an intent to cause harm.[57]

457.   Defendants violated 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604(a) by knowingly causing the caller identification services of the recipients of their call traffic with spoofed phone numbers to transmit misleading or inaccurate caller identification information.

458.   Defendants knew or should have known that they accepted and profited from illegal robocalls with misleading or inaccurate spoofed phone numbers, which sought to defraud, cause harm, or wrongfully obtain things of value from the call recipients.

## COUNT VI
## By State of California for Violations of Business and Professions Code Section 17200 (Unfair Competition)

459.   Plaintiff State of California incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

460.   Defendants have engaged in and continue to engage in unfair competition as defined in California Business & Professions Code section 17200. Defendants' acts of unfair competition include, but are not limited to, the following:

  a.   Defendants, either directly or indirectly as a result of a third party acting on their behalf, have violated 16 CFR §§ 310.3-310.4 by providing substantial assistance or support, through provision of Avid Telecom's services as set forth in Count I, to one or more sellers or telemarketers who Defendants knew or should have known were

---

[57] *Roesel Notice of Apparent Liability*. 33 FCC Rcd at 9218-19, para. 40.

engaged in the deceptive or abusive telemarketing acts or practices set forth in Count I, above.

b.  Defendants, either directly or indirectly as a result of a third party acting on its behalf, have violated 47 C.F.R. § 64.1200(n)(3) and 47 U.S.C. § 227 by failing to take affirmative, effective measures to prevent new and renewing customers from using their network to originate illegal calls as set forth in Count II, above.

c.  Defendants, either directly or indirectly as a result of a third party acting on its behalf, have violated 47 C.F.R. §§ 64.1200(a)(2), and 64.1200(a)(3) and 47 U.S.C. §§ 227 (b)(1)(A)(iii) and (b)(1)(B) by engaging in a pattern or practice of initiating telephone solicitations to cellular and residential telephone lines, including lines in California, using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B), as set forth in Count III, above.

461.  Plaintiff, the People of the State of California, by and through its attorney, Rob Bonta, Attorney General of the State of California, is authorized by 47 U.S.C. § 227(f)(1) to file actions in federal district court to enjoin violations and enforce compliance with the Telephone Consumer Protection Act ("TCPA") on behalf of residents of the State of California and to obtain actual damages or damages of $500 for each violation and up to treble that amount for each violation committed willfully or knowingly. Plaintiff, the People of the State of California, by and through its attorney, Rob Bonta, Attorney General of the State of California, is authorized by California Business & Professions Code sections 17204 and 17206 to obtain injunctive relief to halt acts of unfair competition and enforce

94

compliance with California Business & Professions Code section 17200 and for civil penalties of up to $2,500 for each violation of Business & Professions Code section 17200.

## COUNT VII

### Violations of Chapter 501, Part II, Florida Statutes

462.    Plaintiff State of Florida incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

463.    FDUTPA states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." § 501.204, Florida Statutes.

464.    The provisions of FDUTPA are to be construed liberally to promote the protection of the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices. § 501.202, Florida Statutes.

465.    FDUTPA defines a "violation of this part" to include violations of the Act based on "[a]ny rules promulgated pursuant to the Federal Trade Commission Act" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." § 501.203(3), Florida Statutes.

466.    "A violation of the TSR constitutes an unfair and deceptive act or practice in violation of § 5(a) of the FTC Act." *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 1004 (C.D. Ill. 2014).

467.    The TSR's enabling statute is the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 USC §§ 6101-08).

468.    Under 15 U.S.C. § 6102(c)(1) violations of the TSR are treated as violations of rules passed under the Federal Trade Commission Act (15 U.S.C. § 57a).

95

469.    Violations of rules passed under the FTC Act are unfair and deceptive within the scope of 15 U.S.C. § 45, as set forth in 15 U.S.C. § 57a(d)(3).

470.    Defendants' violations of the TSR constitute violations of FDUTPA.

471.    Defendants' conduct also violates FDUTPA because knowingly transmitting fraudulent robocalls to consumers in Florida is an unfair and deceptive trade practice.

472.    Defendants routinely transmit calls to consumers in Florida which misrepresent the identity of the caller and the nature of goods and services offered through the calls.

473.    Records of calls transmitted by the Defendants indicate that at least 1,184,200,778 calls were directed to phone numbers with area codes assigned to Florida during the period relevant to this Complaint.

474.    At least 387,321,375, or 32.7%, of these calls were directed to phone numbers on the National DNC Registry.

475.    The average duration of the calls Defendants routed to Florida are only 16.7 seconds, indicating that the vast majority of such calls were unwanted - likely because they are fraudulent, pre-recorded or artificially voiced messages - and the recipient almost immediately hung up the phone.

476.    For example, one campaign of calls which harassed thousands of Florida residents for at least 113 days stated: "Hi, this is Vanessa and I'm giving you a call from the dealer service center. We recently noticed your car's extended warranty was going to expire and wanted to give you one final courtesy call before your warranty expires and your coverage is voided. This would make you financially responsible for all services [unintelligible]. Press one now if you wish to extend or reinstate your car's warranty. Once again press one now, or press two to be placed on the DNC, or call 833-304-1447."[58]

---

[58]    A recording of this robocall is available at: https://media.youmail.com/mcs/glb/audio/s6diZGlyX3dsemRmYTp0b21jYXQ3NzgyOjE2MTk3OTI2OTI1ODlmlnUiR4.gen.wav

96

477.   Particularly when the caller's phone number has been spoofed, consumers acting reasonably in the circumstances would be deceived to their detriment when receiving many of the calls transmitted by Defendants.

478.   Furthermore, the call traffic Defendants transmit causes injury, or the risk of injury, to consumers which is substantial, which consumers cannot reasonably avoid, and which is without offsetting benefits to consumers or competition.

479.   Defendants' practices complained of herein are unfair or deceptive or both and constitute violations of § 501.204, Florida Statutes; therefore, Defendants are liable for injunctive, and other equitable, legal, or statutory relief.

480.   Defendants are also liable for civil penalties, as prescribed by §§ 501.2075 and 501.2077, Florida Statutes, for each unfair act or practice they willfully engaged in, as set forth above, found to be in violation of FDUTPA.

481.   Finally, Defendants are also liable for attorney's fees and costs pursuant to § 501.2075, Florida Statutes.

## COUNT VIII

### Violations of the Telephone Solicitation of Consumers Act (the "TSCA")
### Indiana Code 24-4.7-4

482.   Plaintiff State of Indiana incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

483.   Pursuant to Ind. Code § 24-4.7-3-1, the Office of the Attorney General quarterly publishes a no telephone sales solicitation listing ("Indiana's Do Not Call list"). Consumers place their telephone numbers on Indiana's Do Not Call list when they do not want to receive telephone calls soliciting the sale of a consumer good or service, as defined in Ind. Code § 24-4.7-2-3. The telephone calls described above were "telephone sales calls" because they were made to solicit the sale of a consumer good or service or to obtain

information to be used to solicit the sale of a consumer good or service including, without limitation, computer support packages.

484.    By making or causing to be made telephone sales calls to consumers residing in Indiana, the callers are "doing business in Indiana," as defined by Ind. Code § 24-4.7-2-5(a), regardless of where the telephone calls originate or where are located. By controlling, directly or indirectly, one or more persons who made or caused others to make telephone calls to consumers located in Indiana, the persons are "doing business in Indiana," as defined by Ind. Code § 24-4.7-2-5(b), regardless of where the persons are located.

485.    By contacting or attempting to contact subscribers in Indiana by telephone, the callers are "callers," as defined by Ind. Code § 24-4.7-2-1.7 and § 24-5-14-2. By "doing business in Indiana," the callers are "telephone solicitors," as defined by Ind. Code § 24-4.7-2-10.

486.    By regularly engaging in or soliciting consumer transactions, whether or not the callers deal directly with consumers, the callers are "suppliers" as defined by Ind. Code § 24-4.7-2-7.7 and § 24-5-0.5-2.

487.    Telephone sales calls were made to telephone numbers included on Indiana's Do Not Call List at the time of the calls. By making or causing others to make telephone sales calls to telephone numbers on Indiana's Do Not Call List at the time of the calls, the callers committed many violations of the TSCA, Ind. Code § 24-4.7-4-1.

488.    As telephone solicitors, suppliers, and callers, the callers may not transfer a live call to one or more persons if the call has been placed to a consumer in violation of the TSCA, Ind. Code 24-4.7 or the Auto-Dialer Act, Ind. Code 24-5-14. Ind. Code § 24-4.7-4-7(c). Upon information and belief, the callers may have transferred live calls to people where the calls had been placed in violation of the TSCA. .

489.    Avid Telecom, Lansky, and Reeves violated Ind. Code § 24-4.7-4-7(e) by providing substantial assistance to a telephone solicitor, supplier, or caller.

490.    Avid Telecom, Lansky, and Reeves knew or consciously avoided knowing that the telephone solicitor, supplier, or caller was engaged in a practice that violated Ind. Code 24-4.7-4.

491.    Avid Telecom's equipment or services were used for more than the transportation, handling, or retransmitting of a call.

492.    Each telephone call made to telephone numbers on Indiana's Do Not Call list is a violation of Ind. Code § 24-4.7-4-1 and constitutes a deceptive act, as defined by Ind. Code § 24-4.7-5-1.

## COUNT IX

## Violations of the Maryland Telephone Consumer Protection Act (the "MTCPA") Md. Code Ann., Com. Law § 14-3201, *et seq*.

493.    Plaintiff, Office of the Maryland Attorney General, incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

494.    Pursuant to § 14-3201(1) of the MTCPA, no person may violate the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 through 6108, as implemented by the Federal Trade Commission in the Telemarketing Sales Rule (16 C.F.R. Part 310).

495.    Pursuant to § 14-3201(2) of the MTCPA, no person may violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L).

496.    As set out in the preceding paragraphs, Defendants have provided substantial assistance or support, through the provision of Avid Telecom's services, to one or more sellers or telemarketers who Defendants knew or should have known were engaged in the deceptive or abusive telemarketing acts or practices set out in Count I above.

497.     As set out in the preceding paragraphs, Defendants originated and/or transmitted calls from telephone solicitors who Defendants knew or consciously avoided knowing were violating the Telephone Consumer Protection Act by (1) making telephone solicitations to numbers on the National Do Not Call Registry; (2) using automatic dialing and prerecorded messages; and (3) causing misleading information to be transmitted to users of caller identification technologies or otherwise block or misrepresent the original source of the call.

498.     As alleged herein, Defendants also violated the TCPA by failing to take affirmative measures to prevent new and renewing customers from using their network to originate illegal calls, in violation of 47 CFR § 64.1200(n)(3).

499.     As alleged herein, Defendants have devised and carried out the above-described business practices knowingly and deliberately.

500.     Defendants failed to comply with the requirements of the Telemarketing Sales Rule, as set out in Count I above, in violation of § 14-3201(1) of the MTCPA.

501.     Defendants failed to comply with the requirements of the Telephone Consumer Protection Act, as set out in Counts II and III above, in violation of § 14-3201(2) of the MTCPA.

502.     Proof of actual harm is not required in an action brought under the MTCPA by the Attorney General.

503.     Defendants have originated, facilitated and/or transmitted millions of illegal robocalls in Maryland and are liable for millions of dollars in damages.

504.     Each prohibited telephone solicitation and each prohibited practice during a telephone solicitation constitutes a separate violation. *See* MTCPA, § 14-3202(c),

505.     A violation of the MTCPA is an unfair or deceptive trade practice and is subject to the enforcement and penalty provisions contained in Md. Code Ann., Com. Law § 13-401 through § 13-411. *See* MTCPA, § 14-3202.

506.     Pursuant to Md. Code Ann., Com. Law § 13-403(b)(1)(i), the Attorney General may require Defendants to take affirmative action to protect consumers, including the restitution of money or property.

507.     Pursuant to Md. Code Ann., Com. Law § 13-406, the Attorney General may seek an injunction to prohibit a person who has engaged or is engaging in a violation of this title from continuing or engaging in the violation.

508.     Pursuant to Md. Code Ann., Com. Law § 13-409, the Attorney General is entitled to recover the costs of this action.

509.     Pursuant to Md. Code Ann., Com. Law § 13-410, the Attorney General may seek civil penalties of up to $10,000 for each violation.

## COUNT X
## Violations of the Nevada Telecommunication Solicitation Act
## Chapter 228.500 to 228.590

510.     Plaintiff State of Nevada incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

511.     At all times relevant to this complaint, Defendants transmitted 159,576,512 fraudulent robocalls to consumers in Nevada or to consumers with a Nevada based area code.

512.     The Nevada Telecommunication Solicitation Act ("Act"), Nevada Revised Statutes ("NRS") Chapter 228.500 to 228.590, also known as Nevada's Do Not Call Law, prohibits telephone solicitors ("telemarketers") from making unsolicited telephone calls for the sale of goods or services to a telephone number on Nevada's registry.

513.     Pursuant to NRS 228.620, a violation of Nevada's Do Not Call Law constitutes a deceptive trade practice for the purposes of NRS 598.0903 to 598.0999, inclusive, in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"), NRS chapter 598.

514.    Under the NDTPA, NRS chapter 598, and in Nevada's causes of action herein, the term "knowingly" means the person is aware that the facts exist that constitute the act or omission.

515.    Defendants' conduct in transmitting calls, and attendant acts regarding those calls, violated provisions of the NDTPA, by violating Nevada's Do Not Call Law.

## COUNT XI

## Violations of the Nevada Law – Devices for Automatic Dialing and Announcing Chapter 597 *et seq.*

516.    Plaintiff State of Nevada incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

517.    Pursuant to NRS 597.814, a person is prohibited from using a device for automatic dialing and announcing to disseminate a prerecorded message in a telephone call.

518.    Pursuant to NRS 597.814, a person is further prohibited from operating a device for automatic dialing and announcing to place a call-back or second call to the same telephone number if the person at the telephone number terminated the original call.

519.    NRS 597.818 contains the penalties for violation of NRS 597.814, and in addition to those penalties, constitutes a deceptive trade practice for the purposes of NRS 598.0903 to 598.0999, inclusive, in violation of the NDTPA, NRS chapter 598.

520.    Under the NDTPA, NRS chapter 598, and in Nevada's causes of action herein, the term "knowingly" means the person is aware that the facts exist that constitute the act or omission.

521.    Defendants' conduct in transmitting calls, and attendant acts regarding those calls, violated provisions of the NDTPA, by violating the provisions of NRS 597.814 and 597.818.

**COUNT XII**

**Violations of the Nevada Deceptive Trade Practices Act, Chapter 598 *et seq*.**

522.    Plaintiff State of Nevada incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

523.    Pursuant to NRS 598.0916, a person engages in a deceptive trade practice when, in the course of his or her business or occupation, he or she disseminates an unsolicited prerecorded message to solicit a person to purchase goods or services by telephone and he or she does not have a preexisting business relationship with the person being called unless a recorded or unrecorded natural voice informs the person who answers the telephone call of the nature of the call, and provides to the person who answers the telephone call the name, address and telephone number of the business or organization, if any, represented by the caller.

524.    Defendants' conduct in transmitting calls, and attendant acts regarding those calls, including, without limitation, disseminating unsolicited prerecorded messages to solicit a person to purchase goods or services by telephone when Defendants did not have a preexisting business relationship with the person being called and/or failed to provide the person with statutory required information at the time the person answered the telephone, violated provisions of the NDTPA, by violating NRS 598.0916.

525.    Pursuant to NRS 598.0198(2), a person engages in a deceptive trade practice when, in the course of his or her business or occupation, he or she repeatedly or continuously conducts the solicitation or presentation in a manner that is considered by a reasonable person to be annoying, abusive, or harassing.

526.    Defendants' conduct in transmitting calls, and attendant acts regarding those calls, including, without limitation, repeatedly or continuously conducting the solicitation or presentation in a manner that is considered by a reasonable person to be annoying, abusive, or harassing, violated provisions of the NDTPA, by violating NRS 598.0918(2).

527. Pursuant to NRS 598.0923(1)(c), a person engages in a deceptive trade practice when in the course of his or her business or occupation, he or she knowingly violates a state or federal statute or regulation related to the sale or lease of goods or services.

528. Defendants' conduct in transmitting fraudulent robocalls to consumers in Nevada is in violation of provisions of federal law, including without limitation, the Telemarketing Sales Rule, 16 C.F.R. Part 310 via 15 U.S.C. § 6103(a) and provisions of federal law identified herein.

529. Defendants knowingly violated the laws set forth in the preceding paragraph because Defendants knew or should have known that the robocalls were in violation of those laws.

530. By transmitting 159,576,512 fraudulent robocalls to consumers in Nevada or to consumers with a Nevada based area code, Defendants knew or should have known that they were violating federal law.

531. Defendants' conduct in transmitting fraudulent robocalls to consumers in Nevada is in violation of provisions of Nevada State law including, without limitation, the Do Not Call Law, the NDTPA, and other related statutory provisions.

532. Defendants' conduct in transmitting calls, and attendant acts regarding those calls, violated provisions of the NDTPA, and/or other statutory provisions as alleged herein, by violating provisions of federal law, including without limitation, the Telemarketing Sales Rule, 16 C.F.R. Part 310 via 15 U.S.C. § 6103(a), and/or provisions of Nevada State law including, without limitation, the Do Not Call Law and the NDTPA.

533. Pursuant to NRS 598.0923(1)(e), a person engages in a deceptive trade practice when in the course of his or her business or occupation, he or she knowingly uses an unconscionable practice in a transaction.

534. Defendants took advantage of the lack of knowledge, ability, experience or capacity of Nevada consumers to a grossly unfair degree by transmitting calls, and carrying

out attendant acts regarding those calls as alleged herein, thereby committing an unconscionable practice in a transaction in violation of NRS 598.0923(1)(e).

535.   Under the NDTPA, NRS chapter 598, and in Nevada's causes of action herein, the term "knowingly" means the person is aware that the facts exist that constitute the act or omission.

536.   Defendants' violations of the Nevada Do Not Call Law, and/or the NDTPA, and/or other statutory provisions as alleged herein, are subject to injunctions and/or restitution and/or civil penalties and/or damages and/or its costs and attorney's fees pursuant to NRS 597.818, 598.0963, and 598.0999.

537.   Defendants' violations of the NDTPA are further subject to additional penalties for acts committed against consumers in Nevada over the age of 60 or disabled consumers pursuant to NRS 598.0973.

## COUNT XIII

### Violations of New York General Business Law § 399-z

### Pursuant to New York Executive Law § 63(12)

538.   Plaintiff, the NYAG, incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

539.   NY Executive Law § 63(12) authorizes the NYAG to obtain an injunction and other equitable relief whenever any person or entity engages in "repeated fraudulent or illegal acts or … persistent fraud or illegality in the carrying on, conducting or transaction of business."

540.   At all relevant times, Defendants have engaged in the carrying on, conducting or transaction of business in New York within the meaning of Executive Law § 63(12).

541.   Defendants have engaged in repeated and persistent illegality by facilitating illegal calls in violation of GBL § 399-z, specifically:

542.   GBL section 399-z(5), which states that "[n]o telemarketer or seller may make or cause to be made any unsolicited telemarketing sales call to any customer when that customer's telephone number has been on the national 'do-not-call' registry, established by the federal trade commission, for a period of thirty-one days prior to the date the call is made, pursuant to 16 C.F.R. Section 310.4(b)(1)(iii)(B)."

543.   GBL section 399-z(6), which bars telemarketers and sellers from "initiat[ing] any telemarketing sales call by means of a technology that delivers a pre-recorded message, unless the telemarketer or seller has obtained from the customer" prior express written consent.

544.   As set out in the preceding paragraphs, Defendants have repeatedly facilitated unsolicited telemarketing sales calls to customers whose telephone numbers were on the national do-not-call registry, and had been for at least 31 days prior to the call being made.

545.   As set out in the preceding paragraphs, Defendants have repeatedly provided facilitated the initiation of telemarketing sales calls by means of a technology that delivered pre-recorded messages, without the customers' prior express written consent.

546.   Defendants have therefore engaged in repeated illegal conduct in violation of Executive Law § 63(12).

## COUNT XIV

### Violations of New York General Business Law § 399-p

547.   Plaintiff, the NYAG, incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

548.   GBL § 399-p(8) authorizes the NYAG to seek injunctive relief and penalties whenever there is a violation of GBL § 399-p.

549.    GBL § 399-p(4) prohibits "operat[ing] an automatic dialing-announcing device which uses a random or sequential number generator to produce a number to be called."

550.    As set out in the preceding paragraphs, Defendants have facilitated sellers or telemarketers who were operating automatic dialing-announcing devices which used random or sequential number generators to produce numbers to be called.

## COUNT XV

### Violations of the North Carolina Telephone Solicitations Act
### N.C. Gen. Stat. §§ 75-100 to 75-105

551.    Plaintiff State of North Carolina incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

552.    The North Carolina Telephone Solicitations Act was enacted to increase protections for telephone subscribers who wish to stop unwanted telephone solicitations. S.L. 2003-411, 2003 N.C. Sess. Laws 1190, 1190–91.  Such protections include restrictions regarding:  telephone solicitations to telephone subscribers' numbers on the "Do Not Call" Registry, *see* N.C. Gen. Stat. § 75-102(a), (d); unsolicited robocalls, *see* N.C. Gen. Stat. § 75-104; and compliance with the requirements of the FTC's Telemarketing Sales Rule, *see* N.C. Gen. Stat. § 75-102(e).

553.    With respect to telephone solicitations to telephone subscribers' numbers on the "Do Not Call" Registry, N.C. Gen. Stat. § 75-102(a) provides that, subject to some exceptions, no telephone solicitor, as the term is defined in N.C. Gen. Stat. § 75-101(10) and 16 C.F.R. § 310.2(ff), shall make a telephone solicitation to a North Carolina telephone subscriber's telephone number if the subscriber's telephone number appears in the latest edition of the National DNC Registry.

554.    With respect to unsolicited robocalls, N.C. Gen. Stat. § 75-104 provides that, subject to some exceptions, no person may use an automatic dialing and recorded message

107

player—defined in relevant part in N.C. Gen. Stat. § 75-101(2) as any automatic equipment that incorporates a storage capability of telephone numbers to be called that, working alone or in conjunction with other equipment, disseminates a prerecorded message to the telephone number called—to make an unsolicited telephone call.  One of those exceptions allows a person to make such calls if prior to the playing of the recorded message a live operator, among other things, states the nature and length in minutes of the recorded message, and asks for and receives prior approval to play the recorded message from the person receiving the call.

555.  With respect to compliance with the requirements of the FTC's Telemarketing Sales Rule, N.C. Gen. Stat. § 75-102(e) provides that no telephone solicitor shall violate any requirement of section 310.3 of the Telemarketing Sales Rule (Deceptive telemarketing acts or practices), section 310.4 of the Telemarketing Sales Rule (Abusive telemarketing acts or practices), and section 310.5 of the Telemarketing Sales Rule (Record keeping requirements), 16 C.F.R. §§ 310.3 through 310.5.

556.  Defendants Avid Telecom, Lansky, and Reeves made, initiated, and/or transmitted calls from telephone solicitors who Defendants knew or consciously avoided knowing were violating the North Carolina Telephone Solicitations Act by:

    a.    making telephone solicitations in violation of N.C. Gen. Stat. § 75-102(a) to the telephone numbers of North Carolina telephone subscribers when those numbers were in the pertinent edition of the National DNC Registry;

    b.    using automatic dialing and recorded message players defined in N.C. Gen. Stat. § 75-101(2) in violation of N.C. Gen. Stat. § 75-104 to make unsolicited telephone calls to North Carolina telephone subscribers without, among other things, first having live operators inform the telephone subscribers of the nature and length of the recorded message and asking for and obtaining permission to play the message from the person receiving the call, and otherwise not

complying with any of the exceptions set forth in N.C. Gen. Stat. § 75-104; and

    c.    failing to comply with the requirements of the Telemarketing Sales Rule, as set out in the TSR Counts above, in violation of N.C. Gen. Stat. § 75-102(e).

557.    Defendants willfully engaged in the actions and practices described above.

## COUNT XVI

## Violations of North Carolina's Unfair or Deceptive Trade Practices Act
## N.C. Gen. Stat. §§ 75-1.1, *et seq.*

558.    Plaintiff State of North Carolina incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

559.    N.C. Gen. Stat. § 75-1.1 prohibits "unfair or deceptive acts or practices in or affecting commerce."

560.    Under N.C. Gen. Stat. § 75-1.1, a practice or act is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required.

561.    Acts or practices are unfair under N.C. Gen. Stat. § 75-1.1 when they offend established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

562.    Proof of actual harm is not required in an action brought under N.C. Gen. Stat. § 75-1.1 by the North Carolina Attorney General.

563.    Defendants' acts or practices enumerated in the foregoing paragraphs have been in or affecting commerce.

564.    As alleged herein, the calls that Defendants made, initiated, and/or transmitted across the U.S. telephone network possessed the tendency or capacity to mislead or created the likelihood of deception.

565.    Defendants' acts or practices enumerated in the foregoing paragraphs are offensive to established North Carolina public policy, as well as immoral, unethical, oppressive, unscrupulous, and substantially injurious to North Carolina consumers across the State.

566.    As alleged herein, Defendants have devised and carried out the above described business practices knowingly and deliberately.

567.    As set out in preceding paragraphs, in numerous instances, Defendants have provided substantial assistance or support, through the provision of Avid Telecom's services, to one or more sellers or telemarketers who Defendants knew or should have known were engaged in the deceptive or abusive telemarketing acts or practices set out in the TSR Counts above.

568.    Defendants' acts or practices enumerated in the paragraphs above were deceptive telemarketing acts or practices in violation of the TSR. 16 C.F.R. § 310.3(b).

569.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

570.    Defendants' acts or practices that are unfair or deceptive trade practices under the TSR are also deceptive or misleading and constitute unfair or deceptive trade practices prohibited by N.C. Gen. Stat. § 75-1.1 and are violations of North Carolina's Unfair or Deceptive Trade Practices Act.

571.    Plaintiff alleges that the acts, practices, representations and omissions of Defendants described herein violate the prohibition against unfair or deceptive business practices found in Section 75-1.1 of the North Carolina General Statutes.

## COUNT XVII

### North Dakota – Violations of the Unlawful Sales or Advertising Practices law N.D.C.C. ch. 51-15 – Facilitating and Assisting

572.     Plaintiff State of North Dakota incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

573.     With respect to telephone solicitations to telephone subscribers' numbers on the "Do Not Call" Registry, the North Dakota Telephone Solicitations Act, N.D.C.C. § 51-28-06, provides that "[a] caller may not make or cause to be made any telephone solicitation to the telephone line of any subscriber in this state who, for at least thirty-one days before the date the call is made, has been on the … national do-not-call registry… ."

574.     With respect to unsolicited robocalls using prerecorded messages, North Dakota Telephone Solicitations Act, N.D.C.C. § 51-28-02, provides that "[a] caller may not use or connect to a telephone line an automatic dialing-announcing device or deliver a prerecorded or synthesized voice message to a subscriber unless the subscriber has knowingly requested, consented to, permitted, or authorized receipt of the message or the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered."

575.     Pursuant to N.D.C.C. § 51-28-17, a violation of N.D.C.C. ch. 51-28 constitutes a violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D.C.C. ch. 51-15.

576.     N.D.C.C. § 51-15-02, prohibits the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise," regardless of whether a person has been misled, damaged, or deceived by the deceptive conduct.

577.     Pursuant to N.D.C.C. § 51-15-02.3 it is a deceptive act or practice "for any person to provide assistance or support to any person engaged in any act or practice in

111

violation of … [N.D.C.C. ch. 51-15] when the person providing assistance or support knows or consciously avoids knowing that the other person is engaged in an act or practice in violation of … [N.D.C.C. ch. 51-15]."

578.   Defendants Avid Telecom, Lansky, and Reeves engaged in violations of N.D.C.C. § 51-15-02.3 by providing assistance or support, through the provision of merchandise or services, to one or more callers who Defendants knew or consciously avoided knowing were engaged in violations of the North Dakota Telephone Solicitations Act, N.D.C.C. chapter 51-28, and Unlawful Sales or Advertising Practices law, N.D.C.C. chapter 51-15.

579.   Defendants Avid Telecom, Lansky, and Reeves engaged in violations of N.D.C.C. § 51-15-02.3 by originating and/or transmitting calls from one or more callers who Defendants knew or consciously avoided knowing were engaged in violations of the North Dakota Telephone Solicitations Act, N.D.C.C. chapter 51-28, and Unlawful Sales or Advertising Practices law, N.D.C.C. chapter 51-15.

580.   Defendants assisted or supported unlawful robocalls to North Dakota subscribers, which robocalls violated N.D.C.C. chs. 51-28 and 51-15 by:

a.   making telephone solicitations to the telephone line of any subscriber in the state of North Dakota who, for at least thirty-one days before the date the call is made, has been on the national do-not-call registry;

b.   making misrepresentations regarding merchandise offered with the intent that others rely on the misrepresentations made;

c.   making misrepresentations regarding the seller or caller's affiliation with corporations or government entities; and

d.   using or connecting an automatic dialing-announcing device or delivering a prerecorded or synthetic voice message to make unsolicited calls to subscribers in the state of North Dakota without first having live operators obtain the subscriber's consent before the

112

message is delivered, and otherwise not complying with any of the exceptions set forth in N.D.C.C. § 51-28-02.

581.    Under N.D.C.C. § 51-28-19, each telephone solicitation or message constitutes a separate violation and, pursuant to N.D.C.C. §§ 51-28-13 and 51-28-17, North Dakota is entitled to relief under N.D.C.C. § 51-15-02.3 for each violation of N.D.C.C. §§ 51-15-02, 51-28-02, or 51-28-06 that Defendants assisted or supported.

## COUNT XVIII

## North Dakota – Violations of the Unlawful Sales or Advertising Practices law
## N.D.C.C. ch. 51-15 – Deceptive or Unconscionable practices

582.    Plaintiff State of North Dakota incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

583.    N.D.C.C. § 51-15-02, prohibits the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise," regardless of whether a person has been misled, damaged, or deceived by the deceptive conduct.

584.    N.D.C.C. § 51-15-02 prohibits the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition."

585.    Defendants Avid Telecom, Lansky, and Reeves originated, routed, or transmitted illegal robocalls across the U.S. telephone network to millions of telephone subscribers.

113

586.     Defendants Avid Telecom, Lansky, and Reeves provided support and services to Avid Telecom's customers engaged in unlawful conduct, including retail or wholesale voice termination, dialing software, including a predictive dialer, help with DID rotation, DID assignment, call leads, and expertise, or directly participated in Avid Telecom's customers' unlawful acts or practices.

587.     Defendants Avid Telecom, Lansky, and Reeves assisted and facilitated Avid Telecom's customers' attempts to circumvent legal and regulatory protections for consumers.

588.     Defendants' conduct, as described herein, offends public policy, as embodied in federal and state law, and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

589.     The robocall traffic Defendants transmit and support causes injury, or is likely to cause substantial injury, to persons, which injury is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition.

590.     Defendants Avid Telecom, Lansky, and Reeves' acts or practices, as described herein, are deceptive, unconscionable, or causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, in violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D.C.C., § 51-15-02.

## COUNT XIX

### Rhode Island – Violations of the Telephone Sales Solicitation Act

### R I Gen. Laws § 5-61-1, *et seq*.

591.     Plaintiff State of Rhode Island incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

592. The Rhode Island Telephone Sales Solicitation Act ("TSSA"), § 5-61-1, *et seq.*, regulates telephone solicitations and prohibits the use of prerecorded or synthesized messages in almost every instance.

593. The Rhode Island Office of the Attorney General has the authority to institute legal proceedings to prevent and restrain violations of the TSSA and the statute allows courts to grant injunctive relief sufficient to prevent and restrain violations of the TSSA. R.I. Gen Law § 5-61-5.1. Any person, firm, or corporation who violates the TSSA is also liable for a civil penalty up to $10,000 for each violation. *Id.* at 5.1(g).

594. Prior to doing business in Rhode Island, every telephonic seller must register with the Attorney General and file a surety bond, irrevocable letter of credit, or certificate of deposit (collectively, a "security") worth at least $30,000.

595. Additionally, telephonic sellers shall not use prerecorded or synthesized voice messages to make calls into or within the state (except for messages from school districts or from employers advising their employees of work schedules). R.I. Gen. Laws § 5-61-3.4.

596. Lastly, no salesperson or telephonic seller shall make, or cause to be made, any unsolicited telephonic sales calls unless the salesperson or telephonic seller has instituted procedures for maintaining a list of persons who do not wish to receive telephonic sales calls, in compliance with federal law. R.I. Gen. Laws § 5-61-3.5.

597. Avid Telekom, Lansky, and Reeves repeatedly facilitated and caused violations of the TSSA in support of their telephonic seller customers when they, among other things:

    a. Routed telephone solicitations from unregistered telephonic sellers to Rhode Islanders;

    b. Routed telephone solicitations with pre-recorded messages to Rhode Islanders;

    c. Provided telephonic seller customers with Rhode Islanders' telephone numbers who were then targeted for pre-recorded calls;

115

d.    Routed telephone solicitations from telephonic seller customers to Rhode Islanders whose numbers they knew were targeted on the National DNC Registry.

598.    Therefore, the Court may impose appropriate equitable relief preventing Avid Telekom, Lansky, and Reeves from engaged in these acts and practices.

## COUNT XX

### Rhode Island – Violations of the Deceptive Trade Practices Act
### R. I. Gen. Laws § 6-13.1-1, *et seq*.

599.    Plaintiff State of Rhode Island incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

600.    The Rhode Island Deceptive Trade Practices Act ("RI DTPA") makes the employment of unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce unlawful. R.I. Gen. Laws § 6-13.1-2.

601.    Unfair methods of competition and unfair and deceptive acts or practices include, among other things, "conduct that [] creates a likelihood of confusion or of misunderstanding," "any act or practice that is unfair or deceptive to the consumer," and "any other methods, acts, or practices that mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6)(xii), (xiii), and (xiv).

602.    Any person, firm, or corporation who violates the RI DTPA is also liable for a civil penalty up to $10,000 for each violation. R.I. Gen. Laws § 6-13.1-8.

603.    Defendants' acts or practices enumerated in the foregoing paragraphs have been in the conduct of any trade or commerce in Rhode Island.

604.    As alleged herein, the calls that Defendants originated and/or transmitted across the U.S. telephone network violated the TSSA and possessed the tendency or capacity to mislead, deceive, and/or create a likelihood of confusion or misunderstanding.

116

Similarly, as described above, Defendants directly participated in these misleading, deceptive, and/or confusing acts and practices by supporting and servicing Avid Telecom's customers by, for example, providing them with DIDs, providing them with Rhode Islanders to target, and assisting them as they attempt to circumvent legal and regulatory protections for consumers.

605.    Defendants' acts or practices enumerated above were likewise a violation of public policy, embodied in federal and state law and regulation including the TSR, 16 C.F.R. § 310.3(b).  These practices are also immoral, unethical, oppressive, unscrupulous, and substantially injurious to Rhode Island consumers.

606.    Plaintiff alleges that the acts, practices, representations, and omissions of Defendants described herein, pursuant to R.I. Gen. Laws § 6-13.1-2 and § 6-13.1-5, violate the prohibition against unfair or deceptive trade practices found in RI DTPA.

## COUNT XXI

### Violation of the Washington State Consumer Protection Act, RCW 19.86.020

607.    Plaintiff State of Washington incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

608.    Pursuant to the Consumer Protection Act (CPA), RCW 19.86.020, "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

609.    At all relevant times while directing calls to Washington State that included alleged offers to sell goods or services, Defendants engaged in "trade" or "commerce" within the meaning of the Consumer Protection Act, RCW 19.86.010(2).

610.    As alleged herein, the calls that Defendants originated and/or transmitted across the U.S. telephone network possessed the tendency or capacity to mislead or created the likelihood of deception.

117

611.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

612.    Defendants' acts or practices that are unfair or deceptive under the TSR and FTC Act are also unfair or deceptive practices prohibited by RCW 19.86.020 and are violations of Washington CPA.

613.    As set out in preceding paragraphs, in numerous instances, Defendants have provided substantial assistance or support, through the provision of Avid Telecom's services, to one or more sellers or telemarketers who Defendants knew or should have known were engaged in the deceptive or abusive telemarketing acts or practices set out in in the TSR Counts above.

614.    As alleged herein, Defendants directed, controlled, had the authority to control, with knowledge approved of, and participated in the business practices described herein.

615.    Defendants' unfair practices have impacted the public interest and is likely to continue without relief from this Court.

616.    Based on the above unfair acts and practices, Plaintiff State of Washington is entitled to relief under the CPA including injunctive relief and restitution pursuant to RCW 19.86.080, civil penalties pursuant to RCW 19.86.140 for each and every violation of RCW 19.86.020, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to RCW 19.86.080.

**COUNT XXII**

**Knowingly Assisting Violations of Telephone Solicitations Rules**

**Wis. Admin. Code § ATCP 127.20**

617.    Plaintiff State of Wisconsin incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

618.    Many of the robocalls that were transited through Avid Telecom's network were "telephone solicitations" under Wis. Admin. Code § ATCP 127.02(3) and were created and initiated by "sellers" within the scope of Wis. Admin. Code § ATCP 127.01(21).

619.    Pursuant to Wis. Admin. Code § ATCP 127.20, no person may knowingly assist any seller to engage in any activity or practice in violation of Subchapter II - Telephone Solicitations, Wis. Admin. Code § ATCP ch.127 ("Subchapter II").

620.    Defendants violated Wis. Admin. Code § ATCP 127.20 by knowingly assisting, through its VoIP provider services, sellers who Defendants knew were engaged in activities or practices which violated Subchapter II.

621.    Defendants knowingly assisted sellers who made telephone solicitations that violated Wis. Admin. Code § ATCP 127.04 when the sellers failed to disclose in a telephone solicitation:

        a.    the name of the principal seller, Wis. Admin. Code § ATCP 127.04(1)(a); and/or

        b.    the nature of the goods or services which the seller was offering or promoting. Wis. Admin. Code § ATCP 127.04(1)(d).

622.    Defendants knowingly assisted sellers who made telephone solicitations that violated Wis. Admin. Code § ATCP 127.14 when, in the course of a telephone transaction, the seller directly or impliedly:

a.     misrepresented the seller's identity, affiliation, location, or characteristics, Wis. Admin. Code § ATCP 127.14(1);

b.     misrepresented the nature, quantity, material characteristics, performance, or efficacy of the goods or services offered or promoted by the seller, Wis. Admin. Code § ATCP 127.14(5);

c.     misrepresented that the seller is affiliated with, or endorsed by, any government or 3rd party organization, Wis. Admin. Code § ATCP 127.14(9); and/or

d.     made false, deceptive, or misleading representations to a consumer, Wis. Admin. Code § ATCP 127.14(15).

623.    Defendants knowingly assisted sellers who initiated telephone solicitations to consumers before 8:00 AM or after 9:00 PM without the prior consent of the consumers in violation of Wis. Admin. Code § ATCP 127.16(3).

624.    Defendants violated Wis. Admin. Code § ATCP 127.20 each time a seller, knowingly assisted by Defendants, violated Wis. Admin. Code §§ ATCP 127.04, 127.14, and/or 127.16(3).

## COUNT XXIII
### Knowingly Facilitating Violations of Telephone Solicitations
### Do-Not-Call Rules. Wis. Admin. Code § ATCP 127.83(2)(d)

625.    Plaintiff State of Wisconsin incorporates and realleges each of the paragraphs preceding Count I as if fully set forth herein.

626.    Pursuant to Wis. Admin. Code § ATCP 127.83(2)(d), no person may require, instruct, or authorize any person to violate Subchapter V - Telephone Solicitations; State Do-Not-Call Registry, Wis. Admin. Code § ATCP ch.127 ("Subchapter V"), or knowingly facilitate any person's violation of this subchapter.

627.     Defendants violated Wis. Admin. Code § ATCP 127.83(2)(d) by knowingly facilitating, through its VoIP provider services, persons who Defendants knew were engaged in violations of Subchapter V.

628.     Defendants knowingly facilitated persons who violated Wis. Admin. Code § ATCP 127.82(2) when the persons made telephone solicitations, either directly or through an employee or agent, to covered telephone customers whose telephone numbers then appeared on the state do-not-call registry.

629.     Defendants knowingly facilitated persons who violated Wis. Admin. Code § ATCP 127.83(2)(b) when the persons used electronically prerecorded messages in telephone calls for the purpose of encouraging a covered or noncovered telephone customer to purchase property, goods, or services, without first obtaining a written agreement that contains the telephone number and signature of the customer to be called, where the agreement discloses in writing that the customer is not required to sign the agreement as a condition of making a purchase and, by signing the agreement, the customer authorizes telemarketing calls from that person, and where the provisions of Wis. Admin. Code §§ ATCP 127.80(10)(a) or (b) do not apply.

630.     Defendants violated Wis. Admin. Code § ATCP 127.83(2)(d) each time a person, knowingly facilitated by Defendants, violated Wis. Admin. Code § ATCP 127.82(2) and/or 127.83(2)(b).

*The remainder of this page is intentionally left blank.*

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Honorable Court:

1.      Enter judgment in favor of Plaintiffs and against Defendants for the violations as alleged herein pursuant to federal and state laws;

2.      Enter a permanent injunction pursuant to federal and state laws to prevent Defendants from making, initiating, and/or transmitting illegal robocalls to consumers in the United States;

3.      Temporarily and permanently enjoin Defendants from transmitting calls which violate the TSR as described herein;

4.      Award damages, restitution or other compensation on behalf of residents of the respective Plaintiffs' respective jurisdictions for telephone calls transmitted by Defendants which violate the TSR as described herein;

5.      Award civil penalties, attorney's fees, and costs against Defendants as authorized by law;

6.      Award Plaintiffs damages of not more than $1,500 per violation of 47 C.F.R. § 64.1200(n)(3);

7.      Award Plaintiffs damages of not more than $1,500 per violation of 47 U.S.C. § 227(b)(1)(A)(iii);

8.      Award Plaintiffs damages of not more than $1,500 per violation of 47 U.S.C. § 227(b)(1)(B);

9.      Award Plaintiffs damages of not more than $1,500 per violation of 47 C.F.R. § 64.1200(c)(2);

10.     Award Plaintiffs civil penalties not to exceed $10,000 for each violation of 47 U.S.C. § 227(e)(1), or 3 times that amount for each day of a continuing violation;

11.     Grant such other legal or equitable relief as this Honorable Court deems just and proper, including, but not limited to, a forfeiture of the right to conduct business.

12.     With respect to the state law claims set forth by the following Plaintiffs: People of the State of California; Office of the Attorney General, State of Florida,

Department of Legal Affairs; State of Indiana; Office of the Maryland Attorney General; State of Nevada; People of the State of New York, by Letitia James, Attorney General of the State of New York; State of North Carolina; State of North Dakota, *ex rel.* Drew H. Wrigley, Attorney General; State of Rhode Island; State of Washington; and State of Wisconsin:

    a.    Enter judgment against the Defendants and in favor of each of the Plaintiff States and/or Offices of Attorney General, for each violation alleged in this Complaint, or which may be shown through discovery and proven at trial in this matter;

    b.    Find, adjudge, and/or decree that Defendants have engaged in and/or are engaging in trade or commerce within the meaning of the applicable laws generally set forth in paragraph 9 of this Complaint;

    c.    Find, adjudge, and/or decree that Defendants have violated applicable state law, as generally set forth in paragraph 9 of this Complaint, by engaging in the unlawful acts or practices alleged herein;

    d.    Consistent with subparagraph (c) above, preliminarily and permanently enjoin the Defendants from engaging in the unfair, unconscionable, or deceptive acts or practices alleged herein and made unlawful by each State's law as generally set forth in paragraph 9 above, including, but not limited to, transmitting calls to consumers or persons that violate the TCPA, TSR, the applicable state laws generally set forth in paragraph 9 of this Complaint, and/or are otherwise unfair, unconscionable, or deceptive;

    e.    In accordance with each State's law, where applicable, as generally set forth in paragraph 9 of this Complaint and/or as established by each State's common law, order Defendants to pay full restitution to affected consumers or persons who have been harmed by Defendants'

1  violations of those applicable laws generally set forth in paragraph 9

2  of this Complaint[59];

3  f.  In accordance with each State's law, as generally set forth in

4  paragraph 9 of this Complaint and/or as established by each State's

5  common law, order Defendants to disgorge and pay to Plaintiff States

6  and/or Offices of Attorney General, all monies obtained through the

7  violation of the applicable laws alleged herein, and generally set forth

8  in paragraph 9 of this Complaint[60];

9  g.  In accordance with each State's law, as generally set forth in

10  paragraph 9 of this Complaint and/or as established by each State's

11  common law, order Defendants to pay Plaintiff States and/or Offices

12  of Attorney General reasonable attorneys' fees and costs incurred in

13  connection with the investigation and litigation of this matter[61];

14  h.  Grant any other relief that may be appropriate under 15 U.S.C. §

15  6103(a); and

16  i.  Grant such other legal or equitable relief as this Honorable Court

17  deems just and proper.

18

19  [59] California Business & Professions Code § 17203; Florida Statutes § 501.207; Md. Code
Ann., Com. Law §§ 13-403 and 13-406; Nevada Revised Statutes § 598.0975; N.C. Gen.

20  Stat. §§ 75-14, 75-15.1; North Dakota Century Code § 51-15-07; R.I. Gen. Laws § 5-6-61-

21  5.1, *et seq.*; R.I. Gen. Laws § 6-13.1-5.2, *et seq.*; Revised Code Washington § 19.86.080;
Wis. Stat. § 100.20(6).

22

23  [60] California Business & Professions Code § 17203; Florida Statutes § 501.207; Indiana
Code § 24-4.7-5-2(a)(3); Md. Code Ann., Com. Law §§ 13-403 and 13-406; N.C. Gen.

24  Stat. §§ 75-14, 75-15.1; North Dakota Century Code § 51-15-07; R.I. Gen. Laws § 5-6-61-
5.1, *et seq.*; R.I. Gen. Laws § 6-13.1-5.2, *et seq.*

25  [61] Florida Statutes §§ 501.2075 and 501.2077; Ind. Code § 24-4.7-5-2(a)(4-6); Md. Code

26  Ann., Com. Law § 13-409; Nevada Rules of Civil Procedure 54 and Nevada Revised
Statutes § 598.0999(2); N.C. Gen. Stat. § 75-16.1; North Dakota Century Code § 51-15-

27  10; R.I. Gen. Laws § 5-6-61-5.1, *et seq.*; R.I. Gen. Laws § 6-13.1-5.2, *et seq.*; Revised

28  Code Washington § 19.86.080; Wis. Stat. §§ 93.20(2) and 100.263.

13. For the Plaintiff the People of the State of California:

    a. Access civil penalties of $2,500 against each Defendant for each violation of California Business and Professions Code section 17200, under the authority of California Business and Professions Code section 17206; and

    b. Assess additional civil penalties of $2,500 against each Defendant for each violation of Business and Professions Code section 17200 perpetrated against a senior citizen or disabled person, under the authority of Business and Professions Code section 17206.1.

14. For the Plaintiff Office of the Attorney General, State of Florida, Department of Legal Affairs:

    a. Award civil penalties of not more than $10,000 per willful violation of §501.204, Florida Statutes, and reasonable attorney's fees and costs as permitted by §501.2075, Florida Statutes; and

    b. Award civil penalties of not more than $15,000 for each willful violation of Chapter 501, Part II, Florida Statutes which victimizes or attempts to victimize a senior citizen or a person who has a disability as permitted by §501.2077, Florida Statutes.

15. For the Plaintiff State of Indiana:

    a. Order the Defendants to pay civil penalties up to $10,000 for the first violation, and up to $25,000 for each violation after the first violation of Ind. Code § 24-4.7-4. Ind. Code § 24-4.7-5-2(a)(2).

    b. For purposes of Ind. Code § 24-4.7-5-2(a)(2), each telephone call in violation of Ind. Code § 24-4.7-4 is a separate violation.

16. For the Plaintiff the Maryland Office of the Attorney General:

    a. Enter an order pursuant to Md. Code Ann., Com. Law §§ 13-410 and 14-3202 requiring Defendants to pay Plaintiff, Maryland Office of the

1    Attorney General, civil penalties of $10,000 for each violation in this

2    matter.

3    17.    For the Plaintiff State of Nevada:

4       a.    Pursuant to the Nevada Rules of Civil Procedure (NRCP) 8, order

5             Defendants to pay damages in excess of $15,000;

6       b.    Pursuant to NRS 598.0999(2), order Defendants to pay civil penalties

7             in the amount of $5,000 for each and every violation of the Nevada

8             Deceptive Trade Practices Act as alleged herein;

9       c.    Pursuant to NRS  597.818, order Defendants to pay civil penalties in

10            the amount of $10,000 for each and every violation of NRS 597.814,

11            and pursuant to NRS 598.0999(2), pay civil penalties in the amount

12            of $5,000 for each and every violation of NRS 597.814.; and

13      d.    Pursuant to NRS 598.0973, order Defendants to pay civil penalties in

14            the amount of $12,500 for each violation committed against an elderly

15            person or a person with a disability.

16   18.    For the Plaintiff People of the State of New York, by Letitia James, Attorney

17   General of the State of New York:

18      a.    Direct Defendants to pay a civil penalty of $2,000 to the State of New

19            York for each violation of GBL § 399-p(4), pursuant to GBL § 399-

20            p(8);

21      b.    Direct Defendants to pay a civil penalty of $11,000 to the State of

22            New York for each violation of GBL § 399-z, pursuant to GBL § 399-

23            z(14)(a); and,

24      c.    Award Plaintiff, the State of New York, costs plus an additional

25            allowance of $2,000.

26   19.    For the Plaintiff State of North Carolina:

27      a.    Enter an order imposing civil penalties pursuant to N.C. Gen. Stat. §

28            75-105(a)(1) for violations of N.C. Gen. Stat. §§ 75-102 and/or 75-

126

104, in the amounts of five hundred dollars ($500) for each Defendant's first violation, one thousand dollars ($1,000) for a Defendant's second violation, and five thousand dollars ($5,000) for each Defendant's third and subsequent violations occurring within two years of its first violation;

b.    Enter an order pursuant to N.C. Gen. Stat. § 75-105(d) finding Defendants willfully engaged in violations of N.C. Gen. Stat. §§ 75-102 and/or 75-104 and awarding the State of North Carolina reasonable attorneys' fees; and

c.    Enter an order imposing civil penalties of up to $5,000.00 for each of Defendants' acts or practices that were knowingly violative of North Carolina's Unfair or Deceptive Trade Practices Act, pursuant to N.C. Gen. Stat. § 75-15.2.

20.    For the Plaintiff State of North Dakota, *ex rel.* Drew H. Wrigley, Attorney General

a.    Order Defendants to pay civil penalties of up to $5,000.00 for each violation of N.D.C.C. ch. 51-15, pursuant to N.D.C.C. § 51-15-11.

21.    For the Plaintiff State of Rhode Island:

a.    Order Defendants to pay civil penalties of up to $10,000.00 per violation of the RI Deceptive Trade Practices Act, RI Gen Laws § 6-13.1-1 *et seq.*

22.    For the Plaintiff State of Washington:

a.    That the Court assess civil penalties, pursuant to RCW 19.86.140, against Defendants for each violation of RCW 19.86.020 caused by the conduct complained of herein.

23.    For the Plaintiff State of Wisconsin:

a.    Pursuant to Wis. Stat. § 100.26(6), impose civil forfeitures against Defendants of not less than $100 nor more than $10,000, plus related

1  mandatory surcharges and assessments, for each violation of Wis.

2  Admin. Code § ATCP chapter 127;

3  b.  Pursuant to Wis. Stat. § 100.264, impose a supplemental forfeiture

4  against Defendants for each violation of Wis. Stat. § 100.20 that was

5  perpetrated against a person at least 62 years of age or disabled; and

6  c.  Pursuant to Wis. Stats. §§ 93.20(2) and 100.263, award the Wisconsin

7  Department of Agriculture, Trade and Consumer Protection and the

8  Wisconsin Department of Justice the reasonable and necessary

9  expenses incurred in their investigation and prosecution of this matter,

10  including attorney fees.

11  24.  Grant such other legal or equitable relief as this Honorable Court deems just

12  and proper.

13

14  **<u>JURY DEMAND</u>**

15  25.  Please take notice that Plaintiffs demand a trial by jury of all issues so triable

16  pursuant to Rule 38 of the Federal Rules of Civil Procedure.

17

18  *The remainder of this page is intentionally left blank.*

19

20

21

22

23

24

25

26

27

28

RESPECTFULLY SUBMITTED this the 23rd day of May, 2023.

**KRISTIN K. MAYES**
**Attorney General of Arizona**

/s/ Laura Dilweg
Laura Dilweg (AZ Bar No. 036066)
Dylan Jones (AZ Bar No. 034185)
Joseph Hubble (AZ No. 037113)
Assistant Attorneys General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:     (602) 542-4377
consumer@azag.gov
laura.dilweg@azag.gov
*Attorneys for Plaintiff State of Arizona*

**TODD ROKITA**
**Attorney General of Indiana**

/s/ Douglas S. Swetnam
Douglas S. Swetnam (IN Bar No. 15860-49)
*(Pro Hac Vice motion forthcoming)*
Joseph D. Yeoman (IN Bar No. 35668-29)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorneys General
Office of the Indiana Attorney General
Todd Rokita
Indiana Govt. Center South, 5th Fl.
302 W. Washington St.
Indianapolis, IN 46204-2770
Phone: (317) 232-6294 (Swetnam)
          (317) 234-1912 (Yeoman)
Fax:     (317) 232-7979
douglas.swetnam@atg.in.gov
joseph.yeoman@atg.in.gov
*Attorneys for Plaintiff State of Indiana*

**JOSHUA H. STEIN**
**Attorney General of North Carolina**

/s/ Tracy Nayer
Tracy Nayer (NC Bar No. 36964)
*(Pro Hac Vice motion forthcoming)*
Special Deputy Attorney General
Danielle Wilburn Allen (NC Bar No. 58141)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
North Carolina Department of Justice
Consumer Protection Division
P.O. Box 629
Raleigh, North Carolina 27602
Phone: (919) 716-6000
Fax:     (919) 716-6050
tnayer@ncdoj.gov
dwilburnallen@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

**DAVE YOST**
**Attorney General of Ohio**

/s/ Erin B. Leahy
Erin B. Leahy (OH Bar No. 0069509)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Office of Attorney General Dave Yost
30 East Broad Street, 14th Fl.
Columbus, OH 43215
Phone: (614) 752-4730
Fax:     (866) 768-2648
Erin.Leahy@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*Lead Counsel for Plaintiffs*

1
2

**STEVE MARSHALL**
**Attorney General of Alabama**

3

/s/ Lindsay S. Dawson

4

Lindsay S. Dawson (AL Bar No. 1165-G00N)

5

*(Pro Hac Vice motion forthcoming)*

6

Robert D. Tambling (AL Bar No. 6026-N67R)

7

*(Pro Hac Vice motion forthcoming)*

8

Assistant Attorneys General
Office of the Alabama Attorney General

9

501 Washington Avenue
Montgomery, Alabama 36130

10

Phone: (334) 353-2609 (Dawson)

11

          (334) 242-7445 (Tambling)

12

Fax:     (334) 353-8400
Lindsay.Dawson@AlabamaAG.gov

13

Robert.Tambling@AlabamaAG.gov

14

*Attorneys for Plaintiff State of Alabama*

15

**TIM GRIFFIN**
**Attorney General of Arkansas**

16

17

/s/ Amanda Wentz

18

Amanda Wentz (AR Bar No. 2021066)
*(Pro Hac Vice motion forthcoming)*

19

Assistant Attorney General

20

Office of Attorney General Tim Griffin
323 Center St., Ste. 200

21

Little Rock, AR 72201

22

Phone: (501) 682-1178
Fax:     (501) 682-8118

23

Amanda.wentz@arkansasag.gov

24

*Attorney for Plaintiff State of Arkansas*

25
26
27
28

**ROB BONTA**
**Attorney General of California**

/s/ Nicklas A. Akers

Nicklas A. Akers (CA Bar No. 211222)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Bernard A. Eskandari (CA Bar No. 244395)
*(Pro Hac Vice motion forthcoming)*
Supervising Deputy Attorney General
Timothy D. Lundgren (CA Bar No. 254596)
*(Pro Hac Vice motion forthcoming)*
Rosailda Perez (CA Bar No. 284646)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorneys General
Office of the California Attorney General
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
Phone: (415) 510-3364 (Akers)
          (213) 269-6348 (Eskandari)
          (213) 269-6355 (Lundgren)
          (213) 269-6612 (Perez)
Fax:     (916) 731-2146
nicklas.akers@doj.ca.gov
bernard.eskandari@doj.ca.gov
timothy.lundgren@doj.ca.gov
rosailda.perez@doj.ca.gov
*Attorneys for Plaintiff People of the State of California*

1

2

**PHILIP J. WEISER**
**Attorney General of Colorado**

/s/ Michel Singer Nelson
Michel Singer Nelson (CO Bar No.
19779)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General II
Bianca Feierstein (CO Bar No. 56653)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Colorado Office of the Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6220 (Singer Nelson)
        (720) 508-6246 (Feierstein)
michel.singernelson@coag.gov
bianca.feierstein@coag.gov
*Attorneys for Plaintiff State of Colorado,*
*ex rel. Philip J. Weiser, Attorney*
*General*

**WILLIAM TONG**
**Attorney General of Connecticut**

/s/ Kim Carlson McGee
Kim Carlson McGee (CT Bar No.
440655)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Connecticut Attorney
General William Tong
165 Capitol Avenue, Suite 4000
Hartford, CT 06106
Phone: (860) 808-5400
Fax:    (860) 808-5593
kim.mcgee@ct.gov
*Attorney for Plaintiff State of*
*Connecticut*

**KATHY JENNINGS**
**Attorney General of Delaware**

/s/ Ryan Costa
Ryan Costa (DE Bar No. 5325)
*(Pro Hac Vice motion forthcoming)*
Dashiell Radosti (DE Bar No. 7100)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8811 (Costa)
        (302) 683-8812 (Radosti)
Fax:    (302) 577-6499
Ryan.costa@delaware.gov
Dashiell.radosti@delware.gov
*Attorneys for Plaintiff State of Delaware*

**BRIAN C. SCHWALB**
**Attorney General of District of**
**Columbia**

/s/ Adam Teitelbaum
Adam Teitelbaum (DC Bar No.
1015715)
*(Pro Hac Vice motion forthcoming)*
Director, Office of Consumer Protection
Emily Barth (DC Bar No. 1004825)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
D.C. Office of the Attorney General
Office of Consumer Protection
400 6th Street NW, 10th Floor
Washington, DC 20001
Phone: (202) 741-0764
Adam.Teitelbaum@dc.gov
Emily.Barth@dc.gov
*Attorneys for Plaintiff District of*
*Columbia*

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ASHLEY MOODY**
**Attorney General of Florida**

/s/ Patrick Crotty
Patrick Crotty (FL Bar No. 108541)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Miles Vaughn (FL Bar No. 1032235)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Florida Attorney General
Consumer Protection Division
3507 E. Frontage Rd, Suite 325
Tampa, FL 33607
Phone: (813) 287-7950
Fax:    (813) 281-5515
patrick.crotty@myfloridalegal.com
miles.vaughn@myfloridalegal.com
*Attorneys for Plaintiff Ashley Moody,*
*Attorney General of the State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General for Georgia**

/s/ David A. Zisook
David A. Zisook (GA Bar No. 310104)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Office of the Attorney General of the
State of Georgia
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334
Phone: (404) 458-4294
Fax:    (404) 464-8212
dzisook@law.ga.gov
*Attorney for Plaintiff State of Georgia*

**ANNE E. LOPEZ**
**Attorney General of Hawaii**

/s/ Christopher J.I. Leong
Christopher J.I. Leong (HI Bar No. 9662)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorney General
Hawaii Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-1180
Fax:    (808) 586-1205
christopher.ji.leong@hawaii.gov
*Attorney for Plaintiff State of Hawaii*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Stephanie N. Guyon
Stephanie N. Guyon (ID Bar No. 5989)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorney General
Idaho Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
Phone: (208) 334-4135
Fax:    (208) 334-4151
stephanie.guyon@ag.idaho.gov
*Attorney for Plaintiff State of Idaho*

**KWAME RAOUL**
**Attorney General of Illinois**

/s/ Philip Heimlich
Philip Heimlich (IL Bar No. 6286375)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Elizabeth Blackston (IL Bar No.
6228859)
*(Pro Hac Vice motion forthcoming)*
Consumer Fraud Bureau Chief
Office of the Illinois Attorney General
500 S. Second Street
Springfield, IL 62791
Phone: (217) 782-4436
philip.heimlich@ilag.gov
elizabeth.blackston@ilag.gov
*Attorneys for Plaintiff People of the State
of Illinois*

**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Benjamin Bellus
Benjamin Bellus (IA Bar No.
AT0000688)
*(Pro Hac Vice motion forthcoming)*
William Pearson (IA Bar No.
AT0012070)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorneys General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Phone: (515) 242-6536 (Bellus)
          (515) 242-6773 (Pearson)
Fax:     (515) 281-6771
Benjamin.Bellus@ag.iowa.gov
William.Pearson@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

**KRIS KOBACH**
**Attorney General of Kansas**

/s/ Sarah M. Dietz
Sarah M. Dietz (KS Bar No. 27457)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Kansas Attorney General
120 SW 10th Avenue
Topeka, KS 66612
Phone: (785) 296-3751
Fax:     (785) 291-3699
sarah.dietz@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

**DANIEL CAMERON**
**Attorney General of Kentucky**

/s/ Donald J. Haas
Donald J. Haas (KY Bar No. 94090)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Phone: (502) 696-5612
Fax:     (502) 573-8317
donald.haas@ky.gov
*Attorney for Plaintiff Commonwealth of
Kentucky*

1

2

**JEFF LANDRY**
**Attorney General of Louisiana**

3

/s/ Cathryn E. Gits
Cathryn E. Gits (LA Bar No. 35144)

4

*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General

5

Office of the Attorney General Jeff

6

Landry
1885 North Third St.

7

Baton Rouge, LA 70802
Phone: (225) 326-6414

8

Fax:     (225) 326-6499

9

gitsc@ag.louisiana.gov

10

*Attorney for Plaintiff State of Louisiana*

11

**AARON M. FREY**
**Attorney General of Maine**

12

/s/ Laura Lee Barry Womack

13

Laura Lee Barry Womack (ME Bar No.

14

010110)
*(Pro Hac Vice motion forthcoming)*

15

Assistant Attorney General

16

Office of the Maine Attorney General
6 State House Station

17

Augusta, ME 04333

18

Phone: (207) 626-8800

19

Lauralee.barrywommack@maine.gov
*Attorney for Plaintiff Aaron M. Frey,*

20

*Attorney General*

21

22

23

24

25

26

27

28

**ANTHONY G. BROWN**
**Attorney General of Maryland**

/s/ Philip Ziperman
Philip Ziperman (Fed. Bar No. 12430)
*(Pro Hac Vice motion forthcoming)*
Deputy Counsel
Kathleen P. Hyland (Fed. Bar No.
30075)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Ziperman)
          (410) 576-7057 (Hyland)
Fax:     (410) 576-6566
pziperman@oag.state.md.us
khyland@oag.state.md.us
*Attorneys for Plaintiff Maryland Office*
*of the Attorney General*

**ANDREA JOY CAMPBELL**
**Attorney General of Massachusetts**

/s/ Elizabeth Cho
Elizabeth Cho (MA Bar No. 672556)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Massachusetts Office of the Attorney
General
One Ashburton Place, 18th Floor
Boston, MA 02108
Phone: (617) 963-2608
Fax:     617-727-5765
Elizabeth.Cho@mass.gov
*Attorney for Plaintiff Commonwealth of*
*Massachusetts*

1

2

**DANA NESSEL**
**Attorney General of Michigan**

**LYNN FITCH**
**Attorney General of Mississippi**

3

/s/ Kathy P. Fitzgerald

/s/ James M. Rankin

Kathy P. Fitzgerald (MI Bar No.

James M. Rankin (MS Bar No. 102332)

4

P31454)

*(Pro Hac Vice motion forthcoming)*

*(Pro Hac Vice motion forthcoming)*

Special Assistant Attorney General

5

Michael S. Hill (MI Bar No. P73084)

Mississippi Attorney General's Office

*(Pro Hac Vice motion forthcoming)*

P.O. Box 220

6

Assistant Attorneys General

Jackson, MS 39205

7

Michigan Department of Attorney

Phone: (602) 359-4258

General

james.rankin@ago.ms.gov

8

Corporate Oversight Division

*Attorney for Plaintiff Lynn Fitch,*

9

P.O. Box 30736

*Attorney General State of Mississippi*

Lansing, MI 48909

10

Phone: (517) 335-7632

**ANDREW BAILEY**

**Attorney General of Missouri**

11

Fax:     (517) 335-6755

fitzgeraldk@michigan.gov

12

Hillm19@michigan.gov

/s/ Michael Schwalbert

13

*Attorneys for Plaintiff People of the State*

Michael Schwalbert (MO Bar No.

*of Michigan*

63299)

14

*(Pro Hac Vice motion forthcoming)*

15

**KEITH ELLISON**

Assistant Attorney General

**Attorney General of Minnesota**

Office of the Missouri Attorney General

16

815 Olive Street, Suite 200

17

/s/ Bennett Hartz

St. Louis, MO 63101

Bennett Hartz (MN Bar No. 0393136)

Phone: (314) 340-6816

18

*(Pro Hac Vice motion forthcoming)*

Fax:     (314) 340-7891

19

Assistant Attorney General

michael.schwalbert@ago.mo.gov

Office of the Minnesota Attorney

*Attorney for Plaintiff State of Missouri,*

20

General

*ex. rel. Andrew Bailey, Attorney General*

445 Minnesota Street, Suite 1200

21

Saint Paul, MN 55404

22

Phone: (651) 757-1235

23

bennett.hartz@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota,*

24

*by its Attorney General, Keith Ellison*

25

26

27

28

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Anna Schneider
Anna Schneider (MT Bar No. 13963)
*(Pro Hac Vice motion forthcoming)*
Bureau Chief
Andrew Butler (MT Bar No. 53936812)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Montana Attorney General's Office
Office of Consumer Protection
555 Fuller Avenue
Helena, MT 59601
Phone: (406)444-4500
Anna.schneider@mt.gov
Andrew.butler@mt.gov
*Attorneys for Plaintiff State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ Michaela J. Hohwieler
Michaela J. Hohwieler (NE Bar No. 26826)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Attorney General Michael T. Hilgers
2115 State Capitol Building
Consumer Protection Division
Lincoln, NE 68509
Phone: (402) 471-1928
Fax:    (402) 471-4725
Michaela.hohwieler@nebraska.gov
*Attorney for Plaintiff State of Nebraska*

**AARON D. FORD**
**Attorney General of Nevada**

/s/ Michelle C. Newman
Michelle C. Newman (NV Bar No. 13206)
*(Pro Hac Vice motion forthcoming)*
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 North Carson Street
Carson City, NV 89701-4717
Phone: (775) 684-1164
Fax:    (775) 684-1299
MNewman@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

**JOHN M. FORMELLA**
**Attorney General of New Hampshire**

/s/ Mary F. Stewart
Mary F. Stewart (NH Bar No. 10067)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
New Hampshire Department of Justice
Office of the Attorney General
Consumer Protection and Antitrust Bureau
33 Capitol St.
Concord, NH 03301-6397
Phone: (603) 271-1139
Fax:    (603) 271-2110
Mary.F.Stewart@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

**MATTHEW J. PLATKIN**
**Attorney General of New Jersey**

/s/ Deepta Janardhan
Deepta Janardhan (NJ Bar No. 309022020)
*(Pro Hac Vice motion forthcoming)*
Jeffrey Koziar (NJ Bar No. 015131999)
*(Pro Hac Vice motion forthcoming)*
Deputy Attorneys General
New Jersey Office of the Attorney General
Division of Law
124 Halsey Street
Newark, NJ 07101
Phone: (973) 648-7819
Fax:     (973) 648-4887
deepta.janardhan@law.noag.gov
Jeff.koziar@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**RAÚL TORREZ**
**Attorney General of New Mexico**

/s/ Jacqueline Ortiz
Jacqueline Ortiz (NM Bar No. 146309)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
State of New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, New Mexico 87501
Phone: (505)490-4060
Fax:     (505) 490-4883
Jortiz@nmag.gov
*Attorney for Plaintiff Raúl Torrez, New Mexico Attorney General*

**LETITIA JAMES**
**Attorney General of New York**

/s/ Glenna Goldis
Glenna Goldis (NY Bar No. 4868600)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (646)856-3697
Glenna.goldis@ag.ny.gov
*Attorney for Plaintiff Office of the Attorney General of the State of New York*

**DREW H. WRIGLEY**
**Attorney General of North Dakota**

/s/ Parrell D. Grossman
Parrell D. Grossman (ND Bar No. 04684)
*(Pro Hac Vice motion forthcoming)*
Director, Consumer Protection & Antitrust Div.
Elin S. Alm (ND Bar No. 05924)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of North Dakota Attorney General
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Phone: (701) 328-5570
Fax:     (701) 328-5568
pgrossman@nd.gov
ealm@nd.gov
*Attorneys for Plaintiff State of North Dakota*

GENTNER DRUMMOND
**Attorney General of Oklahoma**

/s/ Matthew E. Willoughby
Matthew E. Willoughby (OK Bar No. 33305)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Office of the Oklahoma Attorney General
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 522-2966
Fax:    (405) 522-0085
Matthew.Willoughby@oag.ok.gov
*Attorney for Plaintiff State of Oklahoma ex rel. Attorney General Gentner Drummond*

ELLEN F. ROSENBLUM
**Attorney General of Oregon**

/s/ Jordan M. Roberts
Jordan M. Roberts (OR Bar No. 115010)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Oregon Department of Justice
Consumer Protection Division
100 SW Market St.
Portland, OR 97201
Phone: (971) 673-1880
Fax:    (971) 673-1884
jordan.m.roberts@doj.state.or.us
*Attorney for Plaintiff State of Oregon*

MICHELLE A. HENRY
**Attorney General of Pennsylvania**

/s/ Brandon J. Bingle
Brandon J. Bingle (PA Bar No. 209133)
*(Pro Hac Vice motion forthcoming)*
Senior Deputy Attorney General
Office of Attorney General Michelle A. Henry
Strawberry Square, 15th Floor
Harrisburg, PA 17120-0001
Phone: (814) 878-5858
Fax:    (717) 705-3795
bbingle@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania by Attorney General Michelle A. Henry*

PETER F. NERONHA
**Attorney General of Rhode Island**

/s/ Stephen N. Provazza
Stephen N. Provazza (RI Bar No. 10435)
*(Pro Hac Vice motion forthcoming)*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 S. Main Street
Providence, RI 02903
Phone: (401) 274-4400, ext. 2476
Fax:    (401) 222-1766
sprovazza@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island, by Attorney General Peter Neronha*

138

**ALAN WILSON**
**Attorney General of South Carolina**

/s/ Kristin Simons
Kristin Simons (SC Bar No. 74004)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Danielle Robertson (SC Bar No. 105846)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
South Carolina Attorney General's
Office
P.O. Box 11549
Columbia, SC 29211-1549
Phone: (803) 734-6134 (Simons)
        (803) 734-8044 (Robertson)
ksimmons@scag.gov
danirobertson@scag.gov
*Attorneys for Plaintiff State of South Carolina*

**JONATHAN SKRMETTI**
**Attorney General of Tennessee**

/s/ Austin C. Ostiguy
Austin C. Ostiguy (TN Bar No. 040301)
*(Pro Hac Vice motion forthcoming)*
Tyler T. Corcoran (TN Bar No. 038887)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorneys General
Office of the Tennessee Attorney
General
P.O. Box 20207
Nashville, TN 37202
Phone: (615) 532-7271 (Ostiguy)
        (615) 770-1714 (Corcoran)
Fax:   (615) 532-2910
austin.ostiguy@ag.tn.gov
tyler.corcoran@ag.tn.gov
*Attorneys for Plaintiff State of Tennessee*

**KEN PAXTON**
**Attorney General of Texas**

/s/ Wade A. Johnson
Wade A. Johnson (Fed. Bar No. 105556;
TX Bar No. 24062197)
*(Pro Hac Vice motion forthcoming)*
David Shatto (Fed. Bar No. 3725697; TX
Bar No. 24104114)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorneys General
Attorney General for the State of Texas
Office of the Attorney General
P.O. Box 12548 (MC-010)
Austin, TX 78711
Phone: (512) 463-2100
Fax:   (512) 473-8301
Wade.johnson@oag.texas.gov
David.Shatto@oag.texas.gov
*Attorneys for Plaintiff State of Texas*

**SEAN D. REYES**
**Attorney General of Utah**

/s/ Kevin McLean
Kevin McLean (UT Bar No. 16101)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Utah Attorney General's Office
160 East 300 South, 5th Floor
P.O. Box 140872
Salt Lake City, UT 84114-0872
Phone: (801) 366-0310
Fax:   (801) 366-0315
kmclean@agutah.gov
*Attorney for Plaintiff Utah Division of Consumer Protection*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CHARITY R. CLARK**
**Attorney General of Vermont**

/s/ Edwin L. Hobson
Edwin L. Hobson (VT Bar No. 637)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Office of the Attorney General
Consumer Assistance Program
109 State Street
Montpelier, VT 05609-1001
Phone: (802) 863-2000 (Hobson)
        (802) 828-3171 (Main office)
Fax:     (802) 304-1014
ted.hobson@vermont.gov
*Attorney for Plaintiff State of Vermont*

**JASON S. MIYARES**
**Attorney General of Virginia**

/s/ Geoffrey L. Ward
Geoffrey L. Ward (VA Bar No. 89818)
*(Pro Hac Vice motion forthcoming)*
Senior Assistant Attorney General
Office of the Attorney General of
Virginia
202 N. Ninth St.
Richmond, VA 23219
Phone: (804) 371-0871
Fax:     (804) 786-0122
gward@oag.state.va.us
*Attorney for Plaintiff Commonwealth of*
*Virginia, ex rel. Jason S. Miyares,*
*Attorney General*

**ROBERT W. FERGUSON**
**Attorney General of Washington**

/s/ Mina Shahin
Mina Shahin (WA Bar No. 46661)
*(Pro Hac Vice motion forthcoming)*
Alexandra Kory (WA Bar No. 49889)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorneys General
Washington State Attorney General's
Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 326-5485 (Shahin)
        (206) 516-2997 (Kory)
Fax:     (206) 464-6451
Mina.Shahin@atg.wa.gov
Alexandra.Kory@atg.wa.gov
*Attorneys for Plaintiff State of*
*Washington*

**PATRICK MORRISEY**
**Attorney General of West Virginia**

/s/ Ashley T. Wentz
Ashley T. Wentz (WV Bar No. 13486)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
West Virginia Attorney General's Office
Consumer Protection/Antitrust Division
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax:     (304) 558-0184
Ashley.T.Wentz@wvago.gov
*Attorney for Plaintiff State of West*
*Virginia ex rel. Patrick Morrisey,*
*Attorney General*

**JOSHUA L. KAUL**
**Attorney General of Wisconsin**

/s/ Gregory A. Myszkowski
Gregory A. Myszkowski (WI Bar No.
1050022)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857
Phone: (608) 266-7656
Fax:    (608) 294-2907
myszkowskiga@doj.state.wi.us
*Attorney for Plaintiff State of Wisconsin*

**BRIDGET HILL**
**Attorney General of Wyoming**

/s/ Benjamin M. Peterson
Benjamin M. Peterson (WY Bar No. 8-
6513)
*(Pro Hac Vice motion forthcoming)*
Assistant Attorney General
Wyoming Office of the Attorney General
Kendrick Building
2320 Capitol Avenue
Cheyenne, Wyoming 82002
Phone: (307) 777-8240
Fax:    (307) 777-3435
benjamin.peterson2@wyo.gov
*Attorney for Plaintiff State of Wyoming*

General Background

Avid was establish in 1991 as a wholesale telecom provider. We have a 214 license (2009071500332) for doing international business, a 499 filer ID (828064), and are incorporated in the State of Arizona (L-0967859-1). We have an intolerance for abusive, fraudulent, or non-complaint traffic on our network and have worked diligently and proactively to remove customers we find to be non-compliant. Therefore, to further that goal and specifically in compliance with FCC regulations, we have implemented the below described Robocall Mitigation Plan in order to effectively contribute to the industry efforts of mitigate unlawful robocalls.

Monitoring and Basic Telephone Number Authorization & Blocking

We have many automatic processes in place that block calls prior to them hitting the routing engine in our switch. Examples are:

- Calls with invalid caller ID are blocked
- Calls with matching originating and terminating numbers are blocked
- Calls from blacklisted media IP's are blocked. To explain, these are media IP's that are known to have been used for scams, such as government and corporate impersonation.
- Calls are blocked from numbers that are known to be used for spoofing. This is specifically helpful in blocking government and corporate impersonation scams.
- Due to assumptions that can be made with regard to fraudulent campaigns, as a general network setting, we automatically block ANI's on a real time basis that produce less than 5% ASR, 5 second or less ACD, and any number with greater than 60% short duration calls (calls of 6 seconds or less).
- Calls from wireless ANIs are blocked unless the customer is a wireless carrier.

As to the remainder of the traffic, we have a relationship with our customers that allows us to understand the type of traffic being sent on a daily basis. Any significant change in the traffic patterns and/or changes in customer IP addresses can alert us to potential issues with regard to a customer's traffic will lead us to a more specific review. If the technical review finds that patterns are consistent with illegal robocalling, appropriate action is taken with regard to the customer. Depending on the specific stats and suspected issue, the customer is generally given 24 – 48 hours to investigate. Any inadequate response leads to suspension of the route.

Subscriber Vetting (Know Your Customer)

As for new customers, Avid requires the following:

1. Completion of a Customer Information Form – questions include, among other things, verification of compliance with tracebacks, a description of their vetting process for new customers and actions taken when fraudulent customers are found. All requested information in the document must be completed in order to move forward.

2. Customer Profile Form – questions include, among other things,
   a. 499 Filer ID
   b. FCC registration no
   c. trade references
   d. shaken/stir compliance plan
   e. bank references
   f. state of incorporation
   g. federal tax ID.
   All information requested in the document is required to move forward.
3. Description of the nature of business
4. Company responsible parties
5. Signed Master Service Agreement (MSA)
6. Signed FUSF form for the current year

Applications from Non-US carriers attempting to terminate traffic in the USA via Avid's network are currently prohibited unless the international company or the company principles are highly reputable, established members of the telecom community.

Compliance with Traceback Investigations

Avid Telecom commits to cooperation and timely response to all traceback, trace forward and investigatory requests from the ITG or any other valid law enforcement or government agency demands. We have resources committed to providing complete responses to such requests in a timely manner. Any customer being reported as participating in a government or corporate impersonation scam is immediately suspended. For all tracebacks, customers are notified of the traceback and are required to respond back to Avid with regard action taken. It is made clear that compliance with the US Telecom traceback process is mandatory. Lack of response results in termination of the customer route. Also, any final action by the customer which Avid does not consider to be adequate (example – simply blocking an ANI is not considered to be adequate) results in suspension of the customer until appropriate action is taken. If there are three or more US Telecom tickets for a customer within a one-week period, the customer is suspended until further review of the issues.

Stir-Shaken Capabilities

As an intermediate voice service provider, Avid's switching platform has been upgraded to comply with Stir/Shaken mandate to accept and accurately transmit all Stir/Shaken data it receives in a call path. Avid is completely Stir/Shaken compliant and is  signing all calls for which it is the originating carrier. We will update our plan in regard to any changes related to updated technologies and industry best practices.

| Company Name | Date Added | Date Terminated | Reason for Termination |
|---|---|---|---|
| Ace Peak Investment | 12/9/2020 | 12/14/2020 | Govt Impersonation (SSA) calls - found through manual testing. |
| Advance | 2/16/2021 | 8/26/2021 | Debt Relieft Campaign. |
| All Clear | 6/16/2020 | 8/19/2022 | Traceback on Auto Warranty Traffic |
| Ananya Traders | 5/5/2022 | 5/6/2022 | Govt Impersonation (SSA) calls - found through testing |
| AU Technology | 8/3/2021 | 4/7/2023 | Walmart account impersonation campaign. Carrier had claimed they were fully stir/shaken complaint and were signing all calls. Found calls during testing that were not signed. |
| Aurora Trade LLC | 2/3/2022 | 2/10/2022 | Type of traffic being sent - Account did not move beyond testing |
| Bestiumpro | 1/14/2021 | 2/4/2021 | Tracebacks and use of invalid ANIs |
| ESI | 9/15/2015 | 3/1/2019 | FUSF inactive |
| Forbes and York | 2/7/2023 | 2/9/2023 | Inbound numbers were not being answered on first day of live traffic |
| Fortress | 12/18/2020 | 2/16/2021 | Upon actual testing, customer demanded 3000 channels. Account not activated as this type of request is indicative of doing a quick push of scam traffic. |
| Global Voice | 6/15/2017 | 9/24/2018 | Traceback for Government Impersonation |
| Globex | 9/15/2015 | 12/19/2019 | Terminated for fraudulent campaigns |
| Great Choice | 5/8/2019 | 12/20/2021 | Terminate due to Amazon tracebacks |
| Icon Global | 9/15/2015 | 1/21/2022 | Terminated once policy in place to no longer accept traffic from international IP's (UK). |
| Infinity Sip | 4/7/2022 | 5/3/2022 | Calls regarding credit card forgiveness program. |
| Lotus | 8/1/2016 | 4/19/2021 | Found computer rebate scam traffic in renewed testing for domestic route |
| Mash | 3/1/2018 | 4/14/2021 | Terminated once policy put in place to no longer accept traffic from international customers and IP's (Canada). |
| Mobi | 6/17/2020 | 7/8/2022 | Terminated due to continued auto warranty traffic. (FCC ordered blocking by carriers on 7/21/22) |
| Phonetime | 10/3/2019 | 9/27/2021 | Carrier had no filed robocall mitigation plan |
| SipJoin | 9/15/2015 | 12/17/2020 | Spoofing of originating numbers. |
| SipNex | 7/26/2021 | 5/19/2023 | Tracebacks on auto warranty traffic. We had 0 tracebacks for many years and customer was terminated upon receipt of these tracebacks. |
| Siptech | 8/18/2020 | 12/10/2020 | Terminated due to spoofing of ANIs. |

| | | | |
|---|---|---|---|
| Solus One | 4/14/2020 | 9/27/2021 | Use of international IP's |
| Tel Carrier Access | 10/24/2017 | 2/2/2021 | Government Impersonation (SSA) traffic |
| Telcast | 4/20/2016 | 3/16/2023 | Terminated due to repetitive tracebacks and the number of robocall mitigation blocks on their traffic |
| Third Rock | 10/3/2018 | 10/7/2020 | Traceback for Govt Impersonation |
| Trinity | 4/6/2021 | 8/4/2022 | Company added international IP's to account hosts |
| Trixcom | 11/13/2019 | 5/26/2020 | Traceback for Govt Impersonation/Corona Relief |
| Urth | 4/4/2022 | 10/28/2022 | Terminated due to Student Loan scam calls. Terminated prior to FCC notification on 11/10/22 |
| VC Dreams | 10/13/2020 | 3/23/2021 | Financial institution impersonation traceback |
| Voip Supplier | Never Actived | | Did not accept based on confirmation from ITG company was actually Canadian. |
| Voip Terminator | 4/12/2019 | 3/19/2020 | Terminated due to repetitive tracebacks without resolution |
| Vtell | 4/14/2021 | 9/28/2021 | No robocall mitigation plan filed |
| Vultik | 11/1/2022 | 11/8/2022 | Student loan traceback |
| World Voice | 11/11/2020 | 3/10/2022 | Terminated due to use of international IP's for interconnect |